# 23-6114

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

United States of America,

Appellee,

v.

Isabella Pollok,

Defendant,

Lawrence Ray, AKA Sealed Defendant 1,

Defendant – Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

BRIEF (CORRECTED) AND ADDENDA FOR APPELLANT RAY
_____

Vivian Shevitz
CJA counsel for appellant
315 9th Street
Royal Oak, MI 48067
914 763 2122
Email: vivian@shevitzlaw.com

Of counsel
Julia Pamela Heit
Susan C. Wolfe

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...............................................................i

ADDENDUM TABLE OF CONTENTS......................................v

TABLE OF AUTHORITIES ..........................................................v

PRELIMINARY STATEMENT...................................................1

JURISDICTIONAL STATEMENT ...........................................1

QUESTIONS PRESENTED........................................................2

STATEMENT OF FACTS ...........................................................3

   INTRODUCTION .................................................................3

   The Back Story.....................................................................3

SUMMARY OF ARGUMENT ..................................................11


ARGUMENT

I. THE COURT ERRED IN ADMITTING TESTIMONY OF AN EXPERT WHO DEFINED NON-ESOTERIC TERMS NOT BEYOND THE KEN OF THE AVERAGE JUROR, AND WHOSE TESTIMONY IMPROPERLY BOLSTERED VICTIM-WITNESSES' TESTIMONY ... 12

--ARGUMENT ..........................................................................30

   A. Hughes was erroneously permitted to define non-esoteric terms where the subject matter was not technical and not beyond the ken of the average juror……………………… 31

i

B.    Hughes' testimony mirrored the alleged victims', improperly bolstering their credibility, exploited by the government in summation; Hughes' characterizations and expressions of personal revulsion were inflammatory  and her testimony usurped the jury's role to evaluate credibility..........................................................................33

C.    Hughes' testimony was based on anecdotal evidence that cannot be tested and is unreliable ....................................................36

D.    Hughes improperly testified regarding the motives and states of mind of the defendant and the government's main witnesses......................38

II. "ENTERPRISE" CHARGES SHOULD BE DISMISSED BECAUSE AS THE EVIDENCE SHOWED, THERE WAS NO ENTERPRISE, JUST "RAY," AND THE JURY WAS NOT INSTRUCTED IT MUST FIND AN EXISTING "ENTERPRISE" FOR RICO CONSPIRACY LIABILITY ... 41

A. There is insufficient evidence of shared criminal purpose between alleged members of the Ray Family as required by *Turkette* and *Boyle*. ............................................................................................42

B. The purported "enterprise" consisted of Ray alone; it was not "in commerce" when anyone purportedly agreed to its "formation" in 2010; and/or it is indistinguishable from the  alleged "pattern of racketeering activity".........................................................................48

C.    The court erred in declining to instruct the jury that it must

find an *existing* enterprise, eliminating an essential element of the RICO

conspiracy statute, 18 USC §1962(d), and the issue should be reviewed

*en banc*        51

III.  RICO IS UNCONSTITUTIONALLY VAGUE ................................. 54


IV. THERE IS INSUFFICIENT EVIDENCE SUPPORTING THE VICAR
"ENTERPRISE" AND INTENT ELEMENTS. ........................................ 58


V. THE "ENTERPRISE" WAS USED TO JUSTIFY PREJUDICIAL
VIDEOS OF VOLUNTARY SEX ACTS THAT SHOULD HAVE BEEN
EXCLUDED.   ALL THE CONVICTIONS SHOULD BE REVERSED
BECAUSE OF PREJUDICIAL SPILLOVER. ....................................... 60


VI. THE EVIDENCE WAS INSUFFICIENT TO  PROVE THAT RAY
ENGAGED IN ANY OF THE CORE-ELEMENT CONDUCT REQUIRED
FOR A SEX TRAFFICKING CONVICTION – RECRUIT, ENTICE,
TRANSPORT, ADVERTISE, PATRONIZE, SOLICIT -- A PERSON, IN
CONNECTION WITH A COMMERICIAL SEX ACT ........................... 61

A.    Claudia Drury embraced sex work on her own after positive

experiences on her own, and found sex work gratifying and "life-

affirming;"  Ray did not recruit, entice or solicit her to engage in "a

commercial sex act" ........................................................................... 62

iii

B.    B. Ray's conduct does not fall within that proscribed by the first, elemental paragraph of the statute...........................................65

C.    That Drury believed she owed Ray for damages she caused may have been the reason she gave him proceeds, but it was not the reason she engaged in sex work.........................................................68

VII.  THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE FORCED LABOR COUNTS .....................................................................73

VIII. THE EVIDENCE CHARGING THE PREDICATE ACT OF FORCED LABOR PERTAINING TO FELICIA'S PARTICIPATION IN SEXUAL ACTS WAS INSUFFICIENT....................................................81

IX.   THE EVIDENCE UNDERLYING THE PREDICATE ACTS REGARDING OBSTRUCTION AND WITNESS TAMPERING BY LAWRENCE GRECO WAS INSUFFICIENT........................................84

X.    PURPORTEDLY REJECTING A "LIFE SENTENCE," THE COURT IMPOSED A TERM OF YEARS EXCEEDING DEFENDANT'S LIFE EXPECTANCY; THE FACTORS OF INCAPACITATION AND DETERRENCE WERE NOT SUFFICIENTLY ANALYZED AND CANNOT "BEAR THE WEIGHT ASSIGNED" ......................................87

CONCLUSION .....................................................................96

## ADDENDUM TABLE OF CONTENTS

Judgment …………………………….... A 1 - A 8

Order denying Rule 29 motion ……………… A 9- A 25

Order as to motions in limine (ECF 382)…. A 26- A 90

Order (excerpts, p.1, 18-28) as to Expert Hughes A 91-A 102

DX H 1 (Claudia Drury notes) …………………. A103 - A105

Relevant Statutes ……………………………….. A106 - A 111

    Forced Labor, 18 U.S.C. §1589 …………………. A106 - A 107

    Sex Trafficking, 18 U.S.C. §1591………………… A108 - A 110

    RICO, 18 U.S.C. §1962 …………………………… A-111

Pre-sentence report     Submitted separately, under sealed cover

## TABLE OF AUTHORITIES

Cases

*Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256 (2d Cir. 2002)…………37

*Baker v. IBP, Inc*., 357 F.3d 665 (7th Cir. 2004)…………………………………………50

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001) ………………… 48, 50

*Cruz v. FXDirectDealer, LLC*, 720 F.3d 115 (2d Cir. 2013) …………………………43

*Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420 (E.D.N.Y. 2011) …………39

v

*Discon, Inc. v. Nynex Corp.*, 93 F.3d 1055  (2d Cir. 1996),..................................50

*Dubin v. United States*, 599 U.S. ---, No. 22-10, 2023 WL 3872518 (June 8, 2023)

....................................................................................................................57

*H.J. Inc. v. NW Bell Tel. Co.*, 492 U.S. 229 (1989)..................................................57

*Headley v. Church of Scientology*, 678 F.3d 1173 (9th Cir. 2021) ........................78

*Hill v. Colorado*, 530 U.S. 703 (2000) ....................................................................55

*In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009) .............39

*In re Rezulin Prods. Liab. Litig.,* 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...............39

*Kolender v. Lawson, 461 U.S. 352 (1983)*................................................................55

*Koppell v. New York State Bd. of Elections,* 97 F. Supp. 2d 477 (S.D.N.Y. 2001).37

*Lanzetta v. New Jersey*, 306 U.S. 451 (1939)...........................................................55

*McDonnell v. United States*, 579 U.S. 550 (2016) ...................................................56

*Papachristou v. Jacksonville*, 405 U.S. 156 (1972) ................................................55

*Playtex Prods. v. Procter & Gamble Co*.; 2003 U.S. Dist. LEXIS 8913 *; 2003-2

    Trade Cas. (CCH) P75,153 (S.D.N.Y. 2003) .....................................................36

*Prof'l Home Health Care, Inc. v. Complete Home Health Care, Inc.*, 159 F. App'x

    32, 37 (10th Cir. 2005) .........................................................................................66

*River City Markets, Inc. v. Fleming Foods West, Inc.,* 960 F.2d 1458 (9th Cir. 1992).

....................................................................................................................49

*Salem v. United States Lines Co.*, 370 U.S. 31(1962) ...............................................30

*Skilling v. United States*, 561 U.S. 358 (2010) ........................................................56

*Switzer v. Coan*, 261 F.3d 985 (10th Cir. 2001) ......................................................50

*United States v. Castillo,* 924 F.2d 1227 (2d Cir. 1991) ........................................33

*United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994). .................... 13, 31, 34

*United States v. Applins*, 637 F.3d 59 (2d Cir. 2011). ...................................... 53, 54

*United States v. Banks,* 514 F.3d 959 (9th Cir. 2008) ...........................................58

*United States v. Broxmeyer*, 616 F.3d 120 (2d Cir. 2010)......................................67

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) ..........................................95

*United States v. Cruz*, 981 F.2d 659 (2d Cir. 1992) ...............................................32

*United States v. Davis*, 588 U. S. ___ (2019) ........................................................57

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) ...........................................95

*United States v. Dugue*, 763 F. App'x 93 (2d Cir. 2019) .......................................33

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) ................................. 30, 34

*United States v. Eppolito*, 543 F.3d 25 (2d Cir. 2008) ...........................................72

*United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004)...................................54

*United States v. George*, 779 F.3d 113 (2d Cir. 2015) ...........................................72

*United States v. Hackett*, 762 F.3d 492 (6th Cir. 2014).........................................59

*United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017) ...........................................94

*United States v. Kaplan,* 490 F.3d 110 (2d Cir. 2007) ...........................................87

*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993)...............................................31

*United States v. Marcus,* 628 F.3d 36 (2d Cir. 2010) ...............................................75

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008)................................................35

*United States v. Persico*, 645 F.3d 85 (2d Cir. 2011) ...............................................72

*United States v. Quattrone,* 441 F.3d 153 (2d Cir. 2006)........................................87

*United States v. Rijo*, 508 Fed. Appx. 41 (2d Cir. 2013) (unpub) ..........................34

*United States v. Sinito*, 723 F.2d 1250 (6th Cir. 1984)............................................54

*United States v. Turkette*, 452 U.S. 576 (1981), ......................................................42

*United States v. Veliz,* 800 F.3d 63 (2d Cir. 2015). .................................................87

*United States v. White*, 116 F.3d 903 (D.C. Cir. 1997) ...........................................54

*United States v. Zhong*, 26 F.4th 536 (2d Cir. 2022)........................................ 34, 35

Statutes

18 U.S.C. §1028A ......................................................................................................56

18 U.S.C. §1503(a) ....................................................................................................84

18 U.S.C. §1512(b)(3)................................................................................................84

18 U.S.C. §1589 ................................................................................................ passim

18 U.S.C. §1589(c)(2)................................................................................................80

18 U.S.C. §1591 ................................................................................................ passim

18 U.S.C. §1959 ................................................................................. 1, 58

18 U.S.C. §1962(a) ................................................................................49

18 U.S.C. §1962(b) ................................................................................49

18 U.S.C. §1962(c) ......................................................................... passim

Rules

Fed. R. Evid. 403 ...................................................................... 32, 60, 83

Fed. R. Evid. 702 ..................................................................................31

Fed. R. App. P. 51(b) ............................................................................53

Other Authorities

Doyle, Charles, *Sex Trafficking: An Overview of Federal Criminal Law, Congressional Research Service* (June 25, 2015) ................................................67

https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2022/20220831.htm...88

https://www.nbcnews.com/pop-culture/pop-culture-news/webmd-profile-amber-heard-expert-witness-flooded-negative-reviews-tria-rcna27197 ........................26

Jonathan Jarry, M. Sc., *Tips for Better Thinking; Anecdotes are Not Reliable;* McGill University, Office for Science and Society, January 20, 2021; https://www.mcgill.ca/oss/article/tips-better-thinking-anecdotes-are-not-reliable ................................................................................................37

## PRELIMINARY STATEMENT

Defendant-Appellant Lawrence Ray ("Ray" or "Larry") appeals from a judgment (Addendum ("A") 1) dated January 19, 2023, convicting him after a jury trial of charges involving RICO conspiracy (18 U.S.C. §1962(c) and §1962(d)); extortion and extortion conspiracy (18 U.S.C. §1951); sex trafficking and sex trafficking conspiracy (18 U.S.C. §1591); forced labor (18 U.S.C. §1590, §1594); use of interstate commerce to promote unlawful activity (18 U.S.C. §1952(a)(3)(b)); money laundering (18 U.S.C. §1956(a)(1)(B)(i), (ii)); tax evasion (26 U.S.C. §7201); and violent crime in aid of racketeering ("VICAR," 18 U.S.C. 1959(a)(3)). (Liman, J., S.D.N.Y.) Appellant was sentenced to concurrent 720-months' imprisonment (60 years) and lifetime supervised release.

Notice of appeal was timely filed on January 25, 2023 (DOC 614, 20cr110). Appellant is serving his sentence.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 18 U.S.C. §3231. This Court has jurisdiction under 28 U.S.C. §1291 and 18 U.S.C. §3742.

## QUESTIONS PRESENTED

1. Whether there was insufficient evidence to support the RICO and VICAR convictions given the lack of sufficient evidence of a RICO "enterprise" within the meaning of the statute.

2. Whether the RICO conspiracy instruction was erroneous and should be considered *en banc*.

3. Whether RICO's "enterprise" element is unconstitutionally void for vagueness.

4. Whether testimony of the so-called "blind expert" who "explained" that conduct that would match "victim" testimony can be explained by "coercive control," should have been excluded as improper, unnecessary for jury understanding, and unfair.

5. Where there is insufficient evidence of "sex trafficking" within the meaning of the statutory terms.

6. Whether there is insufficient evidence of "forced labor" as no labor was "forced."

7. Whether there is insufficient evidence of "obstruction" (predicate).

8. Whether the sentence, imposing a term of years exceeding Ray's statistical death, and hence a life sentence, was procedurally and

2

substantively improper, produced by undue empathy with victims who are entitled to justice, not to a life sentence prize.

## STATEMENT OF FACTS

### INTRODUCTION

The relevant facts are set forth at length in the Argument sections of this Brief.  In the interests of brevity, additional facts are included below for background and to support issues raised in the RICO counts.

### The Back Story

While Larry Ray ("Ray") was incarcerated on a previous case his daughter, Talia, became a student at Sarah Lawrence College ("SLC"). Talia's 2013 emails explained that she had arranged for a group of freshman-year friends, including Isabella Pollok, Claudia Drury, and Santos Rosario, to become housemates in an on-campus housing unit called "Slonim 9." (577-78)  Talia told  everyone that her father was in jail on trumped-up charges because he had exposed corrupt politicians,

most notably Rudy Giuliani's candidate for Homeland Security Chief, Bernie Kerik, at whose wedding Ray was best man. (191, 688-90, 697)[1]

Talia's email explained that her father had special skills in cutting-edge methods to help people with BPD (borderline personality disorder), especially her best friend Isabella. (584-86).

When released, Ray came to see Talia at Slonim 9. Talia introduced him to her friends. (191). Santos Rosario, Talia's boyfriend, saw Ray stay over at Slonim 9 once or twice a week. (189-98).

Ray lived in a one-bedroom apartment on East 93rd Street in New York City.[2] Talia and Isabella stayed there with him during summer 2012. Santos spent time there, as did fellow student Dan Levin, also a Slonim housemate. (1515-17).

Ray seemed to be helping Santos and Isabella become more confident, through his advice and through a confrontational approach to their self-destructive issues.

---

[1] Numerical references without prefixes refer to pages of the trial transcript. Other transcripts will be identified separately (e.g., Sentencing Transcript "ST"). Addendum references are "A".

[2] The press reported that Ray *lived* at Sarah Lawrence with his daughter. That is not true, and there is no support for that assertion.

Santos introduced his sisters to Ray.  Felicia Rosario, a psychiatry resident in L.A.,  joined  Santos and Ray after suffering from paranoid ideations while a psychiatry resident in Los Angeles. Yalitza Rosario was a junior at Columbia, struggling socially. (212-15, 1755-57).

Felicia testified that Ray's confrontational method was an approach to mental health in the 70's, and Ray's suggestion had worked well with one of her schizophrenic clients.  (1761-62) Ray told them they had to be honest with themselves about their mental health and who they were hurting, or they would sabotage themselves.  (198, 419-20, 719).

The witnesses described camaraderie not experienced before,  and interesting conversations into the night where Ray held them accountable if they were not honest.  Ray would talk about past experiences, and they would talk about philosophy.  Some of these gab sessions included discussing philosophy, cults and mind control, and critical thinking. (716-20;1764-65).   Larry's interests were discussed openly. (1761-69).

Larry talked about sex. (721)  SLC students were already exposed to new experiences at SLC's well-advertised "Sleaze Week" (1174-76)

Talia's friends at Sarah Lawrence were interested in new experiences and exploring "body positivity" but they lacked confidence. (1176).

Larry described sex as liberating. (1494). He told Santos to have sex with Isabella at times and with others. He later "directed" or "asked" others if them to have sex. (295-96). They did so. There were hours of video and audio stored on devices owned by Ray.

According to Claudia Drury, the most adventurous of the group, Ray suggested she might like sex work; having sex with multiple partners was freeing, and she should try it. (872, 1187).

Sometime later and without prompting, Claudia created a sophisticated escort business. (see Defense Exhibit H 1, Addendum A103-105.) She testified that she loved the work -- that it was life-affirming. (1187-94).

In 2013-14, Ray went to Pinehurst, North Carolina, to do extensive drainage and yard work at the home of his step-father Gordon Ray (who was not present). Larry wanted to make Gordon feel better because he was going through a divorce (864). Isabella and Felicia Rosario went with Ray, knowing it would be hard work. Santos Rosario, Yalitza Rosario, and Claudia Drury came later. The work was arduous: they shoveled

gravel, dug ditches, removed dead grass (291). Larry would sometimes not stop to eat or sleep. He worked in all weather and sometimes through the nights with the others (291-94,1575). Talia, Ray's daughter, was studying at the time and sometimes cooked dinner. (2195).

Larry was rough at times but never forced anyone to work. There was a lot of tussling focusing on sexuality and trying to get Felicia to stop talking incessantly and acting in a helpless way. Ray told her she was a danger to others (*See* GX 2144, a video clip of Felicia being held back by Yalitza and then by Ray and then crumbling). (2193-95).

For some time, Ray believed was being poisoned by Bernard Kerik or his friends as retaliation for Ray derailing plans to make Kerik President Bush's Homeland Security Chief. See https://www.nbcnews.com/id/wbna18002772, excerpted below:[3]

---

[3] That article contains the following about Ray.

The loudest alarm bell was Kerik's relationship with Lawrence Ray. The best man at Kerik's wedding in 1998, Ray went to work for a New Jersey construction company, Interstate Industrial Corp., that was seeking a big New York City contract and trying to overcome concerns inside Giuliani's administration that it had mob ties.

Ray, who told friends that he worked with the FBI, military and intelligence agencies in the 1990s, was indicted

Since then, Ray has feared and experienced retaliation. (1742). In 2015, when Ray was in the Hudson Hotel in New York City with Santos Rosario and Claudia Drury, Frank DiTomasso, one of Kerik's criminal associates, suddenly walked up to Larry and assaulted him violently. (931-34). It was caught on video. DiTomasso was arrested (354).

The incident stoked Ray's belief he was being pursued by Kerik and DiTomasso, and his certainty they were behind the poisoning of him and Talia. Ray came to believe that others in his circle were working for Kerik and DiTomasso. He discussed this with everyone he met. (1878, 2015, 2177).

Claudia Drury came to believe she had poisoned Talia and Larry after an incident at the end of 2013. She went out for a drink with Talia and, when they returned to her apartment, Talia started throwing up

---

in 2000 along with organized-crime figures in what prosecutors described as a scheme to manipulate the stock market. He pleaded guilty and was spared prison time.

\*\*\*

After his guilty plea in 2001, Ray said, he told the FBI that Kerik had agreed to help …DiTomasso try to win city business despite their alleged ties with organized crime. At the time, Kerik solicited and received gifts from company sources, including $165,000 in renovations for his apartment.

(1081-82). That night, at Ray's insistence, Claudia "confessed" to the group she poisoned Talia. She testified that Larry wanted to know who put her up to it (1083). Claudia told them she poisoned Larry at the behest of Bernard Kerik, Frank DiTomasso, and Ray's ex-wife, Teresa (1084-85). Claudia told Ray her parents were involved in the poisoning but testified at trial that none of that was true (1085). She was a life-long storyteller and did not think of ramifications of admitting to poisoning (1086). She claimed she made up the poisons she used, including mercury and cyanide, which she mixed with food in the refrigerator. (*E.g.,* 1923).

Felicia Rosario, during time spent with Larry, said she, too, felt physically ill. They all sought medical attention. Larry and Isabella were referred to a neurologist and another physician. They were once referred to a toxicologist. (1784-89)

Felicia, on the brink of receiving her medical license, r, referred to herself as the Ray family doctor. She reviewed Larry's medical records when he was admitted to Columbia Presbyterian Hospital. The report said he had elevated mercury levels. At one point she called poison

control while living with Ray. They were trying to figure out what happened since they were all sick. (1597-98,1788).

In February of 2021, after Ray's arrest, Felicia still believed she had been poisoned. Before Covid, when living in Piscataway, she suffered from intense body pain and would scream in the middle of the night. She did not know the cause of the pain. She thought Larry or Isabella had been poisoning her. (1789-91).

Felicia testified that she was not sure what made them sick, but they were. She testified she thought it very unlikely they had been poisoned, "but I still don't know what actually happened to us." (1736)

To buttress the testimony of the Rosario siblings and Drury, the government called Dr. Dawn Hughes, to testify about the psychology of "coercive control." She called herself a "blind expert," who did not review anything about the case. The testimony was meant to "explain" why "victims," and obviously the witnesses in this case too, would act in ways that appear destructive. She delved into her view of their mental states.

Facts concerning Hughes' testimony are contained in Point One, an argument that Hughes' testimony should not have been admitted.

## SUMMARY OF ARGUMENT

I.   The court committed manifest error in admitting testimony of a social sciences expert who defined non-esoteric terms not beyond the ken of the average juror  Her partisan testimony improperly tracked and bolstered testimony of alleged victim-witnesses, usurping the jury's role as to credibility, leaving jurors with nothing to do.  She was an improper victim-advocate and summary witness.

II.  The RICO/VICAR "enterprise" charges should be dismissed because, as the evidence showed, there was no enterprise, just "Ray," and the jury was not instructed it must find an existing "enterprise" for RICO conspiracy liability, depriving Ray of a jury verdict on the RICO element of an "enterprise" in commerce.

III. The RICO statute is unconstitutionally vague.

IV.  The evidence was insufficient to  prove that Ray engaged in any of the core-element conduct required for a sex trafficking conviction. *i.e.* recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize,  solicit -- in connection with a commericial sex act.   Claudia Drury chose and performed sex work on her own.

V.   The evidence is insufficient to sustain the forced labor counts.

VI.   The evidence underlying the predicate acts of obstruction and witness tampering by Lawrence Greco was insufficient.

VII.  The "enterprise" was improperly used to justify prejudicial videos of voluntary sex acts that should have been excluded.

VIII. All the convictions should be reversed because of prejudicial RICO spillover.

IX.   The 60-year sentence imposed on this 63-year old man, is a life sentence that is greater than necessary and was imposed in an improper way.

**ARGUMENT**

**I.    THE COURT ERRED IN ADMITTING TESTIMONY OF AN EXPERT WHO DEFINED NON-ESOTERIC TERMS NOT BEYOND THE KEN OF THE AVERAGE JUROR, AND WHOSE TESTIMONY IMPROPERLY BOLSTERED TESTIMONY OF VICTIM-WITNESSES**

The government offered the testimony of clinical and forensic psychologist Dawn Hughes, Ph.D., as an expert "on sexual abuse, interpersonal violence, victimization, and traumatic stress." (ECF 263-1 at 3)  The court denied the defense motion to preclude her testimony or for a *Daubert* hearing. (ECF 287 and 382)  Hughes told the jury at the

outset that her role was "to provide information in the science and literature, her clinical experience, about what we know about violence, abuse, coercive control, and victimization." She called herself a "blind" expert -- not there to tell them anything "particular to this case," since, she said, she knew nothing about it. (479).

Hughes defined non-esoteric words and phrases, like physical abuse, sexual abuse, economic abuse, isolation, *etc.,* and described scenarios that mirrored prior and subsequent testimony of alleged victim-witnesses. The subject matter of an expert's testimony, however, must be "beyond the ken of the average juror" and it may not "impermissibly mirror[] the testimony offered by fact witnesses." *United States v. Amuso,* 21 F.3d 1251, 1263 (2d Cir. 1994).

The witnesses were not children; they did not struggle to articulate their experiences; they were not unable to explain their reactions and behavior. They were extremely articulate college students or graduates and a psychiatrist (Felicia Rosario) on the brink of obtaining her license. They were able to articulate detailed narratives and they were self-aware enough to offer explanations for their conduct and their conduct in relation to that of others.

The government elicited testimony from Hughes that mirrored testimony of each witness, bolstering their testimony and their credibility. It was the opposite of "helpful" to the jury, as required. Fed. Rule Evid. 702. It excused jurors from doing their job of evaluating the substance of the witness' testimony and their credibility.

In summation, the government correlated the witness' testimony, point by point, with that of Hughes. (2825-33) Every aspect of Hughes' testimony was matched with testimony of each alleged victim-witness. The government argued in summation that the jury should embrace the witnesses' testimony because Hughes had heard their stories before.

Hughes' testimony, its absence of esoteric content, and examples of improperly matching witness testimony are as follows:

1) Hughes defined "interpersonal violence" as one person inflicting force, abuse, violence or control against another person. She defined "physical abuse" as "the use of your body against the body of another with the intent to cause harm. She gave a long list of examples ranging from a push or grab to strangling, biting, burning, throwing objects, using weapons, *etc*. Neither the definitions nor the examples

were necessary for the jury to understand the terms physical abuse and interpersonal violence. (486)

The witnesses each testified to their own experiences of physical abuse and violence. Claudia Drury, for example, testified that Ray hit her repeatedly until she stopped flinching (939), Felicia Rosario testified that Ray slapped her, punched her, pulled her hair and choked her (1483), and Santos Rosario testified that Ray hit him with dangerous instruments. (313-18);

2) Hughes defined sexual abuse as being forced to do something of a sexual nature you do not want to do, including being forced to wear sexy clothing, to remain nude, to use objects, to watch others engage in sex or to engage in sex with others. The effects on the victim are feelings of shame, humiliation, degradation, self-loathing, depression. (488-89).

Hughes' general definition was well within jurors' ken. Hughes' examples were seemingly cherry-picked to correspond to a witness's testimony. Santos Rosario testified that Ray had him have sex with Isabella and made another student put on a dress and go to the building's lobby. (295-297, 365). Felicia Rosario testified that Ray asked her to send

him nude photos and to have sex with strangers and record it, which she eventually did; it made her feel disgusting and ashamed. (1494-98, 1552).

3) Emotional abuse, according to Hughes and apparent from the phrase itself, consists of denigrating a person's sense of self-worth through hurtful comments, criticisms, put-downs, and "mean things." The criticisms are often focused on the person's vulnerability, such as feeling fat, ugly or stupid. (498-99). Hughes defined "degradation" similarly; using language that is "horrible, mean and offensive" to make someone feel low and degraded. *Id.* at 499

Even a juror lucky enough to have been spared such things as criticism and hurtful comments would understand the phrase emotional abuse and the conduct associated with it.

Witnesses described their own experiences without having to use Hughes' phrases. Yalitza Rosario testified that Ray made disparaging remarks about her appearance. (2100). Felicia Rosario testified that Ray made her feel worthless, humiliated, degraded, debased, like she was nothing. (1480-83). Santos testified that Ray called him bitch, trash, hemorrhoid and scum. (216)

4)     Indoctrination and gaslighting, Hughes testified, are other forms of "coercive control."  Indoctrination is "getting you to buy into a certain belief system" or group ideology.  Gaslighting is a tactic to get you to deny your own reality and perceptions.  For example, when you try to assert your version of reality, it is "pushed down" and you are told you are crazy. (495-497).

These are also common-usage words jurors would know, if not through their own experience but through books, TV and movies.  The government could have used and explained them in summation without the imprimatur of an expert.

The witnesses provided all the information the jurors needed to understand the concepts: Felicia Rosario, for example, testified that she came to believe she had been poisoned by her siblings, which destroyed her relationship with them. (1551)

5) Hughes testified that the term "grooming" refers to "coercing a child into sexual activity and maintaining the secrecy of the abuse" by first establishing trust and cooperation, and then attachment and dependence. She added that, although grooming is typically seen with

children, young adults can also be susceptible to it. (482-83)[4] The groomer establishes trust through kindness and paying special attention to the person whose dependence is sought. (485) She added that the groomer desensitizes a person to more extreme forms of sexual behavior, by starting with talk and questions about sexual experiences and viewing sexually explicit images and videos and progressing to more risqué behavior. (489-90).

Although "grooming" might not be as familiar in this specific context, the concept and conduct are easily understood and transferable from other contexts, like, Prince Charles was groomed to become King since the day he was born. An expert is not required every time a witness uses a less common word, like acclimated or habituated -- words Hughes also used without defining them. The prosecutor had actual testimony for use in summation without having to have an expert to back up both the witnesses and government theory of prosecution.

---

[4] Despite the lesser frequency, meaning a smaller body of evidence regarding adults, the court erroneously denied a defense motion for a *Daubert* hearing on this issue specifically. ECF 287 at 23. Felicia Rosario, a medical school graduate and resident in psychiatry, cannot be categorized as a young adult for purposes of Hughes' grooming scenario.

The victim-witnesses gave descriptive accounts of similar behavior: Santos thought that Ray was very cool, smart, composed and inspirational when they met, but Ray started treating him differently, with verbal and physical abuse. (197, 216). Drury testified that the group first engaged in fun activities, a bonding experience where Ray was teaching them things. (720). Felicia Rosario testified that when she met Ray, he was smart, nice, charming and kind. When he told her he loved her, it made her feel good. (1487-88). Over time their conversations and emails would get more risqué, such as asking her sometimes bizarre questions about her sexual experiences and sending her a pornographic video. (1493). Yalitza Rosario testified that when she first me Ray, he listened to her, was nurturing and a paternal figure. (2076-79).

6) Hughes testified that people with certain vulnerabilities are more likely to be exploited, such as people with psychological or physical disabilities (484) The government could not have believed the jury was unfamiliar with this unfortunate common human experience, portrayed in books and movies.

Each victim-witness fell into a category Hughes described; Santos testified that he struggled with mental health problems in high school

19

and previously attempted suicide and was hospitalized. (404-05). Drury testified she had been hospitalized for psychiatric problems, including suicide attempts and borderline personality disorder. (766,1129). Felicia testified that she had attempted suicide and had been hospitalized while in medical school. (1513).

7) Hughes defined "psychological destabilization" by symptoms inherent in the phrase itself: anxiety, panic attacks, depression, suicidal ideations, feelings of shame, humiliation, guilt, helplessness and hopelessness, leading to deteriorating functioning, difficulties with judgment and thinking, cognitive confusion, emotional numbing, feeling disconnectedness. (497-98).

Hughes' examples show that just using phrases was unnecessary and unhelpful; the specifics are what give meaning to the experience, and that is what the witnesses provided. The concept could have been expressed by the government in summation in less DSM-y sounding words, like "becoming mentally unstable."

Felicia Rosario testified that while at Pinehurst, her mind was not clear, she was confused, she became increasingly dysfunctional. (1571-72). She also testified that Ray made threats, including, *inter alia,* to

leave her homeless and penniless, to have her arrested and harm her family, which made her feel worthless, confused, humiliated, degraded, debased, like she was nothing. (1480-83). Yalitza testified that she had attempted suicide while part of the group with Ray. (2073-76; 2087-91)

8) Defining another word easily understood in common parlance, Hughes testified that "deprivation" is what "in the literature we think of as torture," *e.g.* depriving someone of sleep, food, or access to others or the outside world, and sensory deprivation. She described the effects of sleep deprivation all too familiar to everyone; "you have brain fog, you feel tired, you feel sluggish . . . ."

Hughes' interjection of the inflammatory word "torture, shows (as she did many times) that she was not a neutral witness. Her definition of torture could easily apply to inmates at the MDC, especially during the Covid lockdowns. The jurors did not need Hughes to "explain" deprivation. Her testimony was inflammatory and unhelpful.

Witness testimony was all that was needed; Drury testified that when the group was in North Carolina doing landscaping work, Ray decided when they would eat and sleep and she was always hungry. (860). Felicia Rosario testified that she needed Ray's permission to open the

refrigerator and leave the house. (1599-60). Yalitza testified that Ray decided when they could eat, putting locks on the refrigerator, and when they could leave. (2096-98)

9)     Hughes described blackmail and the use of collateral as a form of abuse. Blackmail, she said, is a classic "if you do this, I'm going to release this difficult information," such as a threat to post pornographic images. Following the prosecutor's playbook, Hughes said that blackmail can take the form of "written confessions" which "we see" in group cases. The collateral motivates you to stay in the group. (503-05).

Hughes' testimony was a government summation, not testimony to help jurors understand things they would not otherwise have understood. Blackmail is not an esoteric term. Santos testified he gave Ray a written confession and a list of ways he had harmed Ray, and that Ray said he would be sentenced to 300-400 years in prison for all the damage he had caused. (218, 265, 342, 304-06, 351). Felicia Rosario testified that a video was made of her admitting to conspiring to harm Ray, together with her father, who she "confessed" was a heroin dealer. (1479, 1500-01). Yalitza Rosario testified that she gave Ray written confessions of stealing from

22

him and not washing her hands well, and he threatened to turn her in to the police. (2080-81; 2087-91; 2107-08).

Hughes also testified that "we now analyze …jail calls" in which perpetrators "make their victims write [untrue] things." (503-504). Hardly coincidentally, there was similar testimony here. (*See* 1720).

10) Hughes' definition of "economic abuse" was another explanation of a non-abstruse term; she said that it involves taking control of another's finances, creating financial dependence, and limiting the person's access to funds, making it difficult for the person to leave. (507).

Economic abuse is not a mystery, and you certainly know it when you see it – which is what fact-witnesses are for. (*See e.g.* 2199-2200) (Yalitza testified that she had no means of leaving on her own).

11) Wrapping all these forms of abuse together and repeating them, Hughes defined "coercive control" as threats of negative consequences for noncompliance with a person's demands, and re-capped the tactics of coercive control as she had previously defined it, as well as intimidation and isolation. (481,490). She gave as examples of intimidation, pounding a fist on a table, or throwing a coffee cup. (492) Isolation, she opined,

consists of telling a person where he can go, who he can talk to and denigrating others who could be sources or support. (494). These types of conduct, Hughes testified, erode the individual's sense of autonomy, free will and decision-making capacity (479). Hughes repeated the same testimony 20 transcript pages later (497-98), and again 10 pages after that. (507-08).

If the jury could be trusted to understand words like "discordant" (485) and "autonomy" (479), words Hughes also used but without defining them, jurors could certainly be trusted to understand "intimidation and "isolation," especially when a prosecutor uses them in reference to specific conduct witnesses testified about. Hughes' testimony about "denigrating others who could be sources of support" echoed the testimony Santos gave just before hers -- that Ray told him his parents were not good and they had hurt him. (262)

Paralleling the case, Hughes testified that coercive control can also occur in a group context, where one person is subjected to abuse, and the others are motivated to conform their behavior to avoid abuse. (481). There is nothing esoteric or paradoxical about such conduct. It is as if Hughes provided a running commentary about testimony that

immediately preceded and followed hers – training jurors' minds to hear and interpret testimony according to the government's theory.

Santos testified he laughed when Ray had roommate Dan Levin put on a yellow dress because he was "just relieved it wasn't him." (365); s*ee* (1767) (Levin was told to put on a dress and use a sex toy in front of everyone). Felicia Rosario testified that she was required to put a pacifier in her mouth, and on another occasion to wear a diaper and watch cartoons, because she was acting like a child, and the others were not allowed to speak or were required to watch her so she would not get up. (1534-36). Yalitza Rosario testified she had seen Ray abuse Felicia. (2073-76)

Expanding on "control," the prosecutor asked Hughes about control abusers assert over victims' bodies. Hughes answered first by characterizing the conduct -- "we see this in more extreme cases." (500). She gave as examples: being dictated to in matters of personal grooming and being told when and how to use the bathroom.

She opined in non-objective language that such control can have "devastating psychological consequences." *Id.* There was no legitimate reason for this testimony. If the evidence showed the conduct described,

the jury would decide whether or not it proved guilt. Having an expert characterize the conduct did not help the jury give the evidence sober consideration, and it was anathema to the fair administration of justice.[5]

Hughes testified that victims do not utilize "formal help-seeking strategies," like calling the police or talking to medical professionals or religious counselors. "Regrettably," as she put it, they use compliant and appeasement strategies in order *to keep "the lion tamed."* (508-09).

Judge Liman's opinions regarding Hughes repeatedly mention how an expert could "explain seemingly counterintuitive behavior of victims or conduct not normally familiar to most jurors," such as not reporting a sexual assault. ECF 287 at 28; ECF 382 at 49. The fact that victims often do not report crimes against them, and reasons for it, are well known, especially in the wake of recent prosecutions of celebrities. *See, e.g.,* Harvey Weinstein case. Counterintuitive, perhaps, as human behavior can be, but not unfamiliar.

---

[5] This was not a battle of experts who examine victims, such as where Hughes testified on behalf of Amber Heard in the Johnny Depp v. Amber Heard case that Heard was a victim of domestic abuse. https://www.nbcnews.com/pop-culture/pop-culture-news/webmd-profile-amber-heard-expert-witness-flooded-negative-reviews-tria-rcna27197

The prosecutor continued to elicit Hughes' victim advocacy, asking how coercive control is achieved. It is "insidious," she said, "we're trying to desensitize the victim, we're trying to get them closer to this, sort of, line of deviance when they are going to do more full exploitation." (510-12). She continued in a way no one would expect of an expert called to testify in the Southern District of New York, especially a "blind" one: "the perpetrator is usually *very cunning* about explaining away some of the little behaviors. But the more it happens and . . . then by the time you're at, sort of, this, you know, *DEFCON 1, there's nothing left and you're suffocating and you don't know how to get out*." *Id.*

This is a person way too close to the subject to be called objective. Hughes' testimony was inflammatory and lacked any semblance of neutrality.

12) Hughes testified that coercive control could be exerted at a distance. She termed it "psychological entrapment," not a "physical prison, it's a psychological one." By using various forms of abuse, she said, victims know the consequences of certain behavior and proximity does not matter. (512).

27

The witnesses rendered Hughes' testimony superfluous, adding only its biased impact on the jury. For example, Drury testified that, even while she spent a year studying at Oxford, she felt Ray was helping her and was "extremely dependent on him for my psychological and emotional well-being." (741)

13) Hughes testified that victims are prevented from leaving by a lack of funds or nowhere to go, threats to disclose information the individual does not want known, and the fear of not being believed. In the "acute phase," she said, "they don't even know what's going on" so they feel they can't even describe it. She added, blatant hearsay, that she "had been told [by patients] it's my fault too and I'm to blame, so how am I going to tell them myself." (513-14).

Santos' testimony was much simpler, and non-hearsay: Ray made him believe he deserved to be mistreated and that it was his fault. (217); *see* Felicia (1480-83), 1571-72); Yalitza (2199-2200).

14) The prosecutor could easily have argued in summation all of the above with reference to specific conduct, and she did, but always prefaced with "Dr. Hughes told you ...." In summation, the government

neatly weaved Hughes' testimony together with testimony of the fact-witnesses:

- Dr. Hughes told you at the beginning of this trial about techniques that perpetrators use to establish and maintain coercive control … And we're going to recap some of those tactics now. *They track what the defendant did.* (282The defendant "moved what Dr. Hughes called the line of deviance."(2827)
- Dr. Hughes explains gaslighting as a strategy designed to make victims deny their own perceptions and reality. The … entire process was an exercise in gaslighting. (2829)
- You learned from Dr. Hughes about the effect of isolation, dependence on the defendant, insulation from other voices. Think of what Maritza Rosario told you about her three kids. She went seven years without speaking to them. ( 2828)
- And Dr. Hughes told you what emotional abuse looks like hurtful comments, offensive put-downs, criticism, mean things. You heard vile and abusive language in recording after recording. You heard from each of the victims about how the defendant used cruelty. (2830)
- You heard from Dr. Hughes what happens from this kind of surveillance. "It gives your victims the impression that you're all-powerful, you're all-knowing." (2832)

At the outset of her summation, the prosecutor said Hughes' testimony about the techniques of perpetrators *"track what the defendant did."* That was what Hughes was there for, and precisely what an expert witness may not do.

**ARGUMENT**

This Court reviews challenges to the admission of expert testimony by determining whether the district court's decision was manifestly erroneous. *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962); *United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003).

The government elicited repetitive descriptions and characterizations of abuse in all its form, reiterating and foreshadowing in almost minute detail the experiences described by the witnesses. Hughes was not an objective expert witness; she was an advocate for victims of abuse.[6] Her testimony and demeanor lacked the neutral aspect of an expert under oath. For example, she talked about abusers who "beat the crap out of you" (503-504); (507) ("[i]f you're working, usually he'll take all the money, even though you're the one out there doing the hard labor.").

In evaluating the credibility of the witnesses, particularly whether witnesses were coercively controlled or made their own choices, the jury had no work to do. Hughes told them there was (unidentified) literature

---

[6] Among other similar titles, Hughes was the Coordinator for the Child Sex Abuse Survivors Program. (472).

and science, in addition to her clients' experiences, that meant the government's witnesses were victims in every way she described.

Hughes never identified the "science" she was relying on, other than what she observed and heard from her own patients. Cloaked as an expert, she made broad statements about how victims think and feel and behave, and how "perpetrators" behave and what their "goals" are. She made no allowance for individual circumstances and variations, focusing only on conduct and behavior that happened to correspond to the case.

The admission of Hughes' testimony was manifestly erroneous.

### A. Hughes was erroneously permitted to define non-esoteric terms where the subject matter was not technical and not beyond the ken of the average juror

Expert testimony is admissible when her "scientific, technical, or other specialized knowledge" "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see, e.g., United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993). Expert testimony is limited to areas where the subject matter is beyond the ken of the average juror. *Id*. at 936; *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994). Even if expert testimony satisfies Rule 702, it should

be excluded if its probative value is substantially is outweighed by the danger of unfair prejudice. Fed. R. Evid. 403.

Hughes testified about common and easily understood words, phrases, and concepts, such as reactions to distressing events. Her words and phrases were well within average persons' lexicon. *e.g.* sexual abuse, emotional abuse, economic abuse, deprivation, isolation, blackmail, etc.

In *United States v. Cruz*, 981 F.2d 659, 664 (2d Cir. 1992), the government used an officer's testimony about the operation of narcotics deals to bolster the testimony of its cooperating witness. This Court parsed the testimony and found it not beyond the intellectual capacity of the average juror. From movies, television crime dramas and news stories, jurors are already familiar with the concept that drug suppliers typically conceal their identities through intermediaries and do not deal with unknown persons. *Id.* at 11. The Court found that the government's principal use of the officer's testimony was to bolster the main, cooperating witness' version of the events and to be able to argue in summation that the expert witness' description of drug operations was exactly what the cooperating witness described. *Id.* at 12-13. This Court held that "the credibility of a fact-witness may not be bolstered by

arguing that the witness's version of the events is consistent with an expert's description of patterns of criminal conduct . . ." *Id.* at 13-14.

The Court cited *United States v. Castillo,* 924 F.2d 1227, 1231, 1234 (2d Cir. 1991), in concluding that it was impermissible for an officer to testify about routine acts in drug transactions because "guilt may not be inferred from conduct of unrelated persons." *Id. See United States v. Dugue*, 763 F. App'x 93, 96 (2d Cir. 2019) (summary order) (exclusion of defense expert, since the only relevance of the testimony would have been to impugn other witnesses' credibility).

The government had the same *modus operandi* in this case. The subject matter of the expert's testimony did not involve esoteric matters, and the government argued in summation the credibility of its fact witnesses by showing the similarities between their testimony and that of the expert. *See id.* at 16.

**B.      Hughes' testimony mirrored the alleged victims', improperly bolstering their credibility, exploited by the government in summation; Hughes' characterizations and expressions of personal revulsion were inflammatory  and her testimony usurped the jury's role to evaluate credibility**

Hughes' testimony mirrored victims' to an uncanny degree.  It is manifest  error  for  a  court  to  allow  an  expert's  testimony  that

33

"impermissibly mirrors the testimony offered by fact witnesses." *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994). *United States v. Rijo*, 508 Fed. Appx. 41, 44-45 (2d Cir. 2013) (unpub) (error for expert to describe "'typical drug transaction that mirrors" testimony from …fact-witnesses; testimony about vehicles with hidden compartments and use of "bug detector" did not simply explain unfamiliar terms, but "implicitly encouraged the jury to draw the Government's preferred inferences, effectively serving as a 'summary prosecution witness.'" )

Here, Hughes was a summary prosecution witness whose lengthy testimony provided a vocabulary, structure and *mise en scene* for the whole case.

Last year, in *United States v. Zhong*, 26 F.4th 536, 556 (2d Cir. 2022), this Court held that "the government may not use expert testimony to 'provide [itself] with an additional summation by having the expert interpret the evidence." *Id.* at 556, *quoting United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003). In this area, "district courts must proceed with caution." *Id.*

In *Zhong*, the expert "not only described the inner workings of forced-labor operations in general," he also gave a detailed analysis of

the employment contract, describing one clause as "troubling" and another as raising "major red flags." This Court ruled that the jury did not need the expert's analysis of the contract to decide whether it was coercive and violated the forced-labor statute. Likewise, "the jury had no legitimate use for [the expert's] color commentary about its 'troubling" and 'red flag[]'-raising provisions. The government impermissibly used the expert's testimony "to 'interpret' and 'vouch' for" the government's evidence. *Id.* at 556, quoting *Dukagjini*, 326 F.3d at 54.

Hughes' "color commentary" usurped the jury's function. While Hughes may not have studied the evidence in Ray's case, the prosecutors did and it is reasonable to assume they studied Hughes' testimony in other cases and elicited testimony that mirrored that of the fact witnesses in this case. As this Court observed in *United States v. Mejia*, 545 F.3d 179, 190-191 (2d Cir. 2008), "[i]t is a little too convenient that the Government has found an individual who is expert on precisely those facts that the Government must prove to secure a guilty verdict."

Hughes' commentary was far more prejudicial than the expert's in *Zhong.* She used characterizations like "we see this in more extreme cases," and "devastating psychological consequences," and victims

needing "*to keep the lion tamed.*" (500, 508-09).  She described abusers' language as "horrible, mean and offensive," and his behavior as "insidious," very cunning, and driving victims to "DEFCON 1 where there's nothing left and they are suffocating."  (499, 510-12)

Her characterizations and expressions of personal repulsion were inflammatory and prejudicial.  Hughes used language characteristic of a victim advocate and not an expert witness, language designed to inflame passions against the defendant and overtly encourage the jury to draw the government's preferred inferences.

## C.  Hughes' testimony was based on anecdotal evidence that cannot be tested and is unreliable

The "science, literature, [and] clinical experience" Hughes may have relied upon is all, of necessity, anecdotal – the underlying information consists of the lived experiences of individuals as they have related them to others. (479)  Anecdotal evidence consists of any number of layers of hearsay.  As a result, it is not subject to any reliable expert methodology and its reliability is considered highly suspect.  *See Playtex Prods. v. Procter & Gamble Co.*; 2003 U.S. Dist. LEXIS 8913 *; 2003-2 Trade Cas. (CCH) P75,153 (S.D.N.Y. 2003) (Dr.'s "conclusion, based [solely] on anecdote, has not and cannot be tested or verified and has an

insufficient reliable foundation to permit it to be considered"); *Koppell v. New York State Bd. of Elections,* 97 F. Supp. 2d 477, 481 (S.D.N.Y. 2001) (excluding expert testimony where expert report was an anecdotal compendium of opinions).

An expert's analysis "must be reliable at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir. 2002). In a case like this, where the foundation of the expert's analysis is anecdotes from people about their experiences, sufficient reliability is lacking *ab initio*.

Experts in "the science camp" are extremely troubled by anecdotal evidence, and for good reason:

> [A]necdotes are dirty data: they are adulterated with many factors that may have played a role in the outcome we observe. Ask for better evidence if you don't want to risk wasting time, money, and even jeopardizing your own health.

Jonathan Jarry, M. Sc., *Tips for Better Thinking; Anecdotes are Not Reliable;* McGill University, Office for Science and Society, January 20, 2021; https://www.mcgill.ca/oss/article/tips-better-thinking-anecdotes-are-not-reliable

> [A]necdotal evidence can serve as a powerful barrier for scientific reasoning and evidence-based decision-making. Anecdotal evidence generally conveys narrative information, including personal stories and testimonies (Kazoleas, 1993).

A substantial body of work has shown that people are more persuaded by anecdotal than statistical evidence.

Audrey L. Michal, et.al., "When and why do people act on flawed science? Effects of anecdotes and prior beliefs on evidence-based decision-making," National Library of Medicine, December 2021.

Anecdotal evidence is dangerous because it is so comfortable, it is the way we communicate in our ordinary lives about things with a wide range of importance. It can become an excuse for not finding something out for oneself – somebody or a bunch of people have said it before, so it must be true.

It is particularly dangerous to hand it to jurors who have hard work to do and have been asked to do it at the expense of their own lives and work. Hughes' testimony is an egregious example of a jury being overfed on anecdotal evidence, leaving them no room to question and think.

### D. Hughes improperly testified regarding the motives and states of mind of the defendant and the government's main witnesses

There can be no debate that, as Hughes went through her testimony, the jury substituted Ray for the perpetrators/abusers she described and the Rosario siblings and Drury for the victims. She did not

just testify to conduct a patient or colleague related to her or she read about; she testified to states of mind of the victims she described, who were playing the parts of the trial participants.

An expert may not opine as to a party's state of mind or whether a party acted in bad faith. *See Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 442 (E.D.N.Y. 2011) (expert's testimony inadmissible re the "intent, motive, or state of mind, or evidence by which such state of mind may be inferred") *citing In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (excluding expert testimony "as to the knowledge, motivations, intent, state of mind, or purposes of the defendant], its employees, the FDA, or FDA officials"); *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 180-81 (S.D.N.Y. 2008); *In re Rezulin Prods. Liab. Litig.,* 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.").

Hughes' state-of-mind testimony appears on nearly every page of the transcript of her testimony. She often referred to the perpetrator's intent as his "goal" and his purpose as "the function of" (some conduct): --- The "perpetrator's" intent, motive, and state of mind:

- The overarching goal of victimization is an abuse of power and control (480)

- The goal is to gain trust and dependence (482)

- the goal is . . . [to] make the victim feel like they need and they want the perpetrator (483-84)

- They want to slowly desensitize victim to more extreme forms of sexual behavior (489-90)

- The function of intimidation is to continue to maintain power and control and to compel a particular response (492)

- The function of those behaviors . . . is to make sure your victim knows that you are omnipresent . . . (501)

-- The "victims' motives and states of mind:

- Victims often say, he really listened to me, he really cared about me . . . . (485)

- Seeing someone being abused motivates you to try to comply (487)

- The effect on the victim -- shame, humiliation, feeling just disgusting ... self-loathing, dysphoric, hopeless, helpless (488-89)

- So they feel lost, they feel disconnected . . . (498)

This testimony and more like it is inadmissible hearsay by unknown declarants who could not be cross-examined. The extent and breadth of this extremely prejudicial testimony violated Ray's right to Due Process and a fair trial.

It was manifestly erroneous to admit Hughes' testimony that: 1) was non-esoteric and within the average juror's grasp; 2) mirrored the witnesses' testimony and usurped the jury's function; 3) was not objective and was characterized by a victim advocate's choice of language and personal reactions on the subject matter; 4) was based on unreliable anecdotal evidence, and 5) was riddled throughout with references to the states of mind and intent of perpetrators and victims, who were stand-ins for the defendant and the alleged victim-witness in this case.

Ray did not receive a fair trial and he is entitled to a new one.

## II. "ENTERPRISE" CHARGES SHOULD BE DISMISSED BECAUSE AS THE EVIDENCE SHOWED, THERE WAS NO ENTERPRISE, JUST "RAY," AND THE JURY WAS NOT INSTRUCTED IT MUST FIND AN EXISTING "ENTERPRISE" FOR RICO CONSPIRACY LIABILITY

Ray was first charged alone for multiple crimes that would garner significant punishment. Unsatisfied, or perhaps to put pressure on co-defendant Isabella Pollok, the government filed superseding indictments alleging that Ray and Pollok conspired (18 U.S.C. §1962(d)) to commit those offenses, now dubbed racketeering acts, by conducting a criminal "enterprise" in violation of RICO, 18 U.S.C. §1962(c). The association-in-fact-"enterprise" supposedly consisted of what came to be known

41

(unsurprisingly) as the "Ray Family." Its "members" were allegedly Ray and Isabella, together with Ray's daughter Talia, and, later, Ray's father, Greco (aka "Poppy"), and step-father Gordon Ray.

There is insufficient evidence of a RICO "enterprise." What the government alleged as an "enterprise" proved to be no more than one person, Ray. Ray was a one-man show.

There is also insufficient evidence of "shared purposes" on the part of so-called enterprise "members." .

Additionally, Ray argues that an erroneous jury instruction allowed conviction based on a non-existent "enterprise," violating the principle that a jury must decide every element of the crime.

### A. There is insufficient evidence of shared criminal purpose between alleged members of the Ray Family as required by *Turkette* and *Boyle*.

An "association-in-fact" enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle v. United States*, 556 U.S. 938, 944-47 (2009);*United States v. Turkette*, 452 U.S. 576, 583 (1981), ("enterprise" is a separate element that the government must prove). No matter how it is proved, this type of RICO does not exist as a

matter of law, so a jury has to find it if disputed. Under *Boyle*, this type of wholly criminal enterprise "must have at least three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." "[F]or an association of individuals to constitute an enterprise," its alleged "members" must "share a **common purpose** to engage in a particular [criminal] course of conduct and work together to achieve such purposes." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013).

There were no demonstrated shared purposes and goals here. When Ray came to see his daughter Talia at Sarah Lawrence immediately upon his release from incarceration in 2010, Talia gave her father a project: to "help" friends from her dorm who had psychiatric problems and were suicidal become stronger better people. Talia sent an email dated April 17, 2013 to "Honey Boy" (as she called her father Ray). Talia lauded her father for the help he had already given her friends, reporting that they were doing vastly better than she had known them to be at Sarah Lawrence. It read (577-78):

> "What you've done with my friends is the most amazing
> and beautiful and absolutely astounding thing I have ever

seen, and I don't think I have ever even dreamed anything more astounding. *And no dream can be more brilliant than this project you have taken on for me (a fact I never forget, because I know it's the only drive that kept you at this project of fixing these people who I so wanted to see if you could fix (because nothing else real could even hold a candle to this project.* Look at Claudia, look at Isabella, even Iban and even Dan ... *They are all the better for what you did with them.* … [emphasis added].

Talia's "purposes" were to help her father help her friends with their psychological problems.

In an email dated July 10, 2013 from Talia  with copies to her father, Isabella and Claudia, Talia extolled the special skills she believed her father had in dealing with mental illness, stemming from his previous participation with the Department of Defense's "cutting-edge" scientific research (583).

It was Talia who put together the group at Sarah Lawrence and asked her father to "transform" them.

She wrote in one of her emails:  "every single student in that Slonim house was a potential suicide; and every single student who became a part of the little group that sought help from my dad had BPD [bipolar disorder]. Coincidence? No. Attachment theory at work." (584)

Talia wanted to help her friends, and to help herself at the same time:

> … I was also … at high risk for suicide, also unbeknownst to me, in my conscious mind at least. I then presented these people to my dad and wanted him to "fix" them. One of the reasons BPDs so rarely are treated -- despite the fact that we know so much about the disorder -- is that they are extremely difficult for anyone to treat by virtue of the behavioral dynamic characteristic of their disorder. (585) …

Talia Ray was not charged. The evidence belies any conclusion that she was a member of an "enterprise" whose "shared" purpose was to commit a litany of crimes against her friends.

This was not a Ray Family "enterprise." There were no shared, criminal purposes. This was a phony "enterprise."

Supposed enterprise-member Isabella Pollok's purpose was unstated. She was Talia's best friend and became particularly attached to Talia's father. Talia left, and Isabella slept in the same bed with Ray for years. The government dubbed her his "lieutenant" because she followed his instructions (and kept the books well). Isabella, however, was no different from the other people around Ray whom the government called as witnesses.

The government's expert, Dawn Hughes, would describe Isabella's purpose in assisting Ray as a way of *preventing* pain: " … [T]hey are not making independent decisions for themselves, they are making decisions to not get hurt, to not get beat, to not get sexually violated." (493). Functioning under the influence of "coercive control" cannot equate with sharing criminal purposes with the controller. *See* (295-297, 928, 2264) (Ray instructed Isabella to have sex with people); (267-268) (Ray accused Isabella and others of being destructive); (704) (Isabella had been abused as a child and was suicidal); (863) (Isabella and Felicia were having mental breakdowns at Pinehurst).

Nor was there a shared financial purpose among alleged enterprise "members." or any acts done "for the Enterprise's financial gain," as charged in the Second Superseding Indictment, DOC 292 ¶5). According to the testimony, Ray made clear that his money was his and his alone. Any notion that Ray shared a financial purpose with other "members" of an alleged "Enterprise" is belied by the evidence.

Felicia Rosario testified that *everything* Ray took in, including money from Claudia, was Ray's and Ray's alone. He said as much and made it very clear. Any expenditure needed be justified with a receipt.

Anything he gave away, was a gift and a token of his largesse. Ray sent money to his daughter Talia while she was living away from home, and bought nice things for himself and for Isabella. He gave his father and step-father a gift. But he had to approve each expenditure each time.

All the money was Ray's and Ray's alone, and his to decide what to do with. (1691-93). Receiving money or gifts from Ray showed nothing about shared criminal purposes. There was no shared financial stake in an "enterprise."

Nor was there evidence that Ray's biological father (Poppy) was a "member" in any "enterprise." Poppy surfaced after Ray's arrest, and relayed Ray's request to Isabella and Felicia to help him defend himself and gather evidence. Poppy also told Felicia she should not leave Ray and that he would do anything for his son. Felicia testified that she read that as a threat. A father's expressions of concern for his son and his hope that someone close to his son would not abandon him are the weakest thread, if any thread at all, to tie together an Enterprise.

There is no evidence that Poppy was trying to help his son as a "member" of the charged criminal enterprise and as a person who shared its goals. He was a father. Even criminals have parents who care.

47

Similarly, there was no evidence that Ray's step-father, Gordon Ray, was an "enterprise" member or shared criminal goals with Ray. Gordon owned the Pinehurst property in North Carolina where Ray allegedly forced people to work in 2013. Gordon was not even in North Carolina in 2013 when the work was done. (1589-90).

No one shared the "entrepreneurial" purposes the government charged. The group shared Ray. There was insufficient evidence of "shared purpose" of alleged "enterprise" members

## B. The purported "enterprise" consisted of Ray alone; it was not "in commerce" when anyone purportedly agreed to its "formation" in 2010; and/or it is indistinguishable from the alleged "pattern of racketeering activity"

In *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001), the Supreme Court held that to establish liability under § 1962(c), one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Section 1962(c) "applies to 'person[s] who are 'employed by or associated with' the 'enterprise.' In ordinary English one speaks of employing, being employed by, or associating with others, not oneself." *Id*. Therefore, a RICO defendant, a "person," must be distinct from the RICO enterprise that the defendant is "associated"

with or "employed" by. *Id.* at 161-62. The person/enterprise distinction arises from the maxim that a person cannot conspire with himself. *River City Markets, Inc. v. Fleming Foods West, Inc.,* 960 F.2d 1458, 1461 (9th Cir. 1992).

By belatedly charging Isabella Pollok – and deeming her a co-entrepreneur – the government made it possible to up the ante with the RICO and VICAR charges; now the "enterprise" could be described as more than one person.

Factually, however, this "enterprise" was Ray, alone.

Courts have questioned not only whether a defendant can constitute an "enterprise" but whether an alleged "enterprise" has a separate and sufficiently lasting identity apart from a "person" or "persons" who allegedly receive any income from it (18 U.S.C. §1962(a)), (18 U.S.C. §1962(b)(who acquire or maintain any interest in it), or who are employed or associated with it (18 U.S.C. §1962(c)). The Seventh Circuit, in *McCullough v. Suter*, 757 F.2d 142 (7th Cir. 1985), held that a sole proprietorship could be an "enterprise" with which its proprietor could be "associated," because the proprietor "had several people working for him; this made his company an enterprise, and not just a one-man

band, and all section 1962(c) requires … is `some separate and distinct existence for the person ... and the enterprise. *Id.* at 144. The Supreme Court ultimately concluded in *Cedric Kushner Promotions, Ltd.* 533 U.S. at 165, that, as long as an "enterprise" is a corporate entity, it is "different" from the corporate owner/employee who operates it; they are two entities.

Here, the "enterprise" was not a legal entity existing separately from the defendant/alleged operator of it. According to the government, it was Ray's family, who loved him, plus an individual who, according to the reasoning of the government expert, was under his "coercive control," not someone who operated anything. Any distinction between an "Enterprise"/Ray and the "Person"/Ray is absent. As a result, the distinctiveness requirement under the statute was not satisfied. *See, e.g., Baker v. IBP, Inc.*, 357 F.3d 665, 691-92 (7th Cir. 2004); *Switzer v. Coan*, 261 F.3d 985, 992 (10th Cir. 2001) *Stachon v. United Consumers Club, Inc.,* 229 F.3d 673, 676 & n. 3 (7th Cir. 2000).

In a case with language that resonates, *Discon, Inc. v. Nynex Corp.*, 93 F.3d 1055, 1057-58, 1063-64 (2d Cir. 1996), this Court held that section 1962(c)'s distinctness requirement was not satisfied where a

holding company and two of its subsidiaries were named as both the RICO defendants and the RICO enterprise. The three corporations, *although legally separate entities*, were part of a *unified corporate structure and were "guided by a single corporate consciousness." Id.* [emphasis added]. The separate incorporation of the three entities was not dispositive; defendants/three-corporations-individually each were deemed identical to the alleged RICO enterprise (the three corporations and their unnamed agents, collectively *Id*. There were no corporations, partnerships, holding companies or subsidiaries in this case. There was a person, not an Enterprise. There is insufficient evidence of an enterprise in commerce; there is insufficient evidence of an "enterprise" separate and different from Lawrence Ray.

### C. The court erred in declining to instruct the jury that it must find an *existing* enterprise, eliminating an essential element of the RICO conspiracy statute, 18 USC §1962(d), and the issue should be reviewed *en banc*

At a charge conference on April 1, 2022, defense counsel raised the issue of the propriety of the enterprise instruction, seeking the following "enterprise" instruction:

> "If you find that this enterprise existed, you must also determine whether this enterprise continued in an essentially unchanged form during substantially the entire period

charged in the indictment from at least in or about 2010 up to or including 2020 (2608)

Judge Liman declined, because of the Circuit's application of *Salinas v. United States*, 522 U.S. 52 (1997). He said, "they don't have to find an enterprise existed at all, right? And under other cases in the Second Circuit. … So I'm not going to make that change for that reason" (2609).

The Court instead defined the alleged RICO conspiracy as an agreement to **form** an enterprise whose activities would affect interstate commerce through a pattern of racketeering activity:

> In this case, the alleged unlawful object is the formation of an enterprise whose activities would affect interstate commerce through a pattern of racketeering activity. [2971]

But the Second Superseding Indictment did not charge a conspiracy as one to "form" an enterprise. It charges that Ray and Isabella Pollok were persons "employed by and associated with the enterprise described in paragraphs 1 to 7 of the indictment;" and that "[a]t all times relevant to this indictment" – from "at least in or around 2010" through around 2020 -- the Enterprise was engaged in, and its activities affected commerce." (ECF No 292, (¶8)

Nor does the controlling statute, 18 U.S.C. §1962(c) (Addendum A-111) indicate any applicability to nascent associations not yet "formed" (so not demonstrably engaged in interstate commerce).

Appellant contends that the Second Circuit misconstrued *Salinas* first in *United States v. Applins*, 637 F.3d 59 (2d Cir. 2011). He suggests this Court review this important issue *en banc*. Since defense counsel asked for the instruction precluded under Second Circuit precedent, appellant preserved the claim of error sufficiently to merit appellate review. Fed. Rule Crim. Proc. 51(b).

Judge Liman and this Court in *Applins* relied on *Salinas,* but *Salinas* did not rule on the "enterprise" issue and should not have been construed as if determinative. The question presented in *Salinas* was: "Does the conspiracy prohibition contained in the [RICO] Act apply only when the conspirator agrees to commit two of the predicate acts that RICO forbids?" *Salinas* held that a RICO defendant could agree to *do* something (or that others would do something) – commit racketeering *acts* in relation to an enterprise -- and be liable for RICO conspiracy. It did not discuss, much less rule, that a defendant could agree to become,

or *form*, an enterprise, or to conduct an "enterprise" that did not exist and may not exist (until determined by a jury).

There is a conflict in the circuits about the need to prove the enterprise exists in a RICO conspiracy case. Without undertaking a comprehensive analysis of the shifting landscape, the First, Fourth, Sixth, Ninth, and D.C. Circuits all have recognized that the existence of an enterprise is an element of RICO conspiracy. *See, e.g., United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012); *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1984); *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004) ; *United States v. White*, 116 F.3d 903, 923 (D.C. Cir. 1997) (recognizing the "enterprise element" of a RICO conspiracy charge).

There are many other contradictory rulings that space limits disallow. The Court should reconsider, *en banc*, its erroneous ruling in *Applins.* It relieves the government of its burden of proving the existence of an "enterprise," which is a separate element under RICO.

## III.   RICO IS UNCONSTITUTIONALLY VAGUE

The obscure language that allows the arbitrary application of RICO to limitless "*de facto*" enterprise cases – at the prosecutor's whim -- raises

constitutional questions. It gives law enforcement officials "unfettered discretion" in determining whom to prosecute. This was condemned as a violation of due process in *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972) (constitutional requirement that criminal legislation be drafted clearly so as to check arbitrary law enforcement). Such statutes are void for vagueness. *Accord, Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (statute requiring people who "loiter" or "wander" to provide "credible and reliable" identification vague as presently construed, hence violative of Due Process Clause of 14th amendment).

Due Process demands that the government provide clear notice of what it commands or forbids. *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939). A statute is unconstitutionally vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or if the statute "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

Vagueness can arise when a statute does not adequately define what behavior it bars or when a statute is drawn so broadly that it "encourage[s] arbitrary and discriminatory enforcement." *McDonnell v.*

*United States*, 579 U.S. 550, 576 (2016) (quoting *Skilling v. United States*, 561 U.S. 358, 402-03 (2010). In *Kolender* the Court observed that, although the "void for vagueness" doctrine "focuses both on actual notice to citizens and arbitrary enforcement,"

> the more important aspect of the vagueness doctrine "is not actual notice, but the other principal element of the doctrine — the requirement that a legislature establish minimal guidelines to govern law enforcement." … Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections."

461 U.S. at 357-58.

In a footnote, the Court explained how a law with "minimal guidelines" may violate the Separation of Powers because it would be left to Courts to decide who among "all possible offenders" caught in a too-large net should be detained or set free. *Kolender*, *id*.n.7. Extreme elasticity in the RICO statute's limitless enterprise term has opened the door to arbitrary enforcement and prosecutions that violate principles of fundamental fairness. .

Justice Gorsuch's comments in the recent case invalidating the aggravated identity theft statute, 18 U.S.C. §1028A, as vague, apply with equal force here:

Depending on how you squint your eyes, you can stretch (or shrink) [§1028A's] meaning to convict (or exonerate) just about anyone. Doubtless, creative prosecutors and receptive judges can do the same. **Truly, the statute fails to provide even rudimentary notice of what it does and does not criminalize. We have a term for laws like that. We call them vague. And "[i]n our constitutional order, a vague law is no law at all."**

*Dubin v. United States*, 599 U.S. ---, No. 22-10, 2023 WL 3872518, at *13 (June 8, 2023) (Gorsuch, J., concurring) (quoting *United States v. Davis*, 588 U. S. ___ (2019)).

In 1989, in a concurring opinion in *H.J. Inc. v. NW Bell Tel. Co.*, 492 U.S. 229 (1989), the late Justice Antonin Scalia invited a constitutional challenge to the vague standards in RICO:

No constitutional challenge to this law has been raised in the present case and so that issue is not before us. That the highest court in the land has been unable to derive from this statute anything more than today's meager guidance bodes ill for the day when that challenge is presented.

The constitutional challenge is respectfully raised here.

If the conduct in this case falls within the RICO net, it proves the statute is limitless and should be deemed void. It would turn every conspiracy into a RICO case.

Both RICO and VICAR, resting on an "enterprise" element that cannot be defined and can be stretched way too far, are unconstitutionally vague.

## IV. THERE IS INSUFFICIENT EVIDENCE SUPPORTING THE VICAR "ENTERPRISE" AND INTENT ELEMENTS.

Title 18 U.S.C. §1959, referred to as VICAR, provides in pertinent part that one who commits a violent offense for money paid by an "enterprise," or for the purpose of maintaining or enhancing his position in the "enterprise," shall be punished. A State crime can be punished as a federal crime if committed for those purposes. It is not enough to prove that the defendant was a "member" of a "gang" and engaged in an act of violence. There must be a connection between one's act of violence and status. *E.g., United States v. Banks,* 514 F.3d 959 (9th Cir. 2008).

The previous point shows why the "enterprise" is unproven. The "intent" element, also, was not proven. There was insufficient evidence to prove beyond a reasonable doubt that Ray's assaultive conduct against Drury on October 16, 2018, a New York State menacing offense, a

misdemeanor,[7] if it occurred, was committed to "enhance" Ray's status in any enterprise.

The enterprise, as prosecutors set it up, *was* nothing more than one person, Ray himself. There is no evidence that members of the alleged enterprise – that is, Ray's daughter Talia, Isabella Pollok, and Ray's father and step-father – were interested in challenging Ray's "leadership" or "status," even if they had any cognizance of Ray's avatar as an "Enterprise," and Ray's status in it. The notion that a man alleged to have run, by coercion, an "enterprise" consisting primarily of his "family," was in jeopardy of losing status if he failed to act in a certain way, defies reason and belies the evidence. Ray's alleged "status" in an "enterprise" was not the "animating purpose" of his conduct on October 16, 2018. (See *United States v. Hackett*, 762 F.3d 492, 500 (6th Cir. 2014) (VICAR "purpose" element is met if jury can find "animating purpose" of defendant was to maintain or increase his position in the racketeering enterprise.)).

---

[7] On the Rule 29 ruling, Judge Liman held that the underlying violent crime supported by evidence was menacing, a New York State misdemeanor, because Claudia Drury did not suffer injuries that outlasted the violent act. Evidence did not support New York State assault. (Addendum A 20-A 24).

If Ray was the person the government claimed, he would not have to prove his dominance or his connection to the "enterprise" under any circumstances.

There were no "enterprise" goals and there was no enterprise. There is insufficient evidence supporting the VICAR enterprise or intent elements. It should be set aside.

## V. THE "ENTERPRISE" WAS USED TO JUSTIFY PREJUDICIAL VIDEOS OF VOLUNTARY SEX ACTS THAT SHOULD HAVE BEEN EXCLUDED. ALL THE CONVICTIONS SHOULD BE REVERSED BECAUSE OF PREJUDICIAL SPILLOVER.

The government used the "enterprise" charges to support admission of 40 videos of Felicia Rosario and Isabella Pollok having sex voluntarily and not for money. As argued in Point VII, there was no basis for admitting this evidence, which should have been excluded as irrelevant or inadmissible under Fed. R. Evid. 403. Prosecutors justified it as "proof of one of the means and methods of the enterprise." (T.2/22/2022, argument on motions *in limine, p.*21). The phony "enterprise" was used to justify evidence that did nothing but inflame the jury against Ray. This evidence might prove something about Ray, a prohibited purpose under Fed. R. Evid. 404(b), but not about an "enterprise."

## VI. THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT RAY ENGAGED IN ANY OF THE CORE-ELEMENT CONDUCT REQUIRED FOR A SEX TRAFFICKING CONVICTION – RECRUIT, ENTICE, TRANSPORT, ADVERTISE, PATRONIZE, SOLICIT -- A PERSON, IN CONNECTION WITH A COMMERICIAL SEX ACT

18 U.S.C. §1591 is a convoluted statute. Reproduced in the Addendum, A-108-110), it describes two means of committing sex trafficking. The first paragraph lists ten verbs describing the *actus reus* of the offense in relation to "a person" -- recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, solicit. The second paragraph lists an additional means - benefitting from any of the conduct listed in the first paragraph. Without any segue, the paragraph then describes the mental state required, and it all must be in commerce, and to cause the person to engage in a commercial sex act. Counts Four and Five charged sex trafficking and sex trafficking conspiracy, respectively.

The evidence was insufficient that Ray committed any of the actions or conspired to commit any action listed in the statute, which is the foundational elements of the offense. Only three of the actions have any

potential application to the facts of the case – recruit, entice and solicit.[8] Ray did not recruit, entice or solicit Claudia Drury to engage in a commercial sex act.

### A. Claudia Drury embraced sex work on her own after positive experiences on her own, and found sex work gratifying and "life-affirming;" Ray did not recruit, entice or solicit her to engage in "a commercial sex act"

In summer 2014, after Claudia Drury graduated from college, she started hosting at a sex club and became involved in "BDSM," which she described as bondage and "impact play." She found these parties by googling the topic, after Ray had told her about his own experiences and suggested she might like it. (884,1178) She described the parties as entertaining and exotic; she liked the experiences. (1179-80) Although BDSM often involved very painful, choreographed physical violence, she found it very cathartic, as an "outlet for her self-hate." (894-97)

Ray had nothing to do with these activities and did not know about them until she told him afterwards. (887, 1181).

---

[8] The statute was amended, effective May 29, 2015, to add the words advertises, patronizes, and solicits. This applies to conduct after the effective date, as the court instructed the jury. As to advertising, Drury composed and posted her marketing website entirely on her own. Ray was not involved in her marketing efforts. (1188-90) See DH-1, Drury's business plan for her sex work, Addendum 103-105.

She claimed she was not a sexual person before meeting Ray, but acknowledged that, at Sarah Lawrence, students frequently explored their sexual identities, particularly during "sleaze week." There were graphic, sexually explicit posters around campus advertising the events. (1173-76).

Sometime after graduating, Ray suggested during a conversation that she explore escorting, as it would be fun, another kind of sexual rush, and another experience she would have. (766, 901,1187). She stated on cross that she remembered Ray suggesting it as a "hot experience", not as a source of income for herself (1186).

At the time, she was living in an apartment with her mother in New York City and attending classes at Columbia. She relied on her mother for financial support (1161). When her mother could no longer afford the rent and moved out, Drury remained (1162-66). However, she could not afford her living expenses and her tuition at Columbia. (1171). She needed money. That is when she started escorting, in late 2014 (1172-71). She met clients in her mother's apartment until she was evicted. (920). At first, she used an agency, then worked independently through a website called Backpage (904).

Drury started a business on her own. She developed a business plan; she wrote and posted ads on Backpage for her escorting services; she controlled the content, controlled what she would charge for her services, and she took photos of herself. (1187-88). *See DX H-1* (Drury's Notes, Addendum A103-105[9]). She also created a website dedicated to her escorting services. (1188). Neither Ray nor anyone else was involved. A client told her the website was exceptional marketing. (1189-90).

Drury worked as a prostitute from the beginning of 2015 until April 2019. (901). When asked on direct examination if she cared about her clients, she said yes. She explained: "it was very important to me. It was, you know, the only time I had really with positive social interaction in my life, and I felt like I could actually give –give people something or make them happy or not just be someone who ruined everything she touched. It was important to me." (1025-26)

She wrote a note on her phone protesting a naysayer, stating she believed at the time she was escorting that a man who engages a woman

---

[9] Excerpt of DH-1, Drury's notes about marketing (A-105)

Target: Wealthy men that want intellectual / emotional connection

for sex work is no less of a human. She wrote that she found sex work to
be life affirming in many ways. She wrote that she loved what she was
doing (1192-95). She made $2000/hour. (942)

## B.   B. Ray's conduct does not fall within that proscribed by the first, elemental paragraph of the statute

Separating out, for clarity, each of the elements of 18 U.S.C. §1591,
they are:

(a) (1) Whoever knowingly

(i) in or affecting interstate or foreign commerce, or
within the special maritime and territorial jurisdiction
of the [US],

(ii)  recruits            entices
      harbors            transports
      provides           obtains
      advertises         maintains
      patronizes         solicits

(iii) by any means

(iv)  a person;

(2) or benefits, financially or by receiving anything of
value, from participation in a venture which has
engaged in an act described in violation of paragraph (1),

(i) knowing, or
(ii) in reckless disregard of the fact, that
      means of force  threats of force,
      fraud  coercion [defined in (e)(2)] , or
(iii) any combination of such means


(iii) will be used to cause the person to engage in a
      commercial sex act [or the person is under 18]

The verbs recruit, entice and solicit are the only ones that appear to have any potential relation to the government's theory of prosecution and arguments.  Ray did not recruit Drury to prostitution.  According to her, he suggested she might like it.  He was not trying to enlist her.  There was nothing to recruit her to; Ray was not in the business of prostitution. *See* definition in *https://www.merriam-webster.com/dictionary/recruit* (to fill up the number with new members; to enlist as a member of an armed service; to seek to enroll, as in students);  *see Prof'l Home Health Care, Inc. v. Complete Home Health Care, Inc.*, 159 F. App'x 32, 37 (10th Cir. 2005) (unpub) (citing dictionary definition, "the construction of "recruit" most likely correct under Colorado law requires a direct request or plea").

Similarly, Ray's purported words -- it would be "fun," another "sexual rush" like she'd been experiencing lately -- do not rise to the level

of enticement. In *United States v. Broxmeyer*, 616 F.3d 120, 125 (2d Cir. 2010), this Court said that the terms "persuade," "induce," and "entice" are "words of common usage that have plain and ordinary meanings," and that they "are in effect synonyms." At best, Ray did what Drury said he did: he suggested. Perhaps he even recommended, but he did not entice. Enticing someone to sky dive, for example, would take a lot more than "it would be fun" and another experience to have.

Finally, the verb/action "solicit" was not in the statute when Ray supposedly made this suggestion or when Drury started her business. The Sex Trafficking statute was amended in 2015 to make sure that it covered both the supply and demand sides of a prostitution operation. For that reason, the words "patronizes" and "solicits" were added. "Solicit" is a demand-side concept, and Ray was not requesting sexual services from Drury.[10]

---

[10] See Doyle, Charles, *Sex Trafficking: An Overview of Federal Criminal Law, Congressional Research Service* (June 25, 2015) at p. 5 ("Prior to enactment of the Victims Justice Act in 2015, each of the verbs in §1591(a)(1)'s action element—recruits, entices, harbors, transports, supplies, obtains, maintains—seemed to refer to activities on the supply side of a prostitution operation..... The Victims Justice Act [added] "patroniz[ing]" and "solicit[ing]" as alternatives in the section's action element."

In any event, Ray did not "solicit" Drury to become a prostitute. He was not involved in prostitution himself and their conversation was theoretical. According to the Mirriam Webster online dictionary, "solicit" means to make petition to; to approach with a request or plea, to try to obtain by usually urgent requests or pleas; to entice or lure; to proposition someone for sex, especially as in prostitute. Mirriam Webster *https://www.merriam-webster.com/dictionary/solicit.*

### C. That Drury believed she owed Ray for damages she caused may have been the reason she gave him proceeds, but it was not the reason she engaged in sex work

Drury as well as the Rosario siblings all believed that they owed Ray compensation for damaging personal items, appliances, landscaping equipment and the outside property of Ray's stepfather. Drury, and Santos and Yalitza Rosario were accused of and came to believe that they had poisoned Ray, his daughter Talia, Isabella and Felicia Rosario.[11] (217, 398, 694, 1551). Drury and the two Rosarios testified that Ray

---

[11] Felicia Rosario testified that she was not sure what actually made them sick, but they were. At the time she testified she thought it was very unlikely that they had been poisoned "but I still don't know what actually happened to us." (1736)

demanded to be compensated for his and his daughter's suffering. (277, 899, 2080-81)).

Drury had many conversations with Ray about owing him money, but there was no agreement or understanding with him that she would make money from prostitution in order to pay him. (1226). After Drury confessed to the poisoning, Ray told her she had committed a crime for which she would go to jail, and he described awful conditions she would find there. (880-81)

On and off during her testimony, Drury tried to tie her prostitution work to owing Ray money, but she also made it clear that she started and continued to do sex work because she wanted to, and it was important to her. (694-96, 873, 1025-26, 1192-95). Indeed, Ray knew it was important to her.

On one occasion, Ray told her that he had purchased a domain name consisting of her name.com (claudiadrury.com), and posted a video of her confessing to poisoning, dubbing her "an escort who poisons people." (938). He would post information from her journals and threaten to share the website with law enforcement and the press and to post her client list with their personal information (939-40). To prevent Ray from

doing this and destroying her business, she tried to make as much money as she could (940).

Ray did post personal information on the website regarding one of Drury's client's (941). This is not the conduct or the threats of someone seeking to maintain an income stream from the proceeds of prostitution. Posting the personal information of clients is not something any business, especially this one, would do if the goal were securing a continuous stream of income.

On another occasion, Drury told Ray that she had feelings for her client Stuart and he had feelings for her. Ray threatened to disclose her journals to Stuart. Ray was pressuring her to get him more money as he did with others, so she asked Stuart for a large amount of money, which he would not provide. (1032).

In October 2018, Claudia told Stuart about his information on her Ray-run website. She then told Ray what she had said to Stuart, which led to, according to Drury, a violent incident at the Gregory Hotel. (1033). She testified Ray was angry because she told Stuart about the website. (1033-34, 1040). Before he left, Ray told her to behave and focus on work, which she did. (1039-40).

Ray was not in the business of luring people into prostitution. None of the other victim-witnesses in the case were involved in it.

Drury was her own special case. She had the interest and discovered she had the skills and compassion to be enormously successful, and she found it gratifying. If anything, threats Drury said Ray made might constitute extortion (as charged in Count 3), but not a sex trafficking crime.

Finally, there is a stark contrast between the first-paragraph verbs in the statute -- like recruit, entice and solicit -- and the intent/*mens rea* verbs in the second paragraph – knowing *force, threats of force, fraud or coercion would be used.* The structure of the statute inherently suggests an initial deception to lure (although not a word in the statute) a person into sex work. There was no such deception in this case.

Any contention that Ray pushed Drury into prostitution is belied by substantial evidence that Ray was encouraging her to do something productive with her life and education. In April of 2014, after Drury entered and was released from psychiatric treatment at a hospital, Ray told her that if she did not get into a school program, he would not speak

to her again (884). She applied to take classes at Columbia College, and went to live with her father. (882-84, 1135).

Previously, in 2011 and 2012, Ray encouraged her to study abroad at Oxford and he encouraged her to stay in England during her break. (741, 1556, 1159). When she returned, she told Ray she was having thoughts of harming other people and could not control herself. Even as a teenager, she had thoughts of harming others. (766, 1103-04, 1119). Ray urged Drury to take a break and go to a hospital. While she was hospitalized, and diagnosed with borderline personality disorder, Ray encouraged her to work with the clinicians to resolve her conflicts with her parents (1127-29). At the end of her hospitalization, Ray encouraged her to go home with her parents (1129).

There was no hidden agenda for Drury to go into sex work.

Courts view the evidence supporting a guilty verdict "in the light most favorable to the Government." *United States v. George*, 779 F.3d 113, 115 (2d Cir. 2015). The Court must analyze the pieces of evidence "in conjunction, not in isolation." *United States v. Persico*, 645 F.3d 85, 104-105 (2d Cir. 2011) (*quoting United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008).

A pillar of the story is Drury's own testimony that she is and was an inveterate storyteller. As a child, she embellished and made up stories for attention. She continued to tell stories through her high school years and up through the time she met Ray (707, 1065-66).

The way the evidence was presented and the government's arguments discounted the notion of Drury's personal agency, which Drury clearly had when it came to sex work. Ray is not liable for sex trafficking. His convictions on Counts 4 and 5 should be vacated.

## VII. THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE FORCED LABOR COUNTS

The indictment (counts 6,7, and 8) charged Ray with forcing Santos Rosario, Felicia Rosario, Yalitza Rosario, and Claudia Drury to travel to North Carolina to perform physical labor on the property in Pinehurst by threatening to subject them *to serious harm* if they failed to comply with his directive. (18 U.S.C. §1589). There is insufficient evidence of forced labor to sustain these charges even examining the facts in the light most favorable to the government.

Section 1589, quoted below,[12] requires a showing of *force,* as the name of the statute implies. In denying the Rule 29 motion, Judge Liman commented the "jury heard and saw evidence that defendant *forced* his victims to come to Pinehurst, North Carolina in the summer of 2013 to perform grueling labor on the property of Defendant's stepfather, Gordon Ray." (Rule 29 op.7). The characterization is wrong.

Santos traveled to Pinehurst because he was eager to be with his friends and not because Ray did or said anything to induce him to come. Ray never asked Santos to come to Pinehurst.

Ray did ask Claudia to come to Pinehurst. Before traveling to Pinehurst, Claudia was aware she would be working on step-father Gordon's property with Ray and the group. Claudia voluntarily took a train to Pinehurst. There was no threat that induced her to do so.

Ray told Yalitza that Felicia was not well, and she should come to Pinehurst to help her sister (2093-94). Felicia confirmed Ray's concern

---

[12] "(a)Whoever knowingly provides or obtains the labor or services of a person ... −
     (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
     (2) by means of serious harm or threats of serious harm to that person or another person;
     …shall be punished …."

about her health. (1571-72). She was unable to deal with what was going on around her (1572). Yalitza's travel to Pinehurst was motivated by a desire to help her sister, not manipulation or threats by Ray.

Felicia Rosario viewed herself as Ray's wife. She believed they had a romantic relationship. Her passion for Ray kept her at Pinehurst. Ray did not force her to remain.

That the work on the landscape may have seemed grueling to these city folks does not mean labor was forced. *United States v. Marcus,* 628 F.3d 36, 40 (2d Cir. 2010). Santos described how he shoveled gravel, dug ditches, and removed dead grass (291). Santos never claimed Larry forced him to do this work. Santos' statement that *Larry treated him like a slave* was conclusory and hyperbolic statement unsupported by even Santos' testimony, and did not prove the element of force.

Claudia admitted she found the work physically difficult, but knew she was going to work hard on landscape and was excited to go (1143).

Yalitza described life at Pinehurst as hell. Again, this was hyperbole, not "fact." Yalitza had never experienced physical labor. It is unsurprising she would describe yardwork as grueling (2096). Her use of

the word "grueling" and "hell" does not transform her into a victim of forced labor. She never testified Ray coerced her into doing that work.

Ray would not permit Felicia to work every day. He was concerned for her health. Felicia took daily walks for an hour or two (1772). Felicia wanted to help Larry because she was dating him (1574). She might have told the government it felt like school (1774). Felicia voiced complaints about her time at Pinehurst; forced labor was not one of them.

These witnesses' figures of speech are not sufficient to justify forced labor convictions.

The group also complained about living conditions at Pinehurst. Claudia felt she was starving and claimed to have lost 40 pounds. Claudia never revealed any underlying facts, *i.e.,* what she ate each day. She lost weight (as she wanted to do). She did not "starve"; another exaggerated remark without a factual basis.

 Santos testified that Ray decided when they ate and slept. He never said he was starved or sleep-deprived. Adhering to a schedule is not proof of forced labor.

Yalitza contradicted her friends' accusations. She testified the group ate breakfast and lunch regularly, and Talia would cook dinner sometimes (2095-97). "Starvation" was an obvious exaggeration.

Further, Ray did not confine these folks to the property or isolate them. The house was in a suburb near a golf course and a Walmart. The prosecutor argued "these were city kids in a different state, in a rural area far from home . . . That in North Carolina the defendant's power was absolute" (Summation 2807). This is another exaggeration. These were not children. Felicia was 31 years, and the others were in their twenties. Traveling to North Carolina was no big deal for Felicia, who lived in California, and Claudia, who lived in a foreign country for her study abroad program.

Moreover, these "city kids" were free to leave Pinehurst when they wanted. Santos left after three weeks. Ray did not object to his departure; Santos drove back to New York with Isabella and Felicia.

Claudia, too, was not confined to the house; at trial she claimed she did not *feel* she could leave. She never said why. Her feelings aside, Ray did not restrict her movements. Claudia retained possession of her cell phone and credit cards. She had the means to call for help or pay for her

return to New York. Claudia, as did Felicia and Yalitza, had access to a car and left the property on multiple occasions without Ray. After six weeks, Larry told her she should return to New York. Felicia drove her back to New York (1571).

Yalitza, too, claimed she *felt* she could not leave the property. Her actions belie her words. On multiple occasions, she had the opportunity to leave Pinehurst. She and Felicia had the use of a car. They would leave the property to go on supply runs.

Yalitza, because of her past mental history, attempted suicide at Pinehurst and ended up in the hospital (2075-76). She had the opportunity to ask for help or call the police. She did not. She chose to return to Pinehurst.

Yalitza left Pinehurst for good when her mother wired her money (2118-19). Ray did not prevent her from calling her mother or leaving. Yalitza could have left Pinehurst at any time (2119). This was not "forced" labor.

As the Court found in *Headley v. Church of Scientology*, 678 F.3d 1173, 1180-81 (9th Cir. 2021), rejecting a conclusion of "forced labor," the Court concluded that plaintiffs were not restrained "as they had frequent

opportunities to leave the church property and had access to vehicles, phones, and the internet". The same was true at Pinehurst.

Ray did not prevent communications. Maritza Santos knew her adult children (Felicia and Yalitza) were in North Carolina fixing the property. She spoke to them once or twice a week (2459). Her daughters never complained Ray was *forcing* them to do "grueling" work, or that they wanted to return to New York, but Ray would not permit it.

The government pointed to other incidents at Pinehurst to support the forced labor charges. Ray may have been rough. But he did not physically hurt anyone *to force* them to labor.[13] Threats to turn them into law enforcement had nothing to do with the manual labor. Ray never linked any threat of "the police" to a refusal to work. He did not get them to work more or harder. If anything, the threats were to induce them to get money from parents and friends to repair damage these inexperienced workers caused the equipment, property, or the project.

The government also failed to prove that the alleged victims had cause to believe that if they refused to work on the property, someone

---

[13]Yalitza testified she saw Ray pin Felicia to the ground at Pinehurst. In the same breath, Yalitza admitted she, too, physically restrained her sister when she had outbursts (2193).

would suffer *serious harm* as that term is defined in 18 U.S.C. §1589(c)(2), which requires viewing things through the prism of a "reasonable person." The term "serious harm" means any harm,

> whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or continue performing labor or services in order to avoid incurring that harm.

All of Ray's followers were highly-educated adults. Felicia completed undergraduate studies at Harvard and Columbia University medical school. She nearly completed her residency in *psychiatry* at the University of California. Yalitza attended Yale and Columbia Universities, later graduating from Columbia. Claudia spent a year abroad at Oxford University in England while attending Sarah Lawrence from which she graduated. Santos graduated from the prestigious Horace Mann High School and went on to Sarah Lawrence. A reasonable person of the same background would not fear serious harm if he refused to do work at Pinehurst.

The notion that Claudia and Felicia felt compelled to work in Pinehurst because they believed that, were Gordon (Ray's stepdad) to see damage to his property, he could die of a heart attack, is absurd. No

educated person would have found these beliefs reasonable. "Die of a heart attack" in this context, as in many others, is hyperbole for being distressed and upset.

With respect to Count 7, the government charged that Talia, Ray's daughter, conspired to recruit her classmates to work on the landscape at Pinehurst by convincing them to travel from Manhattan to North Carolina. (Count 7). There is no proof of this charge. Talia did nothing to recruit her classmates to work on the Pinehurst landscape. Her only interaction with the group was to prepare dinner on occasion. Other than that, she remained in her room studying for her LSAT exams. Talia's sending Claudia a one sentence e-mail thanking her for acknowledging some of the damage she caused at Pinehurst is not sufficient to establish Talia's involvement in a forced labor conspiracy.

The convictions for all forced labor charges (counts, 6, 7, and 8) should be reversed, and those charges dismissed.

## VIII. THE EVIDENCE CHARGING THE PREDICATE ACT OF FORCED LABOR PERTAINING TO FELICIA'S PARTICIPATION IN SEXUAL ACTS WAS INSUFFICIENT

During the first year of their relationship, Ray lived in New York while Felicia was finishing her residency in psychiatry at the University

of California. During their many telephone calls, Larry began asking Felicia to do things of a sexual nature; to send naked pictures of herself (1493). In April 2012, while Felicia was still 3000 miles away from New York, Ray asked her to have sex with strangers, saying it would be fun and liberating for her. He told her to have sex with strangers in bars, give blow jobs, and record these encounters (1495).

Felicia admitted that because she loved Larry, she complied though it made her feel ashamed (1496-97). There followed a number of incidents (even after she came to New York) where she had sex with strangers in bars at Larry's requests. Sometimes, Isabella recorded these encounters.

Ray did nothing to force Felicia to engage in any of these acts. This was a woman months short of receiving her psychiatric medical degree, who willingly complied with these kinky, sexual requests only because she loved Ray. When Larry suggested that she might like to engage in prostitution, Felicia flatly refused. She had the ability to draw the line when she believed it necessary. None of Felicia's voluntary recorded encounters can be construed as forced sexual acts or trafficking, as the government argued. Felicia suffered remorse. She wasn't forced.

In opposition to defendant's motion to preclude evidence of Felicia having sex with strangers, the government misled the court, stating "it has evidence that Ray "often would lock Felicia out of their residence and not allow her to come back inside until and unless she provided a recording showing that she had sex with a stranger." (Decision 2-24-22 (A-26 – A-90, at p.29).

There is no testimony linking threats to lock Felicia out of the apartment, to her producing or failing to produce a recording of having sex with a stranger.[14]

Felicia's testimony together with the 40 videos were used to stir the passions of the jury against Ray and to introduce a titillating response as well in contravention of Fed. R. Evid. 403. The predicate act charging Felicia's engagement in sexual acts should be dismissed.

---

[14] Felicia testified only that Larry threatened to kick her out on the street, to leave her homeless, and penniless if she did not admit to the accusations Larry lodged against her (1479-80). Felicia's statement is another exaggerated account.

83

## IX. THE EVIDENCE UNDERLYING THE PREDICATE ACTS REGARDING OBSTRUCTION AND WITNESS TAMPERING BY LAWRENCE GRECO WAS INSUFFICIENT.

The government entangled Lawrence Greco, Ray's dad, in the case by accusing him as a co-conspirator of the predicate acts of obstructing justice (18 U.S.C. §1503(a)) and tampering with a witness (18 U.S.C. §1512(b)(3)). These two crimes rest on the same factual basis in this case.

Ray's 82-year old dad, called "Poppy," surfaced in this case only a after his son was arrested and incarcerated on February 11, 2020. He communicated with his son after that time and conveyed requests to Ray's followers. There is no evidence Greco knew anything about the relationship between his son and his accusers throughout the past decade. Only after he learned about his son's arrest in his case did Greco seek to help his son exonerate himself of the charges against him. His son, who was incarcerated, had no access to the evidence and reached out to his family to help him defend himself.

Ray asked his dad, together with Felicia and Isabella (who were still living with him when he was arrested), to gather the evidence that existed to discredit the "poisoners" (1728-29). He asked Poppy to get in

84

touch with a congressman and to get him another attorney – normal arrested-defendant-"moves" in a case.

Greco, who loved his son and wanted to help him, naturally reached out to those closest to Ray to help gather the needed evidence --- Felicia, who held herself out as Ray's wife.

Felicia's "take" on Greco's innocent remarks, claiming that they were "threat" and that she could not "leave," was a product of Felicia's paranoia, not "fact" about Greco's motives at the time.

Further, Felicia did not evince fear of Greco at the time (but rather apparently gathered it for the purposes of the trial). While driving with Greco in 2020, after Ray was in jail, Greco remarked they were supposed to be loyal and asked if she were going to turn on his son. Felicia testified she thought this a threat, to mean that she could not leave (1717). She did not say who she thought was restraining her or how she thought she was being restrained. Ray had no power to prevent her from going anywhere.

To buttress her accusations, Felicia attempted to cast Poppy's remarks in a menacing context by adding that she had been told stories in the past by Larry and Poppy about bar room brawls they were involved

in, and that Larry once mentioned he was related to Al Capone (1882-83). Felicia no doubt intended these latter remarks to bolster her claim that Greco frightened her.

This is nonsense. Brawls occurring in the past did not mean that the person involved in those brawls was now a threat to her.

Felicia's documented fragile mental state (as shown on videos recorded at Pinehurst) existed even before coming to New York to be with Ray. She was vulnerable to experiencing paranoid ideations that people were out to kill or hurt her. Felicia admitted that before moving to New York she "had become extremely paranoid [and] was terrified that people were going to come and kill me .... I was just scared out of my mind. I couldn't sleep. I was afraid" (1502).

This mindset continued throughout her years with Ray. In this mind set, Felicia would construe the innocent acts of a father trying to help his son as threatening. They were not.

Greco, in seeking to help his incarcerated son gather evidence for his trial had no intent to "impede the administration of justice." Greco clearly was not a "corrupt persuader" who believed his actions would likely affect "an existing or foreseeable official proceedings. *United States*

*v. Quattrone,* 441 F.3d 153, 181 (2d Cir. 2006). There was no evidence Greco had the "specific intent" to influence the testimony of Felicia in Ray's forthcoming federal trial. *United States v. Kaplan,* 490 F.3d 110, 126 (2d Cir. 2007); *United States v. Veliz,* 800 F.3d 63, 66 (2d Cir. 2015).

The government's obvious purpose in adding Greco as a coconspirator was to bolster their "enterprise theory by including Greco as part of the *Ray Family.*[15] The was no evidence that Greco committed obstruction or tampered with a witness. Those predicates should be dismissed.

## X. PURPORTEDLY REJECTING A "LIFE SENTENCE," THE COURT IMPOSED A TERM OF YEARS EXCEEDING DEFENDANT'S LIFE EXPECTANCY; THE FACTORS OF INCAPACITATION AND DETERRENCE WERE NOT SUFFICIENTLY ANALYZED AND CANNOT "BEAR THE WEIGHT ASSIGNED"

At the sentencing proceeding, after victim statements were delivered or read, the prosecutor asked the Court to impose a sentence of life imprisonment. It was not a recommendation her office took lightly. "It's reserved often for cases involving murder." (1/20/2023 Sentencing "ST".25). She argued that Ray, through his conduct, "took away these

---

[15] The government labeled Ray's stepdad a co-conspirator only because he was gifted a coat by his son and owned Pinehurst.

victims' lives. … [W]hat he did, how he destroyed these victims' lives, is not so dissimilar from a murder case. The effect on these victims was total, traumatic, and irrevocable." (ST.27-28).

Defense counsel sought a 15-year term for the 62-year-old Ray. That would see him released at age 72.5, to intensive supervision both through supervised release and likely NYS Sex Offender registration. Current life expectancy is about 73.2 years for a male in the United States, and significantly less for a male.[16]

This is not a murder case and the mandated 15-years' incarceration would deter those deterrable and would be sufficient for incapacitation.

Immurement -- for life -- is not required to prevent Ray from harming people. There is no evidence Ray ever attempted to pursue or contact any "victim" who left his orbit. Dan Levin left (and co-produced

---

[16] https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2022/20220831.htm. Incarcerated males likely to live much shorter lives. *See* https://www.vera.org/news/health-care-behind-bars-missed-appointments-no-standards-and-high-costs#:~:text=Each%20year%20that%20someone%20spends,would%20be%20five%20years%20higher ("Each year that someone spends in prison cuts their life expectancy by two years. Mass incarceration multiplies that impact on a societal level: if not for incarceration, …United States life expectancy would be five years higher.")

a Hulu documentary and wrote a book); Santos Rosario left, but initiated contact four years later (358;432). Claudia went to Philadelphia in April 2019. Larry never went looking for her or tried to track her down. He did not continue to demand payments. (1228).

In the end, everyone but Ray's family and Isabella (who went to jail) left him; he did not pursue anyone.

There is no reason to think he would harass them, or anyone else, when released as an old and friendless man – a man whose "story" is all over the Internet and in a popular documentary (produced by Dan Levin).

More significantly, shortly before sentencing, Larry Ray lost everyone he loved and who loved him (except his daughter). In December, 2022, weeks before sentencing, and in the course of one week, Ray lost his father, Poppy, his stepfather, Gordon, and his step-mother. It left Ray with no one in the Courtroom to support him. (ST.31).

As defense counsel argued, Ray's crimes "will simply not be replicable" years from now. "A life sentence is unnecessary to accomplish the aims of incapacitation." (ST.40).

Judge Liman, who witnessed the victims testify, stated he found Ray's case "particularly horrible." (ST.47). "He had the evil genius to take

people who were young, albeit not minors, and who were not broken, and he broke them, although, as this case showed, not beyond repair, and then he used them to his evil ends." (ST.48).

Contrary to Judge Liman's observation that "they were not [previously] broken," each and every one was struggling with psychological demons before meeting Ray, which was part of the government's case. They were suicidal people. Their psychological problems cannot be laid at Ray's feet alone.

There are many awful violent crimes that changes people's lives irreversibly and forever. Many financial crimes deprive people of what they thought and hoped and saved to be able to retire with.

But murder is murder, hard stop, a human being is gone and with him or her a piece of everyone that loved or even knew them. As horrible as the experiences Drury and the Rosarios endured, as they so cogently expressed, they will live, some or all of them to have children, to be grandparents and, with the help of families and friends and professionals, to experience joy and wonder and pride and love.

Judge Liman evinced a strong connection to the people who testified, asserting that Ray "never believed his victims would have the

courage to testify against him. … But they did." …. "Each of his victims who took the stand demonstrated a courage that was extraordinary. . . [They] should be commended for ensuring Mr. Ray's cruelty ended and that others would never again fall prey to it." (ST.50).

Judge Liman was certainly entitled to his reactions and to express them, but sentencing requires an objective view of all the facts.  After addressing the need for incapacitation, Judge Liman went on to "general deterrence."  Crimes "such as this one," Judge Liman stated, are "difficult to detect and difficult to prosecute." (*But see* the text in the footnote).[17] Just punishment requires "decades in prison, to send a message to others who think they might be able to get away with crimes such as these." (ST.53).

Judge Liman imposed a life term without calling it that.  He said it would be "easy" to impose a life sentence.  But to do so "would descend to the defendant's depths." (ST.54).   He did not explain what this meant and we do not know.

---

[17] In October, 2010 Claudia told a professor at Sarah Lawrence College of her concern that a student's father (Ray) was staying in the bedroom with Isabella Pollok.  She also told "the dean and another professor" of hers and Talia's. (734-35).  There could have been early detection if everything worked "right."

Judge Liman stated he would impose "a term of years that honors what the parsimony principle dictates, that I should impose a sentence sufficient but not greater than necessary to satisfy the purposes of sentencing; that it is an appropriate measure of the gravity of Mr. Ray's crimes and that is intended to ensure that Mr. Ray never again presents a risk to society." He then imposed a term of 720 months, or 60 years, plus supervised release of life. (ST.55-56).

Judge Liman adopted a procedurally improper methodology, viewing the term of years as sufficient but not greater than necessary *for the crime*, but not for the man. Judge Liman noted that, if Ray were a younger man, he would have a shot at release before he died, and Ray would not. Judge Liman's distinctions are false ones. He said he was not imposing a life sentence, but then did so, calling it something else. If a "life" sentence would not comport with the parsimony clause, a term of years tantamount to one does not comport either. This is not a proper application of the parsimony clause.

Ray is 63. His life expectancy is 73.2 years. The Court ruled that a life sentence was *not* appropriate because Ray "did not take any lives."

A few lines of transcript later, Judge Liman said the sentence he was going to impose, 60 years, the top of the Guidelines, leaves Ray with no chance of release, which a younger man might have. (ST.54). Under 18 USC §3553, Judge Liman was required to sentence the person before him, not someone else for whom the sentence would be short of life. The sentence is procedurally unreasonable.

Further, if a life sentence is appropriate, a sentencing judge must say he is imposing such sentence in a transparent way. This was a nasty crime, if committed, but it is not murder. If, as Judge Liman stated, imposing a life sentence would be "easy to do," why did he not do it? He should state it plainly.

Second, as to the notion of general deterrence, undeniably this is an entirely idiosyncratic crime. It is not like narcotics dealing or insider trading, where a defendant might undertake some sort of risk assessment/cost/benefit analysis. In those cases, the "cost" of being incarcerated might be a factor that a would-be violator would consider.

It is difficult to conceive of deterrence of individuals an individual like Ray. If Ray is what and who government argued, there are few

people who would duplicate it and even fewer who would sit back and say, I could go to jail for this, better not do it.

If Ray were sentenced to a fifteen-year term, as defense counsel asked, he would be released as an old, sick man, to intensive supervised release and likely New York State sex offender registration for life. Those factors go a long way to incapacitation. Under these circumstances, Judge Liman erred in not even considering such carceral alternatives.

In a child pornography case, *United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017), this Court went beyond the outrage of the district court and held a lengthy sentence unreasonable. This Court vacated after criticizing the district court for "offer[ing] only formulaic reasoning for the period of incarceration and the broad-ranging post-release restrictions it imposed." *United States v. Jenkins*, 854 F.3d 181, 187 (2d Cir. 2017).

While Judge Liman's exposition of facts and consequences was profuse, his reasoning was as formulaic as in *Jenkins*. It was harshness shaped by the huge amount of empathy and respect Judge Liman obviously holds for the victims.

While the Court may have had reason to congratulate the victims, imposition of a life sentence seems more of a reward than a necessity to incapacitate; if Ray received a reasonable term of years, he would be released at the uppermost edge of his life expectancy and subject to incredibly strict conditions of supervision.

In undertaking substantive reasonableness review, as we ask the Court to do in this case, "an appellate court may consider whether a factor relied on by a sentencing court can bear the weight assigned to it.". *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (citing Gall, 552 U.S. at 50). In *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010), the Court stated that "the district court's cursory explanation of its deterrence rationale ignored the parsimony clause."

In this case, Judge Liman ignored parsimony too. Life is for murders. A life sentence by another name is still life behind bars knowing one will die behind bars. Incapacitation and deterrence should be reconsidered under a proper application of the parsimony clause. The case should be remanded for resentencing.

## CONCLUSION

The RICO and VICAR charges should be dismissed. There was insufficient evidence of a RICO "enterprise." The sex trafficking and forced labor charges were not proven sufficiently. Accusations that Ray's father and stepfather were members of a RICO or any obstructive enterprise were insufficiently supported.

The blind expert made a case out of parables. That evidence was unfair; it was not helpful to a fair determination of whether these witnesses, known storytellers, made up stories about Ray's overbearing them or whether they knowingly and voluntarily acted.

The life sentence is unreasonable. Ray should be resentenced.

Dated: September 4, 2023

/s/     Vivian Shevitz

Julia Pamela Heit

Susan C. Wolfe

Attorneys for Appellant Lawrence Ray

UNITED STATES v. RAY    23-6114

ADDENDA (Local Rule 30.1(e)(1), (3))

Judgment          ……………………………..…… A 1- A 8

Order denying Rule 29 motion …………………… A 9- A 25

Order as to motions in limine (ECF 382)…….. A 26- A 90

Order (excerpts, p.1, 18-28) as to Expert Hughes    A 91-A 102

DX H-1 (Drury notes) ………………………………….. A103-A 105

Relevant Statutes ……………………………………….A106-A 111

    Forced Labor, 15 U.S.C. §1589 …………………..    A106 -A 107

    Sex Trafficking, 15 U.S.C. §1591………………..    A108- A 110

    RICO, 18 U.S.C. §1962 ………………………….    A-111

AO 245B (Rev. 09/19)   Judgment in a Criminal Case        (form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT

## Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| LAWRENCE RAY | Case Number:  1:20-cr-00110-LJL-1 |
| | USM Number:  58374-053 |
| | Marne Lynn Lenox & Peggy Cross-Goldenberg |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)   1-9, 11, 13-17
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1962(d) | Racketeering Conspiracy | 2/11/2020 | 1 |
| 18 U.S.C. § 1951 | Extortion Conspiracy | 2/11/2020 | 2 |
| 18 U.S.C. § 1951 and 2 | Extortion | 2/11/2020 | 3 |

The defendant is sentenced as provided in pages 2 through ____8____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)   all remaining open counts   ☐ is   ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

1/19/2023
Date of Imposition of Judgment

_____
Signature of Judge

Lewis J. Liman, United States District Judge
Name and Title of Judge

1/19/2023
Date

# ADDENDUM  A - 1

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 1A

Judgment—Page    2    of    8

DEFENDANT:   LAWRENCE RAY
CASE NUMBER:   1:20-cr-00110-LJL-1

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1591 and 2 | Sex Trafficking | 2/11/2020 | 4 |
| 18 U.S.C. § 1594 | Conspiracy to Commit Sex Trafficking | 2/11/2020 | 5 |
| 18 U.S.C. § 1589 and 2 | Forced Labor | 2/11/2020 | 6 |
| 18 U.S.C. § 1590 and 2 | Forced Labor Trafficking | 2/11/2020 | 7 |
| 18 U.S.C. § 1594 | Forced Labor Conspiracy | 2/11/2020 | 8 |
| 18 U.S.C. § 1952(a)(3)(b) and 2 | Use of Interstate Commerce to Promote Unlawful Activity | 2/11/2020 | 9 |
| 18 U.S.C. § 1956(a)(1)(B)(i), (ii), and 2 | Money Laundering | 2/11/2020 | 11 |
| 26 U.S.C. § 7201 | Tax Evasion | 2/11/2020 | 13 |
| 26 U.S.C. § 7201 | Tax Evasion | 2/11/2020 | 14 |
| 26 U.S.C. § 7201 | Tax Evasion | 2/11/2020 | 15 |
| 26 U.S.C. § 7201 | Tax Evasion | 2/11/2020 | 16 |
| 18 U.S.C. § 1959(a)(3) | Violent Crime in Aid of Racketeering | 2/11/2020 | 17 |

# ADDENDUM A - 2

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ___3___ of ___8___

DEFENDANT:   LAWRENCE RAY
CASE NUMBER:   1:20-cr-00110-LJL-1

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

Seven hundred twenty (720) months imprisonment on Count 1, to run concurrent with two hundred forty (240) months imprisonment on Counts 2, 3, 6, 7, 8, 9, 11, and 17; seven hundred twenty (720) months on Counts 4 and 5; and sixty (60) months on each of Counts 13, 14, 15, and 16; for a total of Seven hundred twenty (720) months imprisonment.

☐  The court makes the following recommendations to the Bureau of Prisons:




☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

☐  at _____ ☐ a.m. ☐ p.m.   on _____ .

☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐  before 2 p.m. on _____ .

☐  as notified by the United States Marshal.

☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:




Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                Sheet 3 — Supervised Release

Judgment—Page   4   of   8  

DEFENDANT:   LAWRENCE RAY
CASE NUMBER:   1:20-cr-00110-LJL-1

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

Five (5) years supervised release on Count 1, to run concurrently with a term of three (3) years supervised release on Counts 2, 3, 6, 7, 8, 9, 11, and  17; a term of supervised release of life on Counts 4 and 5; and a term of three (3) years supervised release on Counts 13, 14, 15 and 16, for a total of supervised release of Life.

# MANDATORY CONDITIONS

1.     You must not commit another federal, state or local crime.
2.     You must not unlawfully possess a controlled substance.
3.     You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
         ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.     ☐✓ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.     ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.     ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.     ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

# ADDENDUM  A - 4

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page ___5___ of ___8___

DEFENDANT:  LAWRENCE RAY
CASE NUMBER:  1:20-cr-00110-LJL-1

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

# ADDENDUM  A - 5

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page   6   of   8  

DEFENDANT:  LAWRENCE RAY
CASE NUMBER:  1:20-cr-00110-LJL-1

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall submit his person, and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any United States Probation Officer, and if needed, with the assistance of any law enforcement.  The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the defendant.  Failure to submit to a search may be grounds for revocation of release.  The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.  Any search shall be conducted at a reasonable time and in a reasonable manner.

The defendant must not have contact with the victims in this case. This includes any physical, visual, written, or telephonic contact with such persons. Additionally, the defendant must not directly cause or encourage anyone else to have such contact with the victims.

The defendant shall be supervised by the district of residence.

# ADDENDUM  A - 6

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___7___ of ___8___

DEFENDANT: LAWRENCE RAY
CASE NUMBER: 1:20-cr-00110-LJL-1

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 1,500.00 | $ TBD | $ 0.00 | $ | $ |

☑ The determination of restitution is deferred until __4/19/2023__ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement   $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

# ADDENDUM A - 7

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 6 — Schedule of Payments

Judgment — Page ___8___ of ___8___

DEFENDANT:  LAWRENCE RAY
CASE NUMBER:  1:20-cr-00110-LJL-1

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑  Lump sum payment of $ __1,500.00__  due immediately, balance due

       ☐  not later than _____ , or
       ☑  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☑ F below; or

**B** ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C** ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑  Special instructions regarding the payment of criminal monetary penalties:
    Restitution to be imposed as determined at a subsequent restitution hearing.  Restitution will be imposed within 90 days.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☑  Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| ISABELLA POLLOK 20CR110 (LJL)-2 | TBD | TBD | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
    See Order of Forfeiture filed on ECF.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

# ADDENDUM A - 8

20-cr-110 (LJL)
United States District Court, S.D. New York

# United States v. Ray

Decided Nov 23, 2022

20-cr-110 (LJL)

11-23-2022

UNITED STATES OF AMERICA, v. LAWRENCE RAY, Defendant.

LEWIS J. LIMAN, United States District Judge

**OPINION AND ORDER**

LEWIS J. LIMAN, United States District Judge

Defendant Lawrence Ray ("Ray" or "Defendant") moves, pursuant to Federal Rule of Criminal Procedure 29, to dismiss all counts against him due to insufficient evidence. For the reasons that follow, the motion is denied.

**BACKGROUND**

Defendant was charged in a second superseding indictment returned by the grand jury on January 13, 2022, in seventeen counts (the "Second Superseding Indictment"). Dkt. No. 292. Count One charged Ray with racketeering conspiracy in violation of 18 U.S.C. § 1962(d). Count Two charged Ray with extortion conspiracy in violation of 18 U.S.C. § 1951. Count Three charged Ray with extortion in violation of 18 U.S.C. §§ 1951 and 2. Count Four charged Ray with sex trafficking in violation of 18 U.S.C. §§ 1591 and 2. Count Five charged Ray with conspiracy to commit sex trafficking in violation of 18 U.S.C. § 1594. Count Six charged Ray with forced labor in violation of 18 U.S.C. §§ 1589 and 2. Count Seven charged Ray with forced labor trafficking in violation of 18 U.S.C. §§ 1590 and 2. Count Eight charged Ray with forced labor conspiracy in violation of 18 U.S.C. § 1594. Counts Nine and Ten charged Ray with two counts of use of interstate commerce to promote unlawful activity in violation of the Travel Act, 18 U.S.C. §§ 1952(a)(3)(B) and 2. Count Eleven

2    charged Ray with money laundering in *2 violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), (ii), and 2. Counts Twelve to Sixteen charged Ray with tax evasion for each of the years 2015 to 2019 in violation of 26 U.S.C. § 7201. Count Seventeen charged Ray with committing a violent crime in aid of racketeering ("VICAR") in violation of 18 U.S.C. § 1959(a)(3).

Trial of the case began on March 10, 2022. Dkt. No. 510. Prior to trial, the Government agreed to dismiss one of the six tax evasion counts, which was then numbered Count Twelve of the Second Superseding Indictment charging tax evasion for the year 2015, and one of the two Travel Act violations, which was then numbered Count Ten of the Second Superseding Indictment charging extortion in violation of the Travel Act. *See* Dkt. No. 502. During the trial, the Government called eighteen witnesses. Based on the Jury verdict, five of those witnesses can now be characterized as Defendant's victims[1]: Santos Rosario, Felicia Rosario, Yalitza Rosario, Maritza Rosario, and Claudia Drury ("Drury"). Santos Rosario, Felicia Rosario, and Yalitza Rosario are siblings and Maritza Rosario is their mother; Santos Rosario was a classmate of Defendant's daughter, Talia


casetext

1

# ADDENDUM A - 9

Ray, at Sarah Lawrence College. Six of the witnesses were members of law enforcement: Mark Lubin, a forensic accountant with the Federal Bureau of Investigation ("FBI"); Special Agent Kelly Maguire of the FBI, the case agent on the matter; Special Agent Rachel Graves of the Child Exploitation and Human Trafficking Task Force; Mathew Frost, a forensic examiner with the FBI; Stephen Flatley of the FBI's Computer Analysis Response Team; and Revenue Agent Valeria Catanzaro of the Internal Revenue Service. Four of the Government witnesses were non-victim lay witnesses: Kyle Sliger, an employee of GoDaddy.com; Julie Gonzalez, a physician and classmate of Felicia Rosario, who [3] testified to Felicia Rosario's request for money from her; Carlos Pagan, a doorman in the building where Defendant resided with his victims; and one of Drury's clients. Finally, the Government called two expert witnesses-Dawn Hughes, a clinical and forensic psychologist, and Andrew Petersohn, a radio frequency engineer trained in cell-site analysis-and a paralegal from the United States Attorney's Office for the Southern District of New York. The defense recalled John B. Minor as a rebuttal expert to Government expert Andrew Petersohn and recalled Glenn Ripa, Esq.

[1] In an Order dated February 24, 2022, the Court granted in part Defendant's motion in limine prohibiting the Government from referring to the alleged victims as "victims" outside of its jury addresses. *See* Dkt. No. 382 at 55-57.

As summarized below, the evidence showed that Defendant unleashed a campaign of terror on his victims, all college classmates of his daughter. He initially befriended them and then, once they were caught in his snare, he steadily groomed them, turned them into his slaves, forced them to engage in labor for his own benefit and the benefit of his relatives, extorted them, and tortured them. He also sex-trafficked one of his victims, Drury.

On April 6, 2022, the Jury returned a verdict of guilty on all counts. Dkt. No. 502. In addition, the Jury found Defendant guilty of the special sentencing factor charged in connection with Count One. *See id*. at 1. In connection with the count charging VICAR, the Jury also found Defendant guilty of assault in the second degree under New York State Penal Law § 120.05 and menacing in the second degree under New York Penal Law § 120.14. *Id.* at 4.

At the conclusion of the Government's case, the defense moved, pursuant to Federal Rule of Criminal Procedure 29, to dismiss each count of the Indictment on the grounds that there was insufficient evidence of defendant's guilt. The motion was cursory. At that point, the defense "highlight[ed] just one are[a] of insufficiency." Tr. 2505. It claimed that the Government introduced insufficient evidence to support that there was a second degree assault, which was one of the predicate crimes charged to support the VICAR count in the indictment, because there [4] was insufficient testimony establishing physical injury or impairment of physical condition of Ms. Drury. *Id.* The defense also argued that the second predicate crime alleged to support the VICAR count, misdemeanor menacing under New York law, was not a crime of violence under VICAR. *Id.* The Court reserved judgment on the motion. *Id.* at 2506.

On April 4, 2022, at the conclusion of all of the evidence, the defense renewed its Rule 29 motion. Tr. 2768-69. The motion was similarly cursory. The defense noted the one area of insufficiency it had "highlighted" earlier. Tr. 2768. It also addressed what it called "a second area of insufficiency related to the tax counts." *Id.* The defense argued that the Government's burden of proof to show that income was taxable for the tax evasion counts also carried with it the burden to show that exceptions do not apply. *Id.* The defense argued that the Government had not proved that the exception for payments made as restitution for damages for physical injury did not apply. *Id.* at 2768-69. The Court once again reserved judgment. *Id.* at 2769.

At the conclusion of trial, the Court invited post-judgment briefing. By letter of June 8, 2022, the defense notified the Court that it did not plan on filing any additional post-trial motions but requested a ruling on the oral Rule 29 motions it made for dismissal due to insufficient evidence. Dkt. No. 565. The Government


ADDENDUM A - 10

United States v. Ray    20-cr-110 (LJL) (S.D.N.Y. Nov. 23, 2022)

responded by letter on July 18, 2022. Dkt. No. 575. The defense declined to reply.

On November 1, 2022, the Court invited briefing from the parties on three specific questions related to the VICAR count: (1) whether there was sufficient evidence that Female Victim-1 suffered "physical injury" as defined in New York Penal Law § 9; (2) whether the Court should apply a categorical approach to 18 U.S.C. § 1959, *see United States v. Keene*, 955 F.3d 391 (4th Cir. 2020); and (3) if the Court applies a categorical

5    approach to 18 U.S.C. § 1959, *5  whether the crime of menacing in violation of New York Penal Law § 120.14 is broader than assault with a dangerous weapon under 18 U.S.C. § 1959. Dkt. No. 591. The defense submitted a letter brief on November 8, 2022. Dkt. No. 594. The Government submitted a letter brief in response on November 10, 2022. Dkt. No. 595. The Court held oral argument on November 21, 2022.

### STANDARD OF REVIEW

"A defendant challenging a conviction on sufficiency grounds undertakes a 'heavy burden.'" *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (quoting *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011)). "A judgment of acquittal can be entered 'only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *Id.* (quoting *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)). A conviction must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011). In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed "in the light most favorable to the Government." *United States v. George*, 779 F.3d 113, 115 (2d Cir. 2015). The Court must analyze the pieces of evidence "in conjunction, not in isolation." *Persico*, 645 F.3d at 104 (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)). The Court exercises an "'exceedingly deferential standard of review,' under which 'we must analyze the evidence in the light most favorable to the prosecution' and credit 'every inference that the jury may have drawn in the government's favor.'" *United States v. Liu*, 2022 WL 14177192, at *2 (2d Cir. Oct. 25, 2022) (quoting *United*

6    *States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008)). *6

### DISCUSSION

The evidence at trial was sufficient for the Jury to reach a verdict of guilty on all counts. Following textbooks that Defendant collected and studied on psychological manipulation, false confessions, and brainwashing, he turned a group of young students-his daughter's college classmates and their siblings-into his slaves. Over a period first of months and then of years, Defendant steadily took over the minds and the bodies of his victims. He induced them to trust him and to believe he was all powerful and all knowing. Having gained their trust and convinced them to accept his lies as their truths, Defendant made these impressionable young individuals doubt their own memories and knowledge, cut off relations with all other adults who might otherwise have offered support and guidance, and then-having induced them to manufacture false confessions with which he could threaten them with prison or worse-he forced them to do his bidding.

Defendant does not identify any respects in which the evidence was deficient on the charges of racketeering conspiracy, extortion conspiracy, extortion, sex trafficking, conspiracy to commit sex trafficking, forced labor, forced labor trafficking, forced labor conspiracy, the Travel Act violations, or money laundering. The Court describes below only some of the overwhelming evidence that supports the Jury's verdict. The other evidence that is not described is no less damning, but it is unnecessary to detail this evidence to support the Court's (and the Jury's) conclusions.

### A. Racketeering Conspiracy



ADDENDUM  A - 11

3

United States v. Ray    20-cr-110 (LJL) (S.D.N.Y. Nov. 23, 2022)

The evidence supports the Jury's conviction of Defendant for racketeering conspiracy. The Court properly, and without objection, charged the Jury that to find Defendant guilty of racketeering conspiracy, it would have to conclude: (1) that there was an agreement among two or more persons to participate in an enterprise that would affect interstate commerce through a *7 pattern of racketeering activity; (2) that the defendant knowingly and willfully became a member of that agreement; and (3) that the defendant or another member of the conspiracy agreed to commit two racketeering acts. *See United States v. Hicks*, 5 F.4th 270, 275 (2d Cir. 2021), *cert. denied*, 212 L.Ed.2d 34, 142 S.Ct. 1157 (2022); *United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018). The Court further instructed that "an 'enterprise' is a group of people who have associated together for a common purpose of engaging in a course of conduct over a period of time" and who "in addition to having a common purpose, must have an ongoing organization, either formal or informal, and . . . must have a core of personnel who function as a continuing unit." *See Boyle v. United States*, 556 U.S. 938, 946 (2009). The Court instructed the Jury on each of the nine types of predicate acts charged in the indictment: (1) acts involving extortion and conspiracy to commit extortion in violation of federal law, specifically the Hobbs Act, 18 U.S.C §§ 1951 and 2; (2) acts involving extortion, conspiracy to commit extortion, and attempted extortion in violation of New York State Penal Law §§ 155.05(2)(e), 155.40(2), 110.00, and 20.00; (3) acts involving sex trafficking by force or coercion in violation of federal law, specifically 18 U.S.C.§§ 1591 and 2; (4) acts involving forced labor in violation of federal law, specifically 18 U.S.C.§§ 1589 and 2; (5) acts involving forced labor trafficking in violation of federal law, specifically 18 U.S.C.§§ 1590 and 2; (6) acts involving the use of interstate commerce to promote unlawful activity, in violation of federal law, specifically 18 U.S.C.§§ 1952 and 2; (7) money laundering, in violation of federal law, specifically, 18 U.S.C.§§ 1956 and 2; (8) acts involving witness tampering, in violation of federal law, specifically 18 U.S.C.§§ 1512 and 2; and (9) acts involving obstruction of justice in violation of federal law, specifically 18 U.S.C.§§ 1503 and 2. Tr. at 2977-2978. *8

There was evidence to satisfy each of the elements of a racketeering conspiracy. The enterprise consisted of "the Ray Family." It was comprised of Defendant, his daughter Talia Ray, and Defendant Isabella Pollok ("Pollok") and over time it came to include Ray's father-inlaw Gordon Ray and his biological father, Lawrence Grecco ("Grecco"). The Ray Family had structure and form, had an ongoing organization, and had a singular illegal purpose, to extort and sex traffic its victims and to force them to engage in labor. And it had longevity; the Ray Enterprise was formed as early as 2010 when the victims were first targeted, it continued through at least 2020 when Defendant sent messages as part of an effort to keep his victims silent, and- but for the investigation and prosecution-it would have had no logical endpoint. Members of the enterprise achieved its illegal purposes through violence and threats of violence and through "collateral"-false confessions-that Defendant manufactured and that the Ray Family collected and maintained to engage in extortion and to ensure their victim's silence. The Jury could find that each member of the Ray Family had his or her assigned role. Defendant controlled the enterprise and was its leader. He groomed his victims, spun the stories that resulted in false confessions, and used this material to force his victims to turn over money to him, to engage in forced labor, and to commit commercial sex acts. Talia Ray, Defendant's daughter, introduced Defendant to her friends, helped him interrogate them and elicit the confessions that became their collateral, and participated in the victim's extortion and forced labor. Pollok, the associate, recorded the interrogations and retrieved the confessions when needed, collected and kept track of Drury's sex trafficking proceeds, participated with Ray in the assault on Drury, and threatened the victims with humiliation and prosecution if they did not keep their silence. The Jury could find that both Talia Ray and Pollok participated in the money laundering; the illegal proceeds were collected by them and funneled through accounts in their names. Ray's father-in-law and *9 his biological father had lesser, but still important, roles in the Ray Family enterprise. Some of the forced labor was conducted on Gordon Ray's property. When the victims were finally able to break free from the Ray Family,

ADDENDUM  A - 12

United States v. Ray    20-cr-110 (LJL) (S.D.N.Y. Nov. 23, 2022)

Grecco made threats on behalf of Defendant in an attempt to interfere with the investigation and to convince the victims to maintain their silence. Ultimately, all of the members of the enterprise benefitted financially from its illegal activities, including Defendant who benefited to the tune of millions of dollars.

There also was extensive evidence that Defendant knowingly and willfully became a member of the agreement among the Ray Family and that Defendant and members of the conspiracy agreed to-and did-commit two racketeering acts. As noted, Defendant was the leader of the enterprise. The Jury could easily find that he agreed with each of the members of the Ray Family to engage in its illegal affairs. As laid out below, in connection with each of the substantive counts, far more than the two required by law, Defendant agreed to and did engage in the alleged racketeering acts, all to further the affairs of the enterprise. The Court now turns briefly to those substantive counts.

**B. Extortion and Extortion Conspiracy**

Count Two charged Ray with extortion conspiracy in violation of 18 U.S.C. § 1951 and Count Three charged Ray with extortion in violation of 18 U.S.C. §§ 1951 and 2. The elements of Hobbs Act extortion are (1) the defendant wrongfully obtained the property of another; (2) the defendant obtained the property with his victim's consent, but that the consent was compelled by the wrongful use or threat of force, violence, or fear; and (3) as a result of the defendant's actions, interstate commerce, or an item moving in interstate commerce, was delayed, obstructed, or affected in any way or degree. *See United States v. Coppola*, 671 F.3d 220, 238 (2d Cir. 2012). The elements of extortion conspiracy are (1) there was an agreement or understanding among two or
10    more persons to extort money from the victims; and (2) the defendant unlawfully, *10 intentionally, and knowingly became a member of the conspiracy. *See United States v. Mulder*, 273 F.3d 91, 109 (2d Cir. 2001).

The evidence of extortion and extortion conspiracy was overwhelming. The Jury heard evidence from several victims about how Defendant used psychological manipulation, violence, and the threat of violence to induce them to make false confessions. The Jury also heard evidence that Defendant used these false confessions, and the threat that he would either make them public or report them to law enforcement, to force his victims to turn over hundreds of thousands of dollars obtained from their parents and, in the case of one of Defendant's victims, from the proceeds of commercial sex acts. To take one example, Defendant psychologically and physically coerced Drury to make false confessions that she poisoned Ray and her college roommates. Ray then used these confessions, and the threat that he would make the confessions public or report Drury to law enforcement, to induce her to engage in acts of prostitution and to turn over the proceeds to him. Defendant's extortion did not stop there. Defendant collected further incriminating information about Drury and those to whom she became close, including the identities of her clients. He then used this information, and the threat that he would expose the information on "claudiadrury.com," a domain name he purchased and a website that he created, if Drury did not continue to engage in acts of prostitution for his benefit. Additionally, as discussed below in connection with Drury's assault at the Gregory Hotel, Defendant used physical and violent force to extort money from Drury and to force her to continue to engage in prostitution.

Drury was just one of Defendant's many victims. To give just one more example, the Jury also heard from the Rosario siblings. One of them was Santos Rosario. He testified that Defendant physically and psychologically
11    coerced him into making false confessions that he *11 caused significant property damage to Defendant's and Talia Ray's property, including to a refrigerator, tools, cookware, and a purse. Defendant then used Santos Rosario's confessions, and the threat that he would use the videotaped confession against him, to force Santos Rosario to pay him hundreds of thousands of dollars. The Jury saw a video of Defendant acting violently towards Santos Rosario in front of his other victims, Felicia Rosario and Drury. The Jury saw videos and heard



ADDENDUM  A - 13

United States v. Ray    20-cr-110 (LJL) (S.D.N.Y. Nov. 23, 2022)

audio of Defendant threatening further violence and threatening to post the false confessions if Santos Rosario did not do as Defendant wished. The message to Defendant's victims was unmistakable: Defendant was capable of extreme violence and cruelty and his victims would suffer the same if they did not cater to his wishes. The record contains other examples.

At Defendant's request, the Court gave a charge on the theory of the defense. Specifically, the Court instructed the Jury that the defense had "asserted that Mr. Ray believed that he was entitled to the property at issue." Tr. 2983. The Court further instructed the Jury that if it concluded "the actual or threatened use of force or violence or the fear of injury" was "inherently wrongful" then Defendant's actions would not be justified by a claim of right to the property. *Id.* The Jury was also to consider whether Defendant obtained the property through other wrongful means, such as threats of reputational or financial harm. *Id.* But the Court instructed the Jury that "[a] defendant cannot be found to have acted wrongfully on the basis that he obtained property by fear of economic or reputational harm if the defendant had a good faith and plausible entitlement to the property demanded and if there is a nexus between the threat and the claim of right." *Id.* at 2983-84; *see United States v. Zappola*, 677 F.2d 264, 267-269 (2d Cir. 1982); *United States v. Clemente*, 640 F.2d 1069, 1077 (2d Cir. 1981). *12

The Jury had sufficient evidence to decisively reject Defendant's theory of the defense because Ray obtained the property through the actual or threatened use of force or violence. Specifically, and not by way of limitation, the Jury heard evidence that on the night of October 15, 2018 into the morning of October 16, 2018, Ray and his co-conspirator Pollok broke into Drury's room at the Gregory Hotel in Manhattan. Ray and Pollok expressed anger that Drury was becoming close to one of her clients and physically and psychologically abused her: They forced Drury to undress, tied her to a chair, poured water over her while she was blasted with cold air from an air conditioning unit, held a plastic bag over her head repeatedly so that she had trouble breathing, and threatened her life. Ray and Pollok took these actions to force Drury to "focus on work"-*i.e.*, generating sex trafficking proceeds to satisfy their extortion demands. The Jury heard an audiotape of this encounter. It then heard testimony and saw evidence that a day later, Drury was forced to hand over an additional $4,000 in prostitution proceeds.

It also heard testimony from Santos Rosario that Defendant physically assaulted him and threatened him with further violence if he did not turn over what Defendant falsely claimed was restitution for damage that Santos Rosario caused to his property. Defendant's other victims, Felicia Rosario and Drury, watched Defendant's violent behavior while it was happening. The Jury saw video of these encounters in the courtroom. Defendant's acts did instill, and naturally would have instilled, terror in the minds of Defendant's victims of the consequences that would follow if they did not comply with Defendant's demands to find money for him.

There also was evidence that Defendant used the threat of reputational harm to extort money from his victims without any good faith and plausible entitlement to that property and without a nexus between the threat and Defendant's claim of right. *See United States v. Jackson*, 180 F.3d 55, 70 (2d Cir.), *on reh'g*, 196 F.3d 383 (2d Cir. 1999). The evidence in this area was *13 extensive. For example, and as noted above, Defendant set up a website in the name of one of his victims, Drury, and threatened to publish-and eventually did publish-information that was embarrassing to her and to those she cared about unless she continued to engage in sex work and make payments to him. The Jury could conclude Defendant had no good faith or plausible entitlement to Drury's prostitution earnings. Defendant did not offer any affirmative evidence that he was harmed by any of his victims-much less by the extraordinary amounts he received-and thus entitled to restitution. There was no nexus between his threats and his alleged claim of right.

**C. Forced Labor, Forced Labor Trafficking, and Forced Labor Conspiracy**



ADDENDUM  A - 14

United States v. Ray    20-cr-110 (LJL) (S.D.N.Y. Nov. 23, 2022)

The evidence at trial was also sufficient to convict Defendant of forced labor, forced labor trafficking, and forced labor conspiracy. Forced labor is a crime under 18 U.S.C. § 1589. The elements of the crime of forced labor under § 1589 are, (1) the defendant obtained or provided the labor or services of another; (2) the defendant did so through one of the following prohibited means: (a) through force, physical restraint, or the threat of either against a person or another person; (b) through serious harm or threats of serious harm to the person or another person; (c) through abuse or threatened abuse of the legal process; or (d) through the use of a scheme, plan, or pattern intended to cause the person to believe that the non-performance of such labor or services could result in serious harm to or physical restraint against that person or another person; and (3) the defendant acted knowingly. *See United States v. Kelly*, 2022 WL 2316177, at *35 (E.D.N.Y. June 29, 2022); *United States v. Sabhnani*, 539 F.Supp.2d 617, 629 (E.D.N.Y. 2008), *aff'd*, 599 F.3d 215 (2d Cir. 2010).[2] The

14   elements of forced labor trafficking *14 under 18 U.S.C. § 1590 are, (1) the defendant recruited, harbored, transported, provided, or obtained an individual; (2) the defendant did so for the purpose of providing or obtaining the labor or services of an individual in violation of the forced labor statute, *i.e.*, the defendant "trafficked" an individual with the purpose of providing or obtaining her labor or services by means of serious harm, or threats of serious harm, to that individual or another person, by means of the abuse or threatened abuse of law or legal process, or by means of any scheme, plan, or pattern intended to cause an individual to believe that, if the individual did not perform such labor or services, the individual or another person would suffer serious harm or physical restraint; and (3) the defendant acted knowingly. *See* 18 U.S.C. § 1590; *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 94 (2d Cir. 2019) ("Section 1590 employs the disjunctive 'or' in delineating the ways in which a defendant can violate the statute. Therefore, if a defendant violates section 1589, he also violates section 1590 if he recruited the person to perform forced labor.").

> [2] 18 U.S.C. § 1589 provides in part:
>
> Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means
>
> (i) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (ii) by means of serious harm or threats of serious harm to that person or another person;
>
> (iii) by means of the abuse or threatened abuse of law or legal process; or
>
> (iv) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be guilty of a crime.

The Jury heard and saw evidence that Defendant forced his victims to come to Pinehurst, North Carolina in the summer of 2013 to perform grueling physical labor on the property of Defendant's stepfather, Gordon Ray. It

15   also saw evidence of the physical force that Defendant *15 employed to get his victims to do manual labor. And it saw evidence of the threats of further physical force-that Defendant conveyed through the violence that he inflicted-if his victims did not work as commanded. The evidence represents paradigmatic forced labor. The Jury also heard evidence of Defendant's abuse or threatened abuse of law or legal process to compel his victims to perform physical labor on his behalf and on behalf of his stepfather. For example, he drove Felicia Rosario to a police station to be booked and held in jail, using the confessions that he extracted as leverage. These actions


casetext

ADDENDUM  A - 15

conveyed that Ray had both the ability and the will to use legal process to imprison Felicia Rosario if she did not continue to work on his behalf. He conveyed the same threat to use the law or legal process to compel Yalitza Rosario to perform physical labor.

The fact that Defendant recruited his victims from New York City and arranged for their transportation to North Carolina supports the conviction for forced labor trafficking. The conviction for forced labor conspiracy was supported by, among other things, evidence of Talia Ray's involvement in and agreement to the crime of forced labor.

**D. Sex Trafficking, Sex Trafficking Conspiracy, and Travel Act**

The evidence before the Jury was easily sufficient to convict Defendant of sex trafficking and sex trafficking conspiracy and of the Travel Act charge in connection with sex trafficking and prostitution. The crime of sex trafficking by force, threats of force, or coercion, or any combination of such means under 18 U.S.C. § 1591 has three elements: (1) a person knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited the victim or knowingly benefitted, financially or by receiving anything of value, from participating in a venture that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited the victim; (2) the person knew or recklessly

16  disregarded the fact that force, threats of force, or coercion, or any combination of such means, *16 would be used to cause the victim to engage in a commercial sex act; and (3) the person's acts were in or affecting interstate or foreign commerce. *See* 18 U.S.C. § 1591(a); *United States v. Shine*, 2022 WL 761520, at *1-2 (2d Cir. Mar. 14, 2022). To prove the crime of sex trafficking conspiracy, the Government had to establish that: (1) from in or about 2011 to on or about 2019, there was an agreement or understanding among two or more persons to sex traffic a person, and (2) the defendant unlawfully, intentionally, and knowingly became a member of the conspiracy. *See United States v. Vanier*, 2021 WL 5989773, at *10 (S.D.N.Y. Dec. 17, 2021) (elements of conspiracy). To prove a violation of the Travel Act, the Government must prove (1) the defendant used or caused someone else to use an interstate facility; (2) the use of an interstate facility was done with the intent to promote, manage, establish, or carry on an unlawful activity; and (3) after this use of an interstate facility, such person performed or attempted to perform an act in furtherance of this same unlawful activity. *See United States v. Salameh*, 152 F.3d 88, 152 (2d Cir. 1998); *United States v. Jenkins*, 943 F.2d 167, 172 (2d Cir. 1991). The Indictment charged as the unlawful activity (i) prostitution, in violation of New York Penal Law § 230.00; (ii) promoting prostitution in the fourth degree, in violation of New York Penal Law § 230.20; (iii) promoting prostitution in the third degree, in violation of New York Penal Law § 230.25; or (iv) promoting prostitution in the second degree, in violation of New York Penal Law § 230.30.

There was sufficient evidence for the Jury to find Defendant guilty of these crimes from Drury's and Felicia Rosario's testimony and the ample documentary evidence offered at trial. Defendant groomed Drury to engage in prostitution by normalizing deviant and commercial sex acts. He then induced her to engage in sex acts for his financial benefit by causing her to make additional incriminating "confessions" through his campaign of physical terror and psychological coercion. Then, when Drury was unable to meet his financial demands,

17  Defendant suggested *17 that she engage in commercial sex acts. But Drury could not satisfy Defendant's insatiable demands for more and more money, so he pushed her to engage in more and more commercial sexual activity-every day, weeks on end, for years. Defendant's use and threats of force reached its pinnacle but not its conclusion in the attack at the Gregory Hotel where Defendant tortured Drury so that she would "focus on work" and engage in ever more commercial sexual activity for his benefit. In sum, through force, threats of force, and coercion, Defendant forced Drury to engage in commercial sexual activity solely for his financial benefit.


casetext

8

ADDENDUM  A - 16

United States v. Ray    20-cr-110 (LJL) (S.D.N.Y. Nov. 23, 2022)

In sex trafficking Drury, Defendant did not act alone. He acted with his confederate Pollok who collected the money, kept track of Drury's activity, and assisted in laundering the proceeds. The evidence establishes sex trafficking conspiracy.

Moreover, this activity, which was the direct result of Defendant's violence and threats, occurred across state lines. Drury traveled from New York to New Jersey for the purposes of engaging in commercial sex acts and Defendant used the facilities of interstate commerce to communicate with Drury and to further her commercial sexual activity. *See also United States v. Ray*, 2022 WL 842254, at *6 (S.D.N.Y. Mar. 20, 2022) (discussing Travel Act evidence).

### E. Money Laundering

The crime of money laundering under 18 U.S.C. § 1956(a)(1)(B) has four elements: (1) that the defendant conducted a "financial transaction," which must in some way or degree have affected interstate or foreign commerce; (2) the financial transaction at issue involved the proceeds of an unlawful activity; (3) the defendant knew that the property in the financial transaction involved the proceeds of some form of unlawful activity; and (4) the defendant knew that the transaction was designed in whole or in part either to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity or to avoid a transaction reporting requirement under State and Federal Law. *See United States v. Gotti*, *18 459 F.3d 296, 334 (2d Cir. 2006). The Second Superseding Indictment charged sex trafficking and federal extortion as the "specified unlawful activity." The evidence was sufficient to support that charge.

Defendant and Pollok collected the proceeds of Drury's prostitution activities, which they obtained through extortion, and then, what money they did not spend on expensive items for themselves, they laundered through a series of bank accounts in Pollok's, Talia Ray's and his victims' names. This money was then used to purchase a portfolio of almost 8,000 GoDaddy domain registrations with a total value of between $17 million and $34 million. Defendant knew the source of the proceeds; he was the one who extorted the money and coerced Drury to engage in prostitution. The Jury also could readily conclude that the purpose of the transactions was to conceal the source of the proceeds. Indeed, the evidence at trial demonstrated that Defendant went to great lengths to avoid a paper trail that might tie him to the money. He purchased the GoDaddy domain names, but he did not do so because of his interest in domain names or for the investment value the domain names represented. The money went in only one direction: into GoDaddy domain names and never out; many were purchased but they were not sold. The Jury could conclude that he funneled the money through nominee accounts and purchased the domain names for the sole purpose of concealing the proceeds of Drury's prostitution activities and his connection to them.

### F. Tax Evasion

The Jury also convicted Defendant of four counts of tax evasion for each of the tax years 2016, 2017, 2018, and 2019. The Jury had ample evidence to support that verdict. There are three elements of tax evasion under 26 U.S.C. § 7201: (1) the defendant owed substantially more federal income tax than was declared due on his income tax return; (2) the defendant committed an affirmative act constituting tax evasion; and (3) the defendant acted willfully. *See United *19 States v. Litwok*, 678 F.3d 208, 215 (2d Cir.2012); *United States v. Josephberg*, 562 F.3d 478, 488 (2d Cir. 2009).

There was ample evidence of each of these elements for each of the tax years charged. The Government presented evidence that there was a substantial amount of income tax due and owing from Defendant for each year in question. An IRS agent testified, based on the evidence admitted at trial, Defendant had taxable income



ADDENDUM  A - 17

of $142,290 for tax year 2019 and owed federal income taxes of $28,276 for that year, taxable income of approximately $1,070,521 for tax year 2018, taxable income of $702,520 for tax year 2017 and tax due and owing of $234,017 for that year, and taxable income for 2016 of at least $73,790 and a resulting tax deficiency of $14,215. In total, for the years 2016 through 2019, Defendant's total unpaid tax liability was $638,290. Tr. 2430. Defendant did not file federal income tax returns for any of the tax years 2016, 2017, 2018, or 2019.

There also was extensive evidence that Defendant took actions that constituted evasion of or attempted evasion for each of the tax years in question. *See Spies v. United States*, 317 U.S. 492, 499 (1943) ("[A]ffirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal."). Defendant conducted his affairs so that he received his income in cash; he was steadfast in ensuring that the proceeds of these affairs could not be traced to him; he laundered his income through a series of accounts in names other than his own but over which the Jury could conclude he had control; and he ultimately held this income in domain names purchased through and held at GoDaddy, an entity *20 that he would have basis to believe would be unlikely to be subject to IRS audit. The Jury easily could have concluded that Defendant's desire to avoid paying taxes played a part in this conduct.

Finally, there was evidence of willfulness. The parties stipulated that prior to the 2015 tax year, Defendant had filed ten Form 1040 United States individual income tax returns. Defendant thus knew of his obligation to file income tax returns and to pay federal income taxes. He had done so many times in the past. But he did not do so for the millions of dollars he received from his extortion and sex trafficking because he did not want to pay taxes on those extraordinary sums. This change in behavior is sufficient to show willfulness.

When the defense renewed its Rule 29 motion, it identified a purported deficiency in the evidence as to these counts. *See* Tr. 2768-69. Defendant argued that the Government did not offer evidence sufficient for the Jury to conclude that the payments from Drury constituted taxable income based on a provision of the Internal Revenue Code ("IRC") that excludes from gross income "the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness." 26 U.S.C. § 104(a)(2). Defendant contends that the proceeds he obtained from Drury represented income he received from her for poisoning him.

The Jury had a basis to reject this defense. Under that provision of the IRC, "damages" is defined as an amount that is received "through prosecution of a legal suit or action, or through a settlement agreement entered into in lieu of prosecution." 26 C.F.R. § 1.104-1(c)(1). A settlement agreement is for damages "on account of personal physical injuries or physical sickness" as long as it is to compensate for damages actually incurred on account of personal physical injuries or personal physical sickness and regardless of whether the legal claim is viable or the claim's validity is doubtful because of uncertainty about the facts or the law. *21 See* 26 C.F.R. § 1.104-1(c). This provision applies to damages paid pursuant to a written binding agreement, court decree, or mediation award. *Id.* § 1.104-1(c)(3).

In this case, the evidence before the Jury supports the conclusion that Defendant did not incur damages in relation to a physical injury or sickness and there was sufficient evidence for the Jury to conclude that he was not physically injured or sick at all. When Defendant was arrested, law enforcement recovered records of his expenditures. They included expensive meals and gifts. They did not include any expensive medical treatments. Defendant told his victims that he was sick, and he convinced them to acknowledge that they poisoned him, in


ADDENDUM  A - 18

order to leverage their confessions against them. But there was no evidence, other than that the evidence that the Jury could conclude was manufactured, that he was sick or had been poisoned by Drury or the Rosario siblings. The defense suggested that such evidence did exist in the form of his victims' confessions, highlighting Defendant's retention of an attorney, who sent a letter to the United States Attorney reporting the purported poisoning. But putting aside the falsity of these confessions which were extracted by Defendant through force and threats of force, Defendant's conduct-and his relationship with the victims-was entirely inconsistent with the notion that Defendant was also a victim. Defendant was in a position of power to Drury and the Rosario Siblings. He coerced them and extorted them. When they attempted to break free of his sway, he lured them back in and forced them to remain close to him. The Jury could conclude that that conduct was not consistent with him being their victim. And, he only sent the letter to the U.S. Attorney *after* he had convinced his victims to make false confessions and when he was using the threat of imprisonment to extort, traffic, and enslave his victims. In other words, the evidence would support that the letter was a tool of his extortion. The Jury could readily have concluded that the notion that Defendant was a victim in this situation was risible. Finally, and *22 on the most elementary level, there could not have been a settlement agreement; Defendant did not forbear from asserting a claim based on Drury's payment to him of her prostitution proceeds. Every demand for payment that was satisfied begot another, sometimes even greater, demand for payment with no prospect that the demands would ever end.

The Jury also could have rejected the testimony of Defendant's attorney, Glenn Ripa, Esq. ("Ripa"), or concluded that the evidence Ripa presented was the product of a ruse. Ripa was retained to represent Defendant in connection with a housing court matter. He did not have a retainer or engagement letter with Defendant. Ripa testified that at some point during the course of his representation of Defendant, he told Defendant that if he was receiving restitution from Drury for the physical damage she caused by poisoning him, those proceeds would not be taxable. Ripa did not recall precisely when he made the statement to Defendant and was not able to say with confidence that the date of the conversation preceded Defendant's decision to stop paying taxes and to launder Drury's prostitution proceeds through nominee accounts and domain names. Ripa also testified that he did not discuss Defendant's taxable income with him for any of the years from 2016 to 2019, and that Defendant did not come to him for tax advice. Indeed, what the Jury could have concluded was notable from Ripa's testimony was what Defendant did not share with him or say to him. Defendant never told Ripa that he was collecting millions of dollars from Drury; in fact, Ripa assumed Defendant was referencing a few hundred dollars. Defendant never showed Ripa a written agreement with Drury to collect damages and Defendant never told Ripa the terms of any oral agreement that he entered into with Drury to collect damages. Defendant did not provide any information about his costs relative to the millions of dollars of "damages" he was receiving. Defendant did not provide records of his expenditures or *23 any medical bills, and Ripa did not estimate the value of any potential claim related to Defendant's alleged "poisoning."

The Jury, however, was instructed on Defendant's theory of defense: that he believed he was permitted to accept payment from Drury and the other victims as repayment for being poisoned and for other harm without reporting the payment as taxable income. The Jury was instructed that if the Government did not prove beyond a reasonable doubt that Defendant acted willfully in violation of a known legal duty and with the specific intent to defeat or evade the assessment of taxes that he knew it was his duty to pay, it was required to acquit Defendant. Tr. 3048. The Jury rejected the defense and concluded that the Government proved beyond a reasonable doubt that Defendant acted with the specific intent to evade the assessment of taxes he knew it was his duty to pay. The Court cannot say that the Jury was wrong.

**G. VICAR**



ADDENDUM A - 19

United States v. Ray    20-cr-110 (LJL) (S.D.N.Y. Nov. 23, 2022)

Defendant's only serious challenge is to the sufficiency of the evidence of Count Seventeen of the Second Superseding Indictment, which charged Ray with a violent crime in aid of racketeering in violation of 18 U.S.C. § 1959. Specifically, the indictment charged that Ray, "as consideration for the receipt of, and as consideration for a promise and agreement to pay, a thing of pecuniary value from the Enterprise, and for the purpose of gaining entrance to and maintaining and increasing position in the Enterprise . . . knowingly assaulted an individual with a dangerous weapon, to wit, RAY assaulted Female Victim-1 by placing a plastic bag over her head and interfering with her ability to breathe, at a hotel in midtown Manhattan, New York, in violation of New York Penal Law §§ 120.05 and 120.14." Second Superseding Indictment at 25-26. The Jury found Defendant guilty of Count Seventeen and also found that Defendant had committed violations of both New York Penal Law §§ 120.05(2) and 120.14. The defense argues that there was insufficient evidence that Defendant committed the crime of assault in the *24 second degree under New York Penal Law § 120.05(2) and that the crime of menacing under New York Penal Law § 120.14 is not a crime of violence under VICAR. The Court accepts the first argument. However, it rejects the second argument and sustains the Jury verdict.

Section 1959 "was enacted to complement RICO," "by allowing the government not only to prosecute under RICO for conduct that constitutes a pattern of racketeering activity in connection with an enterprise but also to prosecute under § 1959 for violent crimes intended, *inter alia*, to permit the defendant to maintain or increase his position in a RICO enterprise." *United States v. Concepcion*, 983 F.2d 369, 380-81 (2d Cir. 1992).[3] The provision addresses "violent crimes committed or sanctioned by high ranking leaders of the enterprise for the purpose of protecting the enterprise's operations and furthering its objectives or where the defendant, as a leader within the enterprise, was expected to act based on the threat posed to the enterprise and that failure to do so would have undermined his position within that enterprise." *United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001). In order to establish a violation of Section 1959, the Government is "required to prove beyond a reasonable doubt: (1) . . . a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of *25 violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise." *Concepcion*, 983 F.2d at 381. The violent acts that can support a § 1959(a) violation include: murder, kidnapping, maiming, assault with a dangerous weapon, and assault resulting in serious bodily injury upon an individual, or the threat or attempt or agreement to commit a crime of violence against any individual in violation of any state or federal law. *See* 18 U.S.C. § 1959(a).

> 3  18 U.S.C. § 1959 reads in part:
>
>> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, *assaults with a dangerous weapon*, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do shall be punished ....
>
> 18 U.S.C. § 1959(a) (emphasis added).

The Second Superseding Indictment charged that Ray's conduct violated New York Penal Law § 120.05(2) and § 120.14. New York Penal Law § 120.05(2) defines assault in the second degree not by the gravity of the physical injury threatened by the defendant but by the physical impairment or pain the defendant inflicts. It states that a person is "guilty of assault in the second degree when[,] [w]ith intent to cause physical injury to another person, he causes such injury to such person or to third person by means of a deadly weapon or a dangerous instrument." N.Y. Penal Law § 120.05(2). A "deadly weapon" is "any loaded weapon from which a



ADDENDUM  A - 20

United States v. Ray    20-cr-110 (LJL) (S.D.N.Y. Nov. 23, 2022)

shot, readily capable of producing death or other serious physical injury, may be discharged, or a switchblade knife, pilum ballistic knife, metal knuckle knife, dagger, billy, blackjack, plastic knuckles, or metal knuckles." *Id.* § 10.00(12). And a "dangerous instrument" is "any instrument, article or substance, . . . which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury." *Id.* § 10.00(13); *see Singh v. Barr*, 939 F.3d 457, 462 (2d Cir. 2019).

The term "physical injury" is defined as "[(1)] impairment of physical condition or [(2)] substantial pain." N.Y. Penal Law § 10.00(9). For a victim to have sustained a physical injury, she need not have sustained a lasting disability. *Vasquez v. Ercole*, 2009 WL 2432364, at *3 (S.D.N.Y. Aug. 7, 2009). But the physical injury "must be more than 'petty slaps, shoves, *26 kicks and the like.'" *People v. Mack*, 755 N.Y.S.2d 437, 439 (3d Dep't 2003) (quoting *Matter of Philip A.*, 400 N.E.2d 358, 359 (N.Y. 1980)); *People v. Henderson*, 708 N.E.2d 165, 166 (N.Y. 1999) (same).

The evidence at trial establishes that Defendant subjected Drury to what can only be described as physical and psychological torture. Defendant wanted to punish her for developing a relationship with a client that presented a threat to the Ray Family enterprise and to force her to continue to engage in commercial sex acts for his financial benefit. Defendant covered Drury's mouth with a pillow and threatened to suffocate her. He forced her to strip, tied her naked to a chair, and then placed the chair next to the hotel room air conditioning unit while pouring cold water over her body. He strangled her with a collar and leash he placed around her neck. He repeatedly put a plastic bag over her head to prevent her from breathing, and Drury almost passed out.

However, even construed favorably to the Government, the evidence does not support the conclusion that Drury experienced "physical injury" as that term has been interpreted under New York law. New York courts have not precisely defined "impairment of physical condition," but their rulings have begun to establish the boundaries. While a victim's "incapacitation" is not necessary, *People v. Franklin*, 540 N.Y.S.2d 288 (2d Dep't 1989), impairment requires more than some momentary limitation of bodily functions, no matter how grave, *see People v. Almonte*, 424 N.Y.S.2d 868, 869 (Sup. Ct. 1980) ("An impairment of physical condition is a weakening or diminution of some physical state of being or health and has also been described as affecting a physical condition in an injurious manner."); *Impairment*, Black's Law Dictionary (10th ed. 2014) ("[A] condition in which a part of a person's mind or body is damaged or does not work well, esp. when the condition amounts to a disability."). For the assault to have caused *27 an impairment of physical function, the impairment must outlast the assault. Thus, in *People v. Franklin*, the court found that there was no physical impairment when the "complainant was hit on the head and 'passed out', but regained consciousness 'a minute' later." The complainant there experienced a limitation of bodily function during the assault itself (the loss of consciousness) and he felt a continuing effects from the assault in the form of dizziness and aches "for about 'four or five hours', and experienced slight bleeding from the head." 540 N.Y.S.2d at 288. But the court found as a matter of law that the assault caused no impairment of physical function. *Id.*; *see also People v. Goins*, 514 N.Y.S.2d 494, 494 (2d Dep't 1987) (finding "no evidence in the record to support" physical impairment when the victim "sustained bruises to his right eye and left wrist as a result of his physical encounter with the defendant" and "suffered headaches for two or three days and missed a day of work as a result of his injuries"); *People v. Prosser*, 516 N.Y.S.2d 559, 559 (4th Dep't 1987) (finding that "hoarseness of voice" from assault did not constitute impairment of physical condition because "the record was insufficient to establish whether the [degree of victim's] hoarseness"). In contrast, in *People v. Tejeda*, 578 N.E.2d 431, 432 (N.Y. 1991), the court found that the victim did suffer physical impairment when as a result of the assault he had a visible scar four

ADDENDUM A - 21

United States v. Ray    20-cr-110 (LJL) (S.D.N.Y. Nov. 23, 2022)

months after being hit with barrel of a pistol. The assault caused an impairment-a physical injury-that outlived the attack itself. *See also People v. Rivera*, 583 N.Y.S.2d 520, 520 (2d Dep't 1992) (noting that "[t]he scar alone is impairment sufficient to constitute physical injury." (internal citations omitted)).

The evidence at trial established that the limitations on Drury's bodily functions (her ability to breathe and her ability to move once tied to a chair), though horrifying, was transitory and lasted no longer than the assault that caused it. Once Defendant left the room, Drury was able to exercise her full range of bodily functions; she was able to move and she was able to *28 breath as normal, with no lasting changes as a result of the attack. There is no evidence, either testimonial or from medical records, that Defendant's actions had a physical impact on Drury beyond the time they spent together in the hotel room.

The evidence also did not establish "substantial pain." "'[Substantial pain' cannot be defined precisely, but it can be said that it is more than slight or trivial pain. Pain need not, however, be severe or intense to be substantial." *People v. Chiddick*, 866 N.E.2d 1039, 1040 (N.Y. 2007); *see also People v. Chery*, 66 N.Y.S.3d 887 (2d Dep't 2018); *People v. Stanback*, 51 N.Y.S.3d 201 (2d Dep't 2017). The term "substantial pain" contains both an objective and a subjective component. *See Matter of Philip A.*, 400 N.E.2d 359 (noting that "[p]ain is, of course, a subjective mater" but "there is an objective level . . . below which the question is one of law"); *United States v. Adetutu*, 2004 WL 25241, at *3 (S.D.N.Y. Jan. 5, 2004) ("New York law requires a showing of both subjective and objective elements to establish the existence of substantial pain."). "The subjective element is established through evidence that the victim of the assault felt 'as though she suffered substantial pain.'" *Adetutu*, 2004 WL 25241, at *3 (quoting *People v. Plate*, 2003 WL 22976610, at *5 (N.Y. Sup. Ct. Dec. 1, 2003)). "The objective element, while more elusive, appears to require a threshold level of evidence of a physical injury that could produce pain that was substantial in either its degree or duration." *Id.* The New York Court of Appeals has outlined several factors relevant to the determination whether pain is "substantial": (1) whether the injury suffered "would normally be expected to bring with it more than a little pain"; (2) the victim's "subjective description of what he felt"; (3) whether the victim sought medical treatment; and (4) the defendant's motive in inflicting the harm. *Chiddick*, 866 N.E.2d at 1040; *see Taylor v. Brown*, 2011 WL 797448, at *17 (S.D.N.Y. Mar. 8, 2011); *People v. Perez*, 965 N.Y.S.2d 702, 706-07 (N.Y. Crim. Ct. 2013). The fact that *29 the defendant intended to cause substantial pain is not sufficient, *Adetutu*, 2004 WL 25241, at *3, nor is the fact that the victim did not testify to her subjective pain sufficient to establish that she did not suffer substantial pain, *see People v. Rojas*, 460 N.E.2d 1100, 1101 (N.Y. 1984) ("The subjective reaction of the victim is but one factor for the jury to consider."). It is not always the case that the victim is available to testify at trial. However, under the statute's plain language, the defendant must both commit the assault "with intent to cause physical injury to another person" and "caus[e] such injury to such person or to third person." N.Y. Penal Law § 120.05(2).

The evidence was insufficient for the Jury to conclude that Drury suffered substantial pain as that term has been understood under New York law. Drury testified to five of Defendant's actions in the hotel room: (1) Defendant covered Drury's head with a pillow and plastic bag, Tr. 1037; (2) he poured cold water over her while she was near an air-conditioning unit, *id.* at 1034-35; (3) he tied her to a chair, *id.* at 1034; (4) he choked her with a collar and a leash, *id.* at 1037-38; and (5) he cut her hair, *id.* at 1038-39. But the Government presented no additional evidence of the pain that Drury felt. Though Drury testified that she "became very, very cold to the point of like feeling like woozy or dizzy," *id.* at 1035, that she was "terrified," *id.* at 1036, and that she was "scared," *id.* at 1040, 1043, she did not testify to any physical pain she experienced as a result of Defendant's actions. There was also no evidence from any other source that the sensation Drury experienced from the assault was one of pain. *See Rojas*, 460 N.E.2d at 1101 (finding the jury could conclude pain was substantial,


ADDENDUM A - 22

even though victim did not testify as to the degree of pain, in part because "the doctor [who treated him] testified that the injury could have caused pain"). From the evidence before the Jury, it would have to speculate that the nature of the assault on Drury would be one that would cause her substantial pain as *30 opposed to, as she testified, causing her substantial terror. Under New York law, the fact that an assault occurred cannot itself and without more establish that it caused substantial pain. *See, e.g.*, *People v. McDowell*, 270 N.E.2d 716, 717 (N.Y. 1971) ("[T]he incidental reference to a blackened eye without any development of its appearance, seriousness, accompanying swelling, or suggestion of pain was insufficient to sustain the felony conviction."); *Adetutu*, 2004 WL 25241, at *3 (complaint did not allege substantial pain where it did "not identify the nature of the pain, where the pain was felt, the intensity of the pain, or its duration"); *Matter of Scott QQ*, 589 N.Y.S.2d 712, 712-13 (3d Dept. 1982) (evidence was insufficient to establish physical injury or substantial pain where the claimant "neither provided evidence as to the duration of any pain nor other objective indicia of substantial pain" (internal quotation marks and citation omitted)); *People v. Cheeks*, 555 N.Y.S.2d 433, 434 (2d Dep't 1990) ("The witnesses never elaborated on the duration or degree of the pain, nor provided some other objective indicia of 'substantial pain' to properly sustain" the charge.); *People v. Baum*, 533 N.Y.S.2d 598, 599 (2d Dep't 1988) (holding the prosecution "did not adduce the minimum threshold level of proof of substantial pain" with descriptions of the fight and punches that victim suffered to his eye because they "failed to develop with particularly the degree and duration of the pain sustained by complainant").

At oral argument, the Government suggested that Drury did not testify to her pain because years of past torture and abuse at the hands of Defendant inured her to pain. But this argument misconstrues the subjective component of substantial pain under New York law. As the New York Court of Appeals wrote, "Pain is, of course, a subjective matter. Thus, touching the skin of a person who has suffered third degree burns will cause exquisite pain, while the forceful striking of a gymnast in the solar plexus may cause him no discomfort at all." *31 *Matter of Philip A.*, 400 N.E.2d at 359. That Defendant's conduct inured Drury to pain is not to excuse it. But if Defendant's conduct prevented Drury from feeling pain, then that outcome would tend to undermine the Jury's conclusion on this count and not to support it.

Drury's experiences were horrific; the Jury could find Defendant's actions were reprehensible. The psychological impact of these events should not be discounted. But the gravity of the attack does not itself establish the necessary sensation of the victim. *Compare*, *e.g.*, *People v. Holden*, 539 N.Y.S.2d 95, 95-96 (2d Dep't 1989) (reversing assault in the second degree conviction for defendant who also committed rape in the first degree, sexual abuse in the first degree and sexual abuse in the third degree because "although the complainant testified she was struck several times prior to the rape, she did not elaborate on her injuries" and did not testify "as to the duration of the pain"), *with People v. Greene*, 517 N.E.2d 1344, 1345 (N.Y. 1987) (finding evidence of substantial pain sufficient for victim who "stopped breathing momentarily and lost consciousness" after being choked because victim was diagnosed with contusions at a hospital and "stated that he suffered from pain and had difficulty swallowing for two days after the incident").

It is important to note that the fact that the assault was committed with instruments-a bag and a pillow-that could have killed Drury is insufficient to establish that it caused physical injury. The New York Court of Appeals' decision in *People v. Rojas*, 460 N.E.2d 1100, is illustrative. There, the prosecution argued that the jury could infer that the victim of defendant's assault suffered "substantial pain" within the meaning of the New York Penal Law because the victim suffered infliction of an injury by a gunshot. The court rejected that argument, ruling that it was the injury, not the means by which the injury was inflicted, that governed. After noting that New York Penal Law already differentiated "the degree of the crime, and thus the *32 punishment, depending upon whether an instrument was used and if so what kind," it held "[t]hat the injury is by gunshot



ADDENDUM  A - 23

cannot . . . establish substantial pain, without more." *Id.* The court upheld the conviction only because there was "testimony that the bullet caused a laceration of the victim's back 1.5 inches in length, the result of which was still visible at the time of trial, . . . the victim returned to the hospital the day after the assault where the wound was redressed because it was still oozing, and the doctor testified that the injury could have caused pain." *Id.* The court concluded based on that testimony: "[T]he jury could infer that the pain was substantial, even though the victim gave no testimony concerning the degree of pain he felt." *Id.* In this case, there is no similar evidence, either from Drury or from any other source, for a reasonable jury to have found that Drury suffered physical injury.

The Jury, however, also concluded that Defendant violated New York Penal Law § 120.14. The evidence supports that conclusion and the law supports that Defendant's violation of New York Penal Law § 120.14 is a crime of violence under VICAR. New York Penal Law § 120.14 prohibits menacing in the second degree. It reads:

> A person is guilty of menacing in the second degree when: (1) He or she intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument or what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm ....

N.Y. Penal Law § 120.14. The evidence at trial established the elements of that offense. Defendant intentionally placed Drury in reasonable fear of serious physical injury and death by displaying a dangerous weapon. In this context, the plastic bag was a dangerous weapon. Used as Defendant deployed it, the plastic bag could asphyxiate Drury and kill her. In fact, Ray covered her head with the bag repeatedly to the point where she "was suffocating" and couldn't "breath." Tr. 1036. And there can be no doubt that there was sufficient evidence that Defendant *33 displayed the plastic bag to her with the intent to place her in fear of death and that such fear of death was reasonable. As Drury testified, "as soon as [Ray] put the bag over my head, [he] said, 'I am going to kill you.'" *Id.* at 1037.

The Court also concludes that Defendant's conviction is supported by evidence that he engaged in an assault with a dangerous weapon and that his actual conduct violated Section 120.14(1). Defendant's argument to the contrary turns upon whether the categorical approach used in the interpretation of certain federal criminal statutes applies to VICAR. Defendant argues that the categorical approach applies to VICAR and thus the jury verdict must be overturned because menacing in the second degree sweeps more broadly than the generic federal offense, even if Defendant's conduct does not. *See* Dkt. No. 594 at 4-5. The Government responds that the categorical approach should not apply and it is sufficient that Defendant engaged in an assault with a dangerous weapon in violation of the New York Penal Law. *See* Dkt. No. 595 at 1. It also argues that, even under the categorical approach, the elements of the New York crime of menacing are a categorical match with an assault with a dangerous weapon. *Id.* at 2-3. The Court need not consider the second of the Government's arguments, because it finds that a categorical approach does not apply to VICAR.

The Second Circuit has not addressed whether a categorical approach applies to VICAR.[4] But this Court finds the Fourth Circuit's decision in *United States v. Keane*, 955 F.3d 391 (4th Cir. 2020), compelling. There, the court considered a question nearly identical to this one: Whether the Virginia law against brandishing a firearm could be a predicate offense of *34 committing assault with a dangerous weapon under VICAR because the Virginia brandishing statute swept more broadly than the federal definition of assault with a dangerous weapon. The court concluded that the conviction need not be overturned. *Id.* at 392-93. The Fourth Circuit held that the categorical approach did not apply to VICAR; it was sufficient that the defendant's actual conduct constituted


ADDENDUM A - 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X
                                                                    :
UNITED STATES OF AMERICA,                                           :
                                                                    :
            -v-                                                     :
                                                                    :         20-cr-110 (LJL)
LAWRENCE RAY,                                                       :
                                                                    :         OPINION AND ORDER
                          Defendant.                                :
                                                                    :
--------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__2/24/2022__

LEWIS J. LIMAN, United States District Judge:

The Government moves for in limine rulings: (1) admitting co-conspirator statements

made in furtherance of the alleged conspiracy, under Federal Rule of Evidence 801(d)(2)(E); (2)

allowing testimony about threats made by the Defendant's father to Felicia after the Defendant's

arrest; (3) admitting journals, notes, and other purported confessions from victims as non-hearsay

statements; (4) admitting prior consistent statements of victims; (5) admitting a summary chart

about sexually explicit videos, under Federal Rule of Evidence 1006; (6) precluding improper

argument or evidence about the investigation; (7) precluding irrelevant and prejudicial argument

or evidence about the alleged victims' parents; (8) precluding testimony from other witnesses

about Claudia's credibility; (9) allowing lay identification testimony, under Federal Rule of

Evidence 701; (10) admitting testimony about the Defendant's prior incarceration and the

publication of an article about the Defendant; (11) limiting the scope of cross-examination for

law enforcement witnesses; (12) precluding the Defendant's introduction of false exculpatory

statements from his post-arrest interview; (13) admitting bank records and other similar records

upon a custodial certification under Federal Rule of Evidence 803(6); (14) allowing an Internal

Revenue Service ("IRS") agent to remain in the courtroom during the trial in order to compute

ADDENDUM  A - 25

tax loss; and (15) allowing evidence about the Defendant's previous filing of tax returns. *See* Dkt. No. 323.

The defense makes the following in limine motions: (1) to preclude evidence that Felicia had sex with "strangers" on the grounds that it is irrelevant to the charge of forced labor and is unduly prejudicial; (2) to preclude evidence that Isabella Pollok had sex with strangers and other "grooming" evidence related to Pollok's sexual activities; (3) to preclude the Government's toxicologist from testifying that Ray was not poisoned; (4) to exclude the maps offered by the Government's cell-site expert; (5) to permit limited attorney-led voir dire; (6) to preclude Government expert Dr. Hughes from transmitting inadmissible hearsay statements to the jury or from testifying about irrelevant and unduly prejudicial conduct and about cases that have no factual connection to the case; (7) to introduce evidence reflecting Ray's then-existing state of mind during the charged racketeering conspiracy; and (8) to preclude trial participants from referring to the complaining witnesses as "victims" or from using inflammatory, confusing or unduly prejudicial language. *See* Dkt. Nos. 325–28.  In addition, the defense adds a number of additional arguments in its response to the Government's in limine motion.  Dkt. No. 371.

Familiarity with the Court's prior orders describing the Second Superseding Indictment in this case is assumed.

## DISCUSSION

A litigant has the right to request, but not necessarily to receive, an in limine ruling regarding the admissibility or inadmissibility of evidence.  Rather, the right to rule on in limine motions resides in a district court's inherent and discretionary "authority to manage the course of its trials." *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176–77 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)).  An in limine motion is intended "to aid the trial process by enabling the Court to rule in advance of trial on the relevance of

ADDENDUM  A - 26

certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (internal citation omitted); *King v. Wang*, 2021 WL 5232454, at *1 (S.D.N.Y. Nov. 9, 2021). "Because a ruling on a motion *in limine* is 'subject to change as the case unfolds,' this ruling constitutes a preliminary determination in preparation for trial." *United States v. Perez*, 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011) (quoting *Palmieri*, 88 F.3d at 139).

## I.     The Government's In Limine Motions

### A.     Co-Conspirator Statements

The Government moves in limine for admission of statements made by Ray's daughter and Pollok as co-conspirator statements made in furtherance of the alleged conspiracy. The Court will receive the statements subject to connection, assuming that the statements on their face or from context show that they were made during and in furtherance of the conspiracy of which Ray's daughter or Pollok, as the case may be, was a member. *See United States v. Coplan*, 703 F.3d 46, 82 (2d Cir. 2012); *United States v. Alameh*, 341 F.3d 167, 176 (2d Cir. 2003); *United States v. Cambindo Valencia*, 609 F.2d 603, 630 (2d Cir. 1979). The Defendant may make a motion to strike if the Government has not established the connection.

Rule 801(d)(2)(E) provides that a statement should not be considered hearsay if it is "offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit a statement under this rule, a district court must find by a preponderance of the evidence: (1) that a conspiracy existed that included the defendant and the declarant; and (2) the statement was made during the course of, and in furtherance of, that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *see also United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990) ("In order to admit a statement under [Federal Rule of Evidence 801(d)], the court must find (a) that there was a

ADDENDUM  A - 27

conspiracy, (b) that its members included the declarant and the party against whom the statement

is offered, and (c) that the statement was made during the course of and in furtherance of that

conspiracy"). These are "preliminary questions of fact" to be resolved by the district court under

a preponderance of the evidence standard. *Bourjaily*, 483 U.S. at 175. "[T]he district court may

consider the hearsay statement itself" as evidence of "the existence of the conspiracy." *United

States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000). However, "'there must be some independent

corroborating evidence of the defendant's participation in the conspiracy.'" *Id.* (quoting *United

States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996)). Moreover, the conspiracy in furtherance of

which the statement was made does not have to be the conspiracy charged in the indictment.

*United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

The Government claims that Ray conspired with his daughter and Pollok to commit

racketeering, extortion, and money laundering; conspired with his daughter to commit forced

labor and forced labor trafficking; and conspired with Pollok to commit sex trafficking.

The Government has proffered evidence that, if established at trial, would support that a

conspiracy existed between Ray and his daughter and between Ray and Pollok. With respect to

Ray's daughter, the Government proffers evidence that she knew of Ray's conduct in extorting

and in forcing labor from the alleged victims; that she participated in the collection of the

incriminating information that would be used to threaten the alleged victims and ensured their

continued obedience—including, notably, collecting information about "damage" done in

connection with the labor on the North Carolina property; and that she profited from Ray's

criminal activities. That evidence is sufficient to establish, at least by a preponderance of the

evidence, that she joined in a conspiracy with Ray. With respect to Pollok, the Government has

proffered evidence that she was the one who recorded the Defendant's interrogations of his

ADDENDUM A - 28

alleged victims which would later be used against the alleged victims, that the Defendant turned to Pollok for assistance during his abuse of the victims and trusted her to oversee the forced labor of one of those victims and the sex trafficking of another, that she played an active role in attempting to intimidate the alleged victims, and that she personally benefitted from the illegal conduct.  That too would be sufficient, if proved, to establish her membership in the conspiracy.

In its opposition to the Government's in limine motion, the defense does not dispute that the Government has proffered evidence that Pollok was a member of a conspiracy with Ray.  It argues that the evidence does not establish that Ray's daughter was a member of the conspiracy.[1] But the defense analyzes each piece of evidence in isolation and not as part of a whole, and it further gives that piece of evidence its most benign interpretation and not the fair interpretation it should receive in context.  However, "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it.  The sum of an evidentiary presentation may well be greater than its constituent parts." *Bourjaily*, 483 U.S. at 180 (analyzing evidence of statements probative of the existence of a conspiracy as a whole and in the context of surrounding circumstances).  That is the case here.  Even accepting the defense's argument that no one piece of evidence would be sufficient to establish the daughter's membership in a conspiracy with Defendant, the pieces in cumulation establish it, at least by a preponderance of the evidence. The evidence establishes, at least by a preponderance, that Ray's daughter knew of the unlawful objects of the alleged conspiracy to extract forced labor from its victims and to extort them and that, knowing of the objects of the conspiracy and intending them to be accomplished, she joined with her father and others in those efforts.  Moreover, although the Government argues that

---

[1] The defense does not appear to argue that there is insufficient independent evidence of Ray's involvement in the conspiracy.  In any event, the Government's proffer demonstrates that there is such sufficient independent evidence.

Ray's daughter moved from New York in 2014 and was not present for each of the overt acts or objectives of the racketeering enterprise, the law is clear that a person need not participate in each of a conspiracy's overt acts, or even know of them, to be a member of the conspiracy. *See United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) ("The government need not show that the defendant knew all of the details of the conspiracy, 'so long as he knew its general nature and extent.' . . . And 'a single act may be sufficient for an inference of involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy.'" (first quoting *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994) and then quoting *United States v. Traumunti*, 513 F.2d 1087, 1112 (2d Cir. 1975)); *Tera Grp., Inc. v. Citigroup, Inc.*, 2019 WL 3457242, at *14 (S.D.N.Y. July 30, 2019) (Sullivan, J.). Of course, the Court will not admit statements of Ray's daughter that were not made during the course of her participation in the conspiracy.

Finally, the defense argues that a conclusion that Ray's daughter was a member of a conspiracy does not mean that each of her statements were made during and in furtherance of that conspiracy and that certain of the statements identified by the Government were not in furtherance of the conspiracy. The point is well-taken. At trial, the Government will have to show that a statement by the daughter or Pollok was made during and in furtherance of the conspiracy of which she was a member before the statement will be received into evidence.

### B.    Threats by Ray's Father to Felicia

The Government moves for a ruling before trial that threats that the Defendant's biological father made to Felicia should be received as evidence of the Defendant's obstruction of justice. The Government proffers that the father conveyed certain messages to Pollok and Felicia: on May 24, 2020, the Defendant asked his father to let Pollok know that "they signed on forever," and on June 14, 2020, the Defendant admonished his father, seemingly in the presence

ADDENDUM  A - 30

of Felicia and Pollok, "No new friends.  There should be no one in anybody's life except each other."  Dkt. No. 323 at 12.  The Government also proffers that on June 19, 2020, the Defendant instructed his father to undertake certain tasks on his behalf, such as finding audio, video, and email confessions of multiple victims in which they claimed to have poisoned him.  Four months later, in approximately October 2020, Ray's father is said to have communicated to Felicia, in sum and substance, "Nobody turns on my son.  I'm 82 years old.  I don't care they could give me 15 to 20 years."  *Id.*  Felicia is expected to testify about the October statement.

The defense opposes the motion but tellingly does not move at this time that for a pretrial ruling that the testimony not be received.  The Court concludes that the Government is not entitled to a pretrial ruling that the testimony is admissible.  The admissibility of the testimony will have to await a further showing by the Government of its relevance.

Two issues are presented: (1) whether testimony regarding the October statement would be hearsay; and (2) whether it is admissible against Ray as evidence of obstruction of justice.  As to the first question, the statement is not hearsay because the witness is the "percipient hearer of the command" and the statement is "offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein."  *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999).

As to the second question, based on its motion, the Government has not established that the testimony is relevant to the charge that Ray obstructed justice.  The statement, which was made by Ray's father, not Ray, bears no indication that Ray's father was communicating to Felicia on behalf of Ray.  That Ray asked his father to assist in his case in June 2020 does not necessarily indicate that in October 2020, when Ray's father allegedly threatened Felicia, he was acting as an agent of Ray or on behalf of or in concert with Ray.  Though relevance is a

# ADDENDUM  A - 31

relatively low bar, a piece of evidence must still "tend to make a fact [of consequence] more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). The Government will have to offer more evidence than it has to date before the Court admits the testimony as evidence of Ray's obstruction of justice.[2]

### C.    Notes, Journals, and Purported Confessions from Alleged Victims

The Government moves in limine for the admission of statements in the notes and journals belonging to the alleged victims and for the confessions made by the alleged victims. The documents were found during various searches by law enforcement agents. The Government argues that the statements and evidence are not being offered for their truth and therefore do not constitute hearsay.

The defense responds that "[w]hile individual statements contained within these materials might satisfy the standards stated above, Rules 801 and 803(3) do not provide the government a blank check to introduce vast swathes of out-of-court statements based solely on its representation that these statements are not being offered for their truth." Dkt. No. 371 at 55. It argues that the evidence is admissible only to show the declarant's contemporaneous state of mind and that the Court should require the Government to identify each statement it intends to offer to ensure it is being offered for a proper purpose. It further contends that the Government should not be permitted to argue that the statements were made at the direction of Ray on the theory that, because he was a participant in the conversations, the statements offered for that reason would functionally be offered for their truth. Finally, it argues that the Court should not inform the jury that the statements cannot be considered for their truth.

---

[2] The Government offers, in a footnote, that "[Ray's father's] statements are also admissible as coconspirator statements under Rule 801(d)(2)(E)." Dkt. No. 323 at 12, n.3. Because the statement is not sought to be admitted for its truth, the rules regarding hearsay do not apply.

# ADDENDUM  A - 32

An out-of-court statement constitutes hearsay only if it is offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). If a statement is offered for something other than its truth, it may not be excluded as hearsay, but it still must satisfy the admissibility requirements of Federal Rules of Evidence 401 and 403. These rules require that the statement be relevant to a fact in dispute, Fed. R. Evid. 401, and the probative value of the statement not be substantially outweighed by the risk of unfair prejudice, confusion, or delay, Fed. R. Evid. 403. *See United States v. Paulino*, 445 F.3d 211, 217 (2d Cir. 2006).

The defense is correct in part and incorrect in part. Although it may take time if the defense objects to the introduction of a particular exhibit, the Court will take the necessary time. The defense is entitled to object if it has a good faith basis and the Court will not admit all of the evidence en masse unless there is consent by the defense that it is admissible en masse.[3] To that extent, the motion in limine is premature and will be denied on that basis alone. But the defense is also incorrect in part. The Government need not establish that a statement offered for something other than its truth is relevant to the declarant's contemporaneous state of mind. The rule regarding statements of a declarant's then-existing state of mind is an exception to the hearsay rule. Fed. R. Evid. 803(3). A statement that is not offered to prove the truth of the matter asserted in the statement is not hearsay at all. Fed. R. Evid. 801. The two are apples and oranges. A statement that is not offered for the truth need only be relevant and, under Rule 403, its probative value cannot be substantially outweighed by its prejudice. Moreover, the Court intends to instruct the jury that the statements are not being offered or admitted for their truth. Such a ruling is merely a statement of the law. It does not reflect, as the defense seems to fear, a

---

[3] The Court has encouraged the parties to work together to narrow the objections to the admissibility of exhibits. The Court reiterates that exhortation.

ADDENDUM  A - 33

prejudgment of a fact at issue or inform the jury that the statement is untrue any more than it informs the jury that the statement is true. The Government has stated that it intends to argue that certain statements were false; the defense can respond that they were true. Finally, the theory that the tapes are not hearsay and could not be offered for the fact that they were made—solely because Ray was a participant in the conversations—is nonsensical. As the Court understands it, any statements by Ray on those tapes would be offered not for the truth of anything Ray is stating but as evidence that he made the statement or was present when other statements were being made. To the extent it is offered for the truth of anything in his statements, the statements would be admissible as party admissions.

### D.  Alleged Victims' Prior Consistent Statements

The Government moves for an advance ruling that it be permitted to offer, during its direct examinations, evidence of prior consistent statements of witnesses whom it claims will testify that Defendant's interrogation tactics led them to make false confessions. It claims that the Defendant is sure to attack the credibility of the "victims" and that, as a result, prior consistent statements about the nature of the abuse and the context of the false statements is admissible.

Federal Rule of Evidence 801 provides that when a declarant testifies and "is subject to cross-examination about a prior statement," a party can offer evidence of a declarant-witness's prior statement if it "is consistent with the declarant's testimony and is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground." Fed. R. Evid. 801(d)(1)(B).

As the language of the Rule makes clear, and as the Second Circuit has confirmed, the declarant need not actually have been cross-examined for the party to offer the prior consistent

ADDENDUM  A - 34

statement.  It is sufficient that it is "clear" that the declarant would be subject to cross-examination and that at least an implied charge of recent fabrication or improper influence or motive have been levelled.  *See United States v. Flores*, 945 F.3d 687, 706 (2d Cir. 2019) (holding that the trial court had discretion to admit prior consistent statements where it was clear that witness would be subject to cross-examination); *United States v. O'Connor*, 650 F.3d 839, 862–63 (2d Cir. 2011) (upholding trial court's admission of prior consistent statements before declarant testified where the defendants "had begun their attacks on the credibility of [the witness's] expected testimony in their opening statements" and "it was clear" the declarant would testify and "could be cross-examined by the defense about the statement"), *cert. denied*, 565 U.S. 1148 (2012).  Moreover, the use of a prior consistent statement is not limited to the rebuttal of a charge of recent fabrication or improper influence or motive.  Under the 2014 amendment to Rule 801(d)(1)(B), a prior consistent statement can be offered to "rebut other attacks on a witness—such as the charges of inconsistency or faulty memory."  Fed. R. Evid. 801(d)(1)(B), Advisory Committee notes to 2014 Amendment.  At the same time, however, the Rule "does not allow impermissible bolstering of a witness" and "the trial court has ample discretion to exclude prior consistent statements that are cumulative accounts of an event."  *Id.* The prior consistent statement thus must have "some rebutting force beyond the mere fact that the witness has repeated on a prior occasion a statement consistent with his trial testimony." *United States v. Pierre*, 781 F.2d 329, 331 (2d Cir. 1986).

The Government points here to two specific sets of alleged prior consistent statements made by the proposed witness Santos.  In one, Santos recounts an incident in which Ray held a "sharp object" to the throat of a man who was one of the roommates at the time and threatened him.  Dkt. No. 323 at 18–19.  In the other, Santos told Ray in a recorded conversation that the

ADDENDUM  A - 35

confessions Santos had made to poisoning Ray and to damaging Ray's property were false, and

he was just "making it up." *Id.* at 19–20.  The Government expects the statements to be

consistent with Santos's testimony; he will testify to being present when Ray threatened one of

the roommates by holding a sharp object to his throat and that Santos made false confessions at

Ray's behest.

It is premature for the Court to rule on whether the statements would be admissible under

Rule 801(d)(1)(B).  Santos has not testified, and the parties have not opened.  It is not clear at

this pretrial stage that Santos will testify or that his testimony would be consistent with the prior

statements or that he will be attacked.  The Court thus will deny the motion in limine and decide

at trial whether the statements are admissible.  *See United States v. Holwell*, 2020 WL 5995100,

at *6 (D.D.C. Oct. 9, 2020).

The defense raises a separate objection.  It argues that the Government should not be

permitted to introduce evidence relating to the incident as a threat of violence.  It claims that it

involved Ray putting a spatula to the individual's throat and that it was intended as a practical

joke which ended with Ray saying "let's make some eggs."  That motion is denied.  The conduct

described is relevant; the defense can cross-examine on whether it was non-violent.  In a

footnote, the defense also argues that the Government should not be permitted to offer other

evidence regarding this same individual because it has not provided notice to the defense of that

evidence.  That motion is denied.  Aside from under Rule 404(b) and with respect to expert

evidence, the Government is not required to preview for the defense all of the evidence it intends

to offer in support of the charges in the indictment.  *See United States v. Cephas*, 937 F.2d 816,

823 (2d Cir. 1991) ("[T]he government need not particularize all of its evidence."); *cf.* Fed. R.

Crim. P. 16.

# ADDENDUM  A - 36

Finally, the individual at issue died apparently as a result of suicide two months after Ray was incarcerated.  The defense moves to exclude any evidence of the apparent suicide.  That motion is granted.  There is no evidence that the suicide was caused by Ray or that it has any other relevance to the case, and introduction of it would be prejudicial under Rule 403.  The Government is precluded from offering evidence of the suicide unless the defense opens the door to such evidence.

E.      **Summary Chart of Sexually Explicit Videos**

The Government anticipates offering a summary chart containing brief, factual descriptions of sexually explicit video files that show Felicia providing sexual services to strangers in various locations in and near New York City.  The videos were recovered from devices and accounts associated with Ray and Pollok and have been turned over to the defense.  The chart summarizes a total of 40 different videos, with a listing for each of the file name, the date and time listed on the recording, and a description of the contents.

Federal Rule of Evidence 1006 provides that the proponent of evidence "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court" so long as the proponent makes "the originals or duplicates available for examination of copying, or both, by other parties at a reasonable time and place."  Fed. R. Evid. 1006.  "The district court must determine as part of the foundation that the summary charts 'fairly represent and summarize the evidence on which they are based.'" *United States v. Koskerides*, 877 F.2d 1129, 1134 (2d Cir. 1989) (quoting *United States v. O'Connor*, 237 F.2d 466, 475 (2d Cir. 1956)); *see United States v. Lasko*, 146 Fed App'x 530 (2d Cir. 2005).

The defense does not object to the summary chart in theory but argues it is premature for the Court to rule on the admissibility of the chart because (1) the evidence upon which it is based

ADDENDUM  A - 37

has not been received in evidence; and (2) the parties are still meeting and conferring about the contents of the chart. It asks that the Court consider an alternative chart and hear the defense's objections to the Government's proposed summary chart.

The first objection is ill-founded. A summary chart may be admitted even if the materials underlying the summary is not. Weinstein's Fed. Evid. § 1006.02. It is proper and efficient for the Court to rule in limine on the chart before a decision is made on whether the underlying evidence will be admitted. The second objection is well-taken. The parties are ordered to meet and confer regarding an alternative chart that minimizes any potential prejudice. As the Court directed during oral argument on February 22, 2022, the defense shall submit its alternative chart by February 25, 2022, along with a letter no more than 3-pages with its objections to the Government's chart. The Government shall respond by February 28, 2022.

### F.  Arguments about Law Enforcement's Investigation of Defendant's Alleged Crimes

The Government moves to preclude the defense from introducing evidence or making arguments about law enforcement's failure to take action against Defendant until 2020. Ray is charged with crimes beginning as early as 2010, but he was not indicted and arrested in this case until 2020. According to the Government, there is evidence that several victims attempted to contact or contacted various law enforcement agencies over the course of the alleged conspiracy. The Government seeks to preclude the defense from offering that evidence or from making arguments that the jury should attribute some significance to the Government's failure to act. The motion raises similar issues to the defense's in limine motion addressed later in this Opinion regarding whether Ray can offer evidence that he made contact with law enforcement during the course of the charged conspiracy.

ADDENDUM  A - 38

The motion is denied in part and granted in part.  To the extent that the Government seeks a ruling in advance of trial to preclude the defense from offering evidence regarding contacts with law enforcement by any witness or by the Defendant, the motion is denied.  It is conceivable that there are circumstances under which such evidence may be relevant.  The Court declines to offer an opinion in advance of trial that this particular area of inquiry is off-limits without knowing the context in which the defense might seek to offer such evidence.

To the extent that the defense intends to argue that some independent significance should be attributed to the Government's failure to act prior to 2020 in terms of whether the Government believed that it had evidence of a crime or that evidence is admissible on that basis alone, that motion is granted.  The evidence is not relevant under Rule 401, and even if it did have any probative value, such value would be substantially outweighed by the danger of unfair prejudice, and jury confusion under Rule 403.  "The length of [a government] investigation, the investigative techniques used, and the fact that [a defendant] was not initially a target of [an] investigation are all irrelevant . . . ."  *United States v. Duncan*, 2019 WL 2210663, at *3 (S.D.N.Y. May 22, 2019).  The question before the jury will be whether or not Ray engaged in the conduct charged in the Second Superseding Indictment and did so with the requisite intent.  Whether the Government initially believed his conduct to be lawful or unlawful, or whether it believed it had enough evidence to commence an investigation, has no tendency to make the charges in the indictment more or less probable.  Fed. R. Evid. 401; *see United States v. Aleynikov*, 785 F. Supp. 2d 46, 65 (S.D.N.Y. 2011) ("As a general matter, the quality and scope of the Government's investigation are not appropriate lines of examination . . . ."), *rev'd on other grounds by* 676 F. 3d 71 (2d Cir. 2012).  The evidence, if admissible only for that purpose, also could only lead to jury confusion, unfair prejudice, and wasted time.  There are all kinds of

ADDENDUM  A - 39

reasons why an investigative agency might or might not commence or advance an investigation having to do not only with the quality of the evidence but also the priorities of the agency and the budget and resources it has to execute on those priorities.  Permitting the defense to offer evidence regarding the Government's "failure" to act prior to 2020 could only result in a sideshow having a relationship that is attenuated at best to the central question whether Ray is or is not guilty of the charges against him.

The Government also argues that the defense should not be permitted to impugn the judicially authorized searches or the method by which the post-arrest interview was administered (including the failure to record it).  To the extent the Government seeks to prevent the defense from eliciting evidence how the searches were executed and the interview conducted, the motion is denied.  If Special Agent Maguire intends to testify regarding her post-arrest interview of Ray, the defense may inquire that the only basis for her testimony is her recollection and her notes and that she does not have any recording of it.  *See United States v. Gallo-Roman*, 816 F.2d 76, 81 (2d Cir. 1987).  If the Government intends to offer evidence from the searches, the defense can inquire into where items were located, who conducted the search, what efforts were made to preserve chain of custody, and the like.  The defense, however, will not be permitted to argue that probable cause did not exist for the searches.  That issue has already been determined by the Court and is not relevant to any issue in dispute at trial.

G.  **Arguments about the Parents of Certain Alleged Victims**

The Government seeks to preclude the defense from arguing that the parents of victims knew or should have known about Ray's relationship with and treatment of the alleged victims, consented to their children being in his care, and consented to or enabled his relationship with the victims.  According to the Government, such line of examination would be simply blaming the parents for Ray's criminal conduct.  The defense responds that its arguments and cross-

examination should not be limited.  Evidence that the parents knew of and consented to the

involvement of their children with Ray, according to the defense, tends to rebut the argument

that the alleged victims were coerced or forced to live with Ray.

The motion is granted for several reasons.  First, the defense has not proffered a good-

faith basis to believe that the parents at issue knew of the acts alleged to constitute extortion,

forced labor, or sex trafficking charged in the indictment.  The testimony that they knew that

their children were living in an apartment also occupied by Ray thus has no relevance to this

case.  Second, none of the "children" at issue in this case were minors; they had all achieved

legal majority.  Thus, even if there was evidence that the parents somehow consented to Ray

allegedly extorting and trafficking their "children" or forcing them to perform labor, that

evidence would not constitute a defense to the charges in the indictment.  Indeed, even if the

alleged victims were minors, a parent cannot consent to the sex trafficking of his child.  *Cf.*

Restatement of the Law—Children and the Law § 2.30(1)(b) (Draft) ("A parent does not have

authority to consent to medical procedures or treatments that provide no health benefit to the

child and pose a substantial risk of serious harm to the child's physical or mental health.").

Finally, the line of examination is excludable under Rule 403.  The distraction to the jury and the

risk of confusing and misleading the jury by engaging in an examination of the relationship

between the alleged victims in this case and their parents far outweighs any minimal probative

value and introduction of the evidence would lead to a lengthy sideshow that would needlessly

delay the case and waste time.  *See Guidi v. Inter-Continental Hotels Grp.*, 2003 WL 190904, at

*1–2 (S.D.N.Y. April 16, 2003) (excluding evidence under Rule 403 where likelihood of jury

confusion is great and where there would be significant trial time wasted and jury attention

diverted from material issues).

ADDENDUM  A - 41

### H.    Questions to Other Witnesses about the Credibility of Claudia

The Government moves to preclude witnesses from asking about specific instances of the conduct of Claudia to attack her character for truthfulness and from asking about her reputation for truthfulness among any community with which the witness is unfamiliar or does not have personal knowledge.  In particular, it focuses on a book by one of Claudia's college roommates and one of the alleged victims, Daniel Levin, in which he described hearing that Claudia had a reputation for dishonesty in high school and admitted that he dated her briefly.  That same book also describes an incident where Claudia was not truthful about her driving exam.

Rule 608(a) permits a witness's credibility to be "attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character."  Fed. R. Evid. 608(a).[4]  In addition, under Rule 608(b), "specific instances of a witness's conduct" may be inquired into on cross-examination if they are probative of the character for truthfulness or untruthfulness of the witness or another witness about whom the witness being cross-examined has testified.  Fed R. Evid. 608(b).  If a witness is to testify regarding the reputation another has in the community for truthfulness or untruthfulness, the witness must be familiar with respect to both the community and the reputation.

The defense is correct that it has the right to confront witnesses against Ray and to cross-examine them aggressively and that "[t]he court should avoid any blanket prohibition on exploration of an area that is central to an assessment of the witness's reliability."  *Maldonado-Rivera*, 922 F.2d at 955.  Still, the proponent of reputation evidence must establish that he or she has some familiarity with the community in which the witness resides in order "to speak with

---

[4] Evidence of a truthful character can only be elicited after the witness's character for truthfulness has been attacked.  *Id.*

authority of the terms in which generally [the witness] is regarded." *United States v. Whitmore*, 359 F.3d 609, 616 (D.C. Cir. 2004) (quoting *Michelson v. United States*, 335 U.S. 469, 478 (1948)).  "Such impeachment is usually limited to testimony by a member of the community in which the witness lives, works or spends a substantial portion of his time, regarding the witness' community reputation for truth." *United States v. Augello*, 452 F.2d 1135, 1139 (2d Cir. 1971) (holding that it was error to admit the reputation testimony of an officer who was "probably was not a member of the communities in which [the primary witness] lived or worked"); *see also United States v. Watson*, 669 F.2d 1374, 1381 (11th Cir. 1982) ("A proper foundation must be laid before the admission of reputation testimony.").

The Government's motion is denied.  "The trial court should exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds." *King v. Wang*, 2021 WL 5232454, at *2 (S.D.N.Y. Nov. 9, 2021) (*United States v. Ulbricht*, 79 F. Supp. 3d 466, 478 (S.D.N.Y. 2015)).  The defense argues that Mr. Levin went on to spend a substantial amount of time with Claudia over the three years after they met in college, including living with her in New York and having a sexual relationship with her.  Although Mr. Levin would not be able to testify to what he heard about Claudia's then-reputation from a handful of people who were friendly with Claudia at an earlier period in time before Mr. Levin had met Claudia if the defense does not establish that he had some contemporaneous familiarity with the community in which she held that reputation, the Court cannot say at this point that the defense will not be able to establish the appropriate foundation.  Notably, the Second Circuit has recently held that a district court committed error when excluding reputation evidence when a proper foundation had been laid. *United States v. Zhong*, No. 19-4110 (2d Cir. Feb. 23, 2020) at 24

ADDENDUM  A - 43

(concluding that district court committed error by not allowing witnesses to reputation for truthfulness where witnesses worked with the defendant).

The parties also agree that if a secondary witness testifies about Claudia's character for truthfulness, the defense can inquire about specific instances of conduct that are inconsistent with that character for truthfulness, but they disagree about what evidence would be inconsistent with the character for truthfulness and what type of evidence would open the door to cross-examination of a secondary witness about the specific instances of conduct.  The Government argues that the secondary witness has to testify about the character of Claudia.  The defense argues that anything that bolsters Claudia's reputation or character, including statements in the Government's opening, will open the door to the questioning of the secondary witness.  In short, the defense argues for a rule that would permit it to offer "specific instances of conduct" any time when the Government will ask the jury to believe a witness.   To the extent the parties seek a ruling on the specific instances of conduct that are inconsistent with a character for truthfulness, the motion is premature, and the Court will rule on the specific instances of conduct at trial if and when the issue arises. However, the Government is correct that only testimony by the secondary witness about the character of Claudia will open the door to inquiry of that witness about the instances of conduct.

Finally, the Government asks for an in limine ruling that it be permitted to offer statements from Mr. Levin's book *Slomin Woods 9* if his credibility is attacked.  The defense objects and argues that the book was written after his motive to fabricate arose.  The motion is premature, and it will be denied on that basis.  Mr. Levin has not testified, and he has not been cross-examined.  The question at this stage is purely hypothetical.

ADDENDUM  A - 44

## I.     Video, Audio, and Handwriting Identifications under Rule 701

The Government argues that Special Agent Kelly Maguire should be permitted to identify by voice or appearance the identities of individuals who are depicted in photographs and video recordings or heard on video or audio recordings seized from the Defendant's residence or otherwise obtained from searches.  It argues that she should be permitted to identify the Defendant in photographs, video, and audio and do the same with respect to other relevant individuals with whom she is familiar based on in-person interactions.

The defense argues that video and photo identifications of Ray should be precluded because Agent Maguire has insufficient familiarity with him, it would not be helpful to the jury which itself can observe Ray, and the Government has made no showing that her identifications would be reliable.  It argues that it is entitled to a *Wade* hearing.  It also makes the same arguments with respect to the other identifications.

The motion as to the identifications of Ray is denied.  The testimony at the suppression hearing established that Agent Maguire spent substantial time with Ray the day that he was arrested.  She spent roughly an hour and a half interviewing him and heard his voice.  Dkt. No. 180 at 117.  She also has been in Court with him on numerous occasions and has had the opportunity to hear his voice on those occasions.  As the defense has pointed out, there is no evidence that Ray's appearance has changed from the date of the recordings until now.  She thus was in a position to observe and perceive Ray, her testimony would be rationally based on those perceptions, it would be helpful to a determination of an issue in fact, and it is not based on scientific, technical, or otherwise specialized knowledge.

The defense's main argument is that the jury will be in a position to observe Ray, and thus Agent Maguire's testimony will do nothing more than what the jury itself will be able to do.  There are several answers to that argument.  First, at least during the Government's case—and

ADDENDUM  A - 45

perhaps throughout the trial—the jury will not necessarily have the opportunity to hear Ray's voice; even if it does, it may not be able to hear it for the concentrated and extended period of time Agent Maguire has heard it.  After the Government closes its case, the Defendant may choose not to testify, and in that event, the jury will never hear his voice.  Second, as to the video identifications, while the jury—if it chooses to look at Ray—will have the opportunity over time to observe him, that observation may be unsatisfactory.  First and foremost, given the Court's current COVID-19 protocol, Ray will be wearing a mask for the duration of the trial and would only remove it for any meaningful period of time if he were to take the witness stand.  Agent Maguire, on the other hand, arrested Ray in February 2020, when he was not wearing a mask, and Agent Maguire was able to observe his face unobstructed.  Furthermore, even if conditions change to permit Ray to remove his mask, the agent's identifications would be helpful and admissible.  To the extent the jurors will have the opportunity to observe Ray in the courtroom, the jurors would be observing him at the expense of observing the witnesses during their testimony, as is necessary to discharge their duties as fact finders.  The Court expects to charge the jurors that one of the ways that they can tell whether to credit a witness's testimony is to observe his or her demeanor on the stand.  And if the jurors were to follow that instruction, they would only be able to observe Ray incidentally, when the jurors might be otherwise occupied (e.g., in entering or leaving the courtroom) and when Ray might be obscured by counsel.  Those observations are not a substitute for Agent Maguire's testimony. Even if the jurors might be able eventually to confirm Agent Maguire's identification or—to the contrary—question that identification, that later identification does not render Agent Maguire's testimony unhelpful.  The Government is entitled to put on its case, and it would be helpful to an accurate determination of the issues in fact if the jurors were to have the benefit of Agent Maguire's observations and

identifications at the time the evidence is offered and not have to rely on their later observations

to determine the significance and meaning of the evidence.  *See United States v. Arroyo*, 600 F.

App'x 11, 15 (2d Cir. 2015) (summary order) (finding a witness's familiarity with a defendant's

"manner of dress, gait, and demeanor" over the course of several encounters sufficient for their

identification to be helpful to the jury) (citing *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir.

2005)); *see also United States v. Suleitopa*, 719 F. App'x 233, 234–35 (4th Cir. 2018) (finding a

government's witness's 8 to10 hours of surveillance video review and observation of the

defendant in court to be sufficient for his identification of the defendant on the video to be

helpful to the jury); *United States v. Pirk*, 2019 WL 442449, at *2–3 (W.D.N.Y. Feb. 5, 2019)

(finding that witness's testimony was helpful to the jury, and therefore admissible, because the

witness had "viewed the video frame-by-frame[] and reflected his observations" concerning the

witness's appearance before and after the charged offenses).

The defense's citation to *Wade* is inapposite.  *See United States v. Wade*, 388 U.S. 218

(1967).  That case involved a pretrial line up, and Second Circuit cases applying that case have

done so concerning out-of-court identification procedures facilitated by the government.  As the

defense quotes in their opposition, "a *Wade* hearing is generally granted where any question is

raised concerning the suggestibility of the identification procedure."  Dkt. No. 371at 23 (quoting

*United States v. Chandler*, 164 F. Supp. 3d 368, 383 (E.D.N.Y. 2016)).  The defense points to

*United States v. Kahan* for the proposition that *Wade* applies to "experienced, trained

government agents," but that case concerned a prior out-of-court, government facilitated

identification procedure where the identifying witness happened to be a government agent.  350

F. Supp. 784, 800 (S.D.N.Y. 1972), *rev'd on other grounds* 479 F.2d 290 (2d Cir. 1973).  *Kahan*

explains that "[t]he *Wade* court expressed concern with the dangers inherent in lineups or show-

ADDENDUM  A - 47

ups involving *any* witnesses." *Id.* (emphasis in original). This case involves no such identification procedure. Unlike in the circumstances of *Wade*, Agent Maguire will identify Ray in open court, under oath, and all circumstances of that identification will be subject to challenge by cross-examination.

As to the other individuals, the Court denies the motion in limine and reserves on the issue until the Government offers evidence or makes a proffer as to the opportunities of the agent to personally observe and perceive those individuals.

The defense also argues that Agent Maguire should not be permitted to testify as to whom certain items belonged. The motion is granted. Belonging is a question of ownership and not of where an item is located. Unless and until Agent Maguire identifies a foundation based upon her personal knowledge (rather than upon hearsay), she will not be permitted to testify to whom certain items belonged.

The Government further argues that Agent Maguire should be permitted to identify the handwriting and entries in the notebooks of the alleged victims "based on her review of their handwriting and entries in those notebooks that are signed by those victims." Dkt. No. 323 at 32. The Government also expects to have the agent identify Ms. Pollok's handwriting. The defense argues that the agent has not acquired familiarity with the handwriting other than in the context of the current litigation and thus that it should be excluded. It relies upon Rules 701 and 901(b)(2) and *United States v. Samet*, 466 F.3d 251, 256 (2d Cir. 2006).

This issue is not amenable to resolution on a motion in limine. For Agent Maguire to testify regarding handwriting the Government must satisfy both Rule 701 and Rule 901(b)(2). The Second Circuit in *Samet* held that "a lay witness who testifies as to her opinion regarding someone's handwriting pursuant to Rule 701 must satisfy Rule 901(b)(2)'s command that that

ADDENDUM A - 48

her familiarity with the handwriting was not acquired solely for purposes of litigation."  466 F.3d at 256.  However, in *Samet*, the Circuit drew a distinction between familiarity acquired for the purposes of testifying—which is not sufficient to satisfy the Rules—and familiarity acquired over the course of an investigation.  *Id.* at 257.  It held that familiarity acquired over the course of an investigation does satisfy the "not acquired for purposes of the litigation" standard of Rule 901(b)(2).  Whether Agent Maguire can establish the requisite foundation that she acquired such familiarity during the course of the investigation and did so other than on the basis of hearsay statements from the alleged victims telling her that certain handwriting belonged to them will have to await testimony at trial or a further proffer from the Government.

### J.    Evidence about Prior Incarceration and *New York Magazine* Article

The Government intends to elicit testimony at trial that the alleged victims were told by Ray's daughter before they even met Ray, that he had been wrongly prosecuted and imprisoned based on a plot by Bernard Kerik and others and that Ray repeated those claims to them, forming the basis for the conspiracy that Ray later accused the alleged victims of participating in and to which they "confessed."  It also expects to elicit testimony about the publication of a *New York Magazine* article in approximately April 2019 and that once Ray and Pollok became aware of the impending article, they began gathering incriminating information against the alleged victims.  According to the Government, the publication of the article, prior to Ray's arrest in this case led him and Pollok to undertake efforts to retaliate against the alleged victims they believed had cooperated with the authors of the article.

The defense objects to both types of evidence.  It does not dispute that in the Second Circuit "[e]vidence of uncharged criminal activity can be admitted as direct evidence under Rule 403 . . . if it is inextricably intertwined with evidence regarding the charged offenses, or if it is necessary to complete the story of the crime at trial."  *United States v. Cedeno*, 756 F. App'x 24,

ADDENDUM  A - 49

28 (2d Cir. 2018) (summary order) (quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)).  It contends that Ray's prior incarceration is only marginally relevant at best; according to the defense, the alleged victims can testify that Ray told them he was the victim of a vast conspiracy by Kerik and others and, as a matter of fact, his prior incarceration was only one of a number of reasons for his falling out with Kerik; another was that Ray spoke out against Kerik when Kerik was nominated as U.S. Secretary of Homeland Security.

The defense argument as to the prior incarceration is without merit.  That Defendant had been imprisoned prior to meeting many of the alleged victims is relevant to the Government's theory of the case.  It is not being received for the fact that Ray was incarcerated but for the effect that the narrative of his "unjust" imprisonment had on the alleged victims and his ability to assert control over them.  It also provides helpful context for relevant pieces of evidence that the Government has represented that it intends to offer for admission at trial, including e-mails sent by Claudia that reference Ray's past imprisonment.[5] *United States v. Diaz*, 176 F.3d 52, 79-80 (2d Cir. 1999) (evidence of "uncharged acts may be admissible as direct evidence of the conspiracy itself" (quoting *United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997))).  There is no unfairness in the receipt of the evidence.  According to the evidence proffered by the Government, Ray injected the fact of the imprisonment into this case when he used it as part of the narrative to impress them with the harm that he had suffered and to convince them that they were part of a group that caused that harm.  Moreover, the evidence is not "'significantly more sensational and disturbing than the charged crimes.'" *Zhong*, slip op. at 19 (quoting *United States v. Curley*, 639 F.3d 50, 62 (2d Cir. 2011) (explaining that Rule 403 analysis applies even to

---

[5] The Government has offered to redact a portion of Claudia's e-mail that references that she Ray was imprisoned for a child-custody matter.

evidence necessary to "complete the story"). The evidence is no more inflammatory or powerful than the evidence that is even more directly relevant to the charged crimes.

The defense argues that the conviction and imprisonment should be excluded because the period of incarceration ended more than a decade ago. It argues that for the same reasons that it is presumed prejudicial to admit evidence of a defendant's prior convictions under Rule 609(b) when more than ten years has passed since the conviction or release from confinement, so too is it prejudicial to introduce the fact of Ray's prior incarceration at the outset of the case. The analogy is inapt. Old convictions are presumptively excluded under Rule 609(b) not because they are more prejudicial than recent convictions but because they are of more marginal value and relevance. *See* Rule 609(b) Advisory Committee notes ("The Committee was of the view that after ten years following a person's release from confinement (or from the date of his conviction) the probative value of the conviction with respect to that person's credibility diminished to a point where it should no longer be admissible."); *see also United States v. Garcia*, 291 F.3d 127, 138 (2d Cir. 2002) (explaining that "[t]he length of time between the events . . . detract from any potential probative value of the prior conviction"); *United States v. Brown*, 2009 WL 728448, at *4 (E.D.N.Y. Mar. 10, 2009) (noting that the probative value of convictions over ten years old "is considered so minimal that such convictions are subject to the more stringent balancing test under Rule 609(b).")

When convictions that are more than ten years old are introduced for non-impeachment purposes, a court measures admissibility under Federal Rule of Evidence 403, whereby evidence is admitted unless its probative value is substantially outweighed by the risk of prejudice, rather than the other way around. *See Scotto v. Brady*, 410 F. App'x 355, 360 (2d Cir. 2010) (summary order). The release from imprisonment here occurred more than a decade ago, but the alleged

ADDENDUM  A - 51

criminal activity in the Second Superseding Indictment took place over the course of a decade, and Ray was released from his imprisonment shortly before he is alleged to have committed the instant crime.  Notably, the fact of his prior incarceration is relevant: the Government proffers that he used the fact of his prior imprisonment as part of his narrative to the victims in order to convince them that he was the subject of a conspiracy, of which they became a part.  Any prejudice that Ray would suffer as a result of introducing evidence related to his prior conviction would not substantially outweigh this probative value.

The defense argues that evidence regarding the *New York Magazine* article is irrelevant and unduly prejudicial under Rules 401, 402, and 403, and depending on how the Government intends to elicit evidence regarding the article, it might constitute inadmissible hearsay under Rules 801 and 802.  The defense also raises the concern that mere publication of an article in a respected national magazine chronicling the events at issue at trial, as well as the fact that the article sparked a federal investigation, might lend credence to the Government's version of those events and improperly bolster the Government's case.

Evidence regarding the drafting and publication of the *New York Magazine* article is relevant, and Defendant has not established that its probative value is substantially outweighed by any prejudicial effect.  The indictment alleges predicate acts of the racketeering conspiracy including acts "indictable under Title 18, United States Code, Section 1512 and 2."  Dkt. No. 292 ¶ 8(i).  As pertinent here, that provision makes it a crime if a person (1) "knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding," 18 U.S.C. § 1512(b)(1), or (2) "corruptly … obstructs, influences, or impedes any official proceeding, or attempts to do so," *id.* § 1512(c)(2).

# ADDENDUM  A - 52

Significantly, for purposes of Section 1512, "an official proceeding need not be pending or about to be instituted at the time of the offense." *Id.* § 1512(f)(1).  Nor need the Government prove that such a proceeding was or would be federal.  *See United States v. Pugh*, 945 F.3d 9, 21 (2d Cir. 2019).  It is sufficient that the Government prove that the proceeding was reasonably foreseeable to the Defendant.  *Id.* (quoting *United States v. Martinez*, 862 F.3d 2223, 237 (2d Cir. 2017), *vacated on other grounds by Rodriguez v. United States*, 139 S.Ct. 2772 (2019)).

Assuming the jury credits the evidence proffered by the Government, it would tend to prove the predicate acts alleged in the indictment.   Specifically, the evidence on its face shows Defendant and his alleged co-conspirator undertook efforts to retaliate against individuals who described to the magazine author evidence that, if credited, would implicate Ray in crimes and could reasonably be believed to lead to some form of an official proceeding.  The evidence on its face also tends to suggest efforts to influence the testimony of those individuals—to prevent it or at least change it.  Assuming the jury further finds that the existence of an official proceeding would be reasonably foreseeable to Ray at the time, the evidence thus would tend to inculpate Ray in the crime of witness tampering under Section 1512.   The conduct of Ray and his co-conspirator in response to the drafting and the publication of the article is also relevant to show the means and methods of the Enterprise, and how its members would assert control over its alleged victims.

The defense offers that the introduction of the article would be unduly prejudicial and could give rise to a risk of juror misconduct.  It raises the concern that a juror, hearing about the article, would be tempted to do research on her own into the article.  The Government states, however, that it does not intend to offer the article itself into evidence and that the testimony and exhibits regarding the drafting and the publication of the article is directly relevant and essential

ADDENDUM  A - 53

to the crime with which Ray was charged by the grand jury.  The force of the evidence is in the alleged efforts by Ray and his co-conspirators to prevent the alleged victims from reporting what they believed had happened to them (and which, if believed, could inculpate Ray in crimes).  As to the risk of juror misconduct, it is purely speculative.  This is a high-profile case that, as the defense has argued, has attracted media attention in the past and is likely to attract media attention during the trial.  The Court will instruct the jurors not to conduct any independent investigation or read or listen to the case and to report to the Court if they have been exposed to any information about the case.  Jurors are presumed to follow such instructions.  *United States v. Pforzheimer*, 826 F.2d 200, 205 (2d Cir. 1987) ("It is a fundamental proposition that a jury is presumed to follow the instructions of the trial judge.").  There is no reason to believe that a juror who follows that instruction will still look up the *New York Magazine* article or that the risk of jurors being exposed to extrajudicial information will be any greater with the introduction of information about the article into the case than it will be without introduction of information about the article into the case.  And to the extent that there would be any residual incremental risk, the Court can address that risk by limiting instructions and other measures such as directing that the title of the article not be received into evidence.  The Government has not, at this time, moved to offer the title of the article into evidence.  To the extent that it does, the Court will consider whether any probative value of the title is substantially outweighed by the prejudicial effect that may come with it.

### K.    Cross-Examination of FBI Witnesses

The Government moves to limit the cross-examination of the three FBI law enforcement witnesses who are expected to testify at trial to the scope of their direct testimony and matters affecting their credibility.  The three witnesses are Special Agent Kelly Maguire who led the team that executed the search warrants in this case and participated in the post-arrest interview of

ADDENDUM  A - 54

Ray, who will testify about the execution of the search and relevant materials found during it and will offer summary charts which will contain timelines prepared from other exhibits in the case; Forensic Examiner Stephen Flatley, who will testify about his forensic examination of digital evidence in the case; and Forensic Accountant Mark Lubin, who will testify about relevant bank transactions and summary exhibits that show the flow of funds at issue in the case as well as about receipts seized from Ray's residence that show his expenditure of what the Government claims are criminal proceeds.

Federal Rule of Evidence 611(b) states that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility" but then goes on to make clear that "[t]he court may allow inquiry into additional matters as if on direct examination."  Fed. R. Evid. 611(b).  "The district court has broad discretion to determine the scope of cross-examination."  *United States v. Koskerides*, 877 F.2d 1129, 1136 (2d Cir. 1989).

The Government expresses concern that the defense will use cross-examination to inquire into the nature of the investigation and the manner in which evidence was gathered.  It also expresses concern that the defense will ask Special Agent Maguire about other events not depicted in her charts or mentioned in her testimony that support their view of the case.

The Government's motion is denied as premature.  *See United States v. Wagner*, 2022 WL 19179, at *4 (S.D.N.Y. Jan. 3, 2022).  "[T]he Government's witnesses have yet to testify and thus the scope of the witnesses' direct examination regarding the investigation of the defendant is still unknown."  *Id.*; *see also United States v. Sampson*, 2015 WL 2066073, at *15 (E.D.N.Y. May 4, 2015).  The Second Circuit case it cites for the proposition that the defense may not inquire into how evidence was gathered did not relate to cross-examination of an agent

ADDENDUM  A - 55

who conducted a search regarding the very search she testified about on direct examination. *See United States v. Malpeso*, 115 F.3d 155, 162–63 (2d Cir. 1997) (holding that district court properly limited scope of cross-examination when defense sought to use it to divert the jury's attention from the conduct of the defendants to the conduct of the FBI, an FBI informant, and the United States Attorney's Office). It very well may be that the defense will seek to ask questions that exceed the scope of direct examination and that therefore should be limited. But whether it seeks to do so, and whether the Court will have to sustain an objection will have to await the direct testimony of the witnesses and the Government's objection to any line of examination it deems exceeds the scope of Rule 611.

### L.     Alleged False Exculpatory Statements During Post-Arrest Interview

The Government intends to offer certain of Defendant's admissions during his post-arrest interview through the testimony of Special Agent Maguire. It contends that, during the same interview, Ray made false self-exculpatory statements, and it seeks to prevent the defense from introducing those statements under Rule 801(d)(2). The defense argues that the Government should not be permitted to offer Agent Maguire's notes of the interview as recorded on FBI Form 302 or, in the alternative, it should be permitted to offer the remainder of the statements (save for references to Ray's prior criminal history) under the rule of completeness.

To the extent that the defense seeks a ruling in limine in advance of trial that under no circumstances will the Form 302 be admitted even in part, that motion is denied. The FBI Form 302 is hearsay and does not qualify as a party admission; nor is there evidence that it constitutes an adoptive admission under Federal Rule of Evidence 801(d)(2). *See United States v. Felix-Jerez*, 667 F.2d 1297, 1299–300 (9th Cir. 1982). The Government's motion is therefore granted to the extent that it seeks to prevent the defense from introducing the statements under Rule 801(d)(2). However, depending upon how the evidence is developed at trial, there may be

circumstances under which the notes can be admissible as a past recollection recorded or be used to refresh recollection.

Ruling on admission of particular statements made by Ray under the rule of completeness is premature.  Under the rule of completeness, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."  Fed. R. Evid. 106.  "The rule of completeness provides that 'even though a statement may be hearsay, an omitted portion of the statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion.'" *United States v. Kopp*, 562 F.3d 141, 144 (2d Cir. 2009) (quoting *United States v. Johnson,* 507 F.3d 793, 796 (2d Cir. 2007)).

Until the Court sees the statement and the portions that the Government seeks to offer as well as the portions that the defense seeks to offer, the Court cannot make a ruling as to the offer under the rule of completeness.  The Court will address the issue after the direct examination of Agent Maguire.

### M.    Bank Records and Recorded Bank Calls, Telephone Records, and Records from GoDaddy

The Government intends to offer certain records at trial, such as bank records and recorded bank calls, telephone records, and records from GoDaddy (including paper records and calls) as business records under Rule 803(6) certified as authentic with a certification of a custodian or another qualified person.  Under Federal Rule of Evidence 902(11), "[t]he original or a copy of a domestic record that meets the requirements of [the business record exception] as shown by a certification of the custodian or another qualified person that complies with a federal

ADDENDUM  A - 57

statute or a rule prescribed by the Supreme Court" is self-authenticating and requires no extrinsic evidence of authenticity to be admissible. Fed. R. Evid. 902(11). Business record certifications are not testimonial, and therefore the Defendant enjoys no right of confrontation against the person who prepares such a certification. *See United States v. Clotaire*, 963 F.3d 1288, 1296 (2d Cir. 2020).

The defense does not object to the motion in limine and the parties indicated that they have reached an agreement on authenticity. Therefore, this motion is moot.

### N.     Presence of Revenue Agent Catanzaro

The Government seeks an order that IRS Revenue Agent Valerie Catanzaro may remain in the courtroom during the testimony of other witnesses to be able to calculate the tax loss caused by Ray's conduct based on witness testimony. Witnesses will testify about the prostitution proceeds and extortion proceeds. Based on the evidence at trial, the Government will have the agent calculate tax due during each of the calendar years 2015 to 2019 and the resulting tax liability. She is also expected to testify concerning her creation of summary charts reflecting the courses of income otherwise presented in the trial.

The defense objects that Agent Catanzaro is testifying as an expert and asks that she be precluded. In the alternative, it asks that Agent Catanzaro's testimony be limited to subjects that do not require expertise (unlike tax computation). It notes that the agent in *United States v. Cadet*, 2009 WL 2959606 (E.D.N.Y. 2009) cited by the Government was noticed as expert testimony. Although the defense identifies numerous cases in which a government agent testified as an expert in this area, these cases do not discuss the ultimate issue of whether such a designation is *required* in order for the witness's testimony to be admissible.

The Second Circuit has not directly addressed the issue whether an IRS agent may testify as a summary witness in a tax evasion case. However, many other circuit courts have addressed

the issue and they have concluded that an IRS agent may do so. *See United States v. Stierhoff*, 549 F.3d 19, 28 (1st Cir. 2008) ("We hold, therefore, that in a tax evasion case, a summary witness may be permitted to summarize and analyze the facts of record as long as the witness does not directly address the ultimate question of whether the accused did in fact intend to evade federal income taxes."); *United States v. Pree*, 408 F.3d 855, 869–70 (7th Cir. 2005) (concluding that an IRS agent properly testified as a summary witness where he analyzed stock sales at issue and described income tax consequences); *United States v. Nicholson*, 961 F.3d 328, 336 (5th Cir. 2020) (affirming admission of summary witness testimony of an IRS agent where the agent's testimony and summary charts were "derived from the evidence that had already been introduced, namely, earlier testimony, tax return documents, and bank account records"); *United States v. Sabino*, 274 F.3d 1053, 1067–68 (6th Cir. 2001), *opinion amended and superseded*, 307 F.3d 446 (6th Cir. 2002) (affirming IRS agent testifying as a summary witness where she "analyzed the multitude of documents and testimony admitted into evidence and properly testified as to the government's calculation of tax due from the [defendants]"). Those conclusions are consistent with the rulings by a number of judges in this District. *See United States v. Barnwell*, 2017 WL 1063457, at *2 (S.D.N.Y. Mar. 20, 2017) (allowing an IRS agent to testify to a defendant's tax liability as a summary witness); *United States v. Ariel Jimenez*, 18 Cr. 879 (SHS) (S.D.N.Y.) (Agent Catanzaro provided summary non-expert testimony in February 2022); *United States v. Rebecca Bayuo*, 15 Cr. 576 (JGK) (S.D.N.Y.) (Agent Catanzaro provided summary non-expert testimony in October 2018); *United States v. Joseph Scali*, 16 Cr. 466 (NSR) (S.D.N.Y.) (Agent Catanzaro provided summary non-expert testimony in February 2018).

 The result follows logically from the Second Circuit's conclusion, on a related issue, that "[a] witness's specialized knowledge, or the fact that he was chosen to carry out an investigation

ADDENDUM A - 59

because of this knowledge, does not render his testimony 'expert' as long as it was based on his 'investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise.'"  *United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007) (quoting *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004)).  In *Rigas*, the Second Circuit found that an accountant testifying to his calculations concerning what a company would have owed if they had not, as other fact witnesses testified, fraudulently reclassified their debt was properly considered summary testimony.  *Id.* at 224; *see also United States v. Blakstad*, 2021 WL 5233417, at *4–6 (S.D.N.Y. Nov. 9, 2021) (finding an accountant properly testified as a summary witness where the witness had reviewed voluminous financial records and produced summary exhibits tracing payments between different financial accounts in a securities fraud prosecution); *Barnwell*, 2017 WL 1063457, at *2 (allowing IRS agent to testify to a defendant's tax liability as a summary witness).  It follows that Agent Catanzaro may testify without being qualified as an expert.  The Court has no reason to doubt the Government's assertion that they intend for Agent Catanzaro's testimony to be limited to that properly offered by a summary witness.

In any event, even if Agent Catanzaro's testimony were to be considered expert, the defense suffered no prejudice from the Government's failure to designate the agent as an expert pursuant to Federal Rule of Criminal Procedure 16.  The defense has known since the Defendant was indicted for tax evasion that the Government would offer evidence that there was tax due and owing and it knew through the Government's disclosure of the documents recovered from Defendant's residence what that evidence would show. The Government has represented that by the end of this week, and thus well before trial, it will provide the defense drafts of Agent Catanzaro's charts based on what he expects the evidence will establish.  The defense therefore

ADDENDUM  A - 60

will not be surprised by "unexpected testimony." *United States v. Cruz*, 363 F.3d 187, 196 (2d Cir. 2004) (quoting *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997)). The defense has both the methodology by which the agent will determine the amount of tax due and owing and the documents to which the agent will apply that methodology.

The Government has satisfied Federal Rule of Evidence 615's sequestration exception for a witness "whose presence a party shows to be essential to presenting the party's claim or defense." Fed. R. Evid. 615(c). Agent Catanzaro's summary testimony must be based on the evidence. *United States v. Koskerides*, 877 F.2d at 1134. Her presence therefore is essential.

### O.     Evidence of Defendant's Earlier Filing of Tax Returns

The Government seeks an order approving its offer of evidence that the Defendant previously filed tax returns in 1998 as evidence to show that his failure to file returns in the tax years 2015 to 2019 was not an innocent error but was "a voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 196 (1991). The Government argues that evidence that Ray filed returns supports that he knew of the obligation to file returns and to report all of his taxable income and tends to prove the ultimate fact that he knew he had tax due and owing. *See United States v. Scali*, 2018 WL 461441, at *5–6 (S.D.N.Y. Jan. 18, 2018) (evidence of defendant's filing history admissible to prove "willfulness and corrupt intent"); *United States v. Gilmartin*, 684 F. App'x 8, 11 (2d Cir. 2017) (summary order) ("[C]ertain facts can support an inference that a defendant willfully violated his duty to obey tax laws, including the defendant's prior taxpaying record").

The defense responds that the evidence of Ray's 1998 tax return would be prejudicial. It does not intend to argue that Ray believed that the tax laws did not apply to him. It intends to argue that Ray did not believe the money received as repayment for poisoning constituted taxable income and thus did not willfully commit tax fraud by failing to report it. It points out

that evidence that Ray last filed a tax return in 1998 would only invite the jury to speculate he is a tax fraud who has not filed returns for years. It identifies no other prejudice than the date of the tax return.

Rule 401 defines relevant evidence as that which "has any tendency to make a fact more or less probable than it would be without the evidence," so long as "the fact is of consequence in determining the action." Fed. R. Evid. 401; *see also Old Chief v. United States,* 519 U.S. 172, 178 (1997). "The fact to which the evidence is directed need not be in dispute." *Old Chief,* 519 U.S. at 179 (quoting Federal Rule of Evidence 401 advisory committee's note) (internal quotation mark omitted).

The previously filed tax return is relevant regardless whether Ray intends to argue that the tax laws do not apply to him. The prejudicial impact can be readily addressed. The Government has represented that it would be prepared to stipulate with the defense that the Defendant has filed a federal tax return prior to the 2015 tax year. If the parties are unable to reach an agreement on such a stipulation, the Court is prepared to address any prejudice to Ray that could result from evidence showing he filed a tax return in 1998 by issuing a limiting instruction—absent objection by the defense—that the jury should not ascribe any significance to the choice of tax year prior to 2015 for which the Government has offered a tax return. *See Pforzheimer*, 826 F.2d at 205; *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) ("Absent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions."). The motion therefore is granted. The Court will receive either a stipulation or the tax return.

ADDENDUM  A - 62

## II. Defense In Limine Motions

### A. Motion to Preclude Evidence that Felicia had Sex with "Strangers"

The defense moves to preclude evidence that Ray forced Felicia to "provide sexual services, including to strangers." Dkt. No. 325 at 1.  According to the Government, it has evidence that Ray "often would lock Felicia out of their residence and not allow her to come back inside until and unless she provided a recording showing that she had had sex with a stranger.  The defendant often directed Pollok to accompany Felicia to ensure that Felicia complied." Dkt. No. 323 at 22.  The Second Superseding Indictment charges such conduct in connection with the "forced labor" predicate racketeering act, and the Government argues that it violates the Trafficking Victims Protection Act, 18 U.S.C. § 1589(1).  The defense argues that "sex with strangers" does not constitute a "service" and does not fall within the purview of "forced labor" because it does not confer a benefit on anyone and that, in the absence of any connection between the evidence and charged conduct, the evidence would be confusing and unduly prejudicial and serve "merely to try to portray Mr. Ray as a generally bad guy."  Dkt. No. 325 at 3.

The Government responds that the evidence would tend to establish that Ray violated 18 U.S.C. § 1589 because he "provided" the sexual "labor or services" of Felicia to others "by means of force or threats of force" and "serious harm and threats of serious harm."  It also argues that the evidence shows that Ray "obtain[ed] the labor or services" of Felicia by force and threat of force and serious harm by causing her to provide him with pornographic videos that she created.  Dkt. No. 367 at 3.  Finally, the Government argues that, even apart from the forced labor charge, the video evidence is probative of the means and methods of the Enterprise and that it is relevant to the charges of forced labor in North Carolina because the coercive conditions on

## ADDENDUM  A - 63

that manual labor can only be understood in the context of the abuse and exploitation that immediately preceded it, and which was a method of the Enterprise. *Id.* at 5.

The Trafficking Victims Protection Act of 2000 ("TVPA"), a subset of the Victims of Trafficking and Violence Protection Act of 2000, Publ. L. No. 106-386, 114 Stat. 1464 (2000), makes it illegal to "knowingly provid[e] or obtai[n] the labor or services of a person by any one of, or by," among other things, "means of force, threats of force, physical restraint or threats of physical restraint to that person or another person," or "means of serious harm or threats of serious harm to that person or another person." 18 U.S.C. § 1589(a)(1), (2). The statute does not define "labor" or "services." The parties have raised the question whether the conduct would constitute "forced labor" as that term should be understood in Section 1589. The Second Circuit has held that the terms "labor" and "services" in the TVPA are to be interpreted in accord with their ordinary meanings. *See United States v. Marcus*, 628 F.3d 36, 44 (2d Cir. 2010). At the same time, however, the Circuit has not considered whether and how far the language of the statute extends beyond conduct from which the defendant derives "pecuniary gain." *Id.* Judge Ross has defined "labor" as the "expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory" and "services" as "useful labor that does not produce a tangible commodity." *United States v. Marcus*, 487 F. Supp. 2d 289, 300 (E.D.N.Y. 2007) (internal citations omitted).[6] The Government has not yet identified a limiting principle to its

---

[6] Other circuits have generally considered the question: the Tenth Circuit has explained that, in affirming a conviction, the Fourth Circuit stated that "sexual acts that have been coerced by other means are covered by the involuntary servitude statute," *United States*. v. *Kaufman*, 546 F.3d 1242, 1262 (10th Cir. 2008) (citing *United States v. Udezor*, 515 F.3d 260 (4th Cir. 2008)), and that the statute applies to "coerced acts other than 'work in an economic sense,'" *id.* at 1263. But in that case—which also considered whether the conduct constituted involuntary servitude—the alleged victims provided a benefit to the defendants both in the form of work on a farm and in the form of creating pornography for the presumed enjoyment of the defendants. *See also Bistline v. Parker*, 918 F.3d 849, 873 (10th Cir. 2019) (holding that plaintiffs who were ordered

argument.  Washing the dishes may also be considered to require the expenditure of physical

effort that is fatiguing, but it is not clear that a parent who threatens force if his child does not do

the household chores would be guilty of a federal crime under the Government's theory.

The Court need not decide, at this juncture, whether the Defendant directing Felicia to

have sex with strangers constitutes forced labor within the meaning of federal law because it

finds that it is relevant to the means and methods of the Enterprise.  The defense has conceded

that testimony that the Defendant directed Felicia to have sex with strangers is relevant to the

means and methods of the Enterprise and, to that extent, has abandoned the most aggressive form

of its in limine motion.

The evidence would be relevant in any event.  The Second Superseding Indictment

alleges that the means and methods of the Enterprise included "[s]ubjecting the Victims to sexual

.and psychological manipulation," Dkt. No. 292 ¶ 7(c), and "[c]reating and collecting sensitive,

humiliating, and incriminating material against the Victims to further the purposes of the

Enterprise, including the continued obedience of the Victims, the enrichment of the Enterprise,

and evasion of detection by law enforcement," *id.* ¶ 7(i).  The "sexual . . . manipulation" is

alleged to be a method by which, among other things, Ray "exract[ed] purported confessions for

the Victims that they had caused harm and damage to members and associates of the Enterprise."

*Id.* ¶ 5.  Evidence that Ray forced Felicia to have sex with strangers and to record those

encounters—and that there is video of such encounters—is relevant to these allegations.  The

relevance of evidence related to this directive and these encounters are not outweighed by unfair

prejudice to Ray.  To the extent the evidence is troubling, that would be because the allegations

into sexual relationships were victims of forced labor); *Gilbert v. United States Olympic Comm.*,
2019 WL 1058194, at *8 (D. Colo. Mar. 6, 2019) (holding that sexual acts that are compelled as
a condition of being permitted to compete in sporting events constituted forced labor).

# ADDENDUM  A - 65

are troubling.  The prejudice that would result from the jury learning about the means Ray used to assert control over Felicia would not be "unfair."

The thrust of the defense argument is that, while the fact that videotapes were made might be admissible, the videotapes themselves should not be received.  The defense asserts that the content of the videotapes themselves is extraordinarily prejudicial and that prejudicial impact far outweighs any probative value.  At argument, the Government stated that it intended only to offer a limited number of still photographs and did not intend to play the videotapes for the jury.  But whether even the limited number of still photographs would survive a Rule 403 review and whether the tapes should be received cannot be decided in the abstract.  The Court will have to evaluate the particular pieces of evidence that may be presented and hear argument before it can decide whether each piece is admissible under the applicable Federal Rules of Evidence; nothing in the Court's Opinion should be read to prejudge the admissibility of particular pieces of evidence with respect to Felicia's sexual conduct with strangers.

> **B.  Motion to Preclude Evidence that Isabella Pollok had Sex with Strangers and Other Grooming Evidence Related to Pollok's Sexual Activities**

In its disclosure letters, the Government claims it has evidence of Ray's co-defendant Pollok having sex with numerous different people and that Ms. Pollok would "teach" an alleged victim how to give a "blowjob."  The Defendant moves to exclude the evidence on the grounds that it is irrelevant, unduly prejudicial, and confusing.  It argues that neither Ray nor Pollok are charged with sexual misconduct related to Pollok and that evidence of Ray allegedly sexually "grooming" Pollok and Pollok's other sexual activities is not directly relevant to the charged crimes.

The Government responds that the evidence is admissible to demonstrate the relationship of trust that developed between Ray and Pollok and to explain the events leading up to Pollok's

ADDENDUM  A - 66

participation with Ray in the charged crimes.  According to the Government, Ray's "grooming"
of Pollok is necessary to show she came to be his loyal deputy and to help him carry out the
goals of the Enterprise, including the sexual manipulation of its victims, the forced labor, and the
sex trafficking.  Dkt. No. 367 at. 8–9.  Sexual grooming was one of Ray's methods of gaining
control over the victims in order to carry out the Enterprise's racketeering activity, including
extortion, forced labor, and sex trafficking.  For that reason, the Government contends that proof
of Pollok's participation in sexual activity with other victims is direct evidence of the charged
crimes.  It further points out that a person can be both a conspirator as well as in a relationship
where she is dominated by her co-conspirator.  *Id.* at 9.

Ray reads the Second Superseding Indictment's allegations and Rule 401 too narrowly.
It is the theory of the indictment that "Ray, with the assistance of Pollok and others, subjected
the Victims to sexual and psychological manipulation, physical abuse, and threats of violence, in
order, among other things, to extract purported confessions from the Victims that they had
caused harm and damage to members and associates of the Enterprise," which were then used to
extort the alleged victims.  Dkt. No. 292 ¶ 5; *see also id.* ¶ 7(c).  It is the Government's theory
that Pollok was "sexually groomed" both to enlist her trust in the conspiracy and also to help
give her the tools to carry out the objectives of the Enterprise.  As noted, the Second Circuit has
held that the Court can admit even "'prior acts to inform the jury of the background of the
conspiracy charged, in order to help explain how the illegal relationship between participants in
the crime developed, or to explain the mutual trust that existed between conspirators.'"  *United
States v. Pascarella*, 84 F.3d 61, 73 (2d Cir. 1996) (quoting *United States v. Rosa*, 11 F.3d 315,
334 (2d Cir. 1993), *cert. denied*, 511 U.S. 1042 (1994)); *see also United States v. Jones*, 738 F
Appx 13, 16 (2d Cir. 2018) (same).  "'The trial court should exclude evidence on a motion *in*

ADDENDUM  A - 67

*limine* only when the evidence is clearly inadmissible on all potential grounds.'" *United States v. Ulbricht*, 79 F. Supp. 3d 466, 479 (S.D.N.Y. 2015) (quoting *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164–65 (S.D.N.Y. 2006)).  The evidence at issue here falls within that category which is necessary and helpful to understand the background of the conspiracy, how the relationship between Ray and Pollok developed, and the mutual trust that existed between them. Nothing in the proffered evidence is more inflammatory or sensational than what is already in the Second Superseding Indictment.

While the Court will not grant the defense motion to preclude generally evidence related to Pollok's sexual acts, this decision should not be read to prejudge the admissibility of particular pieces of evidence.  If the Government offers evidence related to Pollok's sexual acts the probative value of which is substantially outweighed by the risk of unfair prejudice, jury confusion, or another consideration enumerated in Rule 403, the Court will not admit that evidence.

### C.   Motion to Preclude the Government's Toxicologist from Testifying that Ray was not Poisoned

Ray moves to preclude Government expert Dr. Richard Pleus's testimony that Ray has not suffered a health impairment from intentional poisoning.  In support, the defense contends that the relevant question is whether Ray believed he was poisoned and because "whether Mr. Ray was in fact poisoned is not a fact at issue," Dkt. No. 325 at 7, testimony on this point is irrelevant.

The Government responds that it expects to respond to evidence of Ray's belief that he had been poisoned in two ways, one of which implicates testimony that Ray was not, in fact, poisoned.  Specifically, the Government submits that it will seek to show that "the evidence

ADDENDUM  A - 68

indicates that the defendant did not in fact hold this belief, but instead used false accusations to exploit his victims."  Dkt. No. 367 at 10.

Evidence is relevant if it tends to make a fact of consequence more or less probable.  Fed. R. Evid. 401.  Relevance is a "very low standard," *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (quoting *United States. v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008) and, "unless an exception applies, all '[r]elevant evidence is admissible,'" *id.* (quoting Fed. R. Evid. 402). *See also United States v. Quattrone*, 441 F.3d 153, 188 (2d Cir. 2006) ("[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry.").  The Government has explained that evidence relating to whether Ray was, in fact, poisoned—a category to which Dr. Pleus's testimony belongs—is relevant to its theory of the case insofar as it tends to prove that Ray did not actually believe that he was poisoned but made such claims solely to extort his alleged victims.  The Court finds that this satisfies the "low bar" of relevance. The motion is denied.

**D.  Motion to Exclude the Maps Offered by the Government's Cell-Site Expert**

Ray moves to exclude the maps offered by the Government's cell-site expert, arguing that the maps are misleading because they incorrectly suggest that the coverage areas of cell sites are a specific size and that the subject phones are in the shaded areas.  The Government responds that its expert's testimony will explain the maps and make clear that the shaded circles on the map depict a cell-site location, that coverage is varied among cell-site types, and that the cell-site coverage areas are not necessarily circular, thus curing any anticipated confusion.

A summary exhibit must "be based on foundation testimony connecting it with the underlying evidence summarized."  *Fagiola v. Nat'l Gypsum Co. AC & S.*, 906 F.2d 53, 57 (2d Cir. 1990).  "[W]hen summaries are used . . . the court must ascertain with certainty that they are

ADDENDUM  A - 69

based upon and fairly represent competent evidence already before the jury. . . ."  *United States v. Conlin*, 551 F.2d 534, 538 (2d Cir. 1977) (quoting *Gordon v. United States*, 438 F.2d 858, 876 (5th Cir. 1971)).  Furthermore, "[a] chart which for any reason presents an unfair picture can be a potent weapon for harm, and permitting the jury to consider it is error."  *Conlin*, 551 F.2d at 539 (citing *Steele v. United States*, 222 F.2d 628, 630 (5th Cir. 1955)).

Since oral argument on these motions, the Government has submitted revised summary maps.    Dkt. No. 379.  The maps address the Court's concern that the circles could be read, misleadingly, to suggest a cellphone was located within them rather than to identify the location of a cell site.  The expert will explain the summary maps.  They are not misleading.  The motion is denied.

### E.    Motion to Permit Limited Attorney-Led Voir Dire

Ray moves the Court to permit each side thirty minutes of attorney-conducted voir dire as a complement and in addition to the Court's voir dire during the jury selection process.  The motion is denied.

Federal Rule of Criminal Procedure 24(a)(1) provides that "[t]he court may examine prospective jurors or may permit the attorneys for the parties to do so."  Fed. R. Cr. P. 24(a)(1).  The Court has "ample discretion in determining how best to conduct the *voir dire*" because ultimately it falls to the trial judge in the first instance to "impanel an impartial jury ... and he must rely largely on his immediate perceptions."  *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981).  The general view, at least among judges, is that "examination by the court is the preferable practice and . . . it results in great savings of time and improves the character of the examination."  Wright & Miller, Federal Prac. & P. §380.

The defense argues that jurors are more likely to be truthful and forthcoming when questioned by advocates with an in-depth knowledge of the issues in the case than by the Court

ADDENDUM  A - 70

alone.  Dkt. No. 325 at 8.  But, as Judge Weinfeld opined, "based on more than three decades of

judicial service," that he was "persuaded beyond peradventure of doubt" that court-led voir dire

"without exception, has resulted in the empanelling of fair and impartial juries … selected

expeditiously and with full protection of a defendant's constitutional right to an impartial jury"

even in cases involving "the widest publicity in the news media over extended periods of time."

*United States v. Wilson*, 571 F. Supp. 1422, 1428 (S.D.N.Y. 1983).   The defense has offered no

reason in this case to depart from the wisdom of Judge Weinfeld.  With respect to knowledge of

the issues in the case, the Court will rely on counsel to suggest additional questions to pose to the

jurors and will pose them if it considers them to be proper and not repetitive.  Fed R. Cr. P.

24(a)(2).

### F.     Motion to Preclude Government Expert Dr. Hughes from Transmitting Inadmissible Hearsay or Testifying about Irrelevant and Unduly Prejudicial Conduct and Cases

Ray moves in limine to preclude Government expert Dr. Dawn Hughes from

transmitting, through her expert testimony, statements that would constitute inadmissible

hearsay; and from testifying about conduct and cases that have no factual connection to this case

and that are therefore irrelevant and also unduly prejudicial.

Rule 703 allows an expert to base her opinion on facts or data that other experts in the

field would reasonably rely on in forming an opinion on the subject.  Fed. R. Evid. 703.  As the

Court has previously recognized in concluding that Dr. Hughes' testimony is admissible under

Rule 702, such data may include statements that would otherwise be inadmissible as hearsay.

*See* Dkt. No. 287.  However, if those underlying facts or data would be inadmissible, an expert

may disclose them to the jury only if their probative value in helping the jury evaluate the

opinion substantially outweighs the prejudicial effect of the facts or data.  Fed. R. Evid. 703.

The defense argues that allowing Dr. Hughes to transmit hearsay on which she has relied in forming her opinion would "inflame the jury and unduly prejudice Mr. Ray by associating him in the jury's mind with" abusers of the individuals whose statements Dr. Hughes may transmit. Dkt. No. 326 at 4. It also contends that the probative value of such statements is minimal at best. Relatedly, the defense contends that Dr. Hughes should be precluded from testifying about "notorious sexual abuse scandals involving minors that will be well known to members of the jury, but which are entirely unrelated to the alleged conduct at issue in this case." *Id.*

The Government replies that the use of "real-life examples" to explain tactics of coercive control are appropriate and useful because they will help the jury to understand how individuals in positions of authority—like, the Government submits, Ray was—can facilitate the exploitation of a victim and affect her ability to process or report abuse. The Government further submits that Dr. Hughes regularly and routinely gathers data from victim interviews in her practice, and to disallow reference to information gained from that interview would make it difficult for her to transmit her expertise to the jury.

The motion is denied. The Government has represented that Dr. Hughes will not be testifying about the specific facts of this case but rather will be testifying from her general knowledge and using examples that may be familiar to the jury to underscore her generalized testimony. The Court agrees that if Dr. Hughes were not permitted to use generalized examples or refer to limited number of anecdotes and statements that informed her expert opinion, it could be very difficult for her to convey her expert opinion in a manner that the jury will understand. *Cf.* Fed. R. Evid. 702 (allowing an expert to testify if her knowledge will help the trier of fact to understand the evidence). That is particularly the case where, as here, the defense has challenged her expertise and testimony. As the Second Circuit explained in an opinion issued yesterday,

ADDENDUM A - 72

*Zhong*, portions of expert testimony that bear "at best, tangential relevance to [a defendant's] case" are not permissibly admitted. Slip op. at 29. Thus, an expert cannot "provide a detailed commentary on the specific facts" of a defendant's allegedly criminal operation, so as to avoid coming "'dangerously close to usurping the jury's function' by effectively 'providing an overall conclusion of criminal conduct.'" *Id.* at 4 (quoting *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003)); *see also id.* at 27, 29. But, as the Circuit noted, expert testimony may be useful in explaining why victims would be relatively unlikely to seek help or fear the consequences of leaving the control of their abuser. *See id.* at 26–27 (explaining that "forced-labor enterprises . . . may involve complex activities that jurors would not readily understand as aspects of a forced-labor scheme," including that "perpetrators of forced labor may encumber workers by involving them in crimes, making the workers less likely to seek help and more likely to fear the consequences of leaving their company's employ."). In so noting, the Circuit cited favorably to a case where expert testimony "'could have helped the jury' better understand, *inter alia*, 'the relationship between pimps and their prostitutes, . . . how pimps recruit prostitutes, and how pimps control prostitutes." *Id.* at 27, n.11 (quoting *United States v. Brinson*, 772 F.3d 1314, 1319 (10th Cir. 2014)).

The Government submits that Dr. Hughes will use only generalized examples to explain her expertise. Additionally, and as noted in the Court's prior opinion denying the defense challenge to Dr. Hughes' testimony on Rule 702, 401, and 403 grounds, Dr. Hughes will be testifying not about Ray's intent, "but to help a jury understand a common set of conduct experience[d] by victims or the actions normally taken by those committing certain crimes to seduce their victims . . . and to explain 'seemingly counterintuitive behavior' of victims or 'conduct not normally familiar to most jurors.'" Dkt. No. 287 at 21 (quoting *United States v.*

ADDENDUM  A - 73

*Torres*, 2021 WL 1947503, at *7 (S.D.N.Y. May 13, 2021)).  Given that Dr. Hughes will not

testify about Ray, his allegedly criminal conduct, or any statements made by the alleged victims,

and given the lack of similarity of background (other than the alleged offense conduct) between

Ray and the generalized examples that Dr. Hughes may use, there is little, if any, chance that the

jury will "hold Mr. Ray responsible for these other people and their actions."  Dkt. No. 326 at 7;

*see also Zhong*, slip op. at 29–31 (concluding that it was error for the district court to admit

expert testimony that "improperly risked prejudicing the jury against [the defendant]" where the

testimony "highlighted China's poor record with respect to forced labor" and where the

defendant was "a Chinese man who was associated with the Chinese government.").   Because

there is minimal prejudice associated with Dr. Hughes' use of hearsay and demonstrative

examples, the Court concludes that the probative value in helping the jury evaluate Dr. Hughes'

opinion substantially outweighs the prejudicial effect, if any, that would result from her use of

such facts and data.  Fed. R. Evid. 703.

### G. Motion to Introduce Evidence Reflecting Ray's Then-Existing State of Mind During the Charged Racketeering Conspiracy

Ray moves for an in limine order that certain exhibits are relevant and admissible under

Federal Rule of Evidence 803(3) to prove his then-existing state of mind.  The exhibits include

an April 2016 letter from Ray to then United States Attorney Preet Bharara in which Ray states

that "[f]our members of my family and I have been intentionally poisoned by three college

students" and reports that the "three students, from two separate families, have made repeated

statements against their interests about their involvement in the poisoning conspiracy" and that

the students "told us that Bernard Kerik, Frank DiTommaso, Gerald Speziale, and the parents of

the students were/are behind the poisoning with the intention to kill me, my daughter and others

and/or otherwise interfere with my potential testimony in the Bernard Kerik federal case and the

related perjury case against Frank and Peter DiTommaso."  Ray relays that he has reported the incidents to the New York Police Department and the Manhattan District Attorney's Office without success and asks that the United States Attorney investigate.  Dkt. No. 327-8.  The exhibits also include "confessions" from the alleged victims admitting to poisoning Ray that Ray sent to a Special Agent of the United States APA Criminal Investigation Division after meeting with that agent in December 2015, as well as an exhibit reflecting that the EPA declined to pursue the investigation "because it does not have the jurisdiction over the chemical poisoning that occurred to you."  Dkt. No. 327-2–327-7.  Ray argues that his acts in sending the evidence to the EPA and in asking the United States Attorney to investigate constitute assertions that demonstrate that he contemporaneously believed the claims in the letters and, in turn, show that he lacked criminal intent.  Dkt. No. 327 at 4, 6.  He argues that the defense must be permitted to rebut the Government's theory that such beliefs were a mere "cover" or means by which Ray furthered his criminal enterprise by showing that he undertook significant efforts to bring attention to what he believed was his poisoning by the alleged victims in this case.  The defense argues that it does not seek to introduce the documents to prove the truth of the matters in them (i.e., that he was poisoned) but to show his state of mind that he believed that he was poisoned.

The Government responds that the exhibits should be excluded because they do not constitute proper state of mind evidence and are irrelevant and unduly prejudicial.  Dkt. No. 367 at 17–18.  The exhibits are irrelevant, according to the Government, because whether Ray believed he was being poisoned or not has no bearing on the *mens rea* of the charged offenses. *Id.* at 19.  They constitute hearsay, according to the Government, because they were not made contemporaneously with the evidence being described but constitute backward-looking statements and because Defendant is not the declarant–the "confessions" were made by someone

else.  The Government further contends that the statements are not admissible to show Ray was

actively reaching out to law enforcement because such evidence is impermissible offered for the

truth of demonstrating the defendant's innocence.  *Id.* at 22.

As already explained, out-of-court statements are not hearsay when they are offered into

evidence for something other than the truth of the matter asserted.  *See* Fed. R. Evid. 801.

Moreover, a statement that relates to a declarant's state of mind—including motive, intent, or

plan—*at the time he made the statement* is not excluded by the rule against hearsay and may be

admitted if otherwise admissible.  *See* Fed. R. Evid. 803(3); *United States v. Cardascia*, 951 F.2d

474, 488 (2d Cir. 1991); *United States v. Farhane*, 634 F.3d 127, 171–75 (2d Cir. 2011) (Raggi,

J., concurring).  Thus, statements that relate to a defendant's belief at the time the statement is

made are not excludable on the basis of hearsay.  *See United States v. Harris*, 733 F.2d 994,

1004 (2d Cir. 1984).

The Court will admit the statements.  The Government's assertion that the evidence falls

outside Rule 803(3) because it refers to earlier conduct and contains statements of others

mistakes the limited purpose for which the defense seeks to use the evidence.  The evidence is

not being offered for the truth of the statements in the letter or in the materials sent to law

enforcement (i.e., that Ray was poisoned by the alleged victims in this case).  Nor is it even

being offered for the state of mind of those individuals (i.e., that they believed that they had

poisoned Ray or told Ray that he was being poisoned), and it will not be received for that

purpose.  The hearsay exception for state-of-mind evidence under Rule 803 "specifically

excludes 'a statement of memory or belief to prove the fact remembered or believed.'  That

exclusion 'is necessary to prevent the exception from swallowing the hearsay rule.'"  *United*

*States v. Dawkins*, 999 F.3d 767, 790 (2d Cir. 2021) (internal citations omitted).  But that does

not mean that the presence of historical events in a communication renders the statement ineligible for admission under Rule 403 when it is the belief and not the truth of the fact believed in that is relevant.  Here, the exhibits being offered as evidence of Ray's state of mind at the time he conveyed the information to law enforcement—as a non-verbal act in which he demonstrated his acceptance of and in his belief in the information he was transmitting to law enforcement.  In other words, the theory of the defense is that the fact that he sent the information to law enforcement and asked for it to be investigated is evidence that he believed the information he asked law enforcement to investigate.

The Government's reliance on *United States v. Benalcazar*, 2011 WL 4553027, at *14 (N.D. Ill. Sept. 29, 2011), and *United States v. Lumiere*, 16 Cr. 483-01(JSR), Dkt No. 62, 1/6/2017 Tr. at 11, is likewise mistaken.  Those cases stand for the proposition that a defendant's interaction with law enforcement, after the commission of the crime and "offered to negate criminal intent, is not only irrelevant but also confusing and misleading to the jury."  *Bencalazar*, 2011 WL 4553027, at *14.  In those cases, the interaction with law enforcement post-dated the conduct alleged to be criminal.  The interaction was not relevant to, or evidence of, the declarant's then-existing state of mind at the time the defendant was engaged in allegedly criminal activity.  The statements and acts at issue were self-serving ones that were tantamount to the defendant's testimony in court "I am innocent."  They had no other relevance.  To the extent that the statements were offered to show state of mind, they failed the "then-existing" requirement; the evidence was of a later statement offered to show an earlier state of mind.   In *Lumiere*, for example, the Court excluded evidence that the defendant was attempting to cooperate with law enforcement that was proffered as evidence of the defendant's innocence on the grounds that it constituted hearsay, was of minimal relevance, and was unduly prejudicial and

ADDENDUM  A - 77

confusing under Rule 403.  But, in that case, even assuming that the offer to cooperate demonstrated the defendant's state-of-mind, it would only have demonstrated his state of mind after he was charged with the crime and not during his commission of the crime.  Likewise in *United States v. Davidson*, 308 F. Supp.2d 461 (S.D.N.Y. 2004), the statement at issue was made not at the time of the commission of the alleged crime but months after and constituted no more than the defendant's "version of what took place months earlier," *id.* at 480.  It therefore was "not reliable evidence of [the defendant's] state of mind at the time when the allegedly criminal acts were taking place." *Id.*

In this case, by contrast, the interaction with law enforcement occurred during the commission of the alleged crimes and is being offered not to show some prior state of mind but to show the defendant's state of mind contemporaneously with the commission of the alleged crimes.  The indictment alleges that the defendant "[t]hreaten[ed] to turn the Victims in to law enforcement in light of their purported confessions, which threats were made to further the purposes of the Enterprise, including the continued obedience of the Victims, the enrichment of the Enterprise, and evasion of detection by law enforcement."  Dkt No. 292 ¶ 7(j).  Defendant is entitled to prove that he collected the confessions not to threaten the Victims and not to evade detection by law enforcement but to use the confessions with law enforcement and to invite an investigation of what he believed to be a crime against himself.   The defendant may not be able to establish that defense (and it may not be a defense to some of the charges in the Indictment), but the law does not prevent him from trying.  The evidence falls within the protection of 803(3). *See United States v. DiMaria*, 727 F.2d 265 (2d Cir. 1984); *United States v. Harris*, 733 F.2d 994 (2d Cir. 1984); *United States v. Lawal*, 736 F.2d 5 (2d Cir. 1984).

# ADDENDUM  A - 78

For the same reasons, the Court rejects the Government's argument that the Court should exclude the evidence as irrelevant.

> ### H.     Motion to Preclude Trial Participants from Referring to the Complaining Witnesses as "Victims" or from Using Inflammatory, Confusing, or Unduly Prejudicial Language

Ray moves to preclude the Government's lawyers and witnesses from referring to the complaining witnesses in this case as "victims."  The Government opposes the motion but also states that it intends to refer to the complaining witnesses as victims only in its opening and closing statements and that its expert Dr. Hughes may refer to victims generically.   The defense motion is granted in part and denied in part.

The defense cites to a number of cases in which courts have held that it constitutes improper vouching and is inconsistent with the constitutional presumption of innocence for the Government and its witnesses to refer to complaining witnesses as "victims" in a case where the defense is that no crime occurred.  *See State v. Sperou*, 442 P.3d 581, 590 (Or. 2019) (holding that "the use of the term "victim" to refer to the complaining witness or other witnesses, in circumstances where the accusers' own testimony is the only evidence that the alleged criminal conduct occurred, conveys the speaker's belief that the accusers are credible" and that "where a defendant denies that any crime occurred, references to the complaining witness as a 'victim' may undermine the presumption of defendant's innocence because it assumes defendant's guilt, a fact that is necessarily not proved until the jury finds the defendant guilty"); *State v. Albino*, , 24 A.3d 602, 615 (Conn. App. 2011) ("[I]n a case where there is a challenge as to whether a crime occurred, the repeated use of the words victim, murder and murder weapon is improper"); *Jackson v. State*, 600 A.2d 21, 25 (Del. 1991) (opinion on motion for clarification of opinion and/or rehearing *en banc*) (holding that it is improper for the prosecutor to repeatedly use the term "victim" "in a case where consent was the sole defense, and the principal issue one of

ADDENDUM  A - 79

credibility," because it would "suggest to the jury, that a crime necessarily had been committed" whereas "if the defense of consent were accepted by the jury, no crime would have been proven and the complaining witness would not be deemed a victim"); *State v. Devey*, 138 P.3d 90, 95 (Utah 2006) (holding that "where a defendant claims that the charged crime did not actually occur, and the allegations against that defendant are based almost exclusively on the complaining witness's testimony—the trial court, the State, and all witnesses should be prohibited from referring to the complaining witness as "'the victim'"); *Allen v. State*, 644 A.2d 982, 983 n.1 (Del. 1994) ("[W]hen, as here, consent is the sole defense in a rape case, the use of the term 'victim' by a prosecutor at trial is improper and to be avoided."); *State v. Nomura*, 903 P.2d 718, 721 (Haw. App. Ct. 1995) ("[T]he term 'victim' is conclusive in nature and connotes a predetermination that the person referred to had in fact been wronged. Because the question of whether Witness had been abused was a question yet to be decided by the jury, it was improper to refer to her as 'the victim.'"); *cf. United States v. Wagner*, 2022 WL 19179, at *6 (S.D.N.Y. Jan. 3, 2022) (precluding the Government from referring to defendant's ex-girlfriend as a "victim" where the charge did not involve a victim and the probative value of such a reference was "outweighed by the risk of unfair prejudice under Rule 403").[7]

As a general matter, the Court finds those cases persuasive. Indeed, the Government appears tacitly to concede that there is no need for it or its witnesses to refer to the alleged victims in this case as victims outside of jury addresses. At the same time, however, the motion sweeps too broadly. The defense would preclude the Government from referring to the alleged

---

[7] *United States v. Lussier*, 2019 WL 2489906, at *5 (D. Minn. June 15, 2019) and *United States v. Henery*, 2015 WL 409684, at *5 (D. Idaho Jan. 29, 2015) are not to the contrary. Neither considered whether it is proper for the Government and witnesses to refer to the complaining witnesses as victims when the defense is that no crime occurred and that there were no victims.

ADDENDUM A - 80

victims as victims even in its jury addresses. But the Government is permitted to lay out for the jury in its opening statement what it expects the evidence to prove, including that the complaining witnesses are victims and in its closing statement what it believes that the evidence has proved, again that the witnesses are victims. *See United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998) ("what might superficially appear to be improper vouching for witness credibility may turn out on closer examination to be permissible references to the evidence in the case"); *see also United States v. Arias-Javier*, 392 F. App'x 896 (2d Cir. 2010) (summary order) ("The prosecution is permitted vigorously to argue for the jury to find its witnesses credible as long as it does not link its own credibility to that of the witness or imply the existence of extraneous proof supporting the witness's credibility"). There is no basis for the further restriction the defense motion asks the Court to impose.

Recognizing that a number of judges in this District have declined to issue an order similar to the one the defense requests in this case, *see, e,g, United States v. Benjamin*, 18 Cr. 874 (JSR) (S.D.N.Y.), Tr. of May 8, 2019, ECF No. 53 at 6; *United States v. Dupigny*, 18 Cr. 528 (JMF) (S.D.N.Y.), Tr. of Oct 17, 2019, ECF No. 198 at 49–50; *United States v. Maxwell*, 20 Cr. 330 (AJN), Tr. of Nov. 1, 2021, ECF No. 465 at 4–5, the Court respectfully disagrees. Each case must be judged on its own facts. Unless the defense opens the door, the Government is ordered not to refer, in the presence of the jury, to the alleged victims as victims outside of its jury addresses.[8]

The defense also moves to preclude the Government and its witnesses from using inflammatory terms such as "brainwash," "cult," "gaslighting," grooming," and "lieutenant."

---

[8] Unless the defense opens the door, the Government experts may refer generally to victims but not to the alleged victims in this case as victims.

ADDENDUM  A - 81

It argues that such terms pose a grave risk of prejudice and also threaten to intrude upon the Court's role in instructing the jury on the applicable law and on the jury's role in applying the law to the facts before it.  It further contends that words such as "cult" and "groomer" presuppose the ultimate issue of lack of consent and will express to the jury the legal conclusion that Ray committed the conduct of which he is accused.   The Government states that it does not expect to use the words "brainwash" or "cult" but cannot preclude that a witness from using those terms unexpectedly and without being prompted.  The Government does expect to use the words gaslighting, grooming or lieutenant.  For example, Dr. Hughes will describe certain characteristic coercive tactics including gaslighting and grooming.  The defense motion is denied.  Unlike the word "victim," terms such as "gaslighting" and "grooming" do not presume the ultimate issue before the jury.  They are central to the Government's presentation of the facts of the case.  The Government is permitted to use the terms.

I.      **Similar-Incidents Evidence Regarding Ray's Ex-Wife and Two Ex-Girlfriends**

In its opposition to the Government motion in limine, the defense seeks to exclude the Government from offering evidence of prior incidents of alleged violence and financial exploitation in intimate relationships involving Ray's ex-wife and two ex-girlfriends.  Dkt. No. 371 at 37.  The Government claims that the evidence is relevant to show Ray's intent, plan, and knowledge.  The defense objects that the prior acts do not bear a similarity or connection to the charged conduct and are not relevant, and that, even to the extent the evidence is relevant, that relevance would be outweighed by the risk of unfair prejudice.

Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Evidence of other acts "may be

ADDENDUM  A - 82

admissible for another purpose, such as proving . . . intent, . . . plan, [or] knowledge." Fed. R.

Evid. 404(b)(2). "[A] district court may not freely admit evidence of conduct simply because it

relates to the charged crimes or the government offers it for a purpose other than to demonstrate

the defendant's propensity to commit the alleged conduct." *Zhong*, slip op. at 18. But the

government "to offer '"other act" evidence . . . to show knowledge or intent' only when 'such

evidence [is] "sufficiently similar to the conduct at issue" to permit the jury to draw a reasonable

inference of knowledge or intent from the other act.'" *Id.* at 18–19 (quoting *United States v.

Cadet*, 664 F.3d 27, 32 (2d Cir. 2011)).

By letter dated February 23, 2022, the Government stated that it seeks to introduce only

the testimony of one of Ray's ex-girlfriends, Valerie. Dkt. No. 379. As directed by the Court at

the February 22, 2022, oral argument, the defense shall respond to the Government's letter by

5 p.m. on February 28, 2022. The Court will reserve decision on this issue until it has reviewed

the defense's submission.

### J.     Cleo

The Second Superseding Indictment specifically alleges that "Ray led the Enterprise and

targeted a group of college students and others (the 'Victims') for indoctrination and criminal

exploitation by the Enterprise." Dkt No. 292 4. The Government represents that the "others"

includes Cleo. The Government moves in limine for an order Cleo be permitted to testify only

under her first name at trial and that cross-examination be limited to exclude questions regarding

her home and work address, and phone number, and the identity of her employer. The alleged

victim Cleo is an older professional in her fifties who allegedly turned to the Defendant for help

in clearing up her regulatory paperwork after she lost her job in the financial services sector at a

large bank as a result of misconduct by her then-husband. Instead of providing help, the

Defendant allegedly extorted her by forcing her to make confessions and then demanding

ADDENDUM  A - 83

repayment for the allegedly victim's supposed wrongdoings, extracting payments of, on average, between $10,000 to $20,000.  Over time, the alleged victim gave an estimated $100,000 to $200,000 to Defendant.  The Defendant also tried to force the alleged victim to give him the proceeds from the sale of her co-op apartment in Manhattan in payment for the help he provided to her, but—after her attorney became suspicious and caused the proceeds to be placed into an escrow account—she ceased communications with him.  Even then, the Defendant allegedly launched a website about her with her name which discussed her dishonesty.

The defense opposes that motion and also argues that evidence regarding the alleged extortion of Cleo should be excluded as irrelevant.  As to relevancy, it argues that the extortion of Cleo from 2010 to 2011 is standalone uncharged crime that is outside of the time frame and scope of the alleged Enterprise and does not share a nexus with the other alleged extortions because Cleo is decades older than the other alleged victims, did not live with Ray, and had her own well-established career at the time of the alleged crime at issue.  As to permitting the witness to testify by her first name, the defense argues that doing so would wrongly suggest to the jury that she feared violent reprisals from Ray as a consequence of her testimony.  It points out that any professional harm caused to the alleged victim by using her full name would be purely speculative, as she uses a different last name professionally and that the planned testimony has nothing to do with sex or with particularly embarrassing information.  The defense indicates it has no intention to elicit information regarding the witness's address or phone number but that it does intend to elicit evidence that she worked as a financial adviser for years, including the names of her employers, because that evidence is relevant to her anticipated testimony relating to financial transactions with Ray

ADDENDUM  A - 84

The defense's motion to preclude testimony from Cleo is denied.  The testimony is not "other acts" testimony; it is charged by the Indictment.  The Indictment charges that "Ray led the Enterprise and targeted a group of college students *and others* (the 'Victims') for indoctrination and criminal exploitation by the Enterprise."  Dkt No. 292 ¶ 4 (emphasis added).  The Government has represented that Cleo is among the "others."  The Government also has proffered evidence that the extortion of Cleo falls within the scope of the racketeering conspiracy alleged in the indictment.  Contrary to the defense argument, the time frame of the alleged extortion of Cleo falls squarely within the time period of the racketeering conspiracy alleged in the indictment, which charges a racketeering conspiracy from at least in or around 2010 including in or around 2020.  Dkt. No. 292 ¶ 8.  The extortion of Cleo occurred in 2010 to 2011. It thus also falls within the scope of the conspiracy, the purposes of the Enterprise, and the means and methods of the Enterprise.  The purposes of the Enterprise are alleged to include enriching the members and associates of the Enterprise through extortion.  Dkt. No. 292 ¶ 6(a).   The means and methods of the Enterprise include "[e]xtracting purported confessions from the Victims that they had caused harm and damage to members and associates of the Enterprise," "[d]ocumenting and retaining Victims' purported confessions," and "[e]xtorting money from the Victims."  *Id.* 7(f)-(h).  It also involved the same persons who either were members of the Enterprise or other of its alleged victims.  According to the Government proffer, interrogations of Cleo were "often conducted in the presence of the Enterprise's other victims" and "sometimes with their participation."  Dkt. No. 327-1 at 7.  To the extent the predicate acts involve both Cleo and the college students, the evidence, if believed, appears to satisfy the requirements of horizonal and vertical relatedness.  *See United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992).  The evidence thus is relevant.

ADDENDUM  A - 85

The Government's motion that Cleo testify by pseudonym also is denied.  The alleged victim will testify by her full name and will be subject to cross-examination regarding her employer and her employment background.  The burden is on the Government to provide a reason why the jury should not be permitted to hear the witness's full name and the identity of her employer.  *See United States v. Marti*, 421 F.2d 1263, 1266 (2d Cir. 1970).  "[T]he reason may be that the answer may subject the witness to reprisals or that the question is being used to humiliate or annoy the witness." *Id.* (citing *Alford v. United States,* 282 U.S. 687, 694 (1931)).  "The defendant is then required to demonstrate a 'particularized need' for disclosure of the relevant information, which the court weighs against the risks to the witness." *United States v. Marcus*, 2007 WL 330388, at *1 (E.D.N.Y. Jan. 31, 2007) (citing *United States v. Bennett,* 409 F.2d 888, 901 (2d Cir.1969) and *United States v. Cavallaro,* 553 F.2d 300, 305 (2d Cir.1977)).

The Government argues that Cleo should be permitted to testify under her first name because she worked as a financial advisor at a large bank and expects to suffer reputational damages and embarrassment and "severe professional consequences if the defendant's behavior towards her, including extortion, violence, and a process of interrogation and induced confessions, if publicized or disclosed to her professional colleagues and clients."  Gov't Letter (Feb. 11, 2022) at 4.  It argues that she fears that she may be fired or lose the trust (and therefore the business) of her clients if they learn about her association with the Defendant and her testimony at trial.

These generalized, speculative concerns do not demonstrate a genuine risk of reprisal or that the questioning will be used to humiliate or annoy the witness.  The concern that the financial institution or its clients may learn that Cleo was a victim of the Defendant is not sufficient to permit her to testify by pseudonym.  In our society, it is not uncommon that

ADDENDUM  A - 86

individuals can end up being the victims of fraud or extortion, or claim to be so.  The
Government's argument, carried to its logical limit, would permit any victim of crime (or at least
of fraud or extortion) to testify by pseudonym for fear that by revealing the victim's true name
the public will learn that she was "duped" by a defendant.  The risk is even more attenuated here
where the alleged victim does not do business professionally under the name by which she will
testify in court.  The alleged victim also has indicated that she is reluctant to testify in public and
might not appear if she is not granted some degree of anonymity.  But it also is not uncommon
that alleged victims are reluctant to appear in court for any number of reasons.  If it were
sufficient that the Government proffer that the victim will not appear voluntarily unless she is
granted anonymity, any witness could get such anonymity merely on the basis of the
Government request.  If the Government really wants the testimony of Cleo and it is not able to
get it voluntarily without the anonymity the Court will not grant, the Government has ways of
compelling attendance.  It is not for the Court to make the Government's job easier.

     The articulated concern is speculative in yet another manner.  The Government
application is also based on supposition that it will not get out to the public or to colleagues and
clients at work that she is a witness at trial.  There is no reason for any participant in this trial to
publicize that Cleo will be testifying, but the Court views it as unlikely that even if Cleo were
able to testify only by first name but still give the full account of her alleged victimhood in this
high-profile case her participation in it will not be revealed and the purported protection of
testifying by pseudonym will prove to be illusory.  At the same time, there are real costs to Cleo
testifying by first name alone.  There is the risk that the jury will misunderstand the reason that
she is testifying by first name alone and believe that it is because of the risk of reprisal from
Defendant, and not from her employer.  There is also the risk to the integrity of the trial itself.

Without being able to mention Cleo's full name during voir dire, there is no assurance that a member of the jury will not be seated who knows or is familiar with Cleo.

The cases cited by the Government are inapposite.  In *United States v. Paris*, 2007 WL 1484974, at *2 (D. Conn. May 18, 2007), the victim-witnesses who were permitted to testify by their first names and the first initials of their last names were minors who testified they worked as prostitutes for the defendant and who since then had made substantial progress in getting their lives on a constructive and productive course.  The court found revelation of their full names would result in a "great setback" to them.  In *United States v. Jacobson*, 785 F. Supp. 563, 569 (E.D. Va. 1992), the court held that the victims could testify by pseudonyms and keep their true identities secret, but that was because the charge was that the defendant had caused the artificial insemination of the victims with his own sperm rather than using sperm from an anonymous donor as was represented; revelation of the full names of the parents who were artificially inseminated would have caused harm to the psychological health and welfare of the children who were literally the product of the defendant's fraud.  *United States v. Kelly*, No. 19 Cr. 286 (E.D.N.Y.), and *United States v. Maxwell*, 20 Cr. 330 (S.D.N.Y.) both involved testimony by the alleged victims that when they were children they were subject to sexual abuse by the defendant; the witnesses were expected to testify " in explicit detail about degrading and humiliating treatment in a trial that garnered a lot of media attention and where there was significant risk of humiliation and reprisals."  *Kelly*, No. 19 Cr. 286 (E.D.N.Y. Nov. 4, 2021), ECF No. 255 at 20. Finally, in *United States v. Loera*, 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018), the defendant was the leader of a large Mexican drug cartel and the witness had received protection for his testimony at trial.  There was a real risk of reprisal or harassment by the defendant or those associated with him.

ADDENDUM  A - 88

In this case, by contrast, the testimony of Cleo does not relate to sexual harassment or abuse; she was the subject of an alleged extortion.[9]  The Government does not claim that Cleo will be the subject of reprisal or harassment by the Defendant, or anyone associated with him. The risk that she will be the subject of reprisal by her employer for her truthful testimony is purely speculative.  And there is reason to question whether the protection that any order keeping her identity secret at trial would, in the long run, be anything other than illusory.

### K.    Information Alleged Victims Heard from Each Other During the Course of the Alleged Conspiracy

The defense objects to the introduction by the Government of statements by witnesses as to what they heard from other witnesses about an incident that they did not personally observe. The motion apparently is based on statements in the 3500 disclosures.  But interviews conducted in the course of an investigation are intended to elicit information that may go beyond what would be admissible in court.  The Government has not indicated it intends to offer any of the statements at issue.  Thus, the motion is premature.

### L.    Exclusion of Observations of Tina Sheppard and of Testimony by Julie Schulman

In its reply brief, the defense moves to exclude opinions by Government witness Tina Sheppard and the testimony of Julie Schulman, a doctor who examined Ray.  Both motions are made after the deadline for in limine motions.  The Court will not consider them in limine.  It will consider any issues at trial.

### CONCLUSION

The motions in limine are GRANTED in part and DENIED in part.

---

[9] The Court is in receipt of a letter dated February 24, 2022, requesting that other alleged victims be permitted to testify under their first names.  Nothing in this Opinion should be read to prejudge that application.  Throughout this Opinion, the Court has referred to the alleged victims by their first names only pending a decision on that application.

# ADDENDUM  A - 89

The Clerk of Court is respectfully directed to close Dkt. Nos. 323 and 324.


SO ORDERED.


Dated: February 24, 2022
       New York, New York

                                                    _____
                                                          LEWIS J. LIMAN
                                                    United States District Judge


ADDENDUM  A - 90

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                       :

UNITED STATES OF AMERICA,             :

                                       :

          -v-                         :

                                       :           20-cr-110 (LJL)

LAWRENCE RAY,                     :

                                       :          OPINION AND ORDER

                         Defendant.        :

                                       :

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _1/11/2022_

LEWIS J. LIMAN, United States District Judge:

Defendant Lawrence Ray ("Ray" or "Defendant") moves to exclude four of the government's witnesses from testifying as experts at his forthcoming criminal trial. In the alternative, he moves for a *Daubert* hearing to evaluate the proffered testimony of each of the four witnesses. The four witnesses are (1) Andrew Petersohn, a licensed professional engineer, whom the government offers to testify regarding the "geographical area or range within which the wireless devices assigned [three specific numbers] were used on certain dates in 2018 and 2019," Dkt. No. 263-1 at 5, including that the devices used cell sites in close geographic proximity and that two of the devices "most frequently accessed cell sites located near Piscataway, New Jersey," Dkt. No. 263-2 at 4; (2) Dawn Hughes, Ph.D., a clinical and forensic psychologist and purported expert "on sexual abuse, interpersonal violence, victimization, and traumatic stress," Dkt. No. 263-1 at 3, who "is expected to testify about coercive control as a tactic of victimization and a strategy to gain dominance across a spectrum of relationships," *id.* at 4; (3) Richard Pleus, Ph.D., who is expected to testify that Ray "has not suffered any health impairment from intentional poisoning," Dkt. No. 263 at 49–50; and (4) FBI Agent Stephen Flatley, who is expected to testify about the extraction of certain electronic devices and the imaging of digital material in connection with the case, Dkt. No. 263-1 at 2–3.

Finally, Petersohn's testimony is also relevant under Federal Rule of Evidence 401, and its probative value exceeds any potential for unfair prejudice under Federal Rule of Evidence 403. In particular, the government proffers that the expert testimony is being offered to corroborate the testimony of Female Victim-1. She apparently will testify that she met with commercial sex clients at various hotels in New York City, and that on numerous occasions she met with Ray and Pollok at or near her hotel or near the residence of Ray and Pollok in Piscataway, New Jersey, to transfer the proceeds of her commercial sex work. The cell-site location evidence will show that cellphones used by Ray and Pollok accessed cell sites in the vicinity of Female Victim-1's cellphone on the dates of such transfers. It also will establish that the cellphones used by Ray and Pollok were in proximity to one another during relevant calls. "The prejudice that [Ray] purports to identify is simply the concern that the jury will credit [the expert's] testimony . . . . This is not the sort of prejudice against which Rule 403 guards." *United States v. Rosario*, 2014 WL 6076364, at *3 (S.D.N.Y. Nov. 14, 2014).

The Court finds that a preliminary hearing regarding the admissibility of Petersohn's testimony is not necessary "because the Court is exercising its discretionary gatekeeping function in determining the reliability and relevancy of the testimony." *See Frazier*, 2016 WL 4994956, at *3 (holding that *Daubert* hearing was not necessary before admission of cellsite location information and citing cases). The *Daubert* motion is denied.

## II.   Dawn Hughes

Ray argues that the testimony of Dawn Hughes should be excluded for failure to satisfy Rule 16(a)(1)(G), as well as on *Daubert* and Federal Rules of Evidence 401 and 403 grounds.

The government disclosed Dr. Hughes as an expert witness on November 15, 2021. Dkt. No. 263-1. According to its notice, "Dr. Hughes is a clinical psychologist and a board-certified forensic psychologist, and she is a leading expert on sexual abuse, interpersonal violence,

ADDENDUM  A - 92

victimization, and traumatic stress." Dkt. No. 263-1 at 2. She also "maintains an independent

practice in clinical and forensic psychology, is a Clinical Assistant Professor of Psychology in

the Department of Psychiatry at Weill Cornell Medical College, served as President of the

Women's Mental Health Consortium from 2009 to 2017, and was recently elected as President

of the Trauma Division of the American Psychological Association." *Id.* She has published,

made presentations, and conducted health trainings on the topics that will be the subject of her

testimony. *Id.* She has "25 years of clinical and forensic practice assessing victimization," and

her testimony will be based on that experience as well as her trauma-based education and

training and "an extensive study of the empirical data and social science literature on sexual

assault, interpersonal violence, victimization, coercive control, and trauma." *Id.*

The Government describes Dr. Hughes' expected testimony as follows:

Dr. Hughes is expected to testify about coercive control as a tactic of victimization and a strategy to gain dominance across a spectrum of relationships. Dr. Hughes's testimony is expected to explain how the overarching dynamic of victimization is an abuse of power and control where the harasser or perpetrator engages in self-centered behavior to satisfy his own goals and desires regardless of the needs, wants, and well-being of the target or victim. Threats and the imposition of negative consequences for non-compliance with demands and expectations are the cornerstones of victimization. When threats are paired with actual physical or sexual violence and abuse, the perpetrator demonstrates an ability and a willingness to make good on threats. Thereafter, verbal threats become more salient and powerful, and physical or sexual violence by the perpetrator may not be needed to exert the same level of control over the victims. Dr. Hughes is also expected to testify about the common elements of abuse and coercive control in victimization situations, including the following: actual or threatened physical violence, force, and aggression; sexual assault, abuse, control, and coercion, and sexual degradation; financial and economic control; physical and emotional isolation from preexisting support networks and external influence; use of collateral or damaging or compromising information; exploitation of preexisting psychological, developmental, traumatic, or financial vulnerability; psychological degradation and humiliation; gaslighting; and surveillance techniques limiting privacy and independent thought, and instilling the belief that the leader is omnipresent. The function of all these abusive behaviors is to indoctrinate victims into a belief system that benefits the perpetrator, maintains compliance, creates dependency, assures non-disclosure of abuse, preserves dominance, and creates psychological

# ADDENDUM  A - 93

entrapment and cognitive confusion. Dr. Hughes has not evaluated any specific victim in this case, and the Government does not presently intend to offer Dr. Hughes's testimony regarding any specific victim.

*Id.* at 3.

On December 13, 2021, the government furnished the defendant with a bibliography of works relied upon by Dr. Hughes for a 2017 report for a state court proceeding.  Dkt. No. 265 at 23 n.8.

Ray argues that Dr. Hughes's testimony should be excluded because the government has violated Federal Rule of Civil Procedure 16(a)(1)(G) by not disclosing the data and social science literature upon which she will base her testimony.  He also argues that the testimony is inadmissible under *Daubert* and Federal Rule of Evidence 403 because: (1) Dr. Hughes is not qualified to opine on the mental states, motivations, intentions, or subjective mental processes of persons accused of interpersonal violence; (2) her proffered testimony, in large part, is not based on reliable data or expert methodology; (3) significant portions of her testimony do not satisfy the helpfulness requirement of Federal Rule of Evidence 702 because they do not fit the facts of the case; and (4) her testimony would improperly intrude on the jury's province to make credibility determinations and to decide the ultimate issues in the case.

The arguments are without merit.  The government's notice satisfied Rule 16(a)(1)(G).  The government disclosed a summary of the witness's opinions, the bases and the reasons for them, and the witness's qualifications.  Ray's argument that the notice is deficient because it does not disclose "empirical data and social science literature," Dkt. No. 263 at 27, is unconvincing—Dr. Hughes is basing her testimony not on any specific literature but on her clinical and forensic practice assessing victimization, and on her trauma-based education and training, including her study of literature generally regarding sexual assault, interpersonal violence, victimization, coercive control, and trauma.  *See United States v. Maxwell*, No. 20 Cr.

330 (S.D.N.Y. Nov. 11, 2021) ECF No. 435 at 2–3 (finding it sufficient that expert relied on her extensive experience treating victims of sexual abuse combined with her formal training); *see also Amorgianos*, 303 F.3d at 266 (holding that expert need not back his or her opinion with published studies for testimony to be admissible).  As Judge Engelmayer has noted in a related context, "studying the circumstances and psychological drivers of trafficked women is not like studying diseases or potential cures in laboratory animals. . . .  The testimony . . . necessarily uses more qualitative research methodologies.  These involve interviews and case studies and clinical examinations over time."  Tr. at 29:4 to 30:20, *United States v. Randall*, No. 19 Cr. 131 (S.D.N.Y. Feb. 25, 2020) ECF No. 335.  In any event, Ray's argument on this point has been mooted by the government providing a bibliography.

Ray's *Daubert* arguments also are without merit.  Multiple courts in this District and elsewhere have admitted similar testimony where, as here, it is not offered as evidence of the defendant's intent[6] but to help a jury understand a common set of conduct experience by victims or the actions normally taken by those committing certain crimes to seduce their victims, *see United States v. Romero*, 189 F.3d 576, 585–56 (7th Cir. 1999), and to explain "seemingly counterintuitive behavior" of victims or "conduct not normally familiar to most jurors," *United States v. Torres*, 2021 WL 1947503, at *7 (S.D.N.Y. May 13, 2021) (internal quotation marks omitted) (quoting *Joseph*, 542 F.3d at 22); *see also Maxwell*, 20 Cr. 330, ECF No. 435 at 4–5; *United States v. Kidd*, 385 F. Supp. 3d 259, 263–64 (S.D.N.Y. 2019); Tr. 26:25 to 27:14, *United States v. Dupigny*, No. 18 Cr. 528 (S.D.N.Y. Oct. 17, 2019) ECF No. 198; *Randall*, 19 Cr. 131,

---

[6] Rule 704(b) of the Federal Rules of Evidence states: "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have the mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone."  Fed. R. Evid. 704(b).

ADDENDUM  A - 95

ECF No. 335; *Torres*, 2021 WL 1947503, at *7; *United States v. Halamek*, 5 F.4th 1081, 1087–89 (9th Cir. 2021); *United States v. Johnson*, 860 F.3d 1133, 1141 (8th Cir. 2017); *United States v. Batton*, 602 F.3d 1191, 1201–02 (10th Cir.2010); *United States v. Hitt*, 473 F.3d 146, 158 (5th Cir. 2006); *Romero*, 189 F.3d at 585 (7th Cir. 1999).   There are some differences among these cases.   Some involve child sexual abuse while others involve the relationship between pimp and an adult prostitute.   But the Court finds persuasive the observation of the Eighth Circuit that:

> While [certain of] these cases involved sexual abuse of children, [there is] no reason why similar testimony should not also be considered helpful to the jury in cases where, as here, the victim of sexual abuse is an adult. Regardless of the victim's age, expert testimony about how individuals generally react to sexual abuse—such as not reporting the abuse and not attempting to escape from the abuser—helps jurors evaluate the alleged victim's behavior.

*Johnson*, 860 F.3d at 1140.

Ray argues that Dr. Hughes' testimony should not be received because she is not qualified to opine on the mental states, motivations, intentions, or subjective mental processes of persons accused of interpersonal violence and such testimony would therefore not be reliable. Dkt. No. 263 at 26, 28; Dkt. No. 275 at 19–23.   He argues that Dr. Hughes' qualifications and work do not qualify or permit her to testify regarding the intent of Ray or of others engaged in sexual abuse, or "perpetrators' subjective motivations, thought processes, and mental states." Dkt. No. 275 at 20.   Ray notes that Dr. Hughes has no experienced treating those accused of committing abuse and the materials cited in her curriculum vitae and the government's notices demonstrate a lack of familiarity with studies of abusers.   *Id.* at 22.

The objection is misdirected.   As was clarified at argument, Dr. Hughes does not propose to testify to the subjective motivations, thought processes, and mental states of abusers in general or of Ray specifically.   Rather, she intends to testify to a common set of conduct experienced by those who are victims of interpersonal violence and the effect that that conduct commonly has on

ADDENDUM  A - 96

those who are victims of it.  In particular, and notably, she proposed to testify to the "function" of a variety of abusive behaviors and how they affect the victims—in other words, she proposes to testify to the impact that certain conduct has on its victims, *i.e.,* "how victims experience such common elements of abuse and coercive control and how these elements function to allow perpetrators to establish and maintain control."  Dkt. No. 265 at 28.

The government has established Dr. Hughes' competence and qualifications to give that expert testimony.  She has had extensive experience not only with those who have been victims of sexual abuse and has extensive training in this area, but she also maintains an independent practice that specialized in traumatic stress and interpersonal violence and has presented extensively on complex trauma generally.  *See* Dkt. No. 263-1 at 26, 29–31; *see also* Trial Tr. at 3913–18, *United States v. Kelly*, No. 19 Cr. 286 (E.D.N.Y. Sept. 17, 2021) ECF No. 250 (testifying as to experience in trauma psychology and with victims of interpersonal violence). That experience and training qualify her to testify to the type of conduct that victims of sexual abuse and interpersonal violence have faced and the effect of that conduct on the victims. *Maxwell*, 20 Cr. 330, ECF No. 435 at 5; *Halamek*, 5 F.4th at 1088.  Moreover, as long as the expert does not vouch for the victim by diagnosing her as a victim of sexual abuse or express an opinion that sexual abuse has in fact occurred, the testimony does not necessarily invade the province of the jury.  *See Maxwell*, 20 Cr. 330, ECF No. 435 at 9–10*.* [7]

---

[7] Ray suggests that Dr. Hughes should not be permitted to offer testimony that the function of certain abusive behavior was to maintain compliance and assure non-disclosure of abuse, conduct it characterizes as "grooming."  The Court agrees with the defense that Dr. Hughes cannot testify that Ray engaged in "grooming" for the purpose of controlling his victims.  Such testimony would go to Ray's motive and intent.  The government has agreed it will not offer the testimony for that purpose.  However, Dr. Hughes can give testimony about the type of conduct commonly experience by victims of sexual predators.  The fact that the government chose in *Raniere* not to offer Dr. Hughes's testimony regarding grooming techniques, rather than to ask the court to rule on it, does not establish the inadmissibility of such testimony here.

Ray also argues that Dr. Hughes' testimony is not based on sufficient facts or data and is not grounded in any reliable methodology because it is based in large part on unverified stories her clients have told her, and her testimony would also transmit inadmissible hearsay to the jury. Dkt. No. 263 at 32–38.  As already mentioned, Dr. Hughes' testimony is not based exclusively on her experience from her clinical practice—it is also based generally on her training and on "an extensive study of the empirical data and social science literature on sexual assault, interpersonal violence, victimization, coercive control, and trauma."  Dkt. No. 263-1 at 3.  But in any event, similar arguments have been made and properly rejected in other cases, and the Court agrees with their analyses.  The Court rejects the challenge to Dr. Hughes' testimony for the same reasons that Judge Nathan rejected the identical challenge to the testimony of the expert in *Maxwell*:

> Given the realities of studying sensitive criminal acts like sexual abuse, a researcher can only rarely verify reports with absolute certainty.  Yet that does not mean that a clinical or forensic psychologist accepts all statements at face value . . . .  [P]art of [Dr. Hughes'] profession is to examine and diagnose her patients consistent with her significant training and specialized knowledge.

*Maxwell*, 20 Cr. 330, ECF No. 435 at 6.  As to the concern that the government will use Dr. Hughes' testimony as a vehicle to convey otherwise inadmissible hearsay to the jury, Judge Cote cogently answered that argument:

> "An expert witness may base opinions on otherwise inadmissible facts or data," such as the alleged hearsay statements of the interview subjects, "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."  [The expert's] research methodology may be based on qualitative interviews that involve listing to the statements of domestic abuse victims, but her testimony will involve the synthesis and interpretation of those statements, rather than the mere conveyance of those statements to the jury.  That is sufficient to satisfy Rule 703.

*Torres*, 2021 WL 1947503, at *7 (quoting *United States v. Dukagjini*, 326 F.3d 45, 51 (2d Cir. 2003)); *see also United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993) (explaining that

"expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions"); *United States v. Daly*, 842 F.2d 1380, 1387–88 (2d Cir. 1988) (same).[8]

Next, Ray argues that Dr. Hughes' proffered testimony will impermissibly bolster the credibility of government fact witnesses and usurp the jury's factfinder role. Expert "witnesses may not opine as to the credibility of the testimony of other witnesses at the trial," *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988), and "expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702," *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005). Likewise, while "an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimately legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). Thus, testimony that "essentially instruct[s] the jury as to an ultimate determination that [is] exclusively within its province" is inadmissible. *Nimely*, 414 F.3d at 398.

At the same time, however, there is nothing wrong with testimony that corroborates the testimony of a party's fact witnesses and thereby makes that testimony more credible or believable to the jury. That is a necessary condition of all admissible evidence—it has the

---

[8] The defense also argues that Dr. Hughes intends to repeat in front of the jury unproven anecdotes regarding the victimization experienced by others in other cases, depriving Ray of the opportunity to confront and cross-examine the declarants. But Dr. Hughes will be permitted to do so only if the anecdotes are those reasonably relied by those in the field, if they explain her qualifications and the bases for her opinions, and if they are relevant (particularly given any cross-examination) and their probative value is not substantially outweighed by their prejudicial effect. She will not be permitted to give examples "as general proof of the truth of the underlying matter," and she will only be able to give examples in her capacity as an expert witness. *See Dukagjini*, 326 F.3d at 58.

ADDENDUM  A - 99

"tendency to make a fact more or less probable than it would be without the evidence."  Fed. R. Evid. 401(a).

Ray has not established that Dr. Hughes will testify regarding the credibility of any of the witnesses or victims.  The government's disclosure makes clear that she has not examined any specific victim in this case and that she will not offer testimony regarding any specific victim.  Dkt. No. 263-1 at 4.  Her testimony will bolster the testimony of any particular victim or witness only in the sense that if the jury finds Dr. Hughes' testimony regarding modus operandi and the effect of sexual abuse on a victim to be credible and if it finds that the facts as testified to by a victim fit the pattern described by Dr. Hughes, it might find that testimony to be more credible than if Dr. Hughes had not testified.  But the defense will be able to cross-examine both Dr. Hughes and the alleged victims.  If it turns out that the testimony of Dr. Hughes will support the testimony of the victims, that will be because the witnesses testify consistently with what Dr. Hughes will testify is victim experience generally and because the jury—after cross-examination—will believe both Dr. Hughes and the victims.  It will not be because Dr. Hughes lends an expert sheen by testifying that a witness is credible.  Presenting expert testimony that is consistent with lay witness testimony is the permissible building block for any case, whether it be presented by the plaintiff or by the defendant.

As to the concern that Dr. Hughes's testimony will invade the province of the jury, the Second Circuit has distinguished between expert testimony that "a certain pattern of conduct is often found in [a particular type of] cases, leaving it for the jury to determine whether the defendant's conduct fits the pattern," and testimony that a defendant's conduct actually fits a particular pattern.  *United States v. Ruggiero*, 928 F.2d 1289, 1305 (2d Cir. 1991) (quoting *United States v. Scop*, 846 F.2d 135, 141 (2d Cir. 1988)); *see also United States v. Skyers*, 787 F.

# ADDENDUM  A - 100

App'x 771, 775 (2d Cir. 2019) (summary order).  Dr. Hughes proposes to offer the former type

of testimony, and the defense will have the opportunity to cross-examine her on it.  It will be up

to the jury to determine whether Ray's conduct fits the pattern Dr. Hughes describes.

Ray argues that Dr. Hughes' testimony should be excluded because it does not "fit" the

case.  He claims that Dr. Hughes' prior testimony involves allegations of rape, sexual assault or

sexual violence, of sexual abuse of minors and that testimony based on that experience would not

be helpful to the jury because it does not fit the facts of this case which involves "fully formed,

high-achieving adults."  Dkt. No. 263 at 45; Dkt. No. 275 at 27.  "*Daubert*'s 'fit' requirement is

really just a specialized relevance inquiry that asks 'whether expert testimony proffered in the

case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual

dispute.'"  *Maxwell*, 20 Cr. 330, ECF No. 435 at 9 (quoting *Alto v. Sun Pharm. Indus., Inc.*, 2021

WL 4803582, at *3 (S.D.N.Y. Oct. 13, 2021)).  But Dr. Hughes' curriculum vitae makes clear

that her expertise is not limited to sexual abuse created by threats of physical violence or that are

committed against minors.  And Ray's objection is based on a selective quotation of her prior

testimony.  Although she has testified in prior cases that minors are susceptible to grooming

manipulation, in that same testimony she also stated that adolescents and young adults also are

susceptible to grooming mechanisms.  Trial Tr. at 3923:13–22, *Kelly*, No. 19 Cr. 286, ECF No.

250.  In short, as it was with respect to Petersohn's qualifications as an expert, the defense's

argument is based on "an overly narrow assessment" of Dr. Hughes's expertise.  *Raniere*, 2019

WL 2212639, at *6.

Finally, the defense argues that Dr. Hughes' testimony should be excluded under Rule

403 because her repeated references to incidents of sexual assault, child molestation, and child

sexual abuse that form the basis for her opinions would confuse and inflame the jury and create

# ADDENDUM  A - 101

the danger that the jury will associate Ray with such conduct.  That argument is mistaken.  Dr. Hughes' "testimony will help the jury contextualize th[e] seemingly counterintuitive behavior" of the victims.  *Torres*, 2021 WL 1947503, at *7.

"In the context of this case, [the] testimony regarding the generalities of domestic [and sexual] abuse will be no more inflammatory or prejudicial than the other evidence . . . that will be presented to the jury."  *Id.*  In any event, the parties may litigate in limine and close to the date of trial the extent to which Dr. Hughes may refer to any of her prior cases involving child sexual abuse or instances of violent conduct.

## III.   Richard Pleus

The government proffers Dr. Richard Pleus as an expert to testify that there are no biomarkers in Ray's medical records to indicate that he was "exposed to toxins or toxicants—including mercury, estrogen compounds, cleaning fluids, thalium [sic], copper, ricin, cyanide, organophosphates, or arsenic—at doses that would cause the health effects reports by Mr. Ray." Dkt. No. 263-1.  Dr. Pleus concludes that Ray "has not suffered any health impairment from intentional poisoning."  Dkt. No. 263 at 49.  Dr. Pleus's testimony goes to the Indictment's allegation that the "confessions" made by the alleged victims here that they had poisoned him were "false."

Ray argues that Dr. Pleus's testimony should be excluded or limited.  He contends that because Dr. Pleus is not a medical doctor he is not qualified to testify about diagnoses reached by other doctors and that because Dr. Pleus has not examined Ray and has only a selection of his medical records, his testimony is not based on sufficient facts or data under Rule 702(b).  Dkt. No. 263 at 49–50.  Finally, he asserts that Dr. Pleus's testimony would improperly bolster the credibility of the government's witnesses.

ADDENDUM  A - 102

<u>Fundamentals:</u>

- $ for time and company.

- consideration

- non-negotiable

- hygeine

- requests

- cancellations

- extended time

- overnights , etc.

Interview:

Why?

Labor Day 2 Day / interests.

in call

reference

Backpage Ads Workshop:

| | TARGET | PROBLEM | SOLUTION | TRIGGER |
|---|---|---|---|---|
| L I | • wealthy professionals who want upscale | Authenticity | Upscale pedigree and attitude | |
| L II | • wealth professionals who want GND | Not enough fun | Authentic wild side | |
| E | • wealthy professionals who want to relax & connect. | No one to relate to | Intelligent, warm and good personality | |
| K | • wealthy professionals who want kink. | Not a humanizing interaction | Seamlessly blends humanity and kink. | |

ADDENDUM A - 104

<u>Ivy League Beauty</u>

- (Target): Wealthy men that want intellectual/ emotional connection
- <u>Problem</u>: No one gets them
- <u>Solution</u>: Intelligent girl who understands you.

- <u>Lauren 1</u>
<u>Target</u>: Wealthy men who want connection

- <u>Lauren 2</u>
<u>Target</u>: Wealthy men who want NSA fun

- <u>Ella</u>:
<u>Target</u>: Wealthy men who want relatable/DTE/ relaxation

- <u>Kink</u>:
— wealthy men who want kink

page 3 of DX H1, Claudia notebook, business plan

ADDENDUM A - 105

**Relevant Statutes**

**The Forced Labor Statute, 18 U.S.C. §1589, provides:**

(a)Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—

    (1)by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

    (2)by means of serious harm or threats of serious harm to that person or another person;

    (3)by means of the abuse or threatened abuse of law or legal process; or

    (4)by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

(b)Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

(c)In this section:

    (1)The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for

ADDENDUM  A - 106

any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

 (2)The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

(d)Whoever violates this section shall be fined under this title, imprisoned not more than 20 years, or both. If death results from a violation of this section, or if the violation includes kidnaping, an attempt to kidnap, aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title, imprisoned for any term of years or life, or both.

ADDENDUM A - 107

**The Sex Trafficking Statute, 18 U.S.C. §1591, provides:**

(a)Whoever knowingly—

(1)in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2)benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

(b)The punishment for an offense under subsection (a) is—

(1)if the offense was effected by means of force, threats of force, fraud, or coercion described in subsection (e)(2), or by any combination of such means, or if the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had not attained the age of 14 years at the time of such offense, by a fine under this title and imprisonment for any term of years not less than 15 or for life; or

(2)if the offense was not so effected, and the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had attained the age of 14

ADDENDUM  A - 108

years but had not attained the age of 18 years at the time of such offense, by a fine under this title and imprisonment for not less than 10 years or for life.

(c) In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited, the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years.

(d) Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be fined under this title, imprisoned for a term not to exceed 25 years, or both.

(e) In this section:

    (1) The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

(2) The term "coercion" means—

    (A) threats of serious harm to or physical restraint against any person;
    (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or
    (C) the abuse or threatened abuse of law or the legal process.

(3) The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

ADDENDUM A - 109

(4)The term "participation in a venture" means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1).

(5)The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

(6)The term "venture" means any group of two or more individuals associated in fact, whether or not a legal entity.

ADDENDUM A - 110

**RICO, 18 U.S.C. §1962, provides:**

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce….

(b)It shall be unlawful for any person through a pattern of racketeering activity … to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c)It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ….

(d)It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

ADDENDUM A - 111