# 23-6114

*To Be Argued By*:
DANIELLE R. SASSOON

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 23-6114

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

ISABELLA POLLOK,

*Defendant*,

LAWRENCE RAY, AKA Sealed Defendant 1,

*Defendant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

DANIELLE R. SASSOON,
DAVID ABRAMOWICZ,
*Assistant United States Attorneys,
Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .   1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .   3

    A.   The Government's Case and Ray's Criminal
        Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . .   3

        1.   Ray's Extortion Scheme. . . . . . . . . . . . .   5

        2.   Ray's Forced Labor  . . . . . . . . . . . . . . .   8

        3.   Ray's Extortion and Sex Trafficking of
            Claudia Drury . . . . . . . . . . . . . . . . . . .   9

        4.   Ray's Money Laundering and Tax
            Evasion . . . . . . . . . . . . . . . . . . . . . . . . .  11

    B.   The Defense Case . . . . . . . . . . . . . . . . . . . .  11

    C.   The Verdict and Sentencing. . . . . . . . . . .  11

ARGUMENT:

POINT I—Ray's Convictions Were Supported by
    Sufficient Evidence . . . . . . . . . . . . . . . . . . . . . . .  12

    A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  12

    B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  13

    C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  14

        1.   Sufficient Evidence Supported Ray's
            Conviction for Racketeering
            Conspiracy . . . . . . . . . . . . . . . . . . . . . . .  14

ii

PAGE

    2.  Sufficient Evidence Supported Ray's Conviction for a Violent Crime in Aid of Racketeering . . . . . . . . . . . . . . . . . . . . . 21

    3.  Sufficient Evidence Supported Ray's Convictions for Sex Trafficking and Sex Trafficking Conspiracy . . . . . . . . . . . 23

    4.  Sufficient Evidence Supported Ray's Conviction for Forced Labor . . . . . . . . 26

POINT II—The RICO Statute Is Constitutional . . . 29

POINT III—The District Court Properly Admitted the Expert Testimony of Dr. Dawn Hughes . . . . . . 30

  A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . 31

  B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . 34

    1.  Federal Rule of Evidence 702 . . . . . . . 34

    2.  Federal Rule of Evidence 704 . . . . . . . 35

    3.  Standard of Review . . . . . . . . . . . . . . . 35

  C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    1.  Dr. Hughes's Testimony Was the Proper Subject of Expert Testimony . . . . . . . . 36

    2.  Dr. Hughes's Testimony Did Not Improperly Bolster Victims' Credibility . . . . . . . . . . . . . . . . . . . . . . . 42

iii

PAGE

3. Dr. Hughes Did Not Offer Improper
State of Mind Testimony . . . . . . . . . . . 45

4. Any Errors Were Harmless. . . . . . . . . 47

POINT IV—The District Court Properly Admitted
Video Evidence of Forced Sexual Services. . . . 47

POINT V—Ray's Sentence Was Reasonable . . . . . . 49

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . 50

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 53

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 54

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

## TABLE OF AUTHORITIES

*Cases*:

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) . . . . . . . . . . . . . . 34, 35

*Boyle v. United States*,
556 U.S. 938 (2009). . . . . . . . . . . . . . . . . . . . . . . 15

*Gall v. United States*,
552 U.S. 38 (2007). . . . . . . . . . . . . . . . . . . . . . . . 53

*Jackson v. Virginia*,
443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . 13

iv

PAGE

*Kumho Tire Co. v. Carmichael,*
  526 U.S. 137 (1999). . . . . . . . . . . . . . . . . . . . . . . 35

*Nimley v. City of New York,*
  414 F.3d 381 (2d Cir. 2005) . . . . . . . . . . . . . . . . 34

*Salinas v. United States,*
  522 U.S. 52 (1997). . . . . . . . . . . . . . . . . . . . . . 15, 20

*United States v. Amuso,*
  21 F.3d 1251 (2d Cir. 1994) . . . . . . . . . . . . . . . . 43

*United States v. Applins,*
  637 F.3d 59 (2011). . . . . . . . . . . . . . . . . . . . . . 14, 20

*United States v. Arrington,*
  941 F.3d 24 (2d Cir. 2019) . . . . . . . . . . .  14, 21, 22

*United States v. Batton,*
  602 F.3d 1191 (10th Cir. 2010) . . . . . . . . . . . 38, 39

*United States v. Brinson,*
  772 F.3d 1314 (10th Cir. 2014) . . . . . . . . . . . . . . 44

*United States v. Brown,*
  776 F.2d 397 (2d Cir. 1985) . . . . . . . . . . . . . . . . 35

*United States v. Broxmeyer,*
  699 F.3d 265 (2d Cir. 2012) . . . . . . . . . . . . . . 54, 57

*United States v. Burden,*
  600 F.3d 204 (2d Cir. 2010) . . . . . . . . . . . . . . . . 30

*United States v. Castillo,*
  924 F.2d 1227 (2d Cir. 1991) . . . . . . . . . . . . . . . . 40

*United States v. Cavera,*
  550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . . . . 54

v

PAGE

*United States v. Coiro,*
    922 F.2d 1008 (2d Cir. 1991) . . . . . . . . . . . . . . . 30

*United States v. Coonan,*
    938 F.2d 1553 (2d Cir. 1991) . . . . . . . . . . . . . . . 30

*United States v. Coplan,*
    703 F.3d 46 (2d Cir. 2012) . . . . . . . . . . . . . . . 13, 16

*United States v. Cramer,*
    602 F. App'x 837 (2d Cir. 2015) . . . . . . . . . . . . . 57

*United States v. Cruz,*
    981 F.2d 659 (2d Cir. 1992) . . . . . . . 40, 41, 43, 44

*United States v. Diaz,*
    176 F.3d 52 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 25

*United States v. DiDomenico,*
    985 F.2d 1159 (2d Cir. 1993) . . . . . . . . . . . . . . . 35

*United States v. Fernandini,*
    652 F. App'x 4 (2d Cir. 2015) . . . . . . . . . . . . . . . 56

*United States v. Gagliardi,*
    506 F.3d 140 (2d Cir. 2007) . . . . . . . . . . . . . . . . 24

*United States v. Halamek,*
    5 F.4th 1081 (9th Cir. 2021) . . . . . . . . . . . . . 38, 41

*United States v. Hassan,*
    578 F.3d 108 (2d Cir. 2008) . . . . . . . . . . . . . . . . 13

*United States v. Hitt,*
    473 F.3d 146 (5th Cir. 2006) . . . . . . . . . . . . . . . 38

*United States v. Jackson,*
    335 F.3d 170 (2d Cir. 2003) . . . . . . . . . . . . . . . . 13

vi

PAGE

*United States v. Jenkins*,
   854 F.3d 181 (2d Cir. 2017) . . . . . . . . . . . . . . . . . 56

*United States v. Johnson*,
   860 F.3d 1133 (8th Cir. 2017) . . . . . . . . 38, 39, 43

*United States v. Jones*,
   460 F.3d 191 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 55

*United States v. Kellerman*,
   431 F.2d 319 (2d Cir. 1970) . . . . . . . . . . . . . . 16, 19

*United States v. Kelley*,
   551 F.3d 171 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 35

*United States v. Kidd*,
   385 F. Supp. 3d 259 (S.D.N.Y. 2019) . . . . . . . . . 38

*United States v. Kozeny*,
   667 F.3d 122 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 13

*United States v. Le*,
   902 F.3d 104 (2d Cir. 2018) . . . . . . . . . . . . . . . . . 30

*United States v. Locasio*,
   6 F.3d 924 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . 39

*United States v. Lopez*,
   No. 22 Cr. 1071, 2023 WL 7146581 (2d Cir. Oct.
   31, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Marcus*,
   628 F.3d 36 (2d Cir. 2010) . . . . . . . . . . . . . . 21, 29

*United States v. Maxwell*,
   No. 20 Cr. 330 (AJN), 2021 WL 5283951 (S.D.N.Y.
   Nov. 11, 2021) . . . . . . . . . . . . . . . . . . . . . . 37, 38, 43

vii

PAGE

*United States v. McDermott*,
245 F.3d 133 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 17

*United States v. Mejia*,
545 F.3d 179 (2d Cir. 2008) . . . . . . . . . . . . . . . . 43

*United States v. Ministro-Tapia*,
470 F.3d 137 (2d Cir. 2006) . . . . . . . . . . . . . . . . 55

*United States v. Morris*,
350 F.3d 32 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 36

*United States v. Oluwanisola*,
605 F.3d 124 (2d Cir. 2010) . . . . . . . . . . . . . . 36, 47

*United States v. Perez-Frias*,
636 F.3d 39 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 54

*United States v. Plaza*,
752 F. App'x 37 (2d Cir. 2018) . . . . . . . . . . . . . . 40

*United States v. Pope*,
554 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . . 54

*United States v. Pugh*,
945 F.3d 9 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 55

*United States v. Quinones*,
511 F.3d 289 (2d Cir. 2007) . . . . . . . . . . . . . . . . 48

*United States v. Raniere*,
No. 20-3520, 2022 WL 17544087 (2d Cir. Dec. 9,
2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Ray*,
No. 20 Cr. 110 (LJL), 2022 WL 101911 (S.D.N.Y.
Jan. 11, 2022) . . . . . . . . . . . . . . . . . . . 31, 38, 42, 45

viii

PAGE

*United States v. Roldan-Zapata*,
916 F.2d 795 (2d Cir. 1990) . . . . . . . . . . . . . . . . 49

*United States v. Romano*,
794 F.3d 317 (2d Cir. 2015) . . . . . . . . . . 34, 35, 37

*United States v. Romero*,
189 F.3d 576 (7th Cir. 1999) . . . . . . . . . . . . *passim*

*United States v. Ruggiero*,
928 F.2d 1289 (2d Cir. 1991) . . . . . . . . . . . . . . . 46

*United States v. Sabhani*,
599 F.3d 215 (2d Cir. 2010) . . . . . . . . . . . . . . . . 13

*United States v. Siddiqui*,
699 F.3d 690 (2d Cir. 2012) . . . . . . . . . . . . . . 36, 49

*United States v. Skyers*,
787 F. App'x 771 (2d Cir. 2019) . . . . . . . . . . . . . 46

*United States v. Tapia-Ortiz*,
23 F.3d 738 (2d Cir. 1994) . . . . . . . . . . . . . . . . . 42

*United States v. Taylor*,
18 F.3d 55 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . 42

*United States v. Torres*,
No. 20 Cr. 608 (DLC), 2021 WL 1947503 (S.D.N.Y.
May 13, 2021) . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

*United States v. Veliz*,
623 F. App'x 538 (2d Cir. 2015) . . . . . . . . . . . . . 19

*United States v. White*,
7 F.4th 90 (2d Cir. 2021) . . . . . . . . . . . . . . . . . . 22

ix

PAGE

*United States v. Zhong,*
    26 F.4th 536 (2d Cir. 2022) . . . . . . . . . . . . . . 34, 44

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 1959(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Fed. R. Evid. 702(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Fed. R. Evid. 704(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Fed. R. Evid. 704(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 23-6114

--------

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ISABELLA POLLOK,

*Defendant,*

LAWRENCE RAY, also known as Sealed Defendant 1,

*Defendant-Appellant.*

--------

## BRIEF FOR THE UNITED STATES OF AMERICA

--------

### Preliminary Statement

Lawrence Ray appeals from a judgment of conviction entered on January 19, 2023, in the United States District Court for the Southern District of New York, following a jury trial before the Honorable Lewis J. Liman, United States District Judge.

Superseding Indictment S2 20 Cr. 110 (the "Indictment") was filed on January 13, 2022, in seventeen counts. Count One charged Ray with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). Count Two

2

charged Ray with extortion conspiracy, in violation of 18 U.S.C. § 1951. Count Three charged Ray with extortion, in violation of 18 U.S.C. §§ 1951 and 2. Count Four charged Ray with sex trafficking, in violation of 18 U.S.C. §§ 1591 and 2. Count Five charged Ray with conspiracy to commit sex trafficking, in violation of 18 U.S.C. § 1594. Count Six charged Ray with forced labor, in violation of 18 U.S.C. §§ 1589 and 2. Count Seven charged Ray with forced labor trafficking, in violation of 18 U.S.C. §§ 1590 and 2. Count Eight charged Ray with forced labor conspiracy, in violation of 18 U.S.C. § 1594. Counts Nine and Ten charged Ray with use of interstate commerce to promote unlawful activity, in violation of 18 U.S.C. §§ 1952(a)(3)(b) and 2. Count Eleven charged Ray with money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), (ii), and 2. Counts Twelve through Sixteen charged Ray with tax evasion in violation of 26 U.S.C. § 7201. Count Seventeen charged Ray with violent crime in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3).

Trial commenced on March 8, 2022, and ended on April 6, 2022, when Ray was convicted on all counts, other than Counts Ten and Twelve, on which the Government did not proceed at trial. On January 19, 2023, Judge Liman sentenced Ray principally to 60 years' imprisonment and lifetime supervised release.

Ray is serving his sentence.

3

**Statement of Facts**

## A. The Government's Case and Ray's Criminal Enterprise

The evidence at trial established that Lawrence Ray controlled and led a criminal enterprise that targeted a group of young adults, principally composed of his daughter's college roommates, for indoctrination and criminal exploitation. Over the course of nearly a decade, Ray subjected his victims to sexual and psychological manipulation and physical abuse. Ray coerced false confessions from his victims that they had harmed and caused damage to Ray and his family members and associates. He then leveraged these false confessions, and used physical threats and violence, to extort money from his victims, force some of them to perform unpaid and grueling manual labor on a property in Pinehurst, North Carolina, and cause one victim, Claudia Drury, to engage in commercial sex acts for Ray's financial benefit. Ray collected millions of dollars from his victims and laundered the proceeds of his extortion and sex trafficking to conceal their source and evade taxes. Ray operated his enterprise, and carried out his criminal objectives, with the help of family members and his daughter's best friend, codefendant Isabella Pollok.[1] As part of the racketeering

--------

[1] On September 7, 2022, Pollok pleaded guilty pursuant to a plea agreement to a superseding information charging her with money laundering conspiracy, in violation of 18 U.S.C. §§ 371 and 1956(a)(1)(B)(i). (*See* Dkt. 585).

4

conspiracy, Ray agreed with his coconspirators to commit nine types of racketeering acts, including extortion, sex trafficking, forced labor, forced labor trafficking, money laundering, witness tampering, and obstruction of justice.

The Government called 18 witnesses, including five of Ray's victims, namely Claudia Drury—whom Ray sex trafficked, extorted, and forced to perform manual labor—and four members of the Rosario family—siblings Felicia, Santos, and Yalitza and their mother, Martiza, all of whom Ray extorted, among other things. Also among the witnesses were six law enforcement officers, including a Federal Bureau of Investigation forensic accountant whose analysis of financial records showed how Ray concealed the source of approximately $2 million of extortion and sex trafficking proceeds by moving the funds through Pollok's and Felicia Rosario's bank accounts, and two experts, including Andrew Petersohn, whose cell site analysis corroborated that Ray and Pollok picked up sex trafficking proceeds from Claudia Drury at hotels around Manhattan and at locations in New Jersey. In addition to financial records, the Government introduced extensive documentary evidence, such as documents, photographs, and videos recovered from email and iCloud search warrants and a judicially authorized search of Ray's premises at the time of his arrest. Video, audio, and photographic evidence documented in horrifying detail Ray's interrogations, the grueling forced labor in North Carolina, and Ray's ongoing physical and sexual abuse of his victims.

5

### 1. Ray's Extortion Scheme

Starting in 2010, Ray deliberately and methodically groomed his victims—his daughter's college roommates and their friends—for exploitation and extortion, forcing his victims to give him hundreds of thousands of dollars, and in the case of Drury, millions of dollars of prostitution proceeds.

Ray's extortion of Santos Rosario, one of Talia's roommates, illustrates Ray's methods. (Tr. 191-378).[2] In 2010, Ray began living with Talia and her roommates in their college dorm. (Tr. 191-200). Ray first earned Santos's trust and awe, then began accusing him of wrongdoing and verbally and physically abusing him. (Tr. 196-219). That was deliberate: Ray studied articles on psychological manipulation, false confessions, and mind control. (Tr. 2266-70; GX 1403). Ray initially accused Santos and others of deliberately damaging his property. (Tr. 217-19, 277-80, 285-86, 1550-51). Ray also falsely accused Santos and Drury of having violent thoughts against others, leading each to take a medical leave from college. (Tr. 242-52, 772, 812-13). Ray's accusations became increasingly extreme over time and resulted in Ray's victims

───────────

[2] "Tr." refers to the trial transcript; "GX" refers to a Government trial exhibit; "Br." refers to Ray's brief on appeal; "Add." refers to the addendum filed with that brief; "ST" refers to the sentencing transcript; and "Dkt." refers to the District Court's docket in this case. Unless otherwise noted, case text quotations omit internal quotation marks, citations, and alterations.

6

confessing to harming Ray, his family, and his close associates through poisoning, and owing him thousands, and then millions, of dollars. (Tr. 594, 692, 876-78, 1540-51).

Ray used coercive tactics like interrogation, intimidation, threats, and violence to persuade Santos and other victims to doubt their own memories and knowledge, distrust their own families, and falsely confess to wrongdoing. (*See, e.g.*, Tr. 263-76, 773, 817-18, 878-82). Santos, for example, testified that Ray "would hit me, slap me, held a knife to my throat; he hit me with a hammer, he held a knife to my genitals, he put me in a chokehold and put me to sleep." (Tr. 216-17; *see also* Tr. 263-64 (Santos describing violence he witnessed Ray perpetrate against other victims)). On various occasions, Ray punched Felicia Rosario in the face, stomach, and head, kicked her, pulled her by the hair, and gave her a black eye. (Tr. 1483). Ray subjected Daniel Levin, another college roommate whom Ray accused of damaging his property, to sexual humiliation and physical abuse in front of others. (Tr. 1767). The abuse included beating Levin with a hammer, pulling his tongue with pliers, forcing a large dildo into his mouth while Levin was wearing a dress, twisting a handmade garrote around Levin's genitals, and threatening to dismember him with a knife. (Tr. 264, 730, 827-29; GX 2124, 1881).

Ray recorded his victims' false confessions, then used the confessions as collateral to threaten them with imprisonment and demand money. Some of the recordings document Ray's verbal and physical abuse, as well as Ray's threats to expose his victims' supposed

7

crimes if they did not confess, do as he wished, or pay up. (*See, e.g.*, Tr. 187-88, 271-77, 303-08, 693-94, 919-20, 1530-34, 1549-50; GX 4175, 1171, 1886, 4163-65; *see also* Tr. 358 (Santos describing how the interrogations became "scarier"; Ray "would hit me, scream at me, intimidate, trying to hurt me, and everything was my fault")). Santos became suicidal, which Ray exploited too. (Tr. 568-71). During one recorded hourslong interrogation, and just weeks after Santos had been hospitalized for a suicide attempt, Ray asked Pollok to fetch his hammer, which he then brandished at Santos and threatened to put through his skull, before opening a window and telling Santos to jump out. (Tr. 313-14, 466; GX 4176A). Ray later hit Santos repeatedly in the leg with the hammer and said, "I want to take you out in a brutal way," before demanding that Santos "confess to a crime." (Tr. 317-18).

Ray told his victims that paying him back for the supposed damage that they had done was a way to make amends. (*See, e.g.*, Tr. 267, 277, 904; *see also* Tr. 935-36 (Drury describing how Ray told her "over and over again" to "make amends" by giving him money); 1527-41 (Felicia describing Ray's physical and verbal abuse and demands for money); 2078-80 (Yalitza describing how, at first, Ray helped her with her mental health and academics, but then threatened to turn her in to the police if she did not pay damages)). To comply with Ray's demands, Santos borrowed and stole more than $100,000 from his parents to give Ray. (Tr. 280-90; *see also* Tr. 2109-10 (Yalitza obtained money from her parents to pay Ray's expenses at his direction); 2457-58 (Maritza Rosario testimony that

8

she gave her son more than $150,000 to pay Ray for supposed damages)).

## 2. Ray's Forced Labor

Ray deployed the same abusive tactics to force his victims to perform unpaid labor on his stepfather's property in Pinehurst, North Carolina for several weeks around the summer of 2013. (Tr. 830-32). Enlisting his victims in a supposed backyard improvement project, Ray forced the Rosario siblings and Drury to perform demanding physical labor such as digging trenches, transplanting trees, installing drainage pipes, and laying sod with professional equipment, sometimes in extreme heat, thunderstorms, or the middle of the night. (Tr. 830-36, 859-61, 1574-76, 2096-97). Throughout, Ray deprived his victims of sleep, restricted access to food and water, accused them of destroying the property, threatened them with prison, and inflicted senseless violence to express his displeasure with their work. (Tr. 830-34, 860-63, 1576-83, 2103-04). In Pinehurst, Drury lost about 40 pounds (Tr. 860), and Ray physically abused, berated, and threatened Felicia—a Harvard and medical school graduate—who devolved into a childlike, unhygienic, and incompetent state (Tr. 833-34, 1572-73, 1586-87, 1590, 2075, 2094; GX 1882, 2144).

Ray pressured Yalitza to come to Pinehurst despite a recent suicide attempt; she saw Ray assault her sister, including one incident when Ray wrestled Felicia to the ground and another when he punched her in the face. (Tr. 1586-87, 2074-75, 2091-2101). Ray blamed Yalitza for Felicia's decline and Yalitza again

9

attempted suicide in Pinehurst, after which Ray put her back to work on the property. (Tr. 2075-76, 2114 (Ray telling Yalitza, "did you think you were going to have time off after being in the hospital?")).

Talia helped oversee the forced labor. Like her father, Talia accused Drury of damaging the property, which contributed to Drury's belief that she owed Ray more money in damages than she could repay. (Tr. 867-70).

### 3. Ray's Extortion and Sex Trafficking of Claudia Drury

As with Santos, Ray earned Drury's trust and then coerced Drury through violence, threats, and psychological manipulation to confess, and to believe, that she owed him money for property destruction and poisoning. (Tr. 691-94). With Drury, however, Ray ensured that she would have money to pay him for supposed damages by sex trafficking her for four years, during which Ray forced her to make millions of dollars by working a punishing and relentless schedule as a prostitute. (Tr. 695-96).

Ray sexually groomed Drury gradually before forcing her into prostitution. Starting when she was in college, he encouraged her to engage in deviant sexual behavior and exposed her to bondage, domination, sadism, and masochism ("BDSM"). (Tr. 722-23, 750-56, 871-72, 884-88, 894-97). At the same time, he leveraged Drury's recorded false confessions against her, threatening that she would go to prison unless she made monetary repairs. (Tr. 880-81). Drury was afraid of going to prison and felt pressure to pay Ray for

10

damages she supposedly owed, but she lacked the money. (Tr. 898-900). Ray proposed that she earn money by becoming a prostitute (Tr. 901), and made clear at the outset that he was entitled to the money she made (Tr. 904). Ray continued his campaign of interrogations and recorded false confessions (Tr. 918-23, 934-36), and routinely used threats and violence to force Drury to keep working as a prostitute and to earn more money (Tr. 924-25, 1014-16, 1031-32). Ray created a website in Drury's name where he posted Drury's false confession videos and threatened to share the website with law enforcement and the press. (Tr. 938-40). To prevent Ray from following through on his threats, Drury tried to "make as much money as possible" (Tr. 940), and worked without pause (Tr. 1006), living out of hotels (Tr. 696). Ray and Pollok tracked Drury's client appointments and picked up her earnings. (Tr. 644-55, 944, 1013, 1298-1315). Ray was often dissatisfied with Drury's profits and would threaten Drury physically and with prison if she did not earn more money. (Tr. 1007-09).

Ray's violence culminated on October 16, 2018. Ray came with Pollok to Drury's room at the Gregory Hotel and expressed anger that Drury had confided in one of her clients. (Tr. 1032-33). Ray commanded Drury to strip naked, tied her to a chair, and tortured her for hours: he suffocated her repeatedly with a plastic bag, smothered her with a pillow, choked her with a leash and collar, blasted her with cold air and water, cut her hair, and threatened to waterboard her and kill her. (Tr. 1033-50; GX 1709). Before leaving, Ray told Drury to "behave" and "focus on work." (Tr. 1039). Afraid for

11

her life, within hours Drury resumed meeting with clients and earning money for Ray. (Tr. 1040, 1052).

### 4. Ray's Money Laundering and Tax Evasion

At Ray's direction, Pollok meticulously documented millions of dollars in extortion and sex trafficking proceeds in handwritten ledgers and laundered the criminal proceeds through her and Felicia Rosario's bank accounts and by purchasing thousands of domain names for Ray's GoDaddy account to conceal the source of the funds. (Tr. 1621-26, 1678-83, 1688-1701; GX 1404, 1634, 1646). Ray did not pay taxes on the proceeds, and filed no tax returns from 2016 through 2019, despite knowing his tax obligations. (Tr. 2389-2402, 2426-31).

### B. The Defense Case

The defense called two witnesses: a rebuttal cell site expert and Glenn Ripa, who served as Ray's attorney during the charged crimes. Through cross-examination and closing argument, Ray argued that the Government's witnesses were not credible and that Ray genuinely believed he was entitled to the property he took from his victims.

### C. The Verdict and Sentencing

On April 6, 2022, the jury convicted Ray of the 15 counts on which the Government proceeded to trial. On January 19, 2023, Judge Liman sentenced Ray principally to 60 years' imprisonment and lifetime supervised release, and imposed a $1,500 special assessment.

12

# **A R G U M E N T**

## **POINT I**

### **Ray's Convictions Were Supported by Sufficient Evidence**

Ray challenges the sufficiency of the evidence to support seven counts of conviction. (Br. 41, 58, 61, 73, 81, 84). The record reflects ample evidence to support the jury's verdict.

## **A.   Relevant Facts**

At the conclusion of the Government's case at trial, Ray moved under Federal Rule of Criminal Procedure 29 to dismiss each count based on insufficient evidence of guilt. (Tr. 2505). As Judge Liman noted, the motion was "cursory" and highlighted only one area of alleged insufficiency—one not raised on appeal. (Add. 10). The District Court reserved judgment on the motion, which was renewed in "similarly cursory" fashion at the conclusion of all the evidence. (Add. 10; Tr. 2768-69). This time, Ray highlighted another area of purported insufficiency—also not raised on appeal—related to the tax counts. The District Court reserved judgment and invited post-trial briefing. In a letter on June 8, 2022, Ray notified the District Court that he did not intend to file additional post-trial motions or briefing. (Dkt. 565). The Government filed a brief in opposition to Ray's Rule 29 motion on July 18, 2022 (Dkt. 575), to which Ray did not reply.

13

The District Court denied Ray's Rule 29 motion in a detailed written opinion on November 23, 2022. (Add. 9-24).

## B. Applicable Law

"A defendant challenging the sufficiency of the evidence bears a heavy burden," *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011), as the standard of review is "exceedingly deferential," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). This Court reviews the sufficiency of the evidence *de novo*, *see United States v. Sabhani*, 599 F.3d 215, 241 (2d Cir. 2010), but "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence," *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). A jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

With respect to a conspiracy conviction, the deference afforded to a jury's verdict is "especially important" because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003).

14

## C. Discussion

Applying the "exceedingly deferential" standard of review described above, there was ample evidence for the jury to find Ray guilty on all counts.

### 1. Sufficient Evidence Supported Ray's Conviction for Racketeering Conspiracy

On appeal, Ray does not dispute that sufficient evidence proved several counts of conviction, including extortion and money laundering, which were also some of the predicate acts for the racketeering conspiracy charged in Count One. Ray claims, however, that insufficient evidence established an enterprise, which he asserts was required to prove his guilt on the conspiracy charge. (Br. 42). He is mistaken.

As an initial matter, Ray's arguments fail because it is well established in this Circuit that, "[t]o prove a RICO conspiracy, the Government need not establish the existence of an enterprise, or that the defendant committed any predicate act." *United States v. Arrington*, 941 F.3d 24, 36 (2d Cir. 2019). Rather, the Government "need only prove that the defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme." *Id.* at 36-37; *see also United States v. Applins*, 637 F.3d 59, 75 (2011) (holding that "the establishment of an enterprise is not an element of the RICO conspiracy offense").[3]

---

[3] Ray does not claim that Judge Liman's jury instructions were erroneous under this Court's law but urges this Court to reconsider *en banc* its holding in

15

Regardless, the jury was instructed that it was required to find the existence of an enterprise to convict Ray of Count One. Judge Liman instructed that Count One required the jury to find beyond a reasonable doubt "an agreement among two or more persons to participate in an enterprise that would affect interstate commerce through a pattern of racketeering activity." (Tr. 2970). Judge Liman described the alleged enterprise to the jury, and properly defined an "enterprise" as a "group of people who have associated together for a common purpose of engaging in a course of conduct over a period of time," and "must have an ongoing organization, either formal or informal," and a "core of personnel who function as a continuing unit." (Tr. 2969, 2971). *See, e.g.*, *Boyle v. United States*, 556 U.S. 938, 948 (2009). Judge Liman informed the jury that if it concluded that Ray was not a member of the enterprise, it should not proceed to consider whether the Government had proved any of the alleged racketeering acts. (Tr. 2976-77).

———————

*Applins*. (Br. 53-54). *Applins*, however, properly applied *Salinas v. United States*, 522 U.S. 52 (1997), which made clear that a conviction for RICO conspiracy does not require proof that a substantive RICO offense was committed. Ray refers to a supposed circuit split, but some of the cases cited predate *Salinas* or refer to the enterprise element of a RICO conspiracy conviction in passing only. (Br. 54). Regardless, as further described, Judge Liman's instructions required the jury to find the existence of an enterprise, and overwhelming evidence proved that it existed.

16

Moreover, drawing "every inference . . . in the government's favor," *Coplan*, 703 F.3d at 62, there was overwhelming evidence that Ray agreed that an enterprise would be established *and* that such an enterprise in fact existed. As Judge Liman explained in denying Ray's Rule 29 motion, the evidence supported the conclusion that the enterprise Ray agreed with others to join "consisted of 'the Ray Family,'" and included Ray, his daughter Talia, and Pollok—and, over time, Ray's father and stepfather. (Add. 12; Tr. 1597-98). The organization had "longevity," lasting about a decade until Ray's arrest. (Add. 12).

Ray argues that "[t]here was no demonstrated shared purposes and goals." (Br. 43). But as Judge Liman correctly found, the "Ray Family had structure and form, had an ongoing organization, and had a singular illegal purpose, to extort and sex traffic its victims and to force them to engage in labor." (Add. 12). Ray "controlled" the enterprise and was its "leader," but the other enterprise members had their own roles in service of shared purposes and goals. (Add. 12); *see, e.g.*, *United States v. Kellerman*, 431 F.2d 319, 323 (2d Cir. 1970) (members of a conspiracy may serve "different role[s]").

Ray suggests that Talia's purposes were benign (Br. 43-45), but emails, recordings, and witness testimony established that Talia "introduced" Ray to her friends, "helped him interrogate them and elicit the confessions that became their collateral, and participated in the victim's extortion and forced labor." (Add. 12). Documentary evidence showed that after Talia introduced Ray to her roommates around 2010,

17

she celebrated how Ray had exploited her friends. (Tr. 577-80, 583-86). Talia berated and threatened the enterprise's victims for supposedly damaging her property and created a timeline of the victims' supposed wrongdoing. (Tr. 572-74, 877-78, 1553-54; GX 1412F). During one recorded interrogation, Talia threatened Santos with prison time for being a violent criminal who caused damage to Talia and her father. (Tr. 303-06; GX 4175; *see also* Tr. 595-98 (Talia's notes on other victim interrogations)). Financial records and text messages showed that Talia knowingly accepted extortion payments from Ray's victims for years and routinely requested money transfers of criminal proceeds to pay her and Ray's stepfather's expenses. (*See, e.g.*, Tr. 592, 654-58, 2236-40; GX 109 (payments from Santos to Talia), 1411A-C (summary of money transfers to Talia from 2017-19), 1404 (financial analysis summary)). In 2015, she participated in the forced labor of multiple victims—including by having Drury make lists of damage she had supposedly caused to the Pinehurst property (*see* Tr. 580-81, 867-70; GX 3115)—and in 2019 she advised Pollok on a threatening letter to Drury, suggesting Pollok tell Drury, "you're more than evil" (Tr. 660-61). The jury had ample basis to conclude that Talia was an integral and longstanding member of the enterprise who agreed to assist in Ray's criminal scheme. *See United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001) ("[T]he task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court.").

Ray's argument that Pollok was "no different from the other people around Ray whom the government called as witnesses" (Br. 45) was a conclusion the jury

18

could and did readily reject in light of the overwhelming evidence that she conspired with Ray. Documentary evidence—including video and audio recordings, financial records, and emails—corroborated witness testimony that Pollok was Ray's righthand woman who supported various aspects of the criminal enterprise: she recorded and catalogued Ray's interrogations of his victims (Tr. 315, 916, 919), oversaw the sex trafficking of Drury (Tr. 644-53, 944, 1006-14, 1024-50; GX 1410 (cell site evidence), 4060-62 (text messages)), laundered the funds through Pollok's and Felicia Rosario's bank accounts (Tr. 1688-1701; GX 1404), documented the collection and spending of criminal proceeds in handwritten ledgers that were recovered from Pollok and Ray's residence (Tr. 1621-26, 1678-83; GX 1634, 1646), and "threatened the victims with humiliation and prosecution if they did not keep their silence" (Add. 12; GX 3244). Pollok in particular worked alongside Ray to achieve the enterprise's "illegal purposes through violence and threats of violence and through 'collateral'—false confessions—that [Ray] manufactured and that the Ray Family collected and maintained to engage in extortion and to ensure their victim's silence." (Add. 12; *see, e.g.*, Tr. 1014). She even assisted Ray in the assault of Drury at the Gregory Hotel, including by handing Ray the plastic bag he used to suffocate Drury repeatedly and recording a portion of the nightlong encounter. (Tr. 1033-50; GX 1709).

Ray's claim that the enterprise had no "shared financial purpose" (Br. 46) similarly ignores the trial evidence. As the leader of the enterprise Ray had ultimate authority over its profits, but his coconspirators

19

labored for the financial gain of the enterprise and benefited from it. The criminal proceeds of the enterprise—including the proceeds from sex trafficking Drury—were disseminated among Ray's family members and associates, including Talia. (Tr. 1891-1906, 1925-51; GX 1404). And Pollok's detailed handwritten ledgers, receipts, and other financial records showed that Pollok spent criminal proceeds on luxury items for herself, and that she and Ray used the enterprise's criminal profits to stay at luxury hotels and dine at expensive restaurants, among other things. (Tr. 2234, 2252, 2322; GX 506, 507, 1634, 1646, 1650).

Ray also asserts that his father and stepfather were not enterprise members (Br. 47), but a coconspirator may play a lesser role in the enterprise and still be a participant. *See Kellerman*, 431 F.2d at 323. Forced labor took place on his stepfather's property, and his father "made threats on behalf of" Ray to Felicia Rosario after Ray's arrest, "in an attempt to interfere with the investigation and to convince the victims to maintain their silence." (Add. 12-13; Tr. 1727-35; GX 1685).

Putting aside these men's participation in the enterprise, the evidence was more than sufficient to convict Ray of racketeering conspiracy given the overwhelming evidence of a criminal agreement with Talia and Pollok. Ray's argument that a RICO enterprise must be independent of the RICO defendant (Br. 48-49) thus has no bearing here; Ray was distinct from the RICO enterprise, which included other coconspirators united with Ray in a shared criminal purpose. *See, e.g.*, *United States v. Veliz*, 623 F. App'x 538, 542 (2d

20

Cir. 2015) (in case involving racketeering conspiracy related to murder of one defendant's husband, finding that members' "repeated and overlapping participation in the pattern of racketeering activity defeats appellants' contention that the other members' involvement was too isolated to form an association-in-fact").

Ray also argues that insufficient evidence proved that he committed certain predicate racketeering acts of the conspiracy, namely obstruction and the forced sexual services of Felicia Rosario. (Br. 81-87). That argument, regardless of its merit, is not a basis to reverse Ray's conviction on Count One. As Judge Liman properly instructed the jury, the Government was required to prove, among other things, that Ray or another member of the conspiracy agreed to commit two racketeering acts. (Tr. 2975); *see also Salinas*, 522 U.S. at 64 (the Government is not required "to prove each conspirator agreed that he would be the one to commit two predicate acts"). As this Court has also explained, "it is sufficient to allege and prove that the defendant[ ] agreed to the commission of multiple violations of a specific statutory provision that qualifies as RICO racketeering activity." *Applins*, 637 F.3d at 81. It is enough to support Ray's conviction, for example, that the Government proved that Ray agreed to commit numerous acts of extortion and money laundering (indeed, Ray does not challenge the sufficiency of the evidence on Counts Three and Eleven) or numerous acts of sex trafficking and forced labor, *see infra* at Point I.C.3-4.

Regardless, the evidence was sufficient for the jury to find that Ray agreed to commit obstruction for the

21

benefit of the enterprise: a recorded conversation and Felicia Rosario's testimony established that on Ray's behalf, Ray's father tried to intimidate Felicia to remain loyal to Ray after his indictment and arrest. (Tr. 1714-17, 1727-35; GX 1685). Evidence that Felicia performed forced sexual services that constituted forced labor was substantial too. (Tr. 1494-98, 1556-70, 2261-66; GX 1405); *see United States v. Marcus*, 628 F.3d 36, 44-45 (2d Cir. 2010) (forced labor statute encompassed forced services for commercial BDSM website). In any event, as discussed below, the evidence that Ray forced other victims to perform manual labor in Pinehurst was overwhelming and an independent basis for the jury to find that Ray and his co-conspirators agreed to engage in forced labor as part of the pattern of racketeering activity.

### 2. Sufficient Evidence Supported Ray's Conviction for a Violent Crime in Aid of Racketeering

The jury properly convicted Ray of Count Seventeen, which charged him with the brutal assault of Claudia Drury using a plastic bag to torture and suffocate her. In challenging that conviction, Ray relies on the same meritless argument that the Government failed to prove the existence of an enterprise. (Br. 58); *see supra* Point I.C.1. In addition, Ray claims that the Government failed to prove the necessary intent, namely that Ray assaulted Drury at least in part "for the purpose of . . . maintaining or increasing [his] position in" the charged racketeering enterprise. 18 U.S.C. § 1959(a); *Arrington*, 941 F.3d at 38. The evidence, however, readily permitted the jury to infer that Ray

22

assaulted Drury after she put the enterprise at risk by confiding in a prostitution client (Tr. 1031-33), and that he assaulted her to remind her of his dominance within the enterprise and his expectation that she continue prostituting herself for its benefit (Tr. 1033-50). Ray directed Drury at the end of the night of torture to behave and return to work (Tr. 1039-40), which she promptly did, turning over thousands of dollars from additional prostitution carried out hours later (Tr. 1040; GX 1634, 3220, 4061). Asked why she returned to work, Drury explained that she was afraid for her life. (Tr. 1040, 1052). Upon returning home from the assault, Ray and Pollok boasted to Felicia Rosario that Drury had been "crying" and "scared," but the assault "was a success" in sending a message to Drury, who had previously been "noncooperative," that "she needed to work and she needed to make money and she needed to keep escorting, prostituting." (Tr. 1686-87).

This Court "consistently ha[s] construed the maintaining or increasing position language in § 1959 liberally." *United States v. White*, 7 F.4th 90, 101 (2d Cir. 2021). Here, the "motive requirement" was readily satisfied because "the jury could properly infer that [Ray] committed his violent crime . . . in furtherance of [his] membership" in the enterprise, namely to ensure the successful ongoing extortion and sex trafficking of Drury, and her continued obedience. *Arrington*, 941 F.3d at 38.

23

### 3. Sufficient Evidence Supported Ray's Convictions for Sex Trafficking and Sex Trafficking Conspiracy

Ray challenges the sufficiency of the evidence that he sex trafficked Claudia Drury and conspired to do so. (Br. 61). His challenge merely recycles arguments that were made forcefully before the jury, which rightly rejected the arguments based on devastating evidence of Ray's multi-year campaign to force Drury to engage in prostitution for his own profit. As Judge Liman correctly found, "[t]he evidence before the Jury was easily sufficient to convict [Ray] of sex trafficking and sex trafficking conspiracy." (Add. 16).

Ray claims on appeal, as he did unsuccessfully below, that Drury embraced sex work because she liked it, and that Ray merely suggested Drury engage in prostitution, falling short of enticing, recruiting, maintaining, or obtaining Drury to engage in commercial sex. (Br. 62, 66-68; Tr. 2875-76). Overwhelming evidence, however, supported the alternative conclusion that Ray ensnared Drury in a grueling and miserable life of prostitution through a combination of psychological manipulation, threats, and violence. (*See, e.g.*, Tr. 690-96). Those tactics plainly served to "secure [Drury's] services" as a lucrative prostitute and "to keep [Drury] in an existing state" of prostitution for Ray's benefit. *Merriam-Webster.com Dictionary,* Merriam-Webster, *https://www.merriam-webster.com/ dictionary/recruit* (accessed January 19, 2024) ("recruit" means "to secure the services of"); *https:// www.merriam-webster.com/dictionary/maintain* (accessed January 19, 2024) ("maintain" means "to keep

24

in an existing state"); *see also United States v. Gagliardi*, 506 F.3d 140, 147 (2d Cir. 2007) (words like "entice," where not defined in the statute, are "words of common usage that have plain and ordinary meanings"). Ray sexually groomed Drury and gradually desensitized her to sadistic sexual activity by "normalizing deviant and commercial sex acts." (Add. 16; Tr. 722-23, 750-56, 871-72, 884-97). Testimony and documentary evidence—like video recordings, journal entries, and emails—showed that Ray coerced Drury to believe that she owed Ray millions of dollars in damages and that prostitution was the only means to repay that damage and avoid prison. (Add. 16; Tr. 690-96, 880-81, 889-900, 918-36; GX 1412D, 1549, 1886, 4163-65). Financial documents proved that over time Ray extracted approximately $2 million of sex trafficking proceeds from Drury by making her work seven days a week, almost every day of the year, seeing numerous clients a day while living out of hotels. (Tr. 695-96; GX 1404, 1634, 1646).

Ray pressured Drury to earn more money through near-constant prostitution appointments with threats, blackmail, and violent abuse. (Tr. 924-25, 940, 1007-16, 1031-53). Drury emphatically rejected the suggestion that her preferred professional path after graduating college was to live out of hotels working as a prostitute (Tr. 1238); she did so to meet Ray's extortionate demands for money, and under Ray's violent and threatening control she felt that she could not stop (Tr. 696). She described the routine suffering, humiliation, and shame she endured in order to keep up with Ray's bottomless demands for more money. (Tr. 1237-41).

25

As he did below, Ray calls Drury "an inveterate storyteller." (Br. 73; Tr. 2879). A jury, however, was entitled to credit Drury's testimony, which was "not incredible on its face," and was alone "capable of establishing guilt beyond a reasonable doubt." *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999). But the jury did not rely on Drury's word alone. Drury was heavily corroborated by recorded interrogations, financial records, hotel records, text messages, and emails, as well as by Felicia Rosario—who heard Ray and Pollok describe their involvement in Drury's prostitution business (Tr. 1620-21), whose bank account was used to launder sex trafficking proceeds (Tr. 1688-1701; GX 1404), and to whom Ray and Pollok boasted about their assault of Drury at the Gregory Hotel (Tr. 1684-87)—and the victim testimony more generally about Ray's sexual grooming, coercion, threats, and violence (*see, e.g.*, Tr. 216-17, 295-97, 1483, 1767).

Ray argues that there was no understanding with Drury to pay him using prostitution proceeds. (Br. 69). But the evidence showed that Ray made his expectations, and the consequences of noncompliance, crystal clear. As Drury stated: "if I didn't make enough money," he "would threaten me" with blackmail, violence, and prison. (Tr. 1007). Ray reinforced his demands for money with violence, on one occasion beating Drury with a riding crop (Tr. 910-11), on another hitting her repeatedly until she stopped flinching (Tr. 1014-15), and on another suffocating her with a plastic bag and then telling her to "focus on work" (Tr. 1033-50). A jury rightly rejected the ludicrous notion that Ray did no more than "suggest" that Drury engage in prostitution. (Br. 66-68).

26

Ray argues that he would not have posted Drury's personal information to a website if he were "seeking to maintain an income stream from the proceeds of prostitution," and "[i]f anything, threats Drury said Ray made might constitute extortion," but not sex trafficking. (Br. 70-71). But the extortion and sex trafficking of Drury were intertwined. Ray extorted Drury through violence and wrongful threats, and he collected on the extortionate demands by recruiting Drury to prostitution and maintaining her there. As Judge Liman noted, Ray used Drury's false confessions, "and the threat that he would make the confessions public or report Drury to law enforcement, to induce Drury to engage in acts of prostitution and to turn over the proceeds to him." (Add. 13). Moreover, Ray's use of a website to humiliate Drury was one way to demonstrate to her that his threats were credible, and Drury testified that she would "try and make as much money as possible any way I could" to prevent Ray from carrying out threats related to the website. (Tr. 939-42).

In short, a rational jury could easily conclude from these facts that Ray sex trafficked Drury and there is no basis to disturb the jury's findings.

### 4. Sufficient Evidence Supported Ray's Conviction for Forced Labor

Ray's argument that insufficient evidence supported the forced labor convictions (Counts Six, Seven, and Eight) similarly ignores the overwhelming evidence of Ray's guilt. (Br. 73).

27

Ray admits that he was "rough" with the victims in North Carolina but claims that "he did not physically hurt anyone *to force* them to labor." (Br. 79). The evidence readily supported the jury's conclusion otherwise. As several victims testified, and video and photographic evidence confirmed, the victims' time in North Carolina was punctuated with violent outbursts from Ray coupled with demands for more work under demanding conditions of limited sleep, food deprivation, and severe weather. (Tr. 830-36, 859-63, 1574-76, 2073-75, 2096-97; GX 2127, 2144). Some of the violence even occurred *while* the victims were working, such as shoving Yalitza Rosario to the ground while she laid pipes and accusing her of "sabotage" (Tr. 2103-04), and pushing Drury to the ground while she was digging (Tr. 862-63). As Judge Liman found, the "evidence represents paradigmatic forced labor," including "evidence of the physical force that [Ray] employed to get his victims" to "perform grueling physical labor" and "evidence of the threats of further physical force—that [Ray] conveyed through the violence that he inflicted—if his victims did not work as commanded." (Add. 15).

Ray is also incorrect that the forced labor statutes "require a showing of *force*" (Br. 74). Instead, as Judge Liman properly instructed the jury—tracking the language of the statute—there are several additional prohibited means of obtaining manual labor, including threats of force or serious harm, the threatened abuse of law or legal process, or a scheme to cause the victim to believe that if the victim did not perform such labor, another person would suffer serious harm. (Tr. 3000; *see also* Add. 15). The evidence showed, for example,

28

that Ray "drove Felicia Rosario to a police station to be booked and held in jail, using the confessions that he extracted as leverage," which "conveyed that Ray had both the ability and the will to use legal process to imprison Felicia Rosario if she did not continue to work on his behalf," and he "conveyed the same threat to use the law or legal process to compel Yalitza Rosario to perform physical labor." (Add. 15-16; Tr. 834-35, 1581, 2107-09). Ray claims that those threats "had nothing to do with the manual labor" (Br. 79), but that conclusory assertion ignores that Ray put the Rosario sisters back to work on the property after giving them "another chance." (Tr. 2108). Ray also dismisses as "absurd" the notion that Drury or Felicia "felt compelled to work in Pinehurst because they believed that, were Gordon (Ray's stepdad) to see damage to his property, he could die of a heart attack." (Br. 80). But Drury and Rosario were steeped in Ray's psychological manipulation, and the jury was permitted to credit their testimony that they took Ray's threats at face value and felt enormous pressure to continue working. (Tr. 864-65). The evidence thus showed that Ray employed a variety of prohibited means to obtain manual labor, any one of which was sufficient to convict.

Ray claims that the evidence was insufficient because the victims came to North Carolina voluntarily and could have departed. (Br. 74-78). This Court rejected precisely that argument in *United States v. Raniere*, No. 20-3520, 2022 WL 17544087, at *2 (2d Cir. Dec. 9, 2022). There, the Court reasoned that the fact that the victim's labor "arose from her initial participation in consensual . . . activities does not require us to infer, much less conclude, that [she] consented to all

29

of the labor she subsequently undertook." *Id.* (quoting
*Marcus*, 628 F.3d at 45). As here, "the Government
presented evidence that [the victim] was required to
produce 'collateral' . . . which she feared would be re-
leased if she failed to comply with [the defendant's] di-
rectives," and this Court "conclude[d] that the jury was
presented with ample evidence showing that [the vic-
tim's] labor was nonconsensual." *Id.* Moreover, Ray's
argument ignores that the conditions in Pinehurst
were so coercive and dire that Felicia appeared to suf-
fer a nervous breakdown and Yalitza Rosario at-
tempted suicide. (Tr. 833-34, 1572-73, 2075). Felicia
testified that she was "completely and utterly depend-
ent on [Ray] in every way: Mentally, emotionally, fi-
nancially. I had no one else to turn to." (Tr. 1585-86).
Yalitza described having no way to leave and fearing
that Ray would report her to the police if she did.
(Tr. 2111).

Finally, just as the evidence showed Talia Ray's in-
volvement in the RICO conspiracy, so too it estab-
lished her participation in the forced labor conspiracy
specifically. (Add. 16). Photographs, videos, emails,
and financial transactions established how Talia par-
ticipated in, and benefitted from, the forced labor.
(Tr. 867-70; GX 109, 1412F, 1860, 2133).

## POINT II

### The RICO Statute Is Constitutional

Ray's argument that his Count One conviction for
RICO conspiracy should be reversed because RICO is
unconstitutionally vague (Br. 54) should be swiftly re-
jected. The Second Circuit has repeatedly rejected

30

vagueness challenges to the RICO statute. *See, e.g.*, *United States v. Burden*, 600 F.3d 204, 228 (2d Cir. 2010) ("We are of course bound by the law of this circuit, which has consistently rejected [constitutional vagueness] challenges to the RICO statute"); *United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991) (explaining that the Second Circuit has "previously found that RICO was not unconstitutionally vague in a variety of applications" and citing cases); *United States v. Coonan*, 938 F.2d 1553, 1562 (2d Cir. 1991) (rejecting vagueness challenge to RICO's "enterprise" requirement). Ray therefore cannot show constitutional error, much less plain error, which an appellant must show where, as here, he did not raise a constitutional vagueness challenge below. *See United States v. Le*, 902 F.3d 104, 109 (2d Cir. 2018). Ray fails to identify any facts that distinguish the application of the RICO statute here from the myriad cases where this Court has held that the statute was constitutional as applied.

## POINT III

## The District Court Properly Admitted the Expert Testimony of Dr. Dawn Hughes

Contrary to Ray's claims on appeal (Br. 30), Judge Liman properly exercised his broad discretion to admit the expert testimony of Dr. Dawn Hughes. Dr. Hughes's testimony, based on her specialized knowledge as a clinical and forensic psychologist, aided the jury in understanding the tactics and effects of coercive control, an area where jurors were unlikely to have experience. Dr. Hughes testified as a blind expert with no knowledge about the facts of the case and,

31

contrary to Ray's claims, did not improperly bolster the victims' credibility or improperly opine on Ray's state of mind.

### A. Relevant Facts

Prior to trial, Ray moved to exclude the testimony of Government expert witness Dr. Dawn Hughes, a clinical and forensic psychologist. The Government had identified Dr. Hughes as an expert on "sexual abuse, interpersonal violence, victimization, and traumatic stress," who would testify about "coercive control as a tactic of victimization and a strategy to gain dominance across a spectrum of relationships" and "about the common elements of abuse and coercive control in victimization situations." *United States v. Ray*, No. 20 Cr. 110 (LJL), 2022 WL 101911, at *1, *9 (S.D.N.Y. Jan. 11, 2022).

Judge Liman denied Ray's motion in a detailed written opinion. *See id.* Among other things, he rejected Ray's argument that Dr. Hughes's proposed testimony was not based on reliable data or expert methodology, noting that it was derived from "her clinical and forensic practice assessing victimization, and on her trauma-based education and training, including her study of literature generally regarding sexual assault, interpersonal violence, victimization, coercive control, and trauma." *Id.* at *10.

The District Court was also unpersuaded that Dr. Hughes's proposed testimony would involve impermissibly opining on Ray's mental state, explaining:

> Multiple courts in this District and elsewhere have admitted similar testimony

32

> where, as here, it is not offered as evidence of the defendant's intent but to help a jury understand a common set of conduct experience[d] by victims or the actions normally taken by those committing certain crimes to seduce their victims, and to explain seemingly counterintuitive behavior of victims or conduct not normally familiar to most jurors.

*Id.* at \*10 (citing multiple district court and appellate court decisions). Judge Liman noted that the Government was not proposing that Dr. Hughes testify about the "subjective motivations, thought processes, and mental states of abusers in general or of Ray specifically." *Id.* at \*11. Rather, Dr. Hughes would testify about a "common set of conduct experienced by those who are victims of interpersonal violence and the effect that that conduct commonly has . . . *i.e.*, how victims experience such common elements of abuse and coercive control and how these elements function to allow perpetrators to establish and maintain control." *Id.* at \*11.

Finally, the District Court disagreed with Ray that Dr. Hughes's testimony would "impermissibly bolster the credibility of government fact witnesses." *Id.* at \*12. The expert disclosure made clear that Dr. Hughes had "not examined any specific victim in this case" and would "not offer testimony regarding any specific victim." *Id.* at \*13. Therefore, Judge Liman noted:

> Her testimony will bolster the testimony of any particular victim or witness only in the sense that if the jury finds Dr.

33

> Hughes' testimony regarding modus operandi and the effect of sexual abuse on a victim to be credible and if it finds that the facts as testified to by a victim fit the pattern described by Dr. Hughes, it might find that testimony to be more credible than if Dr. Hughes had not testified. . . . If it turns out that the testimony of Dr. Hughes will support the testimony of the victims, that will be because the witnesses testify consistently with what Dr. Hughes will testify is victim experience generally and because the jury—after cross-examination—will believe both Dr. Hughes and the victims. It will not be because Dr. Hughes lends an expert sheen by testifying that a witness is credible. Presenting expert testimony that is consistent with lay witness testimony is the permissible building block for any case . . . .

*Id.* at *13.

Consistent with her expert disclosure, Dr. Hughes testified at trial as a blind expert about interpersonal violence and tactics of coercive control, including techniques of grooming a victim for abuse, and common effects of those tactics and techniques on abuse victims. (Tr. 470-515). She explained that she had no personal knowledge of the case and had not reviewed any case materials, interviewed any victims or witnesses, or interviewed the defendant. (Tr. 478-79).

34

## B. Applicable Law

### 1. Federal Rule of Evidence 702

A district court may admit expert testimony if it finds that "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. If the testimony is instead directed solely to "lay matters which a jury is capable of understanding and deciding without the expert's help," *United States v. Zhong*, 26 F.4th 536, 555 (2d Cir. 2022), the testimony may properly be excluded. But Rule 702 sets a "liberal" and "permissive" standard of admissibility. *Nimley v. City of New* York, 414 F.3d 381, 395-96 (2d Cir. 2005). To assess whether expert testimony is relevant, the district court must consider whether the evidence has "any tendency to make the evidence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).

To determine whether the expert testimony is reliable, "the district court should consider the indicia of reliability identified in Rule 702." *Id.* Specifically, the district court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached." *Id.* at 266. "The fact that the subject matter is not 'scientific' is no bar to admissibility of expert testimony." *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015). As this Court has observed, "Rule 702 itself refers to 'other specialized knowledge,' . . . and 'there are many

35

different kinds of experts, and many different kinds of expertise.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). Rule 702 permits a witness's expertise to come from "personal knowledge or experience," so long as that "specialized knowledge will assist the trier of fact." *Romano*, 794 F.3d at 330; *see Amorgianos*, 303 F.3d at 266-67 (noting that experts need not rely on "published studies").

### 2. Federal Rule of Evidence 704

Although an expert's opinion generally "is not objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704(a), Rule 704(b) specifies that "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged," Fed. R. Evid. 704(b). Rule 704(b) does not "prohibit all expert testimony that gives rise to an inference concerning a defendant's mental state"—the "plain language of the rule, however, means that the expert cannot expressly state the inference, but must leave the inference, however obvious, for the jury to draw." *United States v. DiDomenico*, 985 F.2d 1159, 1165 (2d Cir. 1993).

### 3. Standard of Review

It is well established that "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985). This Court "will find an abuse of discretion only where the trial judge ruled in an arbitrary or irrational fashion." *United States v.*

36

*Kelley*, 551 F.3d 171, 175 (2d Cir. 2009). Even when a defendant preserves his objection to a district court's evidentiary ruling, and that ruling is "manifestly erroneous," the defendant is not entitled to a new trial if the error was harmless. *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012). "Under harmless error review, [this Court] ask[s] whether [it] can conclude with fair assurance that the errors did not substantially influence the jury." *United States v. Oluwanisola*, 605 F.3d 124, 133-34 (2d Cir. 2010).

Where a defendant fails to assert an objection in the district court, the admission of evidence is reviewed for plain error only. *See, e.g.*, *United States v. Morris*, 350 F.3d 32, 36 (2d Cir. 2003).

## C. Discussion

### 1. Dr. Hughes's Testimony Was the Proper Subject of Expert Testimony

Ray argues that Dr. Hughes's testimony should have been precluded because it addressed a subject that was within the ken of the average juror. (Br. 12). Judge Liman was well within his broad discretion to conclude that under Rule 702, Dr. Hughes's "specialized knowledge" would "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

Ray asserts that Dr. Hughes's testimony was limited to defining "non-esoteric terms" that the jury could readily understand without the help of an expert. (Br. 12, 32). The District Court rightly found otherwise. Dr. Hughes relied on far more than mere

37

"anecdotal evidence." (Br. 36-38). She drew on 25 years of experience as a clinical and forensic psychologist with a specialization in interpersonal violence, which included treating thousands of victims of interpersonal violence, as well as trauma-based education and training. (Tr. 470-79). She explained a number of specialized terms for the jury, including coercive control, and the tactics of coercive control, ranging from grooming techniques to methods of physical, sexual, and psychological abuse, and the effect those tactics typically have on abuse victims. (Tr. 479-514).

Ray argues that Dr. Hughes "never identified the 'science' she was relying on" (Br. 31), but it is well established that proper expert testimony is not limited to quantitative or statistical study. For example, in *Romano*, this Court upheld a district court's decision to admit expert testimony about "coin grading and valuation processes," and explained that the fact that the expert's "methods [we]re not entirely replicable" because they were "based in part on his personal experience as a coin dealer for several decades" did not require preclusion under *Daubert*. *Romano*, 794 F.3d at 330, 333. Dr. Hughes's testimony thus readily satisfies Rule 702's permissive standard. As then-District Judge Nathan noted in admitting similar testimony, such testimony is rooted in a "method" that is "reliable and well-accepted" in the profession of clinical psychology. *United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 5283951, at *3 (S.D.N.Y. Nov. 11, 2021).

As a result, and as Judge Liman noted, trial courts in the Southern District of New York have routinely admitted testimony like Dr. Hughes's that draws on

38

clinical study and experience "to help a jury understand a common set of conduct experience[d] by victims or the actions normally taken by those committing certain crimes to seduce their victims, and to explain seemingly counterintuitive behavior of victims." *Ray*, 2022 WL 101911, at *10.[4] And courts of appeals to consider the question have likewise affirmed the admission of similar expert testimony. *See United States v. Romero*, 189 F.3d 576, 584 (7th Cir. 1999) (expert testimony about methods of child molesters); *United States v. Hitt*, 473 F.3d 146, 158-59 (5th Cir. 2006) (same); *United States v. Halamek*, 5 F.4th 1081, 1088-89 (9th Cir. 2021) (expert testimony about behaviors used to groom children for sexual abuse); *United States v. Batton*, 602 F.3d 1191, 1200-02 (10th Cir. 2010) (expert testimony about the characteristics of sex offenders and their victims); *United States v. Johnson*, 860

_____

[4] *See, e.g.*, *Maxwell*, 2021 WL 5283951, at *3; *United States v. Torres*, No. 20 Cr. 608 (DLC), 2021 WL 1947503, at *7 (S.D.N.Y. May 13, 2021); *United States v. Randall*, No. 19 Cr. 131 (PAE) (S.D.N.Y. Feb. 25, 2020), Dkt. 335 at 29-30 (observing that "studying the circumstances and psychological drivers of trafficked women is not like studying diseases or potential cures in laboratory animals. . . . The testimony . . . necessarily uses more qualitative research methodologies. These involve interviews and case studies and clinical examinations over time."); *United States v. Kidd*, 385 F. Supp. 3d 259, 263-64 (S.D.N.Y. 2019); *United States v. Dupigny*, No. 18 Cr. 528 (JMF) (S.D.N.Y. Oct. 17, 2019), Dkt. 198 at 27.

39

F.3d 1133, 1140 (8th Cir. 2017) (expert testimony about general characteristics of adult victims of sexual abuse). Ray claims that Dr. Hughes relied on "inadmissible hearsay by unknown declarants" (Br. 40), but it is well established that "expert witnesses can testify to opinions based on hearsay . . . if experts in the field reasonably rely on such evidence in forming their opinions," *United States v. Locasio*, 6 F.3d 924, 938 (2d Cir. 1993), as is the case with psychologists who form opinions based on their clinical practice treating patients. *See, e.g.*, *Torres*, 2021 WL 1947503, at *7 (expert testimony properly involved the "synthesis and interpretation" of interviews with abuse victims).

Ray claims that while some victim behaviors Dr. Hughes described are admittedly "[c]ounterintuitive," they should have been familiar to jurors. (Br. 26). Judge Liman rightly rejected that argument; while the fact of certain sexual abuse prosecutions might be generally known, the underlying and secretive patterns of abusive conduct are plainly not. *See, e.g.*, *Romero*, 189 F.3d at 584-85 (explaining that the "sophisticated psychological techniques" of abusers defy "widely held stereotype[s]" about molesters and are "something with which most jurors would have little experience"); *Batton*, 602 F.3d at 1201 (describing similar expert testimony "regarding criminal methods" of sex offenders as "beyond the common knowledge of lay jurors"); *Johnson*, 860 F.3d at 1140 ("Regardless of the victim's age, expert testimony about how individuals generally react to sexual abuse—such as not reporting the abuse and not attempting to escape from the abuser—helps jurors evaluate the alleged victim's behavior.").

40

This case bears no resemblance to *United States v. Cruz*, 981 F.2d 659, 664 (2d Cir. 1992), on which Ray relies for the proposition that an expert may not testify about matters that "are not beyond the intellectual capacity of the average juror." (Br. 32). *Cruz* involved a straightforward drug charge. At trial, a law enforcement agent testified both about the defendant's arrest and about simple, undisputed common patterns of drug activity. Because the expert testimony was within the ken of the jury, involved descriptions the defense did not attack as improbable, also involved prejudicial and improper commentary on the defendant's ethnicity, and was delivered by an officer involved in the defendant's arrest, this Court found that the testimony impermissibly suggested to the jury that the "arresting officer [ ] believes the government's witness[ ] to be credible and the defendant to be guilty." *Cruz*, 981 F.2d at 663.[5] By contrast, Dr. Hughes was a blind expert with no knowledge or involvement in the facts of the case, who elucidated the complex behavioral patterns of coercive control in a case where Ray's elaborate multi-phased criminal scheme lasted almost a decade, and where the victims seemingly could have left his sphere of influence at any time. Among other things, she explained how certain behaviors that

---

[5] Since *Cruz*, this Court has repeatedly affirmed that the typical practices of narcotics dealers are a proper subject for expert testimony. *See, e.g.*, *United States v. Plaza*, 752 F. App'x 37, 42-43 (2d Cir. 2018) (citing *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)).

41

might appear benign—such as gaining a victim's trust and providing attention, affection, and economic support—counterintuitively may groom a victim for eventual abuse (Tr. 482-85), how violence does not have to be sustained to be successful as a tactic of control (Tr. 487), why a victim might falsely confess to something he or she did not do (Tr. 503-04) or fail to break away from an abuser (Tr. 513-14), and how perpetrators may "slowly desensitize the victim to more extreme forms of sexual behavior" by moving the "line of deviancy" (Tr. 489). *See Romero*, 189 F.3d at 584 ("This court has recognized the value of expert testimony in explaining a complicated criminal methodology that may look innocent on the surface but is not as innocent as it appears."); *Halamek*, 5 F.4th at 1088 (finding "persuasive" the "reasoning of the opinions of our sister circuits" that expert testimony about grooming is admissible because it "illuminates how seemingly innocent conduct . . . could be part of a seduction technique," and citing cases).

Moreover, even if Judge Liman erred in finding that Dr. Hughes's testimony was not within the ken of the average juror—which he did not—*Cruz* recognized that expert testimony may be used "on some occasions to explain even non-esoteric matters, when the defense seeks to discredit the government's version of events as improbable criminal behavior." *Cruz*, 981 F.2d at 664. The defense sought to do just that throughout the trial, including in opening and closing summations. (Tr. 89-94, 2839, 2855-69, 2874-86). Thus, where, as here, the "defendant[] argued that the Government's version of events did not suggest criminal activity, the Government was justified in introducing expert

42

testimony explaining that" perpetrators of interpersonal violence "employ certain techniques." *United States v. Tapia-Ortiz*, 23 F.3d 738, 741 (2d Cir. 1994); *see also United States v. Taylor*, 18 F.3d 55, 59-60 (2d Cir. 1994) ("[e]ven assuming *arguendo*" that expert testimony about drug dealers' preference for high-powered firearms was "not beyond the ken of the average juror," it was properly admitted because the defendant "specifically disputed the government's claims that the gun found in his apartment was linked to his drug trafficking").

## 2. Dr. Hughes's Testimony Did Not Improperly Bolster Victims' Credibility

Ray's argument that Dr. Hughes's testimony impermissibly mirrored the testimony of Ray's victims and improperly bolstered their credibility is also without merit. (Br. 33). As Judge Liman found, to the extent Dr. Hughes's testimony about coercive control echoed victim testimony about Ray's abusive conduct, that was permissible corroboration of the victims' credibility. *Ray*, 2022 WL 101911, at *13.

Impermissible mirroring does not occur where, as here, a blind expert offers testimony without any knowledge of the facts of the case and without having interviewed the witnesses or of the defendant. (*See* Tr. 2861 (Ray's counsel emphasizing in summation that Dr. Hughes "didn't examine any of the witnesses" and "has no opinion about the relationships at issue in this case")). In *Johnson*, for example, the Eighth Circuit rejected a bolstering argument where the expert did not express any opinion on the victim's

43

truthfulness, did not suggest the victim's behavior was consistent with the behavior of other abuse victims, testified that she had never met the victim, and "merely imparted general knowledge which the jury could then use in evaluating the charges" against the defendant. *Johnson*, 860 F.3d at 1141; *see also Maxwell*, 2021 WL 5283951, at *5 (finding expert testimony "appropriate because she does *not* testify as to any specific witness's credibility," but instead about general characteristics of abuse). Even in *United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994), cited by Ray (Br. 34), where the expert had firsthand knowledge of the case and his testimony "closely aligned with the facts of the case," this Court held that the testimony was properly admitted because it "did not serve simply to bolster the testimony of the government's fact witnesses as to matters readily understood by the average juror," but also involved testimony about common mafia terminology that was a proper subject of expert opinion, *id.* at 1263-64.

Moreover, unlike in *Amuso* and *Cruz*, here there was no risk that "the testimony may create an improper implication 'that a law enforcement specialist . . . believes the government's witness[] to be credible and the defendant to be guilty.'" *Id.* at 1263 (quoting *Cruz*, 981 F.2d at 663). For one, Dr. Hughes was not a law enforcement witness. And for another—unlike the experts in *Amuso* and *Cruz*—Dr. Hughes had no information about the case, much less any knowledge about the Government's witnesses or the defendant. *See, e.g.*, *United States v. Mejia*, 545 F.3d 179, 191 (2d Cir. 2008) (cautioning a heightened risk where case agents with personal knowledge of the defendant are permitted to

44

testify as experts). Finally, *Cruz* was limited to a scenario "where the witness's version is not attacked as improbable or ambiguous evidence" of criminal conduct. *Cruz*, 981 F.2d at 663. But the central pillar of Ray's defense was to portray his victims as unreliable narrators whose versions of events could not be credited. (Tr. 89-94, 2839, 2855-69, 2874-86). Among other things, Dr. Hughes's testimony aided the jury in assessing Ray's specious assertion that Ray was not guilty because he did not hold Drury against her will and she appeared to enjoy prostitution. (*Compare* Tr. 481-514, *with* Tr. 2875-79).

This case is therefore also unlike *Zhong*, 26 F.4th at 556, on which Ray relies. (Br. 34). There, the government "impermissibly" used the expert's testimony to "interpret" and "vouch for" key pieces of trial evidence, and the expert improperly opined on the ethnic dimensions of the case. *Id. Zhong* distinguished the facts of that case from expert testimony akin to Dr. Hughes's testimony that would be permitted, such as expert testimony about typical tactics of perpetrators of forced labor, including preferential practices that "may appear inconsistent with forced labor," or methods that make workers "less likely to seek help." *Id.* at 555-56. Moreover, *Zhong* favorably cited *United States v. Brinson*, 772 F.3d 1314, 1319 (10th Cir. 2014), a sex trafficking case, for the proposition that "an expert's testimony could have helped the jury better understand . . . the relationship between pimps and their prostitutes, . . . how pimps recruit prostitutes, and how pimps control prostitutes." *Zhong*, 26 F.4th at 556 n.11.

45

### 3. Dr. Hughes Did Not Offer Improper State of Mind Testimony

For similar reasons, Dr. Hughes did not offer impermissible state of mind testimony. (Br. 38). In admitting Dr. Hughes's testimony, Judge Liman correctly determined that "Dr. Hughes does not propose to testify to the subjective motivations, thought processes, and mental states of abusers in general or of Ray specifically." *Ray*, 2022 WL 101911, at *11. As in *Romero*, Dr. Hughes's testimony "does not even approach the Rule 704(b) line" for an improper opinion about the defendant's mental state because Dr. Hughes "never directly opined as to [Ray's] mental state," and her testimony "focused primarily on the modus operandi—on the *actions* normally taken by" abusers—and "did not amount to a statement of [her] belief about what specifically was going through [Ray's] mind" at the relevant times. *Romero*, 189 F.3d at 586 (emphasis in *Romero*).[6]

—————

[6] During Dr. Hughes's testimony, Judge Liman enforced the boundary between testimony about an abuser's conduct versus his intent, sustaining all of Ray's objections to questions that risked eliciting testimony about the intent of an abuser. (Tr. 490, 496, 504). Apart from those discrete occasions, Ray did not otherwise object that Dr. Hughes was testifying beyond the bounds of the expert notice or the testimony that Judge Liman had deemed permissible in advance of trial. On appeal, Ray identifies a few instances when Dr. Hughes described the "goal" of an abuser's tactics. (Br. 40). But he did not object to that testimony below,

46

Ray complains that the Government argued that Dr. Hughes described patterns of conduct that track what Ray did. (Br. 29). But it is permissible, for example, for an expert to testify "that a certain pattern of conduct is often found in narcotics cases, leaving it for the jury to determine whether the defendant's conduct fits the pattern." *United States v. Ruggiero*, 928 F.2d 1289, 1305 (2d Cir. 1991). Here, there was even more daylight: Dr. Hughes testified about coercive control, rather than about conduct typical of those who commit racketeering, extortion, forced labor, or sex trafficking. Both parties were permitted to argue, and did argue, in summation what inferences could permissibly be drawn from the trial evidence, including from Dr. Hughes's testimony. As Ray's counsel herself argued: "For all of Dr. Hughes's discussion, she never told you whether coercive control was actually used in this case." (Tr. 2861). *See United States v. Skyers*, 787 F. App'x 771, 775 (2d Cir. 2019) ("It is only as to the last step in the inferential process—a conclusion as to the defendant's actual mental state—that Rule 704(b) commands the expert to be silent.").

––––––––––

which in any event was not an impermissible opinion under Rule 704(b) about Ray's mental state. *See Romero*, 189 F.3d at 585 (reviewing for clear error claims regarding specific questions and answers during the expert's testimony to which the defendant did not object). Ray similarly decries what he calls Dr. Hughes's "victim advocacy" (Br. 27), but he cites no case requiring an expert to be neutral, particularly about sexual and physical abuse.

47

### 4.  Any Errors Were Harmless

Even assuming that the District Court erred by admitting Dr. Hughes's testimony—which it did not—the error was harmless. *See Oluwanisola*, 605 F.3d at 133-34. While Dr. Hughes's testimony was helpful for the jury to understand the dynamics of interpersonal violence—including why the victims remained deferential and loyal to Ray for so many years despite his abuse—the evidence that Ray ran a criminal enterprise and used violence and threats to commit forced labor, extortion, and sex trafficking was overwhelming. *See supra* at Point I. Ray had a full opportunity, and made every effort, to challenge the victims' credibility on cross examination. But setting Dr. Hughes's testimony aside, the victims were heavily corroborated by each other and by compelling documentary evidence, including photographs, videos, audio recordings, journal entries, and emails that laid bare Ray's abuse and criminal intent. The defense made full-throated arguments to the jury about why the victims should not be believed, but those arguments could not hold up against the weight of the evidence from an approximately month-long trial that included the testimony of 18 witnesses, including five of Ray's victims.

### POINT IV

### The District Court Properly Admitted Video Evidence of Forced Sexual Services

Ray argues that the District Court improperly admitted videos of Felicia Rosario engaged in sexual activity with other men because the videos were unduly prejudicial. (Br. 60). Judge Liman, however, properly

48

exercised his discretion to admit that evidence. *See United States v. Quinones*, 511 F.3d 289, 307 (2d Cir. 2007) (district court evidentiary rulings reversed "only for abuse of discretion").

The videos corroborated Felicia's testimony that Ray repeatedly coerced her to have sex with strangers and document it on video, and then routinely threatened to disseminate the videos. (*Compare* Tr. 1494-98, 1556-1564, 2261-66, *with* GX 1405). Before the District Court, Ray made clear that he did not object to Felicia's testimony on the subject; he objected only to admission of the videos. (2/22/2022 Tr. 34). This evidence—both Felicia's testimony *and* the videos—was relevant for several reasons. Ray conceded that evidence of Felicia's sexual grooming and exploitation was admissible as proof of the means and methods of the enterprise. (2/22/2022 Tr. 34). The evidence was also probative of the relationship between Ray and Felicia, including the coercive nature of the relationship and Ray's use of humiliating collateral, that resulted in Ray's extortion and forced labor of Felicia; the forced sexual services were themselves a forced labor racketeering predicate, *see supra* at Point I.C.1; the videos, which established that Pollok supervised Felicia's sexual activity, corroborated Pollok's role as a conspirator and lieutenant of Ray's; and the evidence of Ray's sexual exploitation of his victims corroborated Drury's testimony that Ray groomed her to become a prostitute.

Introducing the video evidence was not unfairly prejudicial. The Government did not play the graphic videos, but instead introduced a summary chart that

49

contained brief factual descriptions of each video. (GX 1405). The content of the chart was no more inflammatory than other evidence and testimony in the case about Ray sexually degrading his victims and trafficking Drury to engage in prostitution, including with clients who subjected her to BDSM. (Tr. 910-11); *see United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (touchstone of prejudice analysis under Rule 403 is whether the proffered evidence does "not involve conduct any more sensational or disturbing than the crimes with which" the defendant is charged). In *Raniere*, this Court affirmed the admission of similarly sexually graphic evidence, where—as here—that evidence had a probative purpose, including as evidence of the defendant's relationship with his victims. *See Raniere*, No. 20-3520, 2022 WL 17544087, at *5-*6. It should do the same here.

Finally, any error in admitting the evidence was harmless in light of the overwhelming evidence of Ray's guilt, including Felicia's detailed and disturbing testimony about Ray's sexual exploitation, to which Ray waived any objection. *See Siddiqui*, 699 F.3d at 702.

## POINT V

### Ray's Sentence Was Reasonable

Ray's challenge to the reasonableness of his within-Guidelines sentence of 60 years' imprisonment for his horrific, multifaceted, and lengthy criminal scheme is meritless. (Br. 87).

50

## A.   Relevant Facts

Ray appeared before Judge Liman for sentencing on January 19, 2023. Without objection, Judge Liman calculated an applicable offense level of 42 and a criminal history category of V, which yielded an advisory range under the United States Sentencing Guidelines of 360 months' to life imprisonment. (ST 8).

In addition to receiving written victim impact statements from Yalitza and Felicia Rosario, Judge Liman heard from several victims at sentencing. In a statement read on behalf of Drury, Drury stated that Ray subjected her to nearly a decade of "unremitting, sadistic torture," which involved abuse that was "highly specific and based on my individual vulnerabilities." (ST 10). She explained that the "cycle of crushing guilty, anxiety, threat, punishment, and immense pressure" that Ray inflicted on her was "truly torturous" (ST 10):

> He destroyed my life, attacked everything precious to me, broke apart my family, convinced me I was incurably evil, intentionally drove me to and orchestrated two psychiatric hospitalizations, sexually groomed me to the point that I would be able to make him millions of dollars from prostitution, enslaved me in that prostitution, made me work years on end from dawn until early hours of the morning, beat me, extorted me, threatened me, pressured me; and the first time I ever defied him in my near decade of knowing him, he stripped me naked,

51

> bound me to a chair, and suffocated me
> with a plastic bag over and over again to
> the point where I was begging for my life.

(ST 11). Drury expressed: "I wish there were words to
say how painful and tormenting and cruel this period
of my life was. I've yet to find them. It was hell." (ST
14).

Santos Rosario and Daniel Levin also addressed
the District Court. Santos described going from a
happy college sophomore to a decade of "absolute mis-
ery" under Ray. (ST 18). He explained:

> Larry made us believe there was some-
> thing deeply wrong with us. I saw my
> brilliant sister Felicia reduced to a shell
> of her former self, my sister Yalitza com-
> mitted to a state institution, and my
> mother and father wept for years in con-
> fusion and helplessness. He used me as a
> tool to drain the little money my family
> had. I lost all my friendships. . . . He
> drove me to attempt suicide more than
> once, and by a certain point, I was con-
> templating it daily. I lost my education
> from one of the top colleges in the coun-
> try. . . . He physically abused, degraded,
> humiliated and blackmailed me to ce-
> ment his control. He took away every-
> thing that made me me—my family, my
> friends, my education, my dignity, my
> pride, my hopes and my dreams.

52

(ST 18-19). Levin talked about how Ray "tortured me and my friends, verbally, physically, emotionally, and sexually," and about the long-lasting effects of that trauma. (ST 21-23).

The District Court heard from the Government, which sought a life sentence and emphasized the horrific nature of Ray's crimes and the continued danger Ray posed. (ST 25-30). Defense counsel advocated for a 15-year sentence. (ST 30-40). Given an opportunity to speak, Ray principally complained about his declining health and prison conditions. (ST 42-44).

After a brief recess, Judge Liman discussed the basis for the sentence and imposed a total sentence of 60 years' imprisonment. (ST 44-55). Judge Liman considered the Section 3553(a) factors (ST 46), and emphasized the need for just punishment, to promote respect for the law, to incapacitate Ray, and for deterrence (ST 53).

He emphasized that Ray's conduct was "particularly aggravated, his crimes particularly heinous." (ST 46). Judge Liman summarized the offense conduct (ST 46-47), and noted that Ray "had the evil genius to take people who were young, albeit not minors, and who were not broken, and he broke them . . . and then he used them to his evil ends" (ST 48). Judge Liman noted that Ray's "crimes spanned years and it destroyed families," and "there was a particular cruelty in the defendant's ways and a particular sophistication in his actions" because he "preyed on his victims' vulnerabilities and he took pleasure in degrading them." (ST 48). Judge Liman enumerated several examples. He also highlighted that "Ray's conduct cannot be explained by

profit motive alone," but "was sadism, pure and simple." (ST 49). Ray's crimes were not "aberrant," but rather "occurred over years, tracking well-honed models of grooming reflected in articles regarding psychological manipulation that he collected." (ST 49). Ray had a "history of violence" and exhibited that "he believed that he was above the law and that he would never be restrained by the law." (ST 49). Judge Liman noted that he had considered Ray's age, "[b]ut there is no reason to believe Mr. Ray will age out of criminal behavior," having "engaged in these crimes in his late 50s" and "committed these crimes with force, but also . . . with his wits" and showing that "he is capable of manipulating others to do his bidding with his mind and words alone." (ST 50-51).

The District Court considered Ray's arguments for a 15-year sentence but did "not find them convincing," in part because such a sentence "would not begin to capture the gravity of Mr. Ray's crimes." (ST 51). Judge Liman noted the importance of incapacitation and emphasized that Ray's "medical conditions do not mitigate the gravity of Mr. Ray's crimes or reduce the need for him to be incapacitated" because "[h]e committed the crimes at issue in this case while ostensibly suffering from the same or similar medical conditions," which "did not prevent him from inflicting acts of unspeakable cruelty on his victims." (ST 52).

## B.  Applicable Law

This Court reviews "the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 51

54

(2007). The defendant "bears a heavy burden because [ ] review of a sentence for substantive reasonableness is particularly deferential." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012). Indeed, this Court will set aside a district court's decision on the ground of substantive unreasonableness "only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). In reviewing sentences, this Court does "not substitute [its] own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case," *id.*, and does "not second guess the weight (or lack thereof) that the judge accorded to a given [Section 3553(a)] factor or to a specific argument made pursuant to that factor," *United States v. Pope*, 554 F.3d 240, 247 (2d Cir. 2009). "In the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Perez-Frias*, 636 F.3d 39, 43 (2d Cir. 2011).

## C.   Discussion

The District Court's decision to impose a within-Guidelines sentence of 60 years' imprisonment for Ray's roughly decade-long sadistic campaign of psychological, physical, and sexual abuse and torture of numerous vulnerable victims through extortion, forced labor, and sex trafficking, and his efforts to conceal his crimes through money laundering, tax evasion, and obstruction, was appropriate and certainly not an abuse of discretion. *See Cavera*, 550 F.3d at 189.

Ray's argument that the sentence was improper because it violated the parsimony clause (Br. 92), should be rejected.[7] Judge Liman was clear that he had "given substantial thought and attention to the appropriate sentence in this case in light of the Section 3553(a) factors and the appropriate purposes of sentencing as reflected in that statute" (ST 46), and explicitly noted that the sentence imposed "honors what the parsimony principle dictates, that I should impose a sentence sufficient but not greater than necessary to satisfy the purposes of sentencing." (ST 55). *See, e.g.*, *United States v. Ministro-Tapia*, 470 F.3d 137, 141 (2d Cir. 2006) (noting that "absent record proof showing otherwise, we assume the district court's awareness of and compliance with" the parsimony clause).

Ray argues that a shorter sentence could have served the goals of sentencing. But Judge Liman presided over the approximately one-month trial and his "sense of what is a fair and just sentence under all the circumstances" is entitled to deference. *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006). Judge Liman explained why a 15-year sentence was inadequate to achieve the aims of sentencing as applied to Ray and his crimes (ST 51-52), emphasizing the need for a sentence that was "an appropriate measure of the gravity of Mr. Ray's crimes" and that ensured "that Mr. Ray

---

[7] Ray describes this as "procedural" error (Br. 92), but "[w]hether the sentence is consistent with the parsimony clause of section 3553(a) is a question of substantive reasonableness." *United States v. Pugh*, 945 F.3d 9, 28 (2d Cir. 2019).

56

never again presents a risk to society" (ST 55). Judge Liman clarified that even though he did "not intend to impose a life sentence per se"—which the Government had asked for "not without reason or justification"—the sentence imposed was "necessary to protect society, to ensure that [Ray] will never victimize these victims or anyone else in the future." (ST 54).

This case is wholly unlike *United States v. Jenkins,* 854 F.3d 181, 184 (2d Cir. 2017), cited by Ray (Br. 94), where a divided panel held that a 225-month sentence for possession of child pornography was unreasonable where, among other things, the defendant (a first-time felony offender) had no victim contact and did not produce or distribute the illicit material. Here, Ray directly terrorized his victims for nearly a decade, deriving sadistic pleasure from their physical and mental abuse, driving several victims to repeatedly attempt suicide (Tr. 466, 882, 1512, 2075, 2088), and leaving his victims with lasting trauma. Moreover, unlike in *Jenkins*, where the "district court offered only formulaic reasoning for the period of incarceration," *Jenkins*, 854 F.3d at 187, Judge Liman described the offense conduct in detail and thoroughly considered the Section 3553(a) factors in determining the appropriate sentence in this case, as reflected in the lengthy sentencing transcript.

The within-Guidelines sentence was not substantively unreasonable, particularly where a Guidelines sentence of life imprisonment would have been reasonable too. *See United States v. Fernandini*, 652 F. App'x 4, 5 (2d Cir. 2015) (explaining that the "district court had wide latitude to impose" a life sentence "for [the

57

defendant's] heinous conduct, notwithstanding" his childhood abuse and rehabilitation). Ray notes that this was not a murder case. (Br. 93). But this case is akin to those where this Court has affirmed life sentences, or the near equivalent of a life sentence, for heinous sex crimes that did not involve murder. *See, e.g.*, *United States v. Lopez*, No. 22 Cr. 1071, 2023 WL 7146581, at *2 (2d Cir. Oct. 31, 2023) (affirming 55-year sentence for child sexual exploitation offenses that exceeded the defendant's life expectancy, noting that "we have ample caselaw affirming sentences that surpass a defendant's expected natural life" and citing cases); *United States v. Cramer*, 602 F. App'x 837, 840 (2d Cir. 2015) (upholding effective life sentence for sex trafficking of a minor); *see also United States v. Raniere*, 18 Cr. 204 (NGG), Dkt. 969 (imposing 120-year prison sentence, which was not challenged on appeal, for convictions that included racketeering, sex trafficking, and forced labor).

In sum, it was eminently reasonable for Judge Liman to conclude that a 60-year sentence for Ray's horrific crimes was necessary, and the sentence cannot be said to be "so shockingly high . . . or otherwise unsupportable as a matter of law that allowing [it] to stand would damage the administration of justice." *Broxmeyer*, 699 F.3d at 289.

58

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:  New York, New York
January 19, 2024

Respectfully submitted,

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
*of America.*

DANIELLE R. SASSOON,
DAVID ABRAMOWICZ,
*Assistant United States Attorneys,*
*Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,942 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: DAVID ABRAMOWICZ,
*Assistant United States Attorney*