23-6114-cr
*United States v. Ray*

# United States Court of Appeals
# for the Second Circuit

_____

August Term 2024

(Argued:  November 7, 2024     Decided: June 2, 2025)

No. 23-6114-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

ISABELLA POLLOK,

*Defendant,*

LAWRENCE RAY,

*Defendant-Appellant.*

_____

Before:        CARNEY, BIANCO, and NARDINI, *Circuit Judges*.

Defendant-Appellant Lawrence Ray appeals from the judgment of the United States District Court for the Southern District of New York (Lewis J. Liman,

*Judge*), entered after a jury trial, at which he was found guilty of, *inter alia*, racketeering conspiracy, extortion, sex trafficking, forced labor, money laundering, tax evasion, and committing a violent crime in aid of a racketeering enterprise. The convictions relate to Ray's operation of a criminal enterprise that targeted a group of young adults, largely composed of his daughter's college roommates, for indoctrination and criminal exploitation, including sex trafficking and forced labor on a property in Pinehurst, North Carolina. Ray challenges his conviction on the grounds that: (1) there was insufficient evidence adduced at trial to sustain his convictions; (2) the racketeering statutes under which he was convicted are unconstitutionally vague; (3) the district court erred in admitting testimony from the government's expert witness regarding, *inter alia*, tactics of coercive control and the effect those tactics typically have on abuse victims; and (4) his 720-month sentence of imprisonment is substantively unreasonable. Upon review, we discern no basis to disturb Ray's convictions or sentence. Accordingly, we **AFFIRM** the judgment of the district court.

> FOR APPELLEE: DANIELLE R. SASSOON, Assistant United States Attorney (David Abramowicz, Assistant United States Attorney, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, New York.
>
> FOR DEFENDANT-APPELLANT: VIVIAN SHEVITZ, CJA Counsel (Julia Pamela Heit and Susan C. Wolfe, CJA Counsel, *on the brief*), Royal Oak, Michigan.

JOSEPH F. BIANCO, *Circuit Judge*:

Defendant-Appellant Lawrence Ray appeals from the judgment of the United States District Court for the Southern District of New York (Lewis J. Liman, *Judge*), entered after a jury trial, at which he was found guilty of the following counts: (1) racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); (2) extortion conspiracy, in violation of 18 U.S.C. § 1951; (3) extortion, in violation of 18 U.S.C. §§ 1951 and 2; (4) sex trafficking, in violation of 18 U.S.C. §§ 1591 and 2; (5) conspiracy to commit sex trafficking, in violation of 18 U.S.C. § 1594; (6) forced labor, in violation of 18 U.S.C. §§ 1589 and 2; (7) forced labor trafficking, in violation of 18 U.S.C. §§ 1590 and 2; (8) forced labor conspiracy, in violation of 18 U.S.C. § 1594; (9) use of interstate commerce to promote unlawful activity, in violation of 18 U.S.C. §§ 1952(a)(3)(b) and 2; (10) money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), (ii), and 2; (11) tax evasion, in violation of 26 U.S.C. § 7201; and (12) violent crime in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3). The convictions relate to Ray's operation of a criminal enterprise that targeted a group of young adults, largely composed of his daughter's college roommates, for indoctrination and criminal exploitation, including sex trafficking and forced labor on a property in Pinehurst, North Carolina. The district court

sentenced Ray principally to 720 months' imprisonment, followed by a lifetime term of supervised release.

On appeal, Ray challenges his conviction primarily on the grounds that: (1) the evidence adduced at trial was insufficient to support convictions for racketeering conspiracy; violent crime in aid of racketeering; sex trafficking and sex trafficking conspiracy; and forced labor, forced labor trafficking, and forced labor conspiracy; (2) the racketeering statutes under which he was charged—18 U.S.C. §§ 1959(a)(3), 1962(d)—are unconstitutionally vague; (3) the district court erred by admitting the testimony of the government's expert, Dr. Dawn Hughes, regarding, *inter alia*, tactics of coercive control and the effect those tactics typically have on abuse victims; and (4) his 720-month sentence of imprisonment is substantively unreasonable. Upon review, we discern no basis to disturb Ray's convictions or sentence.

Accordingly, we **AFFIRM** the judgment of the district court.

## BACKGROUND

According to the evidence adduced at trial, beginning in or around 2010, Ray was introduced, through his daughter, to a group of college students and their friends and family members. After meeting these individuals, Ray worked to gain

their trust and confidence by offering advice and support to help them address their own insecurities, in order to ultimately manipulate, abuse, and extort them. Over the ensuing decade, Ray engaged in a range of conduct to accomplish his criminal objectives, with the assistance of his family members and his daughter's best friend, Isabella Pollok.[1]  For example, Ray coerced false confessions from his victims that they had harmed Ray, his family, and his property, and used those confessions—coupled with threats of, and actual, physical abuse—to extort them for money.  Ray also manipulated one of his victims into engaging in commercial sex acts, and he forced some of his victims to perform manual labor at his stepfather's property in Pinehurst, North Carolina (the "Pinehurst Property"), again by threatening, and actually carrying out, physical abuse.  Moreover, members of Ray's family and close associates also participated in this conduct by, *inter alia*, recording and cataloguing the confessions; being present for Ray's acts of physical abuse against his victims; managing client lists, hotel room reservations, and revenue related to the commercial sex business; and laundering funds Ray received from his victims.

---

[1]  On September 7, 2022, Pollok pleaded guilty pursuant to a plea agreement to a superseding information charging her with money laundering conspiracy, in violation of 18 U.S.C. §§ 371 and 1956(a)(1)(B)(i).

On January 13, 2022, the government filed a superseding indictment, charging Ray with one count of racketeering conspiracy, one count of extortion conspiracy, one count of extortion, one count of sex trafficking, one count of conspiracy to commit sex trafficking, one count of forced labor, one count of forced labor trafficking, one count of forced labor conspiracy, two counts of use of interstate commerce to promote unlawful activity, one count of money laundering, five counts of tax evasion, and one count of committing a violent crime (namely, assault) in aid of racketeering.

Trial commenced on March 8, 2022. The government called eighteen witnesses, including five of Ray's victims, namely, Claudia Drury—whom Ray sex trafficked, extorted, assaulted, and forced to perform manual labor—and four members of the Rosario family—siblings Felicia, Santos, and Yalitza and their mother, Maritza, all of whom Ray extorted, among other things. The government also called six law enforcement officers, including a Federal Bureau of Investigation forensic accountant whose analysis of financial records showed how Ray concealed the source of approximately $2 million of extortion and sex trafficking proceeds by moving the funds through Pollok's and Felicia Rosario's bank accounts, as well as an expert whose cell site analysis corroborated that Ray

6

and Pollok picked up sex trafficking proceeds from Drury at hotels around Manhattan and at locations in New Jersey. In addition, the government introduced documentary evidence, including documents, photographs, and videos recovered from email, iCloud search warrants, and a judicially authorized search of Ray's premises at the time of his arrest. On April 6, 2022, the jury returned a guilty verdict as to all counts, except one count of use of interstate commerce to promote unlawful activity and one count of tax evasion, counts that the government chose not to pursue at trial.

During trial, Ray moved at the conclusion of the government's case and again at the conclusion of the evidence to dismiss all counts of the indictment pursuant to Federal Rule of Criminal Procedure 29, on the ground that the government had presented insufficient evidence for a reasonable jury to find Ray guilty of the charged conduct. In both of these instances, the district court reserved judgment. On November 23, 2022, after inviting post-trial briefing to address related issues, the district denied the Rule 29 motion. *See generally United States v. Ray*, No. 20-cr-110 (LJL), 2022 WL 17175799 (S.D.N.Y. Nov. 23, 2022).

On January 20, 2023, Ray was sentenced. At sentencing, the district court calculated a total offense level of 42 and a criminal history category of V, resulting

in an advisory range under the United States Sentencing Guidelines of 360 months'
to life imprisonment.  The district court sentenced Ray principally to 720 months'
imprisonment, followed by a supervised-release term of life.  This appeal
followed.

## DISCUSSION

### I.  Sufficiency of the Evidence

We review *de novo* a defendant's challenge to the sufficiency of the evidence.
*United States v. Martinez*, 110 F.4th 160, 171 (2d Cir. 2024).  However, a defendant
who challenges the sufficiency of the evidence "bears a heavy burden."  *United
States v. Krivoi*, 80 F.4th 142, 155 (2d Cir. 2023) (internal quotation marks omitted).
In reviewing whether a conviction is supported by sufficient evidence, we will
"sustain the jury's verdict if, crediting every inference that could have been drawn
in the government's favor and viewing the evidence in the light most favorable to
the prosecution, *any* rational trier of fact could have found the essential elements
of the crime beyond a reasonable doubt."  *United States v. Raniere*, 55 F.4th 354, 364
(2d Cir. 2022) (internal quotation marks omitted).

As set forth below, we conclude that the trial evidence was sufficient to support the convictions Ray now challenges on appeal.[2]  We address each of his challenges to those convictions in turn.

### A. Racketeering Conspiracy (18 U.S.C. § 1962(d))

Ray argues that there is insufficient evidence to sustain his conviction for racketeering conspiracy because the government did not establish that there was an enterprise.  We disagree.

The conspiracy provision of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), "proscribes an agreement to conduct or to participate in the conduct of [an] enterprise's affairs through a pattern of racketeering activity."  *United States v. Pizzonia*, 577 F.3d 455, 462 (2d Cir. 2009).  The term "enterprise" includes any "group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  Proof of a formal organization is

---

[2]  Insofar as Ray asserts separately that the government presented insufficient evidence to sustain obstruction and witness tampering offenses as predicate acts to the racketeering conspiracy charge, we need not address that argument.  As set forth below, we conclude the jury was presented with sufficient evidence to support a finding that multiple other predicate acts were proven, such as the charges for sex trafficking and forced labor.  In any event, Ray does not challenge his convictions for money laundering and extortion, offenses that also qualify as predicate acts for the racketeering conspiracy charge, and thus, notwithstanding any arguments regarding obstruction and witness tampering, we find the government presented sufficient evidence to establish the predicate acts necessary to support that charge.

not required to establish the existence of an enterprise because "an association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). "Though the substantive RICO offenses require proof of an enterprise and a pattern of racketeering activity, 'the establishment of an enterprise is not an element of the RICO conspiracy offense.'" *United States v. White*, 7 F.4th 90, 98–99 (2d Cir. 2021) (quoting *United States v. Applins*, 637 F.3d 59, 75 (2d Cir. 2011)). Instead, the government "need only prove that the defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme."[3] *United States v. Arrington*, 941 F.3d 24, 36–37 (2d Cir. 2019).

Here, the government presented sufficient evidence not only to show that Ray knowingly agreed to the general criminal objectives shared by his coconspirators; the evidence further showed in detail that Ray and his

---

[3] As a threshold matter, Ray argues that the district court erred by declining to adopt his proposed instruction for the RICO conspiracy charge, which would have required the jury to find, in part, that an "enterprise existed." Appellant's Br. at 51. Ray acknowledges, however, that the district court's decision, and the instruction ultimately given to the jury, were consistent with our decision in *Applins*. He nevertheless argues that the jury was improperly instructed because he contends that this Court, in *Applins*, misapplied the Supreme Court's holding in *Salinas v. United States*, 522 U.S. 52 (1997). However, *Applins* remains good law in this Circuit, and thus we are bound by it. *See Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995) ("A decision of a panel of this Court is binding unless and until it is overruled by the Court *en banc* or by the Supreme Court.").

confederates formed an enterprise through which they extorted and profited from their victims. This evidence included testimony demonstrating, *inter alia*, that the enterprise consisted of a defined membership, including members of Ray's own family and his close associates. Members of the enterprise connected potential victims to the enterprise, extracted payments from their victims, and threatened victims to keep them under the enterprise's control. The enterprise's members also recorded and catalogued interrogations of its victims during which victims were coerced into making false confessions that the enterprise could later use as blackmail, oversaw a commercial sex business, laundered money through their bank accounts, committed assault to keep victims working for the enterprise, and subjected their victims to forced labor. *See, e.g.*, *United States v. Payne*, 591 F.3d 46, 60–61 (2d Cir. 2010) (finding the evidence sufficient to establish a RICO enterprise where the government presented testimony that there was an identifiable membership, which included individuals who oversaw a drug distribution business, transferred money among members, and participated in violence related to enterprise business).

Ray argues that no reasonable jury could have found the existence of an enterprise because the government did not prove there was profit sharing among

11

its members such that the enterprise had a shared purpose. But this argument fails for at least two reasons. First, as noted above, Ray was convicted of RICO conspiracy, which requires proof only of Ray's agreement that an enterprise would be established and his awareness of the general nature of the conspiracy, not that the enterprise actually existed. *Applins*, 637 F.3d at 77. Second, in any event, there was ample proof that such an enterprise did exist. Although a racketeering enterprise need not display any particular characteristics, *id.* at 78; *see also United States v. Gershman*, 31 F.4th 80, 96 (2d Cir. 2022), such as profit-sharing, there was ample evidence here that profits were in fact shared among the enterprise's membership.

In sum, the government presented evidence sufficient for a rational jury to find that the enterprise element of the racketeering conspiracy charge was proven beyond a reasonable doubt.[4]

---

[4] Ray also asserts that the district court improperly admitted certain video evidence offered by the government to establish the existence of an enterprise in connection with the racketeering charges. In particular, he argues that, because there was no enterprise, admitting the video evidence was irrelevant and prejudicial. However, because the government elicited testimony from which a reasonable jury could find that the enterprise element was met, and the government offered the videos to corroborate that testimony, the district court did not abuse its discretion in admitting this evidence.

12

### B.  Violent Crime in Aid of Racketeering (18 U.S.C. § 1959(a))

To obtain a conviction for a violent crime in aid of racketeering, the government must prove, *inter alia*, that the defendant committed the relevant crime "for the purpose of . . . maintaining or increasing position in [the] enterprise."  18 U.S.C. § 1959(a).  "This motive requirement is satisfied if the jury could properly infer that [Ray] committed his violent crime . . . in furtherance of [his] membership" in the enterprise.  *Arrington*, 941 F.3d at 38 (internal quotation marks omitted).

Ray argues that there was insufficient evidence to establish beyond a reasonable doubt that he committed assault to enhance his leadership role in the enterprise because none of the coconspirators challenged his position.[5]  We disagree.  For instance, the government put forth evidence demonstrating that Ray, with Pollok present, assaulted Drury, who was forced to engage in commercial sex acts on behalf of the enterprise, for providing information about the enterprise to a client.  During this incident, Ray directed Drury to comply with

---

[5]  Ray also contends that his conviction for a violent crime in aid of racketeering should be reversed because the government presented insufficient evidence to sustain the "enterprise" element of this offense.  However, as we explained *supra* in the context of his challenge to his racketeering conspiracy conviction, there was sufficient evidence presented at trial for a rational jury to make that finding.

the directives of, and to continue to work for, the enterprise by continuing to engage in commercial sex acts. In its aftermath, Ray and Pollok told others the incident was a success, believing it had sent Drury a message to remain compliant with the aims of the enterprise. Based on this evidence, a jury could properly infer that Ray committed the assault to maintain or increase his membership in the enterprise. *See Arrington*, 941 F.3d at 39 (finding the government adduced evidence sufficient to sustain Section 1959's intent requirement where it showed the violent crime was committed to "confirm [defendant's] position as an enforcer" within the enterprise); *see also White*, 7 F.4th at 101–03 (same). Accordingly, there was sufficient evidence at trial to support's Ray conviction for assault in aid of racketeering.

### C. Sex Trafficking (18 U.S.C. § 1591) and Conspiracy to Commit Sex Trafficking (18 U.S.C. § 1594)

Ray further argues that there was insufficient evidence to sustain his convictions for sex trafficking and sex trafficking conspiracy because the government failed to establish that he recruited, enticed, or solicited any of his victims to engage in commercial sex acts. We are unpersuaded.

A defendant engages in sex trafficking in violation of Section 1591 if he "knowingly . . . recruits, entices, . . . or solicits by any means a person . . . to engage

14

in a commercial sex act."[6]  *Raniere*, 55 F.4th at 360 (quoting 18 U.S.C. § 1591(a)). Here, we hold that the government presented sufficient evidence to support a conviction on this count.  The government presented evidence, *inter alia*, that Ray coerced a victim, Drury, into believing she owed Ray a significant debt, and that engaging in commercial sex acts was the only way to satisfy the debt.  The jury heard testimony from Drury that Ray threatened, blackmailed, and assaulted her so that she would continue to engage in commercial sex acts for the enterprise, and his demands for money from her became so extensive she was forced to ask her clients for financial assistance.

With respect to the sex trafficking conspiracy charge, the government also presented evidence that at least one of Ray's accomplices, Pollok, acted with him in this sex trafficking scheme by tracking hotel reservations and client lists, as well as overseeing accounting for the commercial sex business, and participating in the assault of Drury to intimidate her into continuing to work for the commercial sex business.

---

[6] Similarly, Section 1594(c) provides that "[w]hoever conspires with another to violate section 1591 shall be fined under this title, imprisoned for any term of years or for life, or both."  18 U.S.C. § 1594(c).

Insofar as Ray contends that, based on the trial evidence, the jury should not have concluded that Drury was recruited, solicited, or enticed into commercial sex work, but instead should have found that Drury participated in this conduct voluntarily, that argument is unavailing. The evidence of sex trafficking presented to the jury was "not incredible on its face," *United States v. Diaz*, 176 F.3d 52, 92 (1999) (internal quotation marks omitted), and thus it was reasonable for the jury to infer that the victim was coerced into engaging in commercial sex acts, *see United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001) ("[T]he task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court.").

### D. Forced Labor (18 U.S.C. § 1589); Forced Labor Trafficking (18 U.S.C. § 1590); and Forced Labor Conspiracy (18 U.S.C. § 1594)

As for the forced labor charges, Ray argues that there is insufficient evidence to sustain his conviction on those counts on the ground that the government failed to establish, as Ray contends is required by Section 1589, a "showing of force"—that is, the government did not demonstrate that Ray forced any of his victims to perform labor at the Pinehurst Property or forcibly prevented them from leaving. Appellant's Br. at 74 (emphasis omitted). We find that argument unpersuasive.

Section 1589 prohibits "knowingly provid[ing] or obtain[ing] the labor or services of a person by any one of, or by any combination of, the following means":

(1) "means of force, threats of force, physical restraint, or threats of physical restraint;" (2) "means of serious harm or threats of serious harm;" (3) "means of the abuse or threatened abuse of law or legal process;" or (4) "means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a); *see also United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010).

Section 1590 provides that a person who "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of" the statutes prohibiting, *inter alia*, forced labor under Section 1589, has engaged in forced labor trafficking. 18 U.S.C. § 1590(a). In other words, "if a defendant violates [S]ection 1589, he also violates [S]ection 1590 if he recruited the person to perform forced labor." *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 94 (2d Cir. 2019).

As an initial matter, contrary to Ray's suggestion, the government was not required to prove a "showing of force" to establish a violation of Section 1589. Indeed, the plain text of the statute expressly provides that "*any one of*" the enumerated types of conduct, such as threatening serious harm or abuse of legal

17

process, standing alone would violate Section 1589. 18 U.S.C. § 1589(a) (emphasis added). Moreover, the listed types of conduct are structured in the disjunctive, further bolstering that interpretation of the plain text. *See United States v. Francis*, 77 F.4th 66, 71 (2d Cir. 2023) (explaining that the use of a disjunctive "or" suggests that clauses listed in a statute should be considered as "alternatives, with each [clause] to be afforded its independent and ordinary significance" (internal quotation marks and citation omitted)); *see also Adia*, 933 F.3d at 94 ("Section 1590 employs the disjunctive 'or' in delineating the ways in which a defendant can violate the statute.").

In any event, witnesses testified that Ray coerced his victims into providing labor at the Pinehurst Property, in part, by physically and mentally abusing them—on one occasion, pinning a victim to the ground and, in another instance, driving a victim to attempt suicide. In addition to that testimony, the government presented other evidence sufficient for a reasonable jury to find that the elements of Section 1589 were satisfied. For example, the government presented evidence demonstrating Ray abused legal process by threatening that, if they did not provide their labor, his victims would be imprisoned for allegedly damaging the Pinehurst Property. In fact, as the district court noted, there was testimony that

Ray "drove Felicia Rosario to a police station to be booked and held in jail, using the confessions that he extracted as leverage," which "conveyed that Ray had both the ability and the will to use legal process to imprison Felicia Rosario if she did not continue to work on his behalf," and he "conveyed the same threat to use the law or legal process to compel Yalitza Rosario to perform physical labor." *Ray*, 2022 WL 17175799, at *6. In short, we conclude that the evidence was sufficient to sustain Ray's convictions under Sections 1589 and 1590.

The government similarly offered sufficient evidence for the jury to convict Ray on the forced labor conspiracy charge under Section 1594.[7] Specifically, there was evidence that at least one of Ray's confederates—his daughter, Talia Ray—conspired with him in the forced labor scheme by, *inter alia*, coercing victims into cataloguing the damage they purportedly caused while working at the Pinehurst Property and extracting money from the victims to repair such damages.

## II.    Constitutional Challenge to RICO Statute

Ray contends that his convictions for racketeering conspiracy and violent crime in aid of racketeering should be reversed because the "enterprise" element

---

[7] Section 1594(b) reads, in relevant part, "[w]hoever conspires with another to violate section . . . 1589 . . . shall be punished in the same manner as a completed violation of such section." 18 U.S.C. § 1594(b).

19

of these crimes makes the RICO statute unconstitutionally vague. That argument is unavailing because we have "consistently rejected such challenges to the RICO statute," and we are bound by that precedent. *United States v. Burden*, 600 F.3d 204, 228 (2d Cir. 2010); *see also Bingham v. Zolt*, 66 F.3d 553, 566 (2d Cir. 1995) ("We have consistently held that RICO's . . . enterprise requirement[ is] not unconstitutionally vague.").

## III. Expert Witness

Prior to trial, Ray moved to exclude the testimony of a government expert witness, Dr. Hughes, who is a clinical and forensic psychologist. The government identified Dr. Hughes as an expert on "sexual abuse, interpersonal violence, victimization, and traumatic stress," who would testify "about coercive control as a tactic of victimization and a strategy to gain dominance across a spectrum of relationships." Dist. Ct. Dkt. No. 263-1 at 2–3. In particular, the government proffered that Dr. Hughes would testify "about the common elements of abuse and coercive control in victimization situations" and how "[t]he function of all these abusive behaviors is to indoctrinate victims into a belief system that benefits the perpetrator, maintains compliance, creates dependency, assures non-disclosure of abuse, preserves dominance, and creates psychological entrapment

and cognitive confusion." *Id*. at 3. The government noted that "Dr. Hughes has not evaluated any specific victim in this case, and the Government does not presently intend to offer Dr. Hughes's testimony regarding any specific victim." *Id*. The district court denied Ray's motion and allowed Dr. Hughes to testify. *See generally United States v. Ray*, No. 20-cr-110 (LJL), 2022 WL 101911, at *8–13 (S.D.N.Y. Jan. 11, 2022).

Ray argues that the district court erred by admitting Dr. Hughes's testimony, because, *inter alia*: (1) the testimony did not contain any specialized knowledge that aided the jury, improperly bolstered fact witness testimony, and contained unreliable anecdotal and hearsay evidence, all in contravention of Federal Rule of Evidence 702; and (2) Dr. Hughes impermissibly testified about Ray's state of mind, in violation of Federal Rule of Evidence 704(b).

We review a district court's admission of expert testimony for abuse of discretion, and "a decision to admit . . . expert scientific testimony is not an abuse of discretion unless it is manifestly erroneous." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 160–61 (2d Cir. 2012) (alteration adopted) (internal quotation marks omitted). "A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact

witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994). As set forth below, we discern no abuse of discretion in the admission of this expert testimony.

### A. Rule 702 Challenge

Under Federal Rule of Evidence 702, a district court may admit testimony by "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" if, *inter alia*, it is more likely than not that the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Such testimony is appropriate "when the untrained layman would be unable intelligently to determine the particular issue in the absence of guidance from an expert." *United States v. Meija*, 545 F.3d 179, 189 (2d Cir. 2008) (internal quotation marks omitted). The proponent of the expert testimony bears "the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (internal quotation marks omitted). Moreover, as the Supreme Court has recognized, "a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other

applicable [Federal Rules of Evidence]," including Rule 403, which permits exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) (internal quotation marks omitted); *accord United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003).

Ray contends that Dr. Hughes's testimony concerning various forms of "abuse, deprivation, isolation, [and] blackmail" explained "common and easily understood words, phrases, and concepts" that were "well within average persons' lexicon," and, as a result, her testimony was improper because it provided the jury with no specialized knowledge which could aid in its decision. Appellant's Br. at 32. We disagree.

We have previously held in other contexts that this type of expert testimony on general background concepts is permissible under Rule 702 where it helps to explain or put into perspective characteristics and operating practices common to certain criminal conduct, with which a jury may not be familiar. For example, in RICO prosecutions, we have long permitted experts to testify regarding the "operation, structure, membership, and terminology of organized crime families." *United States v. Matera*, 489 F.3d 115, 121 (2d. Cir 2007) (internal quotation marks

omitted); *see United States v. Locascio*, 6 F.3d 924, 936–37 (2d Cir. 1993) (collecting cases). Similarly, we have "repeatedly upheld the use of expert testimony by government agents to describe the characteristics and operating methods of narcotics dealers," including testimony concerning methods of selling narcotics, the street value of narcotics, code and jargon used by narcotics dealers, and physical evidence related to narcotic transactions presented before a jury. *United States v. Boissoneault*, 926 F.2d 230, 232–33 (2d Cir. 1991) (collecting cases); *see United States v. Lopez*, 547 F.3d 364, 373 (2d Cir. 2008) ("This court has repeatedly found that the operations of narcotics dealers are a proper subject for expert testimony."). More recently, we held that expert testimony may be appropriate to explain the operations of a forced labor scheme. *See United States v. Zhong*, 26 F.4th 536, 555–56 (2d Cir. 2022). In reaching this conclusion, we explained that this type of scheme "may involve complex activities" that "may appear inconsistent with forced labor," including victims not seeking help or trying to leave the scheme, victims receiving preferential treatment from the perpetrator, and victims leaving and returning to the scheme, and thus expert testimony "may assist jurors in putting these practices in perspective when they otherwise would have difficulty doing so." *Id.*

24

We conclude that, like expert testimony on the practices and operations of organized crime, narcotics dealers, and forced labor schemes, expert testimony regarding the general dynamics of sexual abuse, including coercive control tactics, is admissible under Rule 702, in the exercise of the district court's discretion, when it provides jurors with information to assist them in evaluating, and placing into perspective, conduct that may be the result of complex interpersonal relationships that could be difficult for a jury to understand on its own.  *See also United States v. Shine*, No. 20-314, 2022 WL 761520, at *4 (2d Cir. Mar. 14, 2022) (summary order) (holding the district court did not abuse its discretion in admitting expert testimony regarding common practices and methods used in the commercial sex industry).

In reaching this holding, we join our sister circuits that have held, under analogous circumstances, that methods of sexual abuse are a proper subject for expert testimony.  *See United States v. Halamek*, 5 F.4th 1081, 1088–89 (9th Cir. 2021); *United States v. Young*, 955 F.3d 608, 615 (7th Cir. 2020); *United States v. Johnson*,

860 F.3d 1133, 1140–41 (8th Cir. 2017); *United States v. Batton*, 602 F.3d 1191, 1200–02 (10th Cir. 2010); *United States v. Hitt*, 473 F.3d 146, 158–59 (5th Cir. 2006).[8]

Applying that standard here, we conclude that the district court did not abuse its discretion in admitting Dr. Hughes's testimony, during which she described characteristics and practices typically present in instances of sexual abuse. In particular, Dr. Hughes defined certain specialized terms, such as "coercive control," and explained how perpetrators may utilize a range of tactics to impose coercive control over their victims in both individual and group settings, ranging from grooming techniques to methods of physical, sexual, and psychological abuse. She also explained the impact that coercive control and its tactics have on victims, including becoming dependent on an abuser, choosing not to report abuse to others, and becoming desensitized to abuse. Given the

---

[8] Our sister circuits that have addressed challenges to this type of testimony in contexts other than Rule 702 have also suggested that it is permissible. *See United States v. Hayward*, 359 F.3d 631, 637 (3d Cir. 2004) (assessing a challenge to expert testimony under Rule 704(b) that "focused primarily on the modus operandi—on the actions normally taken by child molesters to find and seduce their victims," and holding the district court did not abuse its discretion by admitting it (internal quotation marks omitted)); *United States v. Long*, 328 F.3d 655, 667–68 (D.C. Cir. 2003) (assessing a challenge to expert testimony under Federal Rules of Evidence 404(a) and 403 that "identif[ied] the behavior and actions of child molesters and explain[ed] their modus operandi," and holding the district court did not abuse its discretion by admitting it), *abrogated in part on other grounds by United States v. Mohammed*, 89 F.4th 158 (D.C. Cir. 2023).

complexity of these types of interpersonal dynamics, the district court reasonably determined that Dr. Hughes's testimony provided specialized knowledge that was "beyond the ken of the average juror," *Amuso*, 21 F.3d at 1263, and could aid the jury in assessing the issues in this case, namely, the relationship between, and behavior of, the defendant and his victims.

Such expert testimony may be particularly important where, as the district court noted here, it "help[s] the jury contextualize the seemingly counterintuitive behavior of the victims." *Ray*, 2022 WL 101911, at *13 (alteration adopted) (internal quotation marks omitted). For example, Dr. Hughes's testimony could have helped the jurors understand and contextualize why sexual abuse victims might not report their abuse or attempt to leave their abuser even when not physically restrained, or why they may falsely confess to something they did not do. *See Zhong*, 26 F.4th at 555–56; *see also Johnson*, 860 F.3d at 1140 ("Regardless of the victim's age, expert testimony about how individuals generally react to sexual abuse—such as not reporting the abuse and not attempting to escape from the abuser—helps jurors evaluate the alleged victim's behavior."). Similarly, such expert testimony can assist jurors in understanding why certain grooming techniques—including gaining the victim's trust by providing attention, affection,

27

and financial support, which may seem benign on their face—can be utilized by an abuser to gain tactical control over a victim for eventual sexual abuse. *See, e.g.,* *Halamek*, 5 F.4th at 1088–89 (holding district court did not err in admitting expert testimony about grooming for child sexual abuse and joining "several other circuit courts of appeal [that] have held that admitting such testimony is not an abuse of discretion because the testimony illuminate[s] how seemingly innocent conduct . . . could be part of a seduction technique," and collecting cases (internal quotation marks omitted)); *see also United States v. Romero*, 189 F.3d 576, 584 (7th Cir. 1999) (affirming the admission of expert testimony about methods of child molesters, noting that abusers use "sophisticated psychological techniques to 'seduce' their victims," and emphasizing that "[the] court has recognized the value of expert testimony in explaining a complicated criminal methodology that may look innocent on the surface but is not as innocent as it appears").

In exercising its discretion, the district court also properly weighed the expert testimony under Rule 403. More specifically, the district court rejected Ray's argument that the expert testimony "would confuse and inflame the jury and create the danger that the jury will associate Ray with such conduct." *Ray*, 2022 WL 101911, at *13. In doing so, the district court explained, after emphasizing

28

the probative value of the testimony to "help the jury contextualize the seemingly counterintuitive behavior of the victims," that "[i]n the context of this case, the testimony regarding the generalities of domestic and sexual abuse will be no more inflammatory or prejudicial than the other evidence . . . that will be presented to the jury." *Id*. (alterations adopted) (internal quotation marks omitted). We find no basis to disturb the district court's balancing under Rule 403.

We also find unpersuasive Ray's argument that the government impermissibly used Dr. Hughes's testimony to bolster its fact witnesses. Although we have recognized that an expert witness's testimony may not "mirror[] the testimony offered by fact witnesses," *Amuso*, 21 F.3d at 1263, no such mirroring occurred here. Dr. Hughes offered general testimony on coercive control and explained various tactics that may be used by perpetrators to achieve coercive control. In doing so, Dr. Hughes made clear that her testimony was based on her twenty-five years of experience as a psychologist specializing in interpersonal violence and traumatic stress, not any knowledge of Ray, his victims, or materials specific to this case. Indeed, her testimony made no mention of Ray or any of his victims, let alone that Ray engaged in, or his victims experienced, any coercive control tactics. Defense counsel recognized as much in her closing argument. As

29

such, Dr. Hughes's testimony about coercive control generally did not bolster or mirror fact witness testimony, but instead, as explained *supra*, provided the jury with contextual background that helped in evaluating the evidence presented in this case.[9] *See United States v. Lombardozzi*, 491 F.3d 61, 78 (2d Cir. 2007) (holding that expert testimony was properly admitted where it provided insight into methods used by alleged criminal organizations and did not link the defendant with particular criminal conduct); *see also United States v. Rivera*, No. 22-2780, 2024 WL 2813548, at *3 (2d Cir. June 3, 2024) (summary order), *cert. denied sub nom.*

---

[9] Ray's other Rule 702 challenges are also without merit. In particular, he contends that Dr. Hughes's testimony should not have been admitted because it is based on unreliable anecdotal evidence. We disagree. As discussed *supra*, her testimony was informed by her training as a psychologist specializing in interpersonal violence and traumatic stress, and her clinical experience treating patients who have suffered traumatic events, including sexual abuse. Such bases for testimony are well within the bounds of Rule 702. *See United States v. Felder*, 993 F.3d 57, 71–72 (2d Cir. 2021) (explaining that an expert's testimony may not only be based on "particularized training" but can also be "from personal observations or experience"). To the extent Ray also asserts that Dr. Hughes's testimony should have been excluded because it was based on inadmissible hearsay, that argument is also unpersuasive. We have "repeatedly held that expert testimony admissible under Rule[] 702 . . . can, under certain conditions, be based on hearsay and evidence not admitted at trial," such as when "experts in the field reasonably rely on hearsay in forming their opinions and drawing their inferences." *United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir. 2000) (internal quotation marks omitted). It is inarguable that psychologists regularly and reasonably rely on hearsay in their work, and we therefore conclude that Dr. Hughes was entitled to rely on hearsay here. *Cf. Locascio*, 6 F.3d at 938 (expert law enforcement witness "was entitled to rely upon hearsay as to such matters as the structure and operating rules of organized crime families . . . since there is little question that law enforcement agents routinely and reasonably rely upon such hearsay in the course of their duties.").

*Rivera v. United States*, 145 S. Ct. 1099 (2025) (holding that general expert testimony regarding the dynamics of sex trafficking relationships did not improperly bolster fact witness testimony); *Johnson*, 860 F.3d at 1140–41 (8th Cir. 2017) (explaining that expert testimony "about how individuals generally react to sexual abuse . . . helps jurors evaluate the alleged victim's behavior . . . [s]o long as the expert does not impermissibly 'vouch' for the victim," and holding that an expert did not improperly bolster the victim's testimony because the expert "merely imparted general knowledge which the jury could then use in evaluating the charges against [the defendant]").

In sum, we conclude the district court did not abuse its discretion in admitting Dr. Hughes's testimony pursuant to Rule 702.

### B. Rule 704(b) Challenge

Ray's challenge to Dr. Hughes's testimony under Federal Rule of Evidence 704(b) is similarly unavailing.

Rule 704(b) provides that "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b).  This rule, however, "does not prohibit all expert testimony that

31

gives rise to an inference concerning a defendant's mental state. The plain language of the rule . . . means that the expert cannot expressly state the inference, but must leave the inference, however obvious, for the jury to draw." *United States v. DiDomenico*, 985 F.2d 1159, 1165 (2d Cir. 1993) (internal quotation marks and citation omitted). In other words, "[i]t is only as to the last step in the inferential process—a conclusion as to the defendant's actual mental state—that Rule 704(b) commands the expert to be silent." *Id.* at 1164 (internal quotation marks omitted).

In a recent decision, the Supreme Court emphasized that "Rule 704(b)'s exception covers a narrow set of opinions," explaining:

> [Rule 704(b)] exclusively addresses mental states and conditions that are "element[s] of the crime charged or of a defense." Rule 704(b) thus proscribes only expert opinions in a criminal case that are about a particular person ("the defendant") and a particular ultimate issue (whether the defendant has "a mental state or condition" that is "an element of the crime charged or of a defense").

*Diaz v. United* States, 602 U.S. 526, 534 (2024) (first alteration added).

Here, as discussed above, Dr. Hughes's testimony commented generally on coercive control and abuse, and was informed by her own experience, not any specific evaluation of Ray, the victims, or the materials in the case. Thus, as the district court correctly noted, "Dr. Hughes [did] not propose to testify to the subjective motivations, thought processes, and mental states of abusers in general

or of Ray specifically." *Ray*, 2022 WL 101911, at *11. Therefore, Dr. Hughes's testimony did not violate Rule 704(b) because, although her testimony (when combined with other evidence in the trial) could have been used to conclude that Ray knowingly engaged in abusive conduct, that final inference was left to the jury. *See Diaz*, 602 U.S. at 538 ("An expert's conclusion that 'most people' in a group have a particular mental state is not an opinion about 'the defendant' and thus does not violate Rule 704(b)."); *Lopez*, 547 F.3d at 373–74 (finding no Rule 704(b) violation where expert testimony included an opinion on whether drug evidence was consistent with drug distribution generally, and did not include an opinion on whether the particular defendant "had the requisite intent to distribute").

## IV.    Sentencing

Finally, Ray argues that the case should be remanded for resentencing because the district court, in imposing his 720-month term of imprisonment, failed to correctly apply the parsimony clause set forth in 18 U.S.C. § 3553(a), and improperly balanced the Section 3553(a) factors, in imposing what Ray deems a *de*

*facto* life sentence. We find no merit to Ray's challenges to the substantive reasonableness of his sentence.[10]

We review a district court's sentencing determination for substantive reasonableness under the abuse of discretion standard. *See United States v. Brooks*, 889 F.3d 95, 100 (2d Cir. 2018). Under this deferential standard, "we do not consider what weight we would ourselves have given a particular factor" at sentencing; "[r]ather, we consider whether the factor, as explained by the district court, can bear the weight assigned it under the totality of circumstances in the case." *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (en banc). A sentence is therefore substantively unreasonable only if "affirming it would damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law." *United States v. Park*, 758 F.3d 193, 200 (2d Cir. 2014) (per curiam) (internal quotation marks omitted). Moreover, in evaluating the substantive reasonableness of a sentence,

---

[10]   Although Ray characterizes his challenge regarding the misapplication of the parsimony principle as procedural, "[w]hether the sentence is consistent with the parsimony clause of [S]ection 3553(a) is a question of substantive reasonableness." *United States v. Pugh*, 945 F.3d 9, 28 (2d Cir. 2019). Similarly, to the extent he contends that the district court misbalanced certain factors under Section 3553(a), that is also reviewed for substantive reasonableness. *See United States v. Mi Sun Cho*, 713 F.3d 716, 723 (2d Cir. 2013). In any event, we discern no procedural error by the district court in imposing the sentence.

"we use as our lodestar the parsimony clause of 18 U.S.C. § 3553(a), which directs sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the factors set out in 18 U.S.C. § 3553(a)(2)—namely, retribution, deterrence, and incapacitation." *Id.* (alteration adopted) (internal quotation marks and footnote omitted). Finally, although a within-Guidelines sentence is "not presumptively reasonable," we have observed that "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Friedberg*, 558 F.3d 131, 137 (2d Cir. 2009) (internal quotation marks omitted).

Here, we conclude that the district court's within-Guidelines sentence was substantively reasonable. At sentencing, after listing the various Section 3553(a) factors, the district court explicitly acknowledged that it was required to impose on Ray a sentence consistent with Section 3553(a)'s parsimony clause, also referred to as the "parsimony principle." Dist. Ct. Dkt. No. 611 at 45–46 ("As [defense counsel] has indicated, the Court is also required to impose a sentence sufficient but not greater than necessary to comply with the purposes [of sentencing set forth in Section 3553(a)]. That's known as the parsimony principle, and it's required by

35

Congress.  I find that the sentence I'm about to pronounce is sufficient but not greater than necessary to satisfy the purposes of sentencing . . . .").

The district court then proceeded to explain in detail how, based on the parsimony clause and the specific factors enumerated in Section 3553(a), it reached its determination.  *See United States v. Ministro-Tapia*, 470 F.3d 137, 141 (2d Cir. 2006) ("[A]bsent record proof showing otherwise, we assume the district court's awareness of and compliance with this statutory sentencing obligation.").  For example, the district court noted the "gravity of the offense and its circumstances," explaining, *inter alia*:

> Mr. Ray's conduct in this case was particularly aggravated, his crimes particularly heinous.  Mr. Ray used his apparent charm, his exaggerated sense of self, and his intelligence to earn the trust of a group of impressionable young adults—his daughter's college classmates and their siblings.  Then, having earned their trust, he robbed them, first of their money, then of their relationships, self-worth, memories, and ultimately their bodies.  He did so through psychological terror and manipulations, skills which he mastered through textbooks on the subject.  He convinced them that what they knew to be true was in fact false, forcing them to confess to a fantastic story regarding his poisoning, which he then threatened to use against them.  Alongside the psychological terror came physical abuse.  He beat his victims, he tortured them, and at times he starved them.  He degraded them sexually to the point where they lost any sense of self-worth.

36

Dist. Ct. Dkt. No. 611 at 46.[11]

The district court explained that the 720-month sentence was necessary not only as a "just punishment" and "to promote respect for the law," but also "for purposes of incapacitation and specific deterrence," emphasizing "the risk that would be created for the public if Mr. Ray[] is released." *Id*. at 51–53.  The district court explicitly considered Ray's arguments in mitigation, including his age and medical conditions, and explained why those factors did not outweigh the other factors supporting the sentence imposed.  *See id*. at 50–51 ("[T]here is no reason to believe Mr. Ray will age out of criminal behavior.  He engaged in these crimes in his late 50s, a time in his life when, according to some statistics, he should have already aged out of his criminal propensities.  There's also no reason to believe that his capacity for the illegal activity he engaged in would diminish with age.  He committed these crimes with force, but he also committed the crimes with his wits. . . .  Supervision also is not sufficient to protect the community.  Mr. Ray has been under supervision before.  He violated its terms."); *id*. at 52 ("The medical

---

[11]  The district court's determination with respect to the nature and circumstances of the crimes was fully supported by the victim impact statements presented to the district court in connection with sentencing, which described the devastating impact that Ray's crimes had on the victims.

37

conditions do not mitigate the gravity of Mr. Ray's crimes or reduce the need for him to be incapacitated. He committed the crimes at issue in this case while ostensibly suffering from the same or similar medical conditions. The conditions did not prevent him from inflicting acts of unspeakable cruelty on his victims. There is no reason to believe that they would do so in the future."). In addition, the district noted the need for "general deterrence," especially because "[c]rimes such as the one that Mr. Ray committed are difficult to detect and difficult to prosecute," and "a sentence of decades in prison" would "send a message to others who think that they might be able to get away with crimes such as these." *Id*. at 53.

Finally, after noting that the sentence did not allow a chance for release given Ray's age, the district court again referenced the parsimony clause and explained that the *de facto* life sentence was necessary to properly reflect and balance the Section 3553(a) factors. *See id*. at 55 ("[The 720-month sentence] honors what the parsimony principle dictates, that I should impose a sentence sufficient but not greater than necessary to satisfy the purposes of sentencing; that it is an appropriate measure of the gravity of Mr. Ray's crimes and that is intended to ensure that Mr. Ray never again presents a risk to society.").

38

In sum, on this record, the Section 3553(a) factors upon which the district court relied "can bear the weight assigned [them] under the totality of circumstances in the case," *Cavera*, 550 F.3d at 191, and the 720-month sentence was not "shockingly high . . . or otherwise unsupportable as a matter of law," *Park*, 758 F.3d at 200 (internal quotation marks omitted).  Ray objects to how the district court balanced these factors—in particular, how it considered incapacitation and deterrence.  However, Ray's mere disagreement with the district court's weighing of certain Section 3553(a) factors does not demonstrate an abuse of discretion.[12] *See United States v. Davis*, 82 F.4th 190, 203 (2d Cir. 2023) ("[T]he weight to be

---

[12]  To the extent Ray also argues that his sentence is unreasonable because he has received a *de facto* life sentence for crimes other than murder, that argument is unavailing.  Life sentences can be substantively reasonable for convictions of serious crimes, such as those present here, that do not involve murder.  *See, e.g.*, *United States v. Brown*, 843 F.3d 74, 82–83 (2d Cir. 2016) ("Given the seriousness of the crimes involved here, a 60 year sentence—which was below the Guidelines range [but exceeded defendant's life expectancy]—is within the realm of punishments that this Court has upheld as reasonable for production of child pornography, even considering that there may be, as [defendant] argues, more serious crimes such as intentional murder." (internal quotation marks omitted)); *see also United States v. Lopez*, No. 22-1071-cr, 2023 WL 7146581, at *2 (2d Cir. Oct. 31, 2023) (summary order) (affirming 55-year sentence for child sexual exploitation offenses that exceeded the defendant's life expectancy, noting that "we have ample caselaw affirming sentences that surpass a defendant's expected natural life," and collecting cases).  The district court imposed the within-Guidelines sentence, under the Section 3553(a) factors, based upon Ray's orchestration of years of psychological, physical, and sexual abuse of his victims through extortion, forced labor, and sex trafficking.  Given the district court's analysis, Ray's sentence was substantively reasonable, even though it exceeds his life expectancy.

afforded any sentencing factor is a matter firmly committed to the discretion of the sentencing judge and is beyond our review, so long as the sentence ultimately imposed is reasonable." (internal quotation marks omitted)).

Accordingly, we conclude the district court's sentence was substantively reasonable.

## CONCLUSION

We have considered the remainder of Ray's arguments and find them to be without merit.  For the foregoing reasons, we **AFFIRM** the judgment of the district court.